**No. 25-4135**

_____

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____


**NARVIN LICHFIELD,**

Plaintiff-Appellant,

v.

**KATHERINE KUBLER, an individual; NETFLIX, INC., a Delaware corporation,**

Defendants-Appellees.


_____

# APPELLANT'S APPENDIX

**Counsel for Plaintiff-Appellant:**

_____


Michael K. Hepworth
Hepworth Legal
320 W 500 S, Ste. 200
Bountiful, UT 84010
(801) 872-2222
*michael@hepworthlegal.com*

## TABLE OF CONTENTS

| DOCUMENT DESCRIPTION | Trial Court Docket No. | Page No. |
|---|---|---|
| Civil Docket, U.S. District Court, District of Utah | | **APP 00003** |
| First Amended Complaint (filed 06/27/2024) | ECF No. 5 | **APP 00012** |
| Defendants' Motion to Dismiss and Special Motion to Strike (Anti-SLAPP) | ECF No. 28 | **APP 00036** |
| Request for Judicial Notice re Defendant's Motion to Dismiss and Special Motion to Strike (Anti-SLAPP) and Attachments 1-19 | ECF No. 29 | **APP 00075** |
| Declaration of Katherine Kubler | ECF No. 31 | **APP 00181** |
| Plaintiff's Memorandum in Opposition to Motion to Dismiss / Anti-SLAPP | ECF No. 35 | **APP 00222** |
| Defendants' Reply in Support of Motion to Dismiss / Anti-SLAPP | ECF No. 36 | **APP 00251** |
| Memorandum Decision and Order Granting Motion to Dismiss and for Relief Under Anti-SLAPP Acts | ECF No. 44 | **APP 00273** |
| Judgment | ECF No. 45 | **APP 00294** |
| Notice of Appeal | ECF No. 50 | **APP 00295** |
| Fee Petition / Anti-SLAPP fees motion papers | ECF Nos. 52-54, 57-58 | **APP 00296** |

Appellate Case: 25-4135     Document: 22     Date Filed: 01/20/2026     Page: 3

ACCO,APPEAL,CLOSED,OPEN_MJ

# US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:24-cv-00458-JNP

| | |
|---|---|
| Lichfield v. Kubler et al | Date Filed: 06/25/2024 |
| Assigned to: Judge Jill N. Parrish | Date Terminated: 09/29/2025 |
| Case in other court: Tenth, 25-04135 | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity-Libel,Assault,Slander | Nature of Suit: 320 Assault Libel & Slander |
| | Jurisdiction: Diversity |

**Plaintiff**

**Narvin Lichfield**
*an individual*

represented by **Sarah Spitzer**
HEPWORTH & ASSOCIATES
320 W 500 S STE 200
BOUNTIFUL, UT 84010
801-872-2222
Email: sspitzer@hepworthlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael K. Hepworth**
HEPWORTH & ASSOCIATES
320 W 500 S STE 200
BOUNTIFUL, UT 84010
(801)872-2222
Email: michael@hepworthlegal.com
*ATTORNEY TO BE NOTICED*

**Christoffer Binning**
124 E 1370 S
FARMINGTON, UT 84025
801-875-8226
Email: c.binning@icloud.com
*TERMINATED: 07/14/2025*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Katherine Kubler**
*an individual*

represented by **David W. Tufts**
DENTONS DURHAM JONES &
PINEGAR PC
111 S MAIN ST STE 2400
PO BOX 4050
SALT LAKE CITY, UT 84110-4050
801-415-3000
Fax: 801-415-3500
Email: david.tufts@dentons.com
*LEAD ATTORNEY*

APP 00003

*ATTORNEY TO BE NOTICED*

**Jacqueline A. Giannini**
DENTONS US LLP
233 S WACKER DR STE 5900
CHICAGO, IL 60606
312-876-2395
Email: jacqui.giannini@dentons.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory R. Naron**
DENTONS US LLP
233 S WACKER DR STE 7800
CHICAGO, IL 60606
312-876-2481
Email: gregory.naron@dentons.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ian Kinghorn**
DENTONS DURHAM JONES &
PINEGAR PC
111 S MAIN ST STE 2400
PO BOX 4050
SALT LAKE CITY, UT 84110-4050
801-573-2604
Email: ian.kinghorn@dentons.com
*ATTORNEY TO BE NOTICED*

**Natalie J. Spears**
DENTON US LLP
233 S WACKER DR STE 7800
CHICAGO, IL 60606
312-876-2556
Email: natalie.spears@dentons.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Netflix Inc**<br>*a Delaware corporation* | represented by | **David W. Tufts**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Jacqueline A. Giannini**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory R. Naron**
(See above for address)

<span style="color:red">APP 00004</span>

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 5

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ian Kinghorn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Natalie J. Spears**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2024 | 1 | COMPLAINT against All Defendants (Filing fee $ 405, receipt number AUTDC-5105425) filed by Narvin Lichfield. (Binning, Christoffer) (Entered: 06/25/2024) |
| 06/25/2024 | | Magistrate Judge Cecilia M. Romero added. Case number will now read **2:24-cv-00458-CMR.** Please make changes to document captions accordingly. (kec) (Entered: 06/25/2024) |
| 06/25/2024 | 2 | NOTICE OF DEFICIENCY re 1 Complaint. The Civil Cover Sheet is missing or incomplete. All civil actions presented for filing must be accompanied by a completed Civil Cover Sheet. See Local Rule DUCivR3-4. Counsel must file a complete Civil Cover Sheet JS44 immediately. (kec) (Entered: 06/25/2024) |
| 06/25/2024 | 3 | Civil Cover Sheet (JS44) Civil Summons may be issued electronically. Prepare the summons using the courts PDF version and email it to utdecf_clerk@utd.uscourts.gov for issuance, filed by Narvin Lichfield. (Binning, Christoffer) (Entered: 06/25/2024) |
| 06/26/2024 | 4 | ORDER TO PROPOSE SCHEDULE - See order for details. Signed by Magistrate Judge Cecilia M. Romero on 6/26/2024. (haa) (Entered: 06/26/2024) |
| 06/27/2024 | 5 | AMENDED COMPLAINT against All Defendants with Jury Demand. filed by Narvin Lichfield. (Binning, Christoffer) (Entered: 06/27/2024) |
| 06/27/2024 | 6 | Summons Issued Electronically as to Katherine Kubler. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 06/27/2024) |
| 06/27/2024 | 7 | Summons Issued Electronically as to Netflix, Inc. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) Modified by adding the correct defendant's name on 6/27/2024 (kec). (Entered: 06/27/2024) |
| 07/09/2024 | 8 | ~~RETURN OF SERVICE Executed for Personal served on Netflix, Inc. c/o Michelle Fowler on July 3, 2024, filed by Plaintiff Narvin Lichfield. (Binning, Christoffer)~~ Modified on 7/9/2024 - stricken as improperly filed. (alf). (Entered: 07/09/2024) |
| 07/09/2024 | 9 | NOTICE OF DEFICIENCY re 8 Return of Service. The document is stricken as improperly filed. Please refile using the event "Summons Returned Executed". The clerk |

APP 00005

Appellate Case: 25-4135 Document: 22 Date Filed: 01/20/2026 Page: 6

| | | |
|---|---|---|
| | | requests the filer of the original document to refile the pleading. The new pleading will receive a new document number on the docket. (alf) (Entered: 07/09/2024) |
| 07/09/2024 | 10 | SUMMONS Returned Executed by Narvin Lichfield. Summons served on Netflix, Inc., on July 3, 2024. (Binning, Christoffer) (Entered: 07/09/2024) |
| 07/19/2024 | 11 | SUMMONS Returned Executed by Narvin Lichfield. Summons served on Katherine Kubler, on 07/19/2024. (Binning, Christoffer) (Entered: 07/19/2024) |
| 07/19/2024 | 12 | MOTION for Extension of Time to File Answer re 5 Amended Complaint filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Text of Proposed Order) Attorney David W. Tufts added to party Katherine Kubler(pty:dft), Attorney David W. Tufts added to party Netflix, Inc.(pty:dft)(Tufts, David) Modified on 7/22/2024 to fix event type (alf). (Entered: 07/19/2024) |
| 07/22/2024 | 13 | NOTICE OF PRESIDING MAGISTRATE JUDGE ASSIGNMENT - This case is assigned to a magistrate judge. Under 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and DUCivR 72-4, you are hereby notified that a magistrate judge for the District of Utah may conduct any or all proceedings in this case, including a jury or bench trial and entry of a final judgment. Exercise of this jurisdiction by the magistrate judge is permitted only if all parties voluntarily sign and return the form. To consent, return the Consent Form to the clerk's office within 21 days via email at consents@utd.uscourts.gov or mail to the address on the form. **Please do not efile the Consent Form in the case.** Notice emailed or mailed to Defendants Katherine Kubler, Netflix, Inc., Plaintiff Narvin Lichfield. Form due by 8/12/2024. (mh) (Entered: 07/22/2024) |
| 07/22/2024 | 14 | ORDER granting 12 Motion for Extension of Time to Answer. Answer deadline updated for All Defendants to 8/30/2024. Signed by Magistrate Judge Cecilia M. Romero on 7/22/2024. (alf) (Entered: 07/22/2024) |
| 07/22/2024 | 15 | NOTICE of Appearance by Ian Kinghorn on behalf of Katherine Kubler, Netflix, Inc. (Kinghorn, Ian) (Entered: 07/22/2024) |
| 07/22/2024 | 16 | MOTION for Admission Pro Hac Vice of Jacqueline A. Giannini , Registration fee $ 50, receipt number AUTDC-5131744, Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Pro Hac Vice App - Giannini, # 2 Text of Proposed Order)(Tufts, David) (Entered: 07/22/2024) |
| 07/22/2024 | 17 | MOTION for Admission Pro Hac Vice of Gregory R. Naron , Registration fee $ 50, receipt number AUTDC-5131751, Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. |

APP 00006

Appellate Case: 25-4135   Document: 22   Date Filed: 01/20/2026   Page: 7

| | | |
|---|---|---|
| | | filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Pro Hac Vice App - Naron, # 2 Text of Proposed Order)(Tufts, David) (Entered: 07/22/2024) |
| 07/22/2024 | 18 | MOTION for Admission Pro Hac Vice of Natalie J. Spears , Registration fee $ 50, receipt number AUTDC-5131755, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. <br> Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing. <br><br> filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Pro Hac Vice App - Spears, # 2 Text of Proposed Order)(Tufts, David) (Entered: 07/22/2024) |
| 07/23/2024 | 19 | NOTICE OF AVAILABILITY OF JUDICIAL SETTLEMENT CONFERENCE. For the benefit of the public and the bar, the District of Utah offers judicial settlement conference as an alternative for dispute resolution assistance in all civil cases and bankruptcy adversary proceedings. The court offers this alternative because, when compared with litigation, it can resolve a dispute faster, at less expense, and with solutions that are better able to meet the parties' needs and interests. Parties may file a stipulated motion for judicial settlement conference. A form motion is available on the court's website. Notice e-mailed or mailed to Defendants Katherine Kubler, Netflix, Inc., Plaintiff Narvin Lichfield. (alf) (Entered: 07/23/2024) |
| 07/23/2024 | 20 | ORDER granting 16 Motion for Admission Pro Hac Vice of Attorney Jacqueline A. Giannini for Katherine Kubler and Netflix, Inc.. <br><br> *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.** <br><br> *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* <br><br> Signed by Magistrate Judge Cecilia M. Romero on 7/23/2024. (alf) (Entered: 07/23/2024) |
| 07/23/2024 | 21 | ORDER granting 17 Motion for Admission Pro Hac Vice of Attorney Gregory R. Naron for Katherine Kubler and Netflix, Inc.. <br><br> *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.** <br><br> *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.* <br><br> Signed by Magistrate Judge Cecilia M. Romero on 7/23/2024. (alf) (Entered: 07/23/2024) |
| 07/23/2024 | 22 | ORDER granting 18 Motion for Admission Pro Hac Vice of Attorney Natalie J. Spears for Katherine Kubler and Netflix, Inc.. |

APP 00007

|  |  |  |
|---|---|---|
|  |  | *Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.***A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.**<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>Signed by Magistrate Judge Cecilia M. Romero on 7/23/2024. (alf) (Entered: 07/23/2024)* |
| 07/31/2024 | 23 | CORPORATE DISCLOSURE STATEMENT under FRCP 7.1 filed by Defendants Katherine Kubler, Netflix, Inc.. (Tufts, David) (Entered: 07/31/2024) |
| 08/07/2024 | 24 | RECEIVED Consent/Reassignment Form from Defendants Katherine Kubler and Netflix, Inc.. (mh) (Entered: 08/07/2024) |
| 08/13/2024 | 25 | NOTICE OF NON-CONSENT Consent to the jurisdiction of the Magistrate Judge under DUCivR 72-4 has not been obtained. Case randomly assigned to Judge Jill N. Parrish and Magistrate Judge Cecilia M. Romero. Magistrate Judge is automatically referred under 28 U.S.C636(b)(1)(A). Magistrate Judge Cecilia M. Romero no longer assigned as the presiding judge to the case. (mh) (Entered: 08/13/2024) |
| 08/21/2024 | 26 | Stipulated MOTION for Leave to File Excess Pages , MOTION for Extension of Time to File Answer re 5 Amended Complaint filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Tufts, David) (Entered: 08/21/2024) |
| 08/22/2024 | 27 | ORDER granting 26 Motion for Leave to File Overlength Memoranda and Extensions of Time. Plaintiff's Response to Defendants' Motions is due October 18, 2024, and Defendants' Reply is due November 12, 2024. Signed by Magistrate Judge Cecilia M. Romero on 8/22/24. (dle) (Entered: 08/22/2024) |
| 08/30/2024 | 28 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Defendants Katherine Kubler, Netflix, Inc.. Motions referred to Cecilia M. Romero.(Spears, Natalie) Modified on 9/3/2024: removed repetitive entry text (alt) (Entered: 08/30/2024) |
| 08/30/2024 | 29 | REQUEST for Judicial Notice re 28 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19) (Spears, Natalie) Modified on 9/3/2024: removed repetitive entry text (alt) (Entered: 08/30/2024) |
| 08/30/2024 | 30 | NOTICE OF NONELECTRONIC FILING of Exhibits 1A - 1C, Exhibit 14 and Exhibits 15A - 15B filed by Defendants Katherine Kubler, Netflix, Inc. re 29 Request,,, (Spears, Natalie) (Entered: 08/30/2024) |
| 08/30/2024 | 31 | AFFIDAVIT/DECLARATION of Katherine Kubler in Support re 28 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Strike 5 Amended Complaint *(Defendants' Rule 12(B)(6) Motion to Dismiss and Special Motion to Strike Pursuant to Anti-Slapp Acts) (Declaration of Katherine Kubler solely in Support of Special Motion to Strike First Amended Complaint Pursuant to Anti-Slapp Acts)* filed by |

APP 00008

Appellate Case: 25-4135     Document: 22     Date Filed: 01/20/2026     Page: 9

| | | |
|---|---|---|
| | | Defendants Katherine Kubler, Netflix, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Spears, Natalie) (Entered: 08/30/2024) |
| 09/03/2024 | 32 | CIVIL STANDING ORDER Signed by Judge Jill N. Parrish on 9/3/2024. (lwh) (Entered: 09/03/2024) |
| 09/03/2024 | 33 | EXHIBITS 1A-1C, 14, and 15A-15B re 29 Request for Judicial Notice in support of 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts*, filed by Katherine Kubler, Netflix Inc, consisting of 4 MP4 files and 2 MP3 files on a single USB flash drive. The files are not uploaded to the docket due to non-PDF file type and the drive will be retained in a case file folder in the Clerk's Office while the case is active, and according to the retention schedule set forth by the Judicial Conference thereafter. (alt) (Entered: 09/03/2024) |
| 09/03/2024 | | Modification of Docket re 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts*, 29 Request. Repetitive text removed from entries and second dft name corrected to conform more closely with this court's "Standards and Guidelines for Adding Parties" (punctuation marks removed from name). (alt) (Entered: 09/03/2024) |
| 09/04/2024 | 34 | NOTICE OF ACKNOWLEDGMENT of Civil Standing Order 32 filed by Defendants Katherine Kubler, Netflix Inc (Tufts, David) (Entered: 09/04/2024) |
| 10/18/2024 | 35 | MEMORANDUM in Opposition re 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Plaintiff Narvin Lichfield. (Binning, Christoffer) (Entered: 10/18/2024) |
| 11/12/2024 | 36 | REPLY to Response to Motion re 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Defendants Katherine Kubler, Netflix Inc. (Spears, Natalie) (Entered: 11/12/2024) |
| 11/15/2024 | 37 | Motions No Longer Referred: 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts*. District Judge Jill N. Parrish will handle the motion. (jfm) (Entered: 11/15/2024) |
| 06/23/2025 | 38 | NOTICE OF ACKNOWLEDGMENT of Civil Standing Order 32 filed by Plaintiff Narvin Lichfield (Binning, Christoffer) (Entered: 06/23/2025) |
| 06/26/2025 | 39 | REQUEST for Oral Argument re 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Plaintiff Narvin Lichfield. (Binning, Christoffer) (Entered: 06/26/2025) |
| 07/14/2025 | 40 | NOTICE OF WITHDRAWAL OF COUNSEL of Christoffer T. Binning filed by Christoffer Binning on behalf of Narvin Lichfield. Counsel selected to discontinue to receive notice on this case. (Binning, Christoffer) (Entered: 07/14/2025) |
| 07/15/2025 | 41 | NOTICE of Appearance by Sarah Spitzer on behalf of Narvin Lichfield (Spitzer, Sarah) (Entered: 07/15/2025) |
| 08/14/2025 | 42 | **NOTICE OF HEARING ON MOTION** re: 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* : (Notice generated by JNP Chambers) Motion Hearing set for 9/18/2025 at 01:00 PM **VIA ZOOM** before Judge Jill N. Parrish. (lwh) (Entered: 08/14/2025) |
| 09/18/2025 | 43 | Minute Entry for proceedings held before Judge Jill N. Parrish: Motion Hearing held on 9/18/2025 re 28 MOTION to Dismiss for Failure to State a Claim MOTION to Strike 5 Amended Complaint *Pursuant to Anti-Slapp Acts* filed by Katherine Kubler, Netflix Inc. All parties appear via zoom. After hearing oral argument, the court took the matter under |

APP 00009

| | | |
|---|---|---|
| | | advisement. Court adjourned. Attorney for Plaintiff: Michael K. Hepworth, Sarah Spitzer, Attorney for Defendant: Jacqueline A. Giannini, Gregory R. Naron, Natalie J. Spears, David W. Tufts. Court Reporter: Laura Robinson. Recording: Zoom.(lwh) (Entered: 09/19/2025) |
| 09/29/2025 | 44 | MEMORANDUM DECISION AND ORDER granting 28 Motion to Dismiss and for Relief Under Anti-SLAPP Acts. Signed by Judge Jill N. Parrish on 9/29/2025. (dle) (Entered: 09/29/2025) |
| 09/29/2025 | 45 | JUDGMENT: IT IS ORDERED AND ADJUDGED that plaintiff Narvin Lichfield's action is dismissed. Case Closed. Magistrate Judge Cecilia M. Romero no longer assigned to case. Signed by Judge Jill N. Parrish on 9/29/2025. (dle) (Entered: 09/29/2025) |
| 10/08/2025 | 46 | Stipulated MOTION for Extension of Time to file Fee Petition filed by Defendants Katherine Kubler, Netflix Inc. (Attachments: # 1 Text of Proposed Order)(Spears, Natalie) (Entered: 10/08/2025) |
| 10/08/2025 | 47 | DOCKET TEXT ORDER granting 46 Motion for Extension of Time. The defendants shall have until October 27, 2025 to file a motion for attorney fees. Signed by Judge Jill N. Parrish on 10/8/25. (ksb) (Entered: 10/08/2025) |
| 10/14/2025 | 48 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Zoom Motion Hearing Motion to Dismiss held on September 18, 2025 before Judge Jill Parrish. Court Reporter/Transcriber Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)201-9731.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this notice. Within 42 days after receiving this notice, a party must file a Redaction Request identifying the information that must be redacted. Please review DUCivR 5.2-1 for additional information about redacting personal identifiers or protected information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 11/4/2025. Redaction Request due 11/25/2025. Redacted Transcript Deadline set for 12/16/2025. Release of Transcript Restriction set for 1/12/2026. (jrj) Modified by removing restricted text on 1/12/2026 (kop). (Entered: 10/14/2025) |
| 10/14/2025 | 49 | Transcript Purchased by: Michael Hepworth re 48 transcript(s) of September 18, 2025. (jrj) (Entered: 10/14/2025) |
| 10/24/2025 | 50 | NOTICE OF APPEAL filed by Narvin Lichfield. Appeals to the USCA for the 10th Circuit. Filing fee $ 605, receipt number AUTDC-5595140. (Hepworth, Michael) (Entered: 10/24/2025) |
| 10/24/2025 | 51 | Transmission of Preliminary Record to USCA re 50 Notice of Appeal (Attachments: # 1 Appendix)(jrj) (Entered: 10/24/2025) |
| 10/27/2025 | 52 | MOTION for Attorney Fees (Defendants' Fee Petition) filed by Defendants Katherine Kubler, Netflix Inc. (Attachments: # 1 Exhibit A)(Spears, Natalie) (Entered: 10/27/2025) |

APP 00010

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 11

| 10/27/2025 | 53 | AFFIDAVIT/DECLARATION of Natalie J. Spears in Support re 52 MOTION for Attorney Fees *(Defendants' Fee Petition)* filed by Defendants Katherine Kubler, Netflix Inc. (Attachments: # 1 Exhibit 1)(Spears, Natalie) (Entered: 10/27/2025) |
| --- | --- | --- |
| 10/27/2025 | 54 | AFFIDAVIT/DECLARATION of David W. Tufts in Support re 52 MOTION for Attorney Fees *(Defendants' Fee Petition)* filed by Defendants Katherine Kubler, Netflix Inc. (Attachments: # 1 Exhibit 1)(Spears, Natalie) (Entered: 10/27/2025) |
| 10/27/2025 | 55 | USCA Case Number Case Appealed to Tenth Case Number 25-4135 for 50 Notice of Appeal filed by Narvin Lichfield. A transcript order form or notice that no transcript is necessary per 10th Cir. R. 10.2. This form must be filed in both the district court and this court. See letter for additional information. (kec) (Entered: 10/27/2025) |
| 11/07/2025 | 56 | AO 435 TRANSCRIPT REQUEST ORDER FORM by Narvin Lichfield for proceedings held on 9/18/2025 before Judge Jill N. Parrish.. (Hepworth, Michael) (Entered: 11/07/2025) |
| 11/10/2025 | 57 | Plaintiff's MEMORANDUM in Opposition re 52 MOTION for Attorney Fees *(Defendants' Fee Petition)* filed by Plaintiff Narvin Lichfield. (Attachments: # 1 Exhibit Exhibit A to Plaintiff's Memorandum in Opposition to Defendants' Fee Petition)(Hepworth, Michael) (Entered: 11/10/2025) |
| 11/24/2025 | 58 | REPLY to Response to Motion re 52 MOTION for Attorney Fees *(Defendants' Fee Petition) (Defendants' Reply in Support of Fee Petition)* filed by Defendants Katherine Kubler, Netflix Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Spears, Natalie) (Entered: 11/24/2025) |
| 11/25/2025 | 59 | Please be advised the Record is complete for purposes of appeal for USCA case number 25-4135 re 50 Notice of Appeal. (kec) (Entered: 11/25/2025) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 01/12/2026 14:37:10 | | |
| **PACER Login:** michaelhepworth | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 2:24-cv-00458-JNP |
| **Billable Pages:** 8 | **Cost:** | 0.80 |

APP 00011

Michael K. Hepworth (UT-15157)
Christoffer T. Binning (UT-17942)
**HEPWORTH LEGAL**
320 W 500 S, Ste. 200
Bountiful, Utah 84010
Phone: (801) 872-2222
michael@hepworthlegal.com
cbinning@hepworthlegal.com

*Counsel for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **NARVIN LICHFIELD**, an individual, | **AMENDED COMPLAINT** |
| *Plaintiff*, | |
| *vs.* | **Case No.:** 2:24-cv-00458-CMR |
| **KATHERINE KUBLER**, an individual; **NETFLIX, INC.**, a Delaware Corporation; and **JOHN DOES A-L**, | **Judge:** Cecilia M. Romero |
| *Defendants.* | **Jury Demand** |

Plaintiff Narvin Lichfield, in support of his Complaint against Defendants Katherine Kubler, Netflix, Inc., and John Does A-L, hereby states the following:

### INTRODUCTION

This is an action for defamation and false light invasion of privacy arising from knowingly false statements and attributions concerning plaintiff Narvin Lichfield ("Narvin") made by defendants Katherine Kubler ("Kubler") and Netflix, Inc. ("Netflix") in their series entitled: The Program: Cons, Cults, and Kidnapping (the "Series").

This complaint seeks to hold Defendants accountable for their egregious conduct and to restore Plaintiff's reputation and peace of mind. The facts in this complaint will demonstrate the extent of Defendants' malicious campaign and its devastating impact on Plaintiff's life and livelihood. The

false accusations made and disseminated by Defendants have immensely harmed Plaintiff financially, mentally, and reputationally. Through this action, Plaintiff seeks not only to vindicate his rights but to send a clear message that such vicious and baseless attacks will not be tolerated in a just society.

## PARTIES, JURISDICTION, AND VENUE

1. At all material times, Narvin is and was a citizen and resident of the state of Utah.

2. Defendant Netflix is an organized corporation under the laws of the State of Delaware. Its principal place of business is in California. It is a media giant whose programming is available worldwide, with 238.3 million paid subscribers and total revenues of $33.7 billion in 2023.[1]

3. On information and belief, defendant Kubler is, and at all relevant times was, an individual residing in Pasadena, California.

4. The Court has diverse citizenship subject matter jurisdiction under 28 U.S.C. § 1332. The parties are completely diverse, and the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Defendant Netflix because Netflix conducts substantial business in the State of Utah and has sufficient minimum contacts with Utah such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

6. This Court has personal jurisdiction over Defendant Katherine Kubler because she created and played a substantial role in the creation of The Series, which has been widely disseminated by and through Netflix, including in Utah, such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and under 28 U.S.C. § 1391(b)(3) because Defendants are subject to the Court's jurisdiction concerning this action.

---

[1] https://www.businessofapps.com/data/netflix-statistics/

APP 00013

## GENERAL ALLEGATIONS

8.    Narvin is an individual who was involved in operating programs for troubled youth for over thirty-two (32) years.

9.    Defendants Netflix, Kubler, and several as-yet unidentified parties created and released a three-episode production series titled "The Program: Cons, Cults, and Kidnapping" (the "Series"). The Series presented itself as a documentary and focused on specific youth programs, including some that Narvin was involved with.

10.    The Series, executively produced by Netflix, presented statements by several individuals, including Defendant Kubler, and therefore, such statements should be construed as Netflix directly making those statements itself, such as when the Series stated it was surreal to see Narvin in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]" and stating he had "gotten away with this for so long [. . . .]" [2]

11.    The Series made representations tending to state to the average, reasonable viewer that Narvin had either facilitated and covered up or engaged in abuse of children, suggesting as much through explicit statements and selective editing to portray Narvin's photograph prominently next to a newspaper clipping of an article purporting to report on a death at a youth program facility like those Narvin was previously involved with. [3] *See screenshot, below.*



---

[2] *See* Series, Part 3, timestamp for time remaining at 18:02–17:52.
[3] *See* Series, Part 3, timestamp for time remaining at 1:05:44–1:05:41.

APP 00014

12. The Series also selectively withheld the relevant abuse and suicide claim statistics of the number of children attending programs such as the Academy at Ivy Ridge (which it prominently highlighted) and other similar youth programs, failing to mention that more than 40,000 children attended such programs with less than the average rate of suicides for Americans being observed among this set of children, and with a negligible percentage of these children ever claiming abuse occurred.

13. The Series framed and outright stated Narvin had held supervisory and executive control over the staffing and day-to-day operation over Ivy Ridge.

14. The Series falsely stated that the youth programs Narvin and his family were associated with were raided by police and shut down for abusing the children enrolled in these programs.[4]

15. Such statements by Defendants were calculated, in the larger context of the other statements made in the Series and in the tone and structure of the Series itself, to further convince viewers of the Series that Narvin committed and/or facilitated child abuse.

16. The Series included false statements from purported experts claiming Narvin was a "punchline" and "wildcard," further defaming his character without basis.[5]

17. The Series is billed in its opening title card and credits as a "Netflix original," with the Series, upon information and belief, appearing on no other major video streaming platform.

18. The subtitle of the Series included the phrase "Cons, Cults and Kidnapping," which falsely implied that the youth programs Narvin was associated with engaged in fraud, were cult-like, and kidnapped children. *See screenshot below.*

---

[4] *See, e.g.,* Series, Part 1, timestamp for time remaining at 9:35.
[5] *See, e.g.,* Series, Part 3, timestamp for time remaining at 41:34–41:25 (calling Narvin as "punchline" and then, at 41:27, beginning the statement by an interviewee for Defendants that he is a "wildcard").

APP 00015



19.     The Series makes several claims of specific criminal activities that the youth programs Narvin was associated with committed or facilitated, with Defendants claiming "kidnapping" was one such activity.[6]

20.     The Series presented itself as an objective documentary, despite not showing a balanced and unbiased presentation of the facts surrounding the youth programs.

21.     For instance, the Series claimed to apply standards of journalistic ethics and integrity by refusing to disclose the identity of a past Ivy Ridge employee when presenting the details of allegations of sexual abuse by this employee because no formal legal allegations and convictions were made regarding the establishment of these claims. Yet, it disclosed and heavily focused on Narvin's identity when no such convictions were made for Narvin.

22.     To this end, after presenting itself as an objective documentary, the Series focused on Ivy Ridge's most troubled and disenchanted former students. Then, they presented these students'

---

[6] *See, e.g.,* Series, Part 3, timestamp for time remaining at 31:25–31:18 (Defendant Kubler referring to a transport company agent or employee who was allegedly used by youth groups Narvin was associated with as paid to kidnap minors for transportation to the program and framing an unfortunate and clearly attempted humorous post by this agent or employee about "[kidnapping] in a little [luxury]" as an admission).

APP 00016

attitudes and exaggerated experiences as a universal experience for all past students who had attended programs Narvin was involved with, even though none of the students depicted had ever attended a program Narvin supervised, chosen staff for, or directed.

23.    The Series opened with a disclaimer stating it included "images and descriptions of abuse involving minors," presenting it as fact that abuse occurred in the programs without using qualifiers like "alleged" while specifically identifying Narvin by name and likeness, thus falsely painting Narvin as involved in abusing minors along with several other criminal activities. *See screenshot below.*

24.    Specifically, the Series showed Narvin's image in a photograph placed immediately next to a newspaper article about a death in a youth wilderness program, with which Narvin never had any involvement or association, while Kubler's voice is heard in a voiceover stating that people in the "higher ups seem to get away with murder," falsely implying Narvin was responsible for a murder.[7]

25.    Narvin has never been charged or formally accused of murder, nor has he had a reputation for being a murderer before the release of the Series.

---

[7] *See* Series, Part 3, timestamp for time remaining at 1:05:42.

APP 00017

26.     The Series presented allegations of "abuse" that conflate loose definitions of abuse with actual claims of legal abuse, characterizing the military academy-style discipline of grossly troubled and criminally convicted teenagers (such as by turning ninety degrees at corners) as abuse while then accusing youth programs it claims Narvin was involved with of legitimate abuse, such as assault.

27.     At no time has Narvin ever been involved in the staffing, supervision, or directing of a youth program that was formally and judicially found to involve child abuse as defined by any legal standard while he acted in such a role.

28.     In the Series, Defendant Kubler also states that Narvin is "a great name for a villain" and "a weak link [of Narvin's family]," such statements serving to bolster further the claim that he has committed several criminal acts the Series suggests or outright states he has committed while simultaneously assassinating his character in his local community and the nation at large.[8]

29.     The Series also showed a social media profile of Narvin going by a name that matches his birth name but with his first name alternatively spelled and with his face visible on the profile, characterizing the presence of this profile as an attempt to hide his identity with the voiceover line: "Narvin Lichfield is a great name for a villain, but he's gone by many aliases. But for a guy who's trying to hide his identity, he is very public on social media."[9]

30.     In the Series, Defendant Kubler is also filmed at a former youth program campus, going through files, which were stored inside buildings on this campus.[10]

31.     In the Series, Defendants made more baseless and defamatory statements that the

---

[8] *See* Series, Part 3, timestamp for time remaining at 42:11–42:06; 42:01–41:58 (last time stamp regarding the "villain" comment).

[9] *See* Series, Part 3, timestamp for time remaining at 41:56–41:50 (approximately).

[10] *See, e.g.,* Series, Part 1, timestamp for time remaining at 1:01:52–1:01:10 (approximately) (these kinds of shots of showing youth program documents and property documenting progress of minors for profit through widespread media publication is a recurring motif of all three episodes of the Series, with efforts to protect third-party minors through blurring and other redaction methodologies varying wildly in efficacy).

APP 00018

youth program Narvin was involved in abused children, committed crimes, and should be in jail, with this footage designed to suggest that these files provide evidentiary support to these baseless claims.[11]

32.    In repeating these false statements in a way that suggests they are credible; Defendants used the Series to tie Narvin to youth outreach programs in which Narvin had no degree of involvement or where he had no expected or actual executive control over the staffing and day-to-day operation of those programs.

33.    Defendants also filmed and published these confidential files, disclosing information on and produced by minors for a national audience to frame Narvin, by his association with the youth programs, as an abuser and criminal.[12]

34.    The Series invaded Narvin's privacy by secretly filming him at a private karaoke event with friends without permission and included this in the Series to further harass and defame him by portraying him in a false light.[13]

35.    Defendants also repeated unfounded allegations of torture committed by Narvin and the youth groups he was a part of.[14]

36.    Upon information and belief, Defendants further portrayed Narvin and his participation in the youth programs in a false light by showing vandalism and graffiti at a former program location in the Series' segments, falsely alleging abuse of which Narvin has no recollection. On information and belief, such graffiti was not present during any period when Narvin was associated.[15]

---

[11] *Id.*

[12] *Id.*

[13] *See* Series, Part 3, timestamps time remaining 33:00–32:58 (presented with the representation that Narvin wanted to "live lavishly" and "spend lavishly," framing this vacation as an extravagant venture that financially harmed Narvin's ability to fund the youth programs properly).

[14] *See* Series, Part 3, timestamps time remaining 32:41–32:33.

[15] *See, e.g.,* Series, Part 1, timestamps time remaining 17:12 (graffiti stating "I didn't lie,"); 26:25 (graffiti stating "You tried to break us but we on top"); 20:49 (single graffiti tag stating "Rapist"); (graffiti stating "What must I do to be saved?" with style closely matching all other instances mentioned herein and with several other examples found in each of the three parts of the Series).

APP 00019

37.     Upon information and belief, the Series further uses suggestive graffiti to falsely craft an inflated perception that the youth programs and Narvin have committed widespread child abuse.[16]

38.     The Series also shows a scene where a featured guest and "expert" comments that the youth programs were structured as a family business. Defendant Kubler then states that Narvin's family is "definitely" a family of secrets.[17]

39.     Such statements, in the context of the other direct allegations and strategically placed suggestions made throughout the Series, were used by Defendants to impress upon the average, reasonable viewer that the family-oriented structure of the youth programs business was to cover up previously raised allegations made in the Series, such as murder, systemic child abuse, and kidnapping.

40.     The Series also made false claims about program operations, such as stating that students never went outside or made phone calls, a general rule implemented as a policy of the youth programs.[18]

41.     The Series made further false claims by stating or strongly suggesting that males strip-searched females.[19]

42.     The Series included manipulated and scripted statements from Narvin's estranged son, Nathan, to take advantage of Nathan and portray Narvin in a false light.[20]

43.     Specifically, Defendants manipulated Nathan, who has mental health issues, into divulging family matters to Defendants so they may leverage these matters to further knowingly defame Narvin by presenting this information without proper context to lead viewers to believe that Narvin started WWASP to harm people when Narvin never had any ownership in WWASP nor started

---

[16] *See* Series, Part 1, timestamp for time remaining at 1:02:01.
[17] *See* Series, Part 3, timestamp for time remaining at 40:10–39:57.
[18] *See, e.g.,* Series, Part 1, timestamp for time remaining at 49:07–48:55; 47:16–47:02.
[19] *See, e.g.,* Series, Part 1, timestamp for time remaining at 51:39–51:36.
[20] *See* Series, Part 3, timestamp for time remaining at 39:01–30:50 (approximately).

APP 00020

WWASP.[21]

44.    Narvin's association with WWASP was essentially that of a franchisee. Narvin's programs had to pay dues to WWASP for membership, and WWASP's profits were not shared with Narvin.

45.    The Series also included statements from Narvin's son where he claimed Narvin used profits from WWASP and affiliated programs to pay for an expensive home in St. George, Utah, along with other expensive assets.[22]

46.    The Series also shows Defendants Kubler and others burning program files and destroying evidence that could disprove their false allegations.[23]

47.    Defendants Kubler and others, by improperly removing, destroying, and burning confidential student files that are the private property of the programs.[24]

48.    The Series makes all the above mischaracterizations intentionally to craft deceptive presentations to lead the general public into believing false representations regarding Narvin so that he is portrayed in a false and biased light that directly states and implies he has committed child abuse, among other crimes.

49.    Defendants lack any legitimate factual foundation for these false and defamatory representations. Instead, they intentionally manipulate the content of the Series to fit a pre-conceived false narrative, knowing such information is baseless or likely false, causing irreparable harm to Narvin's reputation.

50.    The Series included false and defamatory statements from commentators Maia

---

[21] *Id.*; see also 38:16–38:04 (with Nathan describing Narvin as "a man with two faces" and a "dark side," which Defendants represented in a larger context of allegations of Narvin and the youth programs he was involved in being instruments for criminal kidnapping, murder, and child abuse.

[22] *See* Series, Part 3, timestamp for time remaining at 36:53–36–40.

[23] *See* Series, Part 3, timestamp for time remaining at 6:25–4:52.

[24] *Id.*

APP 00021

Szalavitz and Tom Houlihan, who were presented as experts. These commentators made unsupported claims that the programs were improperly staffed and unprofitable without considering whether such statements were, in fact, true.

51.    The Series falsely claimed that students never went outside or participated in activities, directly contradicting other statements in the series. As a result, it defamed the Plaintiff through association with these untrue statements.

52.    Defendant Kubler made false claims that the programs lacked sufficient staff and were inexpensive to run when, in fact, they were adequately staffed and faced high operating costs and risks. This demonstrated her lack of understanding of program operations and further defamed the Plaintiff and the programs with misinformation.

53.    The Series falsely suggested that many students died by suicide because of the programs when official records show the number of suicides was no higher than national background rates. Defendants inflated these suggestions by making unsubstantiated claims about a large number of deaths that are not factually supported to exist as represented.[25]

54.    Defendants inflated and lied about the number of suicides from past students of these youth programs by focusing on the issue of suicide and presenting it as a core problem systemic to these youth programs and by making unsubstantiated claims about disproportionately high deaths that are not factually supported to exist as represented.[26]

55.    Over the life of Narvin's more than thirty (30) year career involved in these youth programs, he has helped over 36,000 students, with a remarkedly low percentage of these students having claimed any abuse[27] or suicide attempts compared to the larger U.S. population of similar

---

[25] *See* Series, Part 3, timestamp for time remaining at 8:05–7:46 (approximately); 7:46–7:14 (claiming "about 40" past participates of youth programs associated with Narvin have killed themselves in a larger segment promoting the allegation that these programs cause high rates of suicide).

[26] *Id.*

[27] As it may defined by criminal statute or related civil cause of actions under Utah law.

demographics to those students.

56. Also, Defendant Kubler is shown picking up a random sticky note with a student's name and suggesting the student died in the program, with no evidence whatsoever to support her implication, demonstrating her reckless disregard for the truth in attempting to paint the program in a false light.

57. The Series glorified a student riot started by an individual with a criminal history that put other students and staff at risk of harm, completely misrepresenting the incident to support their defamatory "abuse" narrative when the rioting students perpetrated the actual abuse.[28]

58. The Series deceptively edited and presented an incident of a staff member restraining an attacking student to falsely claim it was an example of staff abusing students, using footage that was taken out of context to do so.

59. The Series made numerous other false claims about the youth programs, such as students never being allowed to make phone calls, go outside, or have more than one "fun day" per year, and males strip-searching females, which were untrue and further defamed the youth programs and Narvin by association.

60. The Series conflated Kubler's personal family issues and poor academic performance before attending the program with alleged "abuse" at the program to manipulate viewers into believing a false narrative and further defame Narvin and others she targeted.[29]

61. The Series highlighted a 2003 newspaper article about Narvin's false arrest in Costa Rica on abuse charges without disclosing that he was exonerated, and all charges dismissed at the prosecutor's request to obfuscate the truth and lend false credibility to the abuse allegations and further defame Narvin and the programs.[30]

---

[28] *See* Series, Part 1, timestamp for time remaining at 7:46–3:18.
[29] *See* Series, Part 1, timestamp for time remaining at 56:14–55:44 (approximately).
[30] *See* Series, Part 3, timestamp for time remaining at 35:33–35:11.

APP 00023

62. Defendants selectively omitted contextual and factual information regarding the segment on Narvin's Costa Rica arrest to mislead the average, reasonable viewer into believing Narvin was convicted of child abuse when publicly accessible articles proved Narvin was exonerated of any criminal charges related to that arrest in Costa Rica.

63. The Series intentionally ignored the fact that Narvin's Costa Rican arrest was on charges that were voluntarily dropped by the public prosecutor—a nearly unprecedented outcome given the severity of the underlying allegations advanced by the government. The Series was carefully crafted to suggest the opposite of the truth of the criminal matter in Costa Rica.

64. The Series also used manipulative filmmaking techniques like eerie music and ominous imagery to create a false impression that the program was hiding terrible secrets and mislead viewers into believing the defamatory allegations.[31]

65. Defendant Kubler's statements in the Series reveal her motivation to pursue and head the creation of the Series—an intention to seek to harm Narvin and others associated with her program experience for profit without regard for the truthfulness of her representations.

66. Defendant Netflix, upon information and belief, exercised a substantial degree of direct control over editing the final product of the Series and had executive decision-making on the content and statements appearing in the Series.

67. Upon information and belief, Defendant Netflix was pivotal in the formation and defamatory nature of the Series by, among other things, having final discretion on its content. Thus, all statements presented in the Series, including those by Defendant Kubler, were formed and articulated by Netflix itself.

68. Upon information and belief, Defendant Netflix conspired with all other Defendants, specifically Defendant Kubler, to realize the Series and advertise it to a large audience that included

---

[31] *See generally* Series, Parts 1–3.

and targeted Narvin's local community, family members, and business associates.

69.    Defendant Netflix also provided critical funding and financial support for all other Defendants, specifically Defendant Kubler, in the production and facilitation of the Series, so that without this funding and support, the Series would not have been realized.

70.    Defendant Netflix is directly involved in the creative process of the series through its exercise of executive control over and funding of the series. Therefore, it is responsible for the tone, editing decisions, content, character, funding support, and statements in the Series.

71.    Defendant Netflix also took deliberate measures in marketing and advertising to expose the Series to an extensive group of global viewers, with *Forbes* stating in an article that the limited series "racked up 22.7 million viewing hours between its March 5 premiere and March 10 [according to Netflix's own data analytics]."[32]

72.    Such exposure to the Series has tainted Narvin's standing in his local community and his reputation in the eyes of viewers worldwide.

73.    Since the premiere of the Series, Narvin has suffered anonymous online threats of violence, targeted group harassment campaigns, online and in-person hate, and been the victim of specific death threats across varying degrees of credibility and concern.

74.    Overall, the Series dramatized, misleadingly, and defamatorily portrayed the youth programs and individuals involved. It included dozens of distinct false statements packaged in deceptive editing and outright misrepresentations to push a predetermined false narrative of "abuse" without factual basis, resulting in significant reputational harm to Narvin and others.

---

[32] *See* Forbes>Business>Breaking, "'The Program' Docuseries Is Among Netflix's Most-Watched: What To Know About The Real Academy At Ivy Ridge," https://www.forbes.com/sites/maryroeloffs/2024/03/13/the-program-docuseries-is-among-netflixs-most-watched-what-to-know-about-the-real-academy-at-ivy-ridge/?sh=1e2d13f113cf (accessed June 1, 2024 at 10:00 PM EST).

APP 00025

**FIRST CAUSE OF ACTION**
*Defamation Per Se – Against All Defendants*

75.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

76.     Defendants published statements that falsely impute criminal conduct to Plaintiff and tend to injure Plaintiff in his profession. Under Utah law, it is defamation per se to falsely charge someone with a crime or conduct incompatible with the exercise of a lawful business, trade, profession, or office.

77.     Defendants' defamatory statements include, but are not limited to, the following:

a.     Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[33]

b.     Presenting Plaintiff as either facilitating or being complicit in murder by saying people in the "higher ups" "get away with murder" while showing Plaintiff's picture next to a news article about a murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

c.     Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

d.     Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;

e.     Presenting statements that Plaintiff was effectively a mastermind and architect,

---

[33] *See* Series, Part 3, timestamp for time remaining at 18:02–17:52.

APP 00026

along with his brother Robert, of an abusive system of youth programs;

f.    All other instances of defamation articulated in this Complaint.

78.    The defamatory statements made by Defendants were published and disseminated publicly through Netflix's online services and various social media platforms, reaching many people throughout Utah, the United States, and globally.

79.    Defendants published these statements with the requisite degree of fault. Defendants acted negligently and with reckless disregard for the truth in publishing these false statements. They had no basis for believing the statements true and failed to conduct a reasonable investigation before widely disseminating such serious allegations. Defendants knew or had reason to know that these statements were false.

80.    These actions and statements by Defendants were false and malicious and caused Plaintiff significant emotional distress, forming the basis of this complaint.

81.    The statements Defendants published concerning Plaintiff were not privileged.

82.    Defendants' false statements are defamation per se, partly because they attribute to Plaintiff the commission of a crime involving moral turpitude for which Plaintiff could be indicted. As such, Plaintiff is entitled to presumed damages.

83.    Because Defendants are guilty of oppression and malice, express and implied, they must pay Plaintiff an additional amount for the sake of example and punishment.

84.    Plaintiff has suffered substantial injury to his reputation and standing in the community, as well as emotional distress, humiliation, embarrassment, and other damages as a direct and proximate result of Defendants' defamatory publications.

85.    Because Plaintiff has been obligated to procure the services of an attorney to protect his rights, Plaintiff is entitled to an award of all costs and attorney's fees.

APP 00027

**SECOND CAUSE OF ACTION**
*Defamation – Against All Defendants*

86.    Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

87.    Beginning in March 2024 and continuing to the present, Defendants have published and communicated false and defamatory statements about Plaintiff through Netflix's online services and various social media platforms. These statements are outlined in the foregoing paragraphs, and include but are not limited to:

a.    Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[34]

b.    Presenting Plaintiff as either facilitating or being complicit in murder by saying people in the "higher ups" "get away with murder" while showing Plaintiff's picture next to a news article about a murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

c.    Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

d.    Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;

e.    Presenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs;

---

[34] *See* Series, Part 3, timestamp for time remaining at 18:02–17:52.

APP 00028

f.    All other instances of defamation articulated in this Complaint.

88.    The statements Defendants published about Plaintiff are false.

89.    The statements Defendants published about Plaintiff are defamatory.

90.    The statements Defendants published about Plaintiff are not privileged.

91.    The statements Defendants published about Plaintiff are made with the requisite degree of fault.  Defendants published the false statements, knowing they were untrue or with reckless disregard for their truth, as evidenced by their persistence in repeating the allegations after Plaintiff took steps to stop the defamatory attacks.

92.    Defendants' statements were deliberately made with malice, aiming to subject the Plaintiff to public contempt, hatred, and ridicule.

93.    The false and defamatory statements were published to third parties and publicly disseminated through Netflix's online services and social media platforms.

94.    Plaintiff has suffered injury to his reputation, emotional distress, and other damages as a direct and proximate result of Defendants' defamatory statements.

95.    Such injury has manifested, among other symptoms of anxiety and negative impact on quality of life, as anonymous online threats of violence, targeted group harassment campaigns, online and in-person hate, and being the victim of specific death threats across varying degrees of credibility and concern.

96.    The statements that Defendants published about Plaintiff caused damages to Plaintiff in an amount to be determined at trial.

97.    Because the Defendants are liable for oppression and malice, express or implied, they must pay Plaintiff an additional amount for the sake of example and punishment.

98.    Because Plaintiff has been obligated to procure the services of an attorney to protect his rights due to Defendants' acts, Plaintiff is entitled to an award of reasonable attorney fees as part

APP 00029

of his damages.

**THIRD CAUSE OF ACTION**

*False Light Invasion of Privacy – Against All Defendants*

99.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

100.     The key elements necessary to state a false light claim are (1) the publication or broadcast of a false statement of fact that places the plaintiff in a false light in the public eye; (2) if the plaintiff is a public figure, a demonstration by clear and convincing evidence that the statement was published or broadcast with "actual malice," and (3) a demonstration that the publication or broadcast of the falsehood would be deemed "highly offensive to a reasonable person."

101.     The first two elements of the false light tort described above are identical to parallel elements for defamation. Both torts require falsity, and both torts require, at least for public figures, actual malice. Both elements are satisfied by the facts pled herein.

102.     Plaintiff is neither a public figure nor a quasi-public figure requiring "actual malice."

103.     However, the third crucial element of the false light tort is not identical to defamation, and the United States Supreme Court has differentiated the two torts on this ground. Unlike defamation, which requires proof of injury to reputation, false light does not require proof of defamatory harm. The false light tort substitutes for the defamation element requirement of damage to reputation, which is the requirement that the plaintiff, in a false light, establish that the falsehood is highly offensive to a reasonable person. In this case, the false statements and attributions outlined in the Defamatory Statements would be highly offensive to a reasonable person.

104.     Defendants publicized matters concerning Plaintiff that placed them before the public in a false light.

105.     The false light in which Plaintiff was placed due to Defendants' actions would be highly offensive to a reasonable person. To be publicly and falsely accused of murder, abuse, covering

APP 00030

up rape and assault to protect abusers, participating in child trafficking, and other related condemnations would undoubtedly be highly offensive to a reasonable person.

106. Defendants consistently manipulated the public narrative regarding Plaintiff by intentionally misrepresenting the facts they alleged or completely concocting stories with no factual basis.

107. Defendants knew the falsity of the publicized matter and the false light in which Plaintiff was placed and had personal knowledge that their allegations about Plaintiff were false.

108. As a proximate result of the foregoing, Plaintiff has suffered damages in an amount to be proven at trial and seeks actual and presumed damages.

109. Defendants' conduct as described herein was done with a conscious disregard for the rights of Plaintiff, with intent to maliciously vex, annoy, and/or harass him, and with motives of fraud and oppression to exploit him for their gain. Such conduct was unauthorized and constitutes oppression, fraud, and/or malice, entitling Plaintiff to an award of punitive damages appropriate to set an example of Defendants in an amount determined at trial.

## FOURTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress – Against All Defendants*

110. Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

111. In Utah, a plaintiff is entitled to damages where a defendant intentionally engaged in some conduct toward the plaintiff (a) with the purpose of inflicting emotional distress or (b) where any reasonable person would have known that such would result, and the defendant's actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality. *Camco Constr. Inc. v. Utah Baseball Acad. Inc.*, 2018 UT App 78, ¶ 12, 424 P.3d 1154, 1158.

112. Defendants, either personally or through their agents, engaged in and subjected

APP 00031

Plaintiff to outrageous and intolerable conduct offending generally accepted standards of decency and morality. Examples of this outrageous and intolerable conduct include but are not limited to:

a.    Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[35]

b.    Presenting Plaintiff as either facilitating or being complicit in murder by saying people in the "higher ups" "get away with murder" while showing Plaintiff's picture next to a news article about a murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

c.    Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

d.    Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse by stating "[Plaintiff's youth program] was only open for about nineteen months before authorities were alerted to abuse, raided the facility, and [Plaintiff] was arrested]," where no such conviction or abuse occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;[36]

e.    Presenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs;

f.    All other instances of defamation articulated in this Complaint.

113.    The repeated and continuous nature of their conduct, which has not ceased since March 2024, continues to be spread through Netflix's online services and various social media

---

[35] *See* Series, Part 3, timestamp for time remaining at 18:02–17:52.
[36] *See* Series, Part 3, timestamp for time remaining at 35:33–35:10.

APP 00032

platforms, with significant followings and audiences, which also amounts to extreme and outrageous behavior.

114.    Defendants' false statements were extreme and outrageous, going beyond all possible bounds of decency, and were intolerable in a civilized community. Defendants' statements were not only intended to inflict emotional harm but also sought to undermine Plaintiff's reputation within the community.

115.    Defendants acted with the intent to inflict emotional distress or knew that emotional distress was likely to result from their actions.

116.    Defendants' false statements were published verbally or in writing to third parties through Netflix's online services and social media platforms.

117.    Defendants made these statements intending to harm Plaintiff, knowing them to be false, or with reckless disregard for their truth or falsity. Defendants' statements are provably false, as demonstrated in this Complaint.

118.    Defendants' conduct directly caused Plaintiff emotional distress. As a result of Defendants' false misrepresentations, Plaintiff and his family have received threats and harassment from his local community and Netflix's global audience. As a result, Plaintiff has been required to adjust many facets of his life due to the shame and revulsion directed at him and his family due to Defendants' conduct.

119.    Defendants' conduct also directly caused Plaintiff's emotional distress because Defendants' inflammatory and false statements caused Plaintiff to be in a hypervigilant state and be on constant alert for verbal altercations and potentially physical attacks from Defendants or Defendants' associates.

120.    As a direct result of Defendants' false publications, Plaintiff suffered severe emotional distress, including severe anxiety, humiliation, deep depression, and damage to his reputation.

APP 00033

Plaintiff's severe emotional distress manifested itself in physical maladies, including stomach pain and nausea.

121.    This severe distress and resulting symptoms required treatment from medical professionals, which resulted in Plaintiff incurring medical expenses.

**FIFTH CAUSE OF ACTION**
*Civil Conspiracy – Against All Defendants*

122.    Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

123.    Defendants Netflix, Kubler, and several as-yet unidentified parties combined and conspired to produce and publish the Series to reach a global audience while making explicitly defamatory statements and framing Plaintiff in a defamatory and false light.

124.    Defendants had a common object and agreement to portray Plaintiff in a false and negative light and falsely accuse him of serious criminal conduct, including kidnapping, child abuse, and murder, to harm his reputation for their financial gain and notoriety from the Series.

125.    In furtherance of this common plan, Defendants engaged in numerous unlawful and overt acts, including: a) Making numerous demonstrably false statements of fact about Plaintiff, such as claiming youth programs he was involved with were raided by police and shut down for child abuse when they voluntarily closed, and directly implying Plaintiff was involved in a murder; b) Manipulating and taking statements out of context through strategic editing to falsely portray Plaintiff as having committed crimes and abuse; c) Trespassing at former program locations to stage misleading scenes; d) Destroying evidence that could disprove their false allegations; e) Presenting so-called experts who made unsupported claims without any direct knowledge; and f) Using emotionally manipulative filmmaking techniques to lead viewers to false conclusions.

126.    Defendants engaged in these overt acts with malice and intent to injure Plaintiff by destroying his reputation with baseless criminal accusations presented as fact to a broad audience.

APP 00034

127.    Defendants also took measures to conceal the truth regarding the falsity of their claims made throughout the Program regarding allegations Plaintiff was an abuser and criminal, with representations Plaintiff had directly controlled or exercised influence to facilitate rampant abuse in several youth programs showcased in the Series, by intentionally destroying business records and other relevant materials created by the Academy at Ivy Ridge at or near the time Defendants' allegations of abuse were to have occurred.

128.    As a direct and proximate result of Defendants' conspiracy and wrongful actions, Plaintiff suffered significant damages, including his reputation and standing in the community and emotional distress.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all claims, causes of action, issues, and defenses properly triable before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief against Defendants, as follows:

A.     For actual and presumed damages in an amount to be determined at trial;

B.     For punitive damages;

C.     Pre- and post-judgment interest;

D.     For costs of suit, including attorney's fees; and

E.     For such further relief as the Court deems just and proper.

**DATED:** June 27, 2024

/s/ Michael K. Hepworth
Michael K. Hepworth(UT-15157)
**HEPWORTH LEGAL**
*Counsel for Narvin Lichfield*

/s/ Christoffer T. Binning
Christoffer T. Binning (UT-17942)
**HEPWORTH LEGAL**
*Counsel for Narvin Lichfield*

APP 00035

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L,<br><br>Defendants. | **DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PURSUANT TO ANTI-SLAPP ACTS**<br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>Judge Jill N. Parrish |

APP 00036

## **TABLE OF CONTENTS**

**Page**

RELIEF SOUGHT ........................................................................................................... 1

INTRODUCTION........................................................................................................... 1

STANDARD ON RULE 12(B)(6) MOTION AND MATERIALS CONSIDERED ...................... 2

FACTUAL BACKGROUND........................................................................................... 3

    A.    The Series and Documentarian Katherine Kubler .................................. 3

    B.    WWASP: The Lichfield Family Business ................................................ 4

    C.    Plaintiff's Career in the Controversial Troubled Teen Industry with WWASP ................................................................................................... 5

    D.    Plaintiff's Public Figure Status ............................................................. 5

    E.    This Lawsuit............................................................................................ 7

ARGUMENT ................................................................................................................. 7

I.    PLAINTIFF'S CLAIMED DEFAMATIONS ARE NOT ACTIONABLE FOR MULTIPLE REASONS. ............................................................................................ 7

    A.    Plaintiff's Generalized Complaints About the Series Are Not "Of and Concerning" Him. .......................................................................... 8

    B.    Plaintiff's Allegations About Statements That Were Never Made Also Fail. ................................................................................................. 10

    C.    Any Statements That Were Actually Made About Plaintiff Are Not Actionable Under the First Amendment and Utah Law. ................... 11

        1.    Plaintiff's Admitted Involvement with WWASP Defeats Any Claim of Material Falsity—Which He Fails to Plead. ........................... 11

        2.    Ms. Kubler's Comments About Plaintiff "Getting Away" Without Accountability Are Non-Actionable Expressions of Her Opinion. ......... 14

        3.    The Series' Accurate Report of the Investigation of Plaintiff's Costa Rica Facility and His Arrest Is Non-Actionable and Privileged. ........................................................................................... 20

    D.    Plaintiff's Claims Also Should Be Dismissed Because He Does Not—and Could Not—Plead Actual Malice. .......................................... 23

II.    PLAINTIFF'S REMAINING TORT CLAIMS ARE DUPLICATIVE OF HIS DEFAMATION CLAIM AND FAIL AS A MATTER OF LAW. ................................... 25

APP 00037

III.    SINCE DISMISSAL IS IN ORDER AND THE CLAIMS ARE DIRECTED TO
        SPEECH ON A MATTER OF PUBLIC CONCERN, DEFENDANTS ALSO ARE
        ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS. ........................................ 27

CONCLUSION ..................................................................................................................... 30

APP 00038

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ampex Corp. v. Cargle*,
128 Cal. App. 4th 1569 (2005) ........................................................................28

*Anderson v. Cramlet*,
789 F.2d 840 (10th Cir. 1986) .........................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................2, 25

*Bennett v. Jones, Waldo, Holbrook & McDonough*,
2003 UT 9, 70 P.3d 17 .....................................................................................26

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ...........................25

*Blatty v. N.Y. Times Co.*,
42 Cal.3d 1033 (1986) .......................................................................................9

*Brokers' Choice of Am. v. NBC Universal*,
861 F.3d 1081 (10th Cir. 2017) ...................................................9, 11, 12, 21, 24

*Bustos v. A&E Television Net.*,
646 F.3d 762 (10th Cir. 2007) (Gorsuch, J.)..................................................13

*CACI Premier Technology, Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) .....................................................................19, 20

*Casper v. Washington Post Co.*,
549 F. Supp. 376 (E.D. Pa. 1982) ...................................................................21

*Chau v. Lewis*,
935 F. Supp. 2d 644 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) ......................16, 17

*Couch v. Verizon Commc'ns Inc.*,
105 F.4th 425 (D.C. Cir. 2024).....................................................................23, 25

*CVB, Inc. v. Corsicana Mattress Co.*,
604 F. Supp. 3d 1264 (D. Utah 2022)...............................................................9

*D'Addabbo v. Smith*,
2018 WL 5779077 (D. Utah Sept. 13, 2018).....................................................27

APP 00039

*Davidson v. Baird*,
  2019 UT App 8 ...................................................................................18, 23, 26

*Deripaska v. Assoc. Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ..............................................................13, 19

*Diamond Ranch Academy, Inc. v. Filer*,
  117 F. Supp. 3d 1313 (D. Utah 2015)............................................................22, 27

*Diamond Ranch Academy, Inc. v. Filer*,
  2016 WL 633351 (D. Utah Feb. 17, 2016) ................................................24, 27, 28

*Dorsey v. Nat'l Enquirer*,
  973 F.2d 1431 (9th Cir. 1992) ...........................................................................22

*Eliott v. Lions Gate Ent'mnt*,
  639 F. Supp. 3d 1012 (S.D. Cal. 2022) ................................................................13

*Ferlauto v. Hamsher*,
  74 Cal. App. 4th 1394 (1999) ............................................................................18

*Friedman v. Kennard*,
  248 F. App'x 918 (10th Cir. 2007) ......................................................................12

*Gallagher v. Philipps*,
  563 F. Supp. 3d 1048 (S.D. Cal. 2021)................................................................22

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*,
  130 F.3d 1381 (10th Cir. 1997) ...........................................................................2

*Gilbert v. Sykes*,
  147 Cal. App. 4th 13 (2007) ..............................................................................28

*Global Relief Found. v. N.Y. Times Co.*,
  390 F.3d 973 (7th Cir. 2004) .............................................................................21

*Goguen v. NYP Holdings, Inc.*,
  544 P. 3d 868 (Mont. 2024)...............................................................................22

*Greenbelt Coop. Pub. Ass'n v. Bresler*,
  398 U.S. 6 (1970).............................................................................................20

*Hogan v. Winder*,
  762 F. 3d 1096 (10th Cir. 2014) .................................................................14, 18, 19

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988).............................................................................................26

iv

APP 00040

*Immanuel v. Cable News Network, Inc.*,
   618 F. Supp. 3d 557 (S.D. Tex. 2022) ...................................................................17

*Jarrow Formulas, Inc. v. LaMarche*,
   31 Cal.4th 728 (2003) ...........................................................................................28

*Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv. Servs.*,
   175 F. 3d 848 (10th Cir. 1999) ......................................................................15, 17

*Keisel v. Westbrook*,
   2023 UT App 163 ......................................................................................10, 17, 26

*Kennedy v. Peele*,
   552 F. App'x 787 (10th Cir. 2014) .........................................................................2

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021).................................................................................22

*LifeVantage Corporation v. Domingo*,
   2016 WL 4705540 (D. Utah Sept. 8, 2016) (Parrish, J.) ...............................13, 27

*Lott v. Levitt*,
   556 F.3d 564 (7th Cir. 2009) ..................................................................................2

*Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*,
   810 F.3d 1161 (10th Cir. 2016) ............................................................................12

*Martin v. Hearst Corp.*,
   777 F.3d 546 (2d Cir. 2015).................................................................................21

*Martineau v. Currutt*,
   2022 WL 180735 (D. Utah Jan. 19, 2022) (Parrish, J.) .........................................12

*Masson v. New Yorker Mag.*,
   501 U.S. 496 (1991)...............................................................................................12

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
   674 F.3d 369 (4th Cir. 2012) ................................................................................25

*McClatchy Newsp. v. Superior Court*,
   189 Cal. App. 3d 961 (1987) ................................................................................22

*Milkovich v. Lorain Jour.*,
   497 U.S. 1 (1990)............................................................................................15, 16

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)...............................................................................................23

APP 00041

*Nunes v. Rushton*,
　299 F. Supp. 3d 1216 (D. Utah 2018) (Parrish, J.) .....................................................2, 9, 16, 17

*Partington v. Bugliosi*,
　56 F.3d 1147 (9th Cir. 1995) ...................................................................................10, 16, 17

*Paterno v. Superior Court*,
　163 Cal. App. 4th 1342 (2008) .........................................................................................22

*Peterson v. Grisham*,
　2008 WL 4363653 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir.
　2010) ...................................................................................................................................15

*Phila. Newsp., Inc. v. Hepps*,
　475 U.S. 767 (1986)............................................................................................................11

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
　890 F.3d 828 (9th Cir. 2018) .............................................................................................28

*Porter v. Staples the Office Superstore*,
　521 F. Supp. 3d 1154 (D. Utah 2021) (Parrish, J.) ...........................................................26

*Resolute Forest Prods. v. Greenpeace Int'l*,
　302 F. Supp. 3d 1005 (N.D. Cal. 2017) .......................................................................28, 29

*Rinsley v. Brandt*,
　700 F.2d 1304 (10th Cir. 1983) ....................................................................................18, 20

*Sipple v. Found. for Nat'l Progress*,
　71 Cal. App. 4th 226 (1999) ..............................................................................................22

*Smith v. Press Democrat*,
　2011 WL 5006463 (N.D. Cal. 2011) .................................................................................22

*St. Amant v. Thompson*,
　390 U.S. 727 (1968)............................................................................................................25

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
　864 F.3d 236 (2d Cir. 2017)...............................................................................................12

*Vowell v. Gannett Sat. Info. Net.*,
　2017 WL 499942 (D. Utah Feb. 7, 2017) ..........................................................................13

*West v. Thomson Newsp.*,
　872 P.2d 999 (Utah 1994)............................................................................................7, 9, 14

*Westmont Residential LLC v. Buttars*,
　2014 UT App 291 ...............................................................................................................16

APP 00042

*White v. Ockey*,
  2006 WL 2323093 (D. Utah Aug. 9, 2006) ...........................................................12

*Wilkow v. Forbes, Inc.*,
  2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001)....................22

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*,
  450 F.3d 1132 (10th Cir. 2006) ...........................................................4, 24, 28

**Statutes**

Cal. C.C.P. § 425.16 ...........................................................1, 27, 30

Cal. Civ. Code § 47(d) ...........................................................21, 22

Utah Code Ann. § 45-2-3(4) ...........................................................22

Utah Code Ann. § 78B-25-102 ...........................................................27

Utah Code Ann. § 78B-25-107 ...........................................................28

Utah Code Ann. § 78B-25-110 ...........................................................27

APP 00043

## RELIEF SOUGHT

Defendants move to dismiss the First Amended Complaint ("FAC") with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) because it fails to state a cause of action as a matter of law, and to strike the FAC pursuant to the California Anti-SLAPP Act, Cal. C.C.P. § 425.16, or alternatively, the Uniform Public Expression Protection Act, Utah Code Ann. § 78B-25-101, *et seq.* (the "Anti-SLAPP Acts"), and award attorneys' fees.

## INTRODUCTION

This case involves protected First Amendment speech on a matter of public concern. Defendant Katherine Kubler's documentary series, *The Program: Cons, Cults and Kidnapping* ("The Program" or the "Series"), describes the first-hand experiences of Ms. Kubler and others who were interned in facilities for "troubled teens" that were part of a network known as the "World Wide Association of Specialty Programs and Schools" ("WWASP"). WWASP was founded, owned and operated by Plaintiff Narvin Lichfield's brother. Plaintiff, a prominent figure in the controversial "troubled teen industry", who admits he ran WWASP programs, filed this lawsuit to punish and censor Ms. Kubler from telling her story and expressing her opinions. His claims fail as a matter of law. The Series provides exactly the kind of perspective on contentious subjects that is protected by constitutional free speech guarantees.

The Series, which streams on Netflix, is a memoir and a documentary; haunted by her experience at one of the WWASP facilities, the "Academy at Ivy Ridge" in New York, Ms. Kubler sets out to (1) explain the troubled teen industry; (2) explore others' experiences at WWASP facilities; and (3) identify the individuals who ran and profited from the WWASP institutions. The Series details Ms. Kubler's investigative findings and presents her critiques and opinions that these programs are abusive and ruined lives. The Series also shows that Ms. Kubler's opinions are shared by others—including state and federal officials, experts, and other victims who as adults are now speaking out.

Under both Utah law and the First Amendment, the Series' recitation of Kubler's and others' experiences, and generalized criticism of WWASP, cannot be the basis of a defamation claim by Plaintiff. For this and multiple independent reasons, Plaintiff's claims fail as a matter of law.

## STANDARD ON RULE 12(B)(6) MOTION AND MATERIALS CONSIDERED

The Court begins by considering the well-pleaded facts, to decide "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Conclusory allegations must be disregarded (*id*. at 678–679), and the Court need not "take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009). Instead, the First Amendment requires the Court to conduct "a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation without 'indulging inferences in favor of the nonmoving party.'" *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1233 (D. Utah 2018) (Parrish, J.) (citations omitted).

The court will "ordinarily examine . . . documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." *Kennedy v. Peele*, 552 F. App'x 787, 792 (10th Cir. 2014) (citations omitted). Defendants request the Court take judicial notice of material incorporated into the FAC—including the entirety of the three-part Series. *See* Request for Judicial Notice and exhibits.[1] Any allegations that contradict such materials need not be taken as true. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict such a properly considered document are not well-pleaded facts").

---

[1] This joint motion to dismiss and strike does not require the Court to go outside what is appropriate for review on a Rule 12(b)(6) motion; and since the Complaint fails to state a claim under Rule 12(b)(6), Defendants also are entitled to relief on the motion to strike as a matter of law. Defendants submit herewith the Declaration of Katherine Kubler solely to support their additional argument on the Motion to Strike that Plaintiff could never plausibly plead a false statement of fact (given his admissions and the public record), or actual malice (given Ms. Kubler's extensive research and personal experiences). The Court need not reach these additional arguments if it finds Plaintiff failed to state a claim under Rule 12(b)(6).

2

APP 00045

## FACTUAL BACKGROUND

### A.    The Series and Documentarian Katherine Kubler

*The Program: Cons, Cults and Kidnapping* was released on Netflix on March 5, 2024. (FAC ¶ 71.) The three-part docuseries explores Ms. Kubler's and other survivors' experiences at the behavior modification center for teens in upstate New York called The Academy at Ivy Ridge ("Ivy Ridge"), and unravels the tangled web of the "troubled teen industry". (Series, Exs. 1A–1C). The Series also discusses the now-defunct organization known as WWASP, which was a major player in the industry. (*Id.*)

In 2004, as a sophomore in high school, Ms. Kubler was sent to Ivy Ridge. (Ex. 1A, Episode 1 at 6:55–7:35.) In Ms. Kubler's experience at Ivy Ridge, students were forced to follow draconian rules and were not allowed to conduct basic activities, such as, go outside, talk to each other, look out the window, make eye contact, or even smile. (*Id.* at 8:05–8:55, 12:45–14:50.) Students were assigned points and levels depending on their behavior, and could only exit the program by accumulating enough points (and by not losing points for supposed infractions). (*Id.* at 15:12–16:16.) Ms. Kubler spent 15 months at Ivy Ridge and was traumatized by her experience. (*Id.* at 46:45.)

Episode 1 of the Series focuses on Ms. Kubler's experience at Ivy Ridge and the experiences of other survivors. Episode 2 focuses on the seminars at Ivy Ridge and other tactics the program used to keep teens enrolled. Plaintiff Lichfield is not mentioned in the first two episodes. In Episode 3, which focuses on WWASP and the troubled teen industry more broadly, Ms. Kubler explores who was profiting from the various WWASP programs and the connections between facilities, including facilities with which Plaintiff was involved. (FAC ¶ 9.)

APP 00046

The Series was produced in California, where the creation, editing and pre- and post-production took place (Kubler Decl. ¶¶ 40–43), and where, at the time the Series was published, all Defendants resided. (FAC ¶¶ 2–3).

**B.    WWASP: The Lichfield Family Business**

As has been widely reported, during its operation, WWASP was "an association of residential treatment programs for troubled and at-risk teenagers." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1135 (10th Cir. 2006) ("*Pure, Inc.*") (Ex. 19.) It did "not own or operate schools; rather, it market[ed] its members' schools to parents who might be interested in them." *Id*. WWASP was formed in Utah in 1997 by three trustees—Robert B. Lichfield (Plaintiff's brother (FAC ¶ 77e)), Brent M. Facer and J. Ralph Atkin. (Ex. 17, WWASP Articles of Incorporation.)

As was well known, Ivy Ridge was one of WWASP's member programs. (Ex. 2, Letta Tayler, *Too-Tough Love?; Authorities raid academy; owner investigated over mistreatment*, Newsday, May 25, 2003.) In 2005, Ivy Ridge was fined by the New York Attorney General for falsely marketing to parents that it awarded accredited high school diplomas when it had no such accreditation and was handing out fake diplomas. (Ex. 16, Assurance of Discontinuance.) WWASP also faced widespread allegations of abuse at its member programs. As the Tenth Circuit noted:

> Around this time, television programs and print articles were describing abuse and neglect at [WWASP] schools. For example, the news magazine 48 Hours reported a child's allegation that he had been handcuffed for two consecutive days and had his mouth covered in duct tape. The Miami Herald ran an article describing a mother's report that her teenager came home from a [WWASP] school with ringworm scars and chemical burns. Forbes Magazine reported that children were punched, kicked, thrown, and forced to sit on cement floors for twelve hours at a time. The teenager quoted in the article also claimed that students who tried to flee from such punishment were locked in a small cell for days.

*Pure, Inc.*, 450 F.3d at 1135–36. WWASP dissolved operations in 2016. (Ex. 18, Articles of Dissolution.)

4

### C.  Plaintiff's Career in the Controversial Troubled Teen Industry with WWASP

Plaintiff concedes that he has been "involved in operating programs for troubled youth for over thirty-two (32) years" (FAC ¶¶ 8, 55.); he has had an "association with WWASP" as a "franchisee"; and that his "programs had to pay dues to WWASP for membership." (*Id.* ¶ 44.) Plaintiff also admits his involvement in the "staffing, supervision, or directing of . . . youth program(s)" (*id.* ¶ 27) working with more than 36,000 teens (*id.* ¶ 55).

Earlier this year, Plaintiff appeared on several episodes of the podcast "Trapped in Treatment," to discuss his career in the troubled teen industry. Plaintiff freely admits he began his career in the troubled teen business working for the marketing arm of his brother's troubled teen enterprise. (Ex. 15A, Trapped in Treatment Episode 3 at 15:33–18:54; *see also* Defs. Judicial Notice, and cases cited.)

In the early 2000s, Plaintiff moved on to owning and operating his own WWASP facilities. He opened his first facility, Carolina Springs Academy, in South Carolina as a "franchisee" of his brother Robert's enterprise. (FAC ¶ 44; Ex. 15B, Trapped in Treatment Episode 10 at 5:47–7:59.) He later opened Dundee Ranch Academy in Costa Rica.  (Ex. 2, Tayler.)

In May 2003, Plaintiff was arrested in Costa Rica when Dundee Ranch was raided by Costa Rican authorities investigating abuse. (FAC ¶¶ 61–63; Ex. 3, *School owner arrested in abuse case*, Tampa Bay Times, May 24, 2003; Ex. 4, Tim Weiner, *U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home*, The New York Times, May 27, 2003.)

### D.  Plaintiff's Public Figure Status

For nearly the entirety of his career, Plaintiff has publicly promoted his work with WWASP and has defended the centers against allegations of abuse. After he was arrested in Costa Rica, Plaintiff gave Inside Edition an interview and tour of the Dundee Ranch facility. (Ex. 14, Inside Edition; *see also* Ex. 1C, Episode 3 of the Series at 25:00–25:05.) He further defended himself and

APP 00048

Dundee Ranch in the media, claiming that "there was no abuse at all at Academy Dundee. We never held any kids there against their will. I was like Uncle Buck to those kids." (Ex. 5, James Varney, *Tough love school sent to timeout; Academy's doors closed indefinitely*, Times-Picayune, June 25, 2003.)

Plaintiff called his "high impact" behavioral modification methods—which reportedly included "tactics such as making students walk 100 miles around a track under the hot Pacific sun to earn their 'freedom,' or forcing them to spend up to five days in 'solitary confinement' as punishment for looking out of the window during a lesson"—"no different from any boarding school in England." (Ex. 6, Adam Williams, *Costa Rica government closes controversial 'tough love' youth camp*, The Tico Times, March 22, 2011; *see also* Ex. 7, Tim Rogers, *'Tough Love' Teen Facility Under Fire*,' The Tico Times, October 25, 2002). According to Plaintiff, following his 2003 arrest, he was "the poster child of abuse". (Ex. 15B, Trapped in Treatment Episode 10 at 21:33–22:18.)

A few months after his May 2003 arrest, it was reported that Plaintiff was ordered by the South Carolina Department of Social Services to stay away from his program in South Carolina, Carolina Springs Academy, pending the Costa Rican charges. (Ex. 8, Toby Hayes, *Utah-based school owner banned; Campuses in S.C., elsewhere cited with abuse*, Deseret News, July 6, 2003; Ex. 13, Maia Szalavitz, *Help at Any Cost*, at p. 145; Ex. 9, Tim Rogers, *Owner: Dundee Will Return*, The Tico Times, July 11, 2003.) Plaintiff called it a "witch hunt".  (Ex. 10, Tim Smith, *Youth home president says he's target of 'witch hunt*,' The Greenville News, August 22, 2003.)

Plaintiff admits that he has "a bit of a persecution complex," noting that "after everybody starts shooting at you, you learn to duck your head." (Ex. 11, Kirk Brown, *School of Troubles: Another chance for abandoned boarding school*, Independent Mail, December 10, 2010.) When Plaintiff later opened a new facility in South Carolina, he used an "alias" he called his "stage name"

6

APP 00049

"Nate Browning" because his "name has been destroyed on the Internet." (Ex. 12, Kirk Brown, *Second-chance school in Abbeville County*, Anderson Independent-Mail, May 4, 2014.)

Plaintiff continues to defend his controversial methods, despite the blowback it has caused him personally. (Ex. 15B, Trapped in Treatment Episode 10 at 10:51–11:57.) In his interview on a podcast earlier this year, Plaintiff admitted that "I rarely look up myself on the internet, you know, because I already know what's there." (*Id*. at 23:07–23:23.)

### E.    This Lawsuit

Plaintiff alleges five causes of action against Netflix and Ms. Kubler: (1) defamation per se; (2) defamation; (3) false light invasion of privacy; (4) intentional infliction of emotional distress; (5) injunctive relief; and (5) civil conspiracy. (ECF No. 5, FAC.) The FAC contains pages upon pages about matters not relevant to Plaintiff, and at the end, recites five statements on which Plaintiff actually bases his claims. *See* FAC, *passim* and, *e.g*., ¶¶ 77 (a)–(e).

## ARGUMENT

### I.    PLAINTIFF'S CLAIMED DEFAMATIONS ARE NOT ACTIONABLE FOR MULTIPLE REASONS.

"[T]o state a claim for defamation" plaintiff must show that defendants published statements "*concerning him*, that the statements were *false, defamatory, and not subject to any privilege*, that the statements were published with the requisite *degree of fault*, and that their publication resulted in damage." *West v. Thomson Newsp.*, 872 P.2d 999, 1007–08 (Utah 1994) (emphasis added). Plaintiff's FAC fails as a matter of law on all counts.

*First*, many of the allegedly defamatory statements are not actionable because they are not about Plaintiff. Several challenged statements are from Episodes 1 and 2, which never even mention Plaintiff. Statements that are not about Plaintiff (*e.g*., that are about WWASP generally) are not actionable because "to state a claim for defamation," Plaintiff must show that Defendants' statements were "*concerning him*" specifically. *West*, 872 P.2d at 1007 (emphasis added).

7

*Second*, a number of challenged statements are not actual statements from the Series. Plaintiff cannot state claims based on his own interpretation of the Series. The FAC is rife with invented statements that simply do not appear in the Series.

*Third*, even for those statements from the Series that do exist and were about Plaintiff, they also fail as a matter of law. To the extent statements in the Series connect him with WWASP programs, that connection is true by his own admission, and cannot be the basis of any claim. (*See e.g.* FAC ¶¶ 77c, e.) Certain of the statements—*e.g*., about Plaintiff having "gotten away with this for so long . . . the children he abused, the parents he conned, all the crimes he's gotten away with" (FAC ¶ 77a); and "people in the 'higher ups' '[seem to] get away with murder'" (FAC ¶ 77b)— constitute non-actionable opinions and hyperbolic expressions. Likewise, the statements relating to Plaintiff's Costa Rica arrest—which Plaintiff exaggerates in his FAC—are true, and also protected by the fair report privilege. (FAC ¶ 77d.) And all of these statements are also not actionable because Plaintiff is a public figure on this controversial topic and must prove the fault standard of actual malice, which Plaintiff does not (and cannot) even plead.

A.    **Plaintiff's Generalized Complaints About the Series Are Not "Of and Concerning" Him.**

As a threshold matter, much of the Complaint is devoted to disputing the Series' searing first-person point of view about the harm caused by WWASP and other "troubled teen" programs. For example, the FAC challenges:

- scenes and statements from the Series that generally comment on WWASP, Ivy Ridge, or the business of for-profit schools for troubled teens (*see, e.g.,* FAC ¶¶ 36–37, 40–41, 50–60); and

- the Series' criticism of "youth programs" *generally*. *Id.* ¶ 59 (asserting that the Series' "claims about the youth programs . . . defamed the youth programs and Narvin by association").

None of these criticisms are actionable because they do not specifically concern Plaintiff. It is axiomatic that "to state a claim for defamation," plaintiff must show that defendants'

APP 00051

statements were "*concerning him*" specifically. *West*, 872 P.2d at 1007 (emphasis added).[2] This is

not just a rule of state law, but "derives directly and ultimately from the First Amendment." *Blatty*

*v. N.Y. Times Co.*, 42 Cal.3d 1033, 1042 (1986) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966)

and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256, 262 (1964)).[3] Plaintiff is "required to show

*specific reference*" to him. *Id.* The reason is clear: "[T]he absence of the 'of and concerning'

requirement 'could invite any number of vexatious lawsuits and seriously interfere with public

discussion of issues, or groups, which are in the public eye. . . . Such suits would be especially

damaging to the media, and could result in the public receiving less information about topics of

general concern.'" *Id.* at 1044. That public policy exists precisely for lawsuits like this one.

Under the First Amendment, Plaintiff cannot ask the court, in the guise of a defamation

claim, to silence the viewpoints of Ms. Kubler and other youths who feel strongly that their lives

were ruined by WWASP "youth programs". Plaintiff's attempt to use defamation law to muzzle

and rewrite Ms. Kubler's story is manifest in his claim that the Series "conflated Kubler's personal

family issues and poor academic performance before attending the program with alleged 'abuse'

at the program" in order to "defame Narvin and others she targeted." (FAC ¶ 60.)

Furthermore, even if these statements were "of and concerning" Plaintiff, the Series'

criticism of these programs generally (as challenged by Plaintiff throughout the FAC, *see supra*)

would still be constitutionally protected as opinion. Much of what is depicted is simply historical

truth—*e.g.*, instances of physical abuse, captured on video—and the first person accounts of Ms.

---

[2] *Nunes,* 299 F. Supp. 3d at 1233–34 (plaintiff "must show that [the] defendant[ ] published . . . statements concerning him [or her]", statements that only "indirectly concerned Nunes" were not actionable); *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1305–06 (D. Utah 2022) (rejecting conclusory argument that plaintiff was "the intended subject" of statement that summarized harm to industry; "[t]his is insufficient to show the statement plausibly referred especially to" plaintiff).

[3] Given the constitutional mandate of the First Amendment, *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1104 (10th Cir. 2017), the body of federal and state case law throughout the country applying it to state defamation law claims is instructive.

APP 00052

Kubler and other survivors. Plaintiff may disagree with Ms. Kubler's belief that these programs abuse children, and with her use of pointed language to express that view, but the First Amendment and Utah Constitution protect Ms. Kubler's right to tell her story in her own words. "'Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability" under the Utah Constitution and First Amendment. This is especially true in this case, because "this protection is even more pronounced in matters of public concern.'" *Keisel v. Westbrook*, 2023 UT App 163 ¶ 36 (quoting *West*, 872 P.2d at 1013–15). *See infra*, Section I.C.

The Series is exactly the kind of perspective on controversial subjects that constitutional free speech guarantees: "When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers [her] personal perspective about some of its ambiguities and disputed facts, [her] statements should generally be protected by the First Amendment"; otherwise, "figures closely involved in a public controversy, or others whose perspectives might be of interest to the public" would be denied a voice, and "the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered." *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995).

**B.    Plaintiff's Allegations About Statements That Were Never Made Also Fail.**

Plaintiff claims the Series states that he "exercised direct control" in youth programs (FAC ¶ 77c)—namely, Ivy Ridge—in which he had no "actual executive control over the staffing and day-to-day operation." (*Id.* ¶¶ 13, 32.)  But the Series never says that Plaintiff operated Ivy Ridge, or staffed or supervised Ivy Ridge. He professes in lawyerly fashion that he was never "involved in the staffing, supervision, or directing of a youth program that was formally and judicially found to involve child abuse as defined by any legal standard while he acted in such a role." (*Id.* ¶ 27.) But again, the Series doesn't say he was.

10

APP 00053

As for those programs that *were* identified as supervised by Plaintiff—in Costa Rica and South Carolina—the Series does not state what Plaintiff claims it does in his allegations. (FAC ¶ 77c.) Nor does the Series go beyond the truthful public record fact that the Costa Rica facility was raided and he was arrested. *See* discussion *infra*, Section I.C.2. Plaintiff does not plead (nor could he) that he was not involved with either of those programs.

Another statement Plaintiff makes up is that he was "a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." (FAC ¶ 77e.) Again, the Series says no such thing. *Robert*, not Narvin Lichfield, is presented as the WWASP mastermind; the Series highlights how Robert set up the whole web of WWASP entities and profited from them. (Ex. 1C, Episode 3 at 17:30–18:00 (repeating Robert Lichfield's name in connection with WWASP's formation a number of times and describing Robert as "Founder and Owner"); *id*. at 35:20–35:40 (referring to Robert as "the guy who created it all").)

### C. Any Statements That Were Actually Made About Plaintiff Are Not Actionable Under the First Amendment and Utah Law.

Plaintiff's challenges to statements that are actually about him also fail for three independent reasons.

#### 1. Plaintiff's Admitted Involvement with WWASP Defeats Any Claim of Material Falsity—Which He Fails to Plead.

To begin, a plaintiff "must shoulder the burden in his case-in-chief of proving the *falsity* of a challenged statement if he is a public figure or the statement involves a matter of public concern." *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1107 (10th Cir. 2017) (citation omitted); *see Phila. Newsp., Inc. v. Hepps*, 475 U.S. 767, 775 (1986). Here, there is no question the Series is a matter of public concern, and Plaintiff is a limited purpose public figure. Thus, to meet his burden, "plaintiff must show the statement is not only false, but 'materially false,'" that is, "likely to cause reasonable people to think 'significantly less favorably' about the

11

APP 00054

plaintiff than they would if they knew the truth." *Brokers' Choice*, 861 F.3d at 1107 (affirming dismissal, citations omitted); *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified'" (citation omitted)).

Here, Plaintiff complains that the Series misstates his involvement with WWASP (*e.g.,* FAC ¶¶ 77c, e), yet concedes that the "gist" of comments about him are substantially true, and fails to allege facts proving material falsity. The FAC not only fails to provide allegations specific to falsity but omits direct assertions of underlying falsity for many purportedly defamatory statements. "[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (affirming dismissal).[4]

Plainly put, Plaintiff *does not and could not challenge the truth of statements about his role in and links to WWASP*. Plaintiff *admits* that he has been "involved in operating programs for troubled youth for over thirty-two (32) years" (FAC ¶ 8); that this is his "career" (*id.* ¶ 55); and that it has been spent in the Lichfield family business—WWASP. *See id.* ¶ 14 (referring to "youth programs Narvin and his family were associated with"). Plaintiff further admits that he and the programs he ran were associated with WWASP and he profited from that association as a "franchisee" to whom WWASP referred clients. *See id.* ¶¶ 43–44. The gist of what the Series says is no different:  that Plaintiff was associated with the WWASP network of "youth programs" and made money from them. *See Friedman v. Kennard*, 248 F. App'x 918, 921 (10th Cir. 2007) (dismissal proper where plaintiff's "own pleading tend[ed] to defeat his claim"); *Martineau v.*

---

[4]  *See, e.g., Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1185 (10th Cir. 2016) (affirming dismissal of defamation claim where plaintiff failed to allege facts supporting falsity); *White v. Ockey*, 2006 WL 2323093, at *4 (D. Utah Aug. 9, 2006) ("Plaintiff failed to plead that the statements were false. Therefore, Plaintiff's defamation claim must be dismissed").

APP 00055

*Currutt*, 2022 WL 180735, at *5 (D. Utah Jan. 19, 2022) (Parrish, J.) (complaint's "contradictory factual assertions render [plaintiff's] defamation per se claim inherently implausible"); *see also Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 146 (D.D.C. 2017) (where Plaintiff "does not deny" and there is "readily available, judicially noticeable information" that he "openly associates himself with [an entity like WWASP]," for Defendants "to do the same cannot be defamatory") (dismissing complaint).

Nor is it false (much less materially so) to say that "Narvin used profits from WWASP and affiliated programs to pay for an expensive home in St. George, Utah, along with other expensive assets." (FAC ¶ 45.) Again, Plaintiff admits his programs were affiliated with WWASP, that his career and business was running those programs, and he *does not plead* (because he cannot) that he did not buy homes and other assets with money from his business.[5]

In more hairsplitting, Plaintiff asserts that he was a WWASP "franchisee" who did not technically share in WWASP corporate profits (*id.* ¶ 44), but the Series doesn't make that claim, and even if it did, that would not establish material falsity as a matter of law. *See Bustos v. A&E Television Net.*, 646 F.3d 762, 764, 765, 767 (10th Cir. 2007) (Gorsuch, J.) (holding that reference to plaintiff as "member" rather than "affiliate" of prison gang was not a material falsehood).[6]

---

[5] That's not defamatory in any event. *Cf. LifeVantage Corporation v. Domingo,* 2016 WL 4705540, at *7 (D. Utah Sept. 8, 2016) (Parrish, J.) ("[M]erely calling a person selfish or self-serving in his or her business dealings, without more, cannot be defamatory.").

[6] *See also Vowell v. Gannett Sat. Info. Net.*, 2017 WL 499942, at *1-3 (D. Utah Feb. 7, 2017) (dismissing claim alleging that by incorrectly labeling plaintiff a "defendant" in FTC case, article "effectively characterized him as an alleged scam artist who stole millions of dollars," where "the truth is that he was allegedly helping an alleged scam artist" hide funds; there is "little material difference between the reputational harm"); *Eliott v. Lions Gate Ent'mnt*, 639 F. Supp. 3d 1012, 1026 (S.D. Cal. 2022) (noting that the "only explicit statements made about Plaintiff" in docuseries about NXIVM group "assert that he was a NXIVM recruiter and instructor. These cannot be defamatory because they are true").

13

In sum, the gist of the core factual assertion relating to Plaintiff is that he was associated with WWASP and made money from controversial WWASP programs that faced allegations of abuse, including by his own son, and were shut down.  That gist is unassailably true.

### 2.     Ms. Kubler's Comments About Plaintiff "Getting Away" Without Accountability Are Non-Actionable Expressions of Her Opinion.

Other challenged statements—for example, Ms. Kubler's emotional and figurative expressions about "all the crimes" Plaintiff has "gotten away with" and that he "got away with murder" (FAC ¶ 77a, b)—are nonactionable as a matter of law for multiple reasons. These statements not only lack defamatory meaning in the context of the Series, but also are subjective expressions of opinion, conjectural hyperbole, and conclusions drawn from disclosed facts that are protected under Utah law and the First Amendment.

### a.     Context is Key

"[D]efamatory meaning is a matter of context. . . . If the context makes clear a reasonable reader would not accept the statements at face value, the statements do not cause damage to the plaintiff's reputation and are therefore not defamatory." *Hogan v. Winder*, 762 F. 3d 1096, 1106 (10th Cir. 2014) (citing *Mast v. Overson*, 971 P.2d 928, 933 (Utah Ct. App. 1998)); *West*, 872 P.2d at 1009–10 (explaining that a statement in context of a "traditional source of harsh political invective" is "less likely" to be read as defamatory).

Likewise, in determining as a matter of law whether a statement is protected opinion, Utah courts consider the "totality of the circumstances," including: "(i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears." *West*,

14

APP 00057

872 P.2d at 1018 (citing *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)).[7]

Regarding the last two factors—the general "context and the broader setting in which the statements were made,"—"'[s]ome types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Id.* at 1019–20 (citation omitted). Here, a review of the Series as a whole shows it is a personal story with a strong point of view, and the broad context and general tenor of the Series signals opinion. "Where the tone of a piece is 'pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage,' readers are notified 'to expect speculation and personal judgment.'" *Peterson v. Grisham*, 2008 WL 4363653, at *3 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir. 2010) (citation omitted).

In addition, the "common meaning and usage" of the language at issue also supports non-actionability here: "[l]oose, figurative [and] hyperbolic" language supports the conclusion that the statement is opinion and constitutionally protected. *Milkovich v. Lorain Jour.*, 497 U.S. 1, 21 (1990). "Even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. . . ." *Peterson*, 2008 WL 4363653, at *3 (citing *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002)).

### b.    The Challenged Statements Are Protected Opinion and Hyperbole

*First*, Plaintiff alleges as defamatory a segment where "Kubler claims Plaintiff had 'gotten away with this for so long'" and that "it was surreal to see Plaintiff in person '[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with'". (FAC ¶ 77a.) This is textbook non-actionable opinion and hyperbole.

---

[7] Under the First Amendment, federal courts have also taken a contextual approach, considering "(1) the phrasing of the allegedly defamatory statement; (2) the context in which the statement appears; (3) the medium through which it is disseminated; and (4) the circumstances surrounding its publication." *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv. Servs.*, 175 F. 3d 848, 853 (10th Cir. 1999).

15

APP 00058

In this segment, Ms. Kubler is commenting, in the general context and setting of a story told candidly from her point of view and based on facts previously disclosed and discussed, that Plaintiff has escaped accountability for the harm the WWASP programs have caused. Ms. Kubler's comments identify no specific "crime"; the term is clearly being used in a loose and figurative sense. Hyperbolic statements expressing a speaker's subjective beliefs are not actionable even if they appear to accuse the plaintiff of crimes. *See Milkovich*, 497 U.S. at 16–17 (citing *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86 (1974) ("traitor" used "in a loose, figurative sense" and was "merely rhetorical hyperbole"); *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 24 (while "'crooks' can carry a criminal connotation, in the context of Defendants' online review" it "is clearly not being used in this manner" and "was no more than rhetorical hyperbole") (citation omitted); *Nunes*, 299 F. Supp. 3d at 1231–32 (comments that plaintiff needed to consult a lawyer about accusations of harassment "did not make factual assertions of specific criminal conduct" and was "no more than rhetorical hyperbole").[8]

As the Series points out, these programs are *not* illegal, and have been allowed by an ineffectual legal and regulatory system to continue operating, with those who profit never being held accountable. It is Ms. Kubler's constitutionally unassailable opinion that youth programs like Ivy Ridge, that are part of the WWASP network, abused children and duped parents, and *should be* outlawed—based on what *she experienced*, as described and depicted in the Series. As here, "when an author outlines the facts available to [her], thus making it clear that the challenged statements

---

[8] Likewise non-actionable are "namecalling" statements like "great name for a villain"; "family of secrets"; "punchline"; "wildcard"; and Plaintiff's son Nathaniel's descriptions of him ("a man with two faces"; "dark side") (FAC ¶¶ 16, 28, 29, 43). *See Westmont Residential*, 2014 UT App 291, at ¶ 24 ("rhetorical hyperbole, including 'juvenile name-calling,' . . . is not defamatory because it cannot 'reasonably [be] interpreted as stating actual facts'"; affirming dismissal) (citation omitted); *Partington*, 56 F.3d at 1160 (describing plaintiff attorney as "[a] steer[] being led to the slaughterhouse" is "precisely the type of rhetorical flourish that the First Amendment protects"); *Chau v. Lewis*, 935 F. Supp. 2d 644, 660–61 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) ("[E]pithets such as 'sucker', 'fool', and 'frontman' . . . represent precisely the type of hyperbolic language that lacks precise meaning and is incapable of being proven true or false").

16

APP 00059

represent [her] own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment" as non-actionable opinion. *Partington*, 56 F.3d at 1156-57; *Jefferson Cty. Sch. Dist.*, 175 F.3d at 853–54; *see also Keisel*, 2023 UT App 163 ¶ 64 (if facts underlying an expressed opinion "are publicly known or disclosed, the opinion, justified or unjustified, is privileged as a matter of law," because listeners "will understand they are getting the author's interpretation" and are "unlikely to construe the statement as insinuating the existence of additional, undisclosed defamatory facts") (citation omitted).

As the Series also relates, Plaintiff ran two of these programs (as a WWASP "franchisee") and did marketing for WWASP (Ex. 1C, Episode 3 at 29:34–30:36); it is Ms. Kubler's protected opinion that WWASP abused children and conned parents and, based on these disclosed facts about Plaintiff's involvement with WWASP, that he likewise "abused" children and "conned" their parents. *See, e.g., Partington*, 56 F.3d at 1156–57. Ms. Kubler's "opinions about the legal significance of [Plaintiff's] actions, even opinions that are questionable, are not actionable as defamation." *Nunes*, 299 F. Supp. 3d at 1232; *Chau*, 935 F. Supp. 2d at 660–61 (statements that plaintiff investment manager "played the role" of a "crook[ ] or moron[ ]", and that he "[didn't] give a [f——] about the investors" was "pure opinion that does not imply that it is premised on any undisclosed set of facts" and "merely represents [author's] own thesis of the origins of the financial crisis").

Further, Ms. Kubler's comments are made in the *specific context* of a segment where she describes her feelings and emotional reaction to seeing Plaintiff in the flesh at a Karaoke event, after having researched and read about him for so long.[9] In context, viewers would understand the

---

[9] Plaintiff's bare bones allegation that the Series invaded his "privacy by secretly filming him at a private karaoke event" to "further harass and defame him by portraying him in a false light" (FAC ¶ 34) cannot be the basis for a claim. Not only is this statement conclusory, but Plaintiff does not deny that it is true footage of him. A defamation claim cannot be premised on the use of true footage. *See, e.g., Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 564 (S.D. Tex. 2022) ("Because CNN reported what Dr.

17

APP 00060

comments to be a visceral expression of her subjective viewpoint. *See, e.g., Hogan*, 2012 WL 4356326, at *9 (in context of bitter dispute, statement that plaintiff was "accused of extortion in court documents that were unsealed" did not reasonably convey that he was "criminally charged"); *Davidson v. Baird*, 2019 UT App 8, ¶ 32 (statement that plaintiff "destroyed" town "is obviously intended to express [defendant's] 'subjective belief and amounts to rhetorical hyperbole'" (citation omitted)). Particularly where—as here—the storyteller was personally involved in the controversial story, viewers fully expect that he or she is biased, and "language which generally might be considered as statements of fact may well assume the character of opinion." *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1401–03 (1999).

In *Rinsley v. Brandt,* 700 F.2d 1304, 1306 (10th Cir. 1983), defendant's book "bitterly criticize[d]" plaintiff psychiatrist's "abuse of power in institutionalizing and treating mental health patients," including as an example an adolescent patient that plaintiff kept in seclusion, physically restrained, and "God knows what other cruelties he calls treatment." The patient ultimately died. "Stating that he is overwhelmed by 'anger and rage at the unbelievable arrogance of this man's methods,' [author] asks, 'What does it take to put a stop to such a man? How many more children must die?'" *Id.* at 1306–07. The Tenth Circuit found this and similar passages were "severe criticisms of Rinsley and his methods. But they are exactly that—exaggerated expressions of criticism. They are the type of statement that our society, interested in free and heated debate about matters of social concern, has chosen to protect." *Id.* at 1308. Again, the same is true here.

*Second*, Plaintiff complains that the Series "[p]resent[s] Plaintiff as a murderer by saying people in the 'higher ups' '[*seem to*] get away with murder' while showing Plaintiff's picture next to a news article about a murder at a youth program". (FAC ¶ 77b; *see also id.* ¶¶ 11, 24; Ex. 1C,

---

Immanuel had said, primarily using her own words and videos, the reports that she had said what she said are not materially false and cannot be the basis of a claim for defamation.").

18

APP 00061

Episode 3 at 00:00:19 – 00:00:33 for actual language.) The news clipping to which Plaintiff refers

is fleetingly shown as part of a larger bulletin board that is filled with news clippings, photos, and

other material; the headline of the clipping that happened to be next to Plaintiff's photo (he is not

identified) refers to a teen having died in a "Program" involving "Therapy Hikes". (*Id.*) The

clipping does not refer to "murder" and the Series makes no other reference to Plaintiff being

involved in any "murder," or any program involving "Therapy Hikes." *Id.*

Moreover, the hyperbolic, idiomatic expression "seem to get away with murder" belies any

factual accusation of an actual murder. As the Tenth Circuit explained, "[w]e all know of colloquial

or hyperbolic uses" of phrases like "extortion"—or here, "get away with murder"—and it does not

"always refer[] to a crime or similarly heinous conduct. Like with other words, context matters."

*Hogan,* 762 F. 3d at 1107–08 (affirming dismissal).[10]

That is precisely what the court held in *CACI Premier Technology, Inc. v. Rhodes*, 536

F.3d 280 (4th Cir. 2008). There, a government contractor that provided interrogation services in

Iraq sued a talk radio show's host based on "several statements," including that plaintiff's

employees "could kill without being held to account": "So for those people that just want to kill

for the sake of killing . . . call CACI and Titan, especially if you want to torture people, and never

have to come under the long arm of the law. I mean, *that's how you get away with murder.*" *Id.* at

300–01 (emphasis added). The court held that the host "was using hyperbole and exaggeration to

make the point, which was well supported by her sources . . ., that current laws are ineffective in

---

[10] And here, the prefatory words "seem to"—which Plaintiff omits in his FAC—further signal that what follows is opinion. *See Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) ("[T]he word 'basically' preceding the phrase 'undermine democratic movements' is a red flag that [speaker] is using 'loose' or 'hyperbolic' language.").

APP 00062

regulating military contractors operating abroad," and this could not "support[] a claim for defamation by CACI." *Id.* at 302 (affirming dismissal on summary judgment).

*Third*, Plaintiff also complains about statements of Ms. Kubler's opinion or hyperbolic expressions elsewhere in the Series. For instance, Plaintiff argues that the Series "makes several claims of specific criminal activities that the youth programs Narvin was associated with committed or facilitated, with Defendants claiming 'kidnapping' was one such activity." (FAC ¶ 19.) The Series does not use the term "kidnapping" in connection with Plaintiff or the programs he ran; it is not of and concerning him. *See* Section I.A, *supra*. Even if it was, it is not actionable because it is either (a) like "extortion" and "blackmail," an expression of opinion based on disclosed facts, namely Ms. Kubler's own personal experiences disclosed in the Series (Ex. 1A, Episode 1 at 7:05–7:35) or (b) if it is a statement of fact it is not "false," *see Anderson v. Cramlet*, 789 F.2d 840, 844–45 (10th Cir. 1986) (that plaintiff was wrongly labeled a "kidnapper" instead of having violated a custody order was not material falsehood); *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) ("blackmail" used in "a loose, figurative sense"). Indeed, as Plaintiff acknowledges, some people involved in the transportation to teens to WWASP programs describe this process as "kidnapping." (FAC ¶ 19 n.6.)

Again, through the Series, Kubler and other teens are now speaking out as adults on their treatment in these programs. They are entitled to their "severe" opinions and criticisms, which are an important part of the "free and heated debate about matters of social concern" that this country "has chosen to protect." *Rinsley,* 700 F.2d at 1308.

> **3. The Series' Accurate Report of the Investigation of Plaintiff's Costa Rica Facility and His Arrest Is Non-Actionable and Privileged.**

As one of his purported claims, Plaintiff argues that the Series "[p]resent[s] an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred

APP 00063

and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest." (FAC ¶ 77d; *see also id.* ¶¶ 61–63.)

*First*, the claimed defamation simply does not exist. The Series does not assert that Plaintiff was "convicted," much less specify that he was convicted for a crime of child abuse. The Series only states that "Dundee was only open for 19 months before authorities were alerted to abuse, raided the facility and Narvin was arrested." (Ex. 1C, Episode 3 at 30:36–30:42.)

*Second*, no claim will lie for the truthful report that Plaintiff was arrested. Plaintiff *admits* he was arrested, but asserts that the charges were eventually dropped (FAC ¶ 63). The statement is not just substantially but *literally* true, and it is not rendered "false" because it doesn't include additional information favorable to Plaintiff.

> [T]he omission of additional favorable information from an otherwise true publication does not render a statement materially false. '[T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light.'

*Brokers' Choice*, 861 F.3d at 1108 (citations omitted); *Global Relief Found. v. N.Y. Times Co.,* 390 F.3d 973 (7th Cir. 2004) (reports, gist of which were that plaintiff was being investigated by federal government, held substantially true). [11]

*Third*, the truthful report of Plaintiff's arrest also is subject to the privilege for fair reports of official proceedings.  As to this privilege, under the doctrine of "dépeçage," California's Civil Code Section 47(d) applies because the Defendants and their work on the Series were based in California (FAC ¶¶ 2–3), where the Series was created, edited, produced and published. (Kubler

---

[11]  *See also Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015) (reporting that plaintiff arrested on drug charges was true, even when prosecution declined to press charges and arrest was therefore in effect expunged); *Casper v. Washington Post Co.*, 549 F. Supp. 376, 378 (E.D. Pa. 1982) (omitting that officers were acquitted of criminal charges did not make story about their police brutality actionable defamation).

APP 00064

Decl. ¶¶ 40–43.)[12] California's privilege is absolute and protects publications or broadcasts containing "a fair and true report" of, *inter alia*, "(A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof," and is broadly construed in the interest of protecting a free press. Cal. Civ. Code § 47(d).

As "absolute privilege," Section 47(d) is limited only by the media's responsibility to "ensur[e] that the 'gist or sting'" of the report is "accurately conveyed" and "this responsibility carries with it a certain amount of literary license." *Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226, 242 (1999). Because the privilege is absolute, it "does not require the reporter to resolve the merits of the charges, *nor does it require that he present the [plaintiff's] version of the facts." Dorsey v. Nat'l Enquirer,* 973 F.2d 1431, 1436 (9th Cir. 1992) (emphasis added). Thus, *Paterno v. Superior Court* rejected plaintiff's argument that it could avoid the privilege because defendant did not "place [the] legal proceeding in 'context' by including what [plaintiff] considers are the 'key facts.'" 163 Cal. App. 4th 1342, 1355 (2008); *Smith v. Press Democrat*, 2011 WL 5006463, at \*5 (N.D. Cal. 2011) ("[T]he fair and true report privilege does not require the Press Democrat to have presented plaintiff's side of her story"). Nor can Plaintiff evade the privilege by claiming Defendants are "biased" against him. *McClatchy Newsp. v. Superior Court*, 189 Cal.

---

[12] There is a "true conflict" of laws regarding the Utah and California fair report privileges:  while Utah's privilege requires that the publication be made "without malice," Utah Code Ann. § 45-2-3(4), California's fair report privilege, Cal. Civ. Code § 47(d), is "absolute" and is *not* defeasible by malice. *See, e.g., Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1082 (S.D. Cal. 2021). Under the doctrine of "dépeçage," whether a statement is defamatory is "distinct from the issue of whether that statement is privileged," *Diamond Ranch Academy, Inc. v. Filer*, 117 F. Supp. 3d 1313, 1322 (D. Utah 2015) (citation omitted), and privileges "meant to protect speakers"—including specifically fair report—are governed by the law of speaker's domicile.  *Wilkow v. Forbes, Inc.,* 2000 WL 631344, at \*7 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001). California's interest "in fixing the scope of a privilege applicable to conduct taking place within its borders is paramount," and the policy reflected in its fair report privilege "would be wholly eviscerated" if it was "evaluated under another state's privilege laws." *Id.; accord Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176–78 (2d Cir. 2021); *Goguen v. NYP Holdings, Inc.*, 544 P. 3d 868, 881 (Mont. 2024) (all holding that issue of fair report privilege was governed by law of speaker's domicile).

APP 00065

App. 3d 961, 971 (1987) ("allegations of conspiracy" between newspaper and source of official information "do not pierce the protective shield embodied in the statute").

### D. Plaintiff's Claims Also Should Be Dismissed Because He Does Not—and Could Not—Plead Actual Malice.

In addition to all of the foregoing grounds for dismissal, under the First Amendment a limited purpose public figure like Plaintiff may recover only on clear and convincing proof of "actual malice"—that Defendants purposely published known falsehoods, or in fact subjectively entertained serious doubts as to the truth of the statements at issue prior to publication. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). This standard, designed to provide the "breathing space" needed to ensure robust reporting on public figures and events, *id.* at 271–72, is "famously 'daunting,'" *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024) (citations omitted), and at the "motion-to-dismiss stage," courts may "peer down the road towards a plaintiff's eventual evidentiary burden to deduce whether he plausibly alleged the types of facts that can, if proven, satisfy" that burden. *Id.*

***Plaintiff is a Limited Purpose Public Figure.*** "The level of protection that a statement receives, under principles of free speech and expression, depends upon the identity of the plaintiff alleging defamation." *Davidson*, 2019 UT App 8, ¶ 37. And "'those who by choice or mishap acquire the status of a public official or public figure surrender a sizeable measure of their right to recover damages from those who defame them,' in the form of facing a heavier burden to demonstrate that defamation occurred." *Id.* (quoting *O'Connor v. Burningham*, 2007 UT 58, ¶ 8).

Plaintiff's legal conclusion that he "is neither a public figure nor a quasi-public figure requiring 'actual malice'" (FAC ¶ 102) is incorrect. "There are two ways an individual can be considered a public figure": (1) where the individual is "a public figure for all purposes" by virtue of their "general fame or notoriety"; and (2) if an individual "intentionally sought or obtained a position of influence" as to "a particular public controversy", in which case they are a "limited purpose public figure" ("LPPF"). *Davidson,* at ¶¶ 37–39 (citations omitted).

23

APP 00066

To determine whether an individual is a LPPF, Utah courts first "isolate the specific public controversy related to the defamatory remarks." *Pure, Inc.*, 450 F.3d at 1137. As the courts have squarely found, "it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers." *Id.*; *accord Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, at *6, *17 (D. Utah Feb. 17, 2016) ("a public debate . . . is clearly occurring" regarding "private for-profit teen rehabilitation programs").

The Court then determines whether plaintiff inserted himself into that controversy "in order to influence the resolution of the issues involved." 450 F.3d at 1137. Here, by both Plaintiff's own words and actions, Plaintiff inserted himself into this public controversy. *See* Factual Background, Section D. As in *Pure, Inc.*, "the record includes numerous news accounts about the public debate" and that Plaintiff has taken "an active role in this debate by both promoting" his programs and defending those "that are marred by scandal." 450 F.3d at 1137. Unsurprisingly, his arrest and closure of his Costa Rica facility in particular was covered extensively in the press and was the basis for investigation of his South Carolina facility. (Ex. 8, Hayes; Ex. 10, Smith.) Since the beginning of his career, Plaintiff has been publicly associated with WWASP and the troubled teen industry in news reports (Exs. 2-12), a leading book on the subject (Ex. 13), and in other media (Ex. 14), and he continues to speak freely about his involvement to this day. (Ex. 15A-15B.)

***Plaintiff Does Not and Cannot Plead Actual Malice.*** Dismissal is in order because Plaintiff expressly abjures responsibility to properly plead actual malice (FAC ¶ 102), and he *cannot* do so for the simple reason there is no false statement of fact: the statements challenged by Plaintiff are all either substantially true or protected opinion that could not be "false" facts. *Brokers' Choice*, 861 F.3d at 1106 ("by requiring proof that the defendant published with knowledge or reckless disregard that the statement was false," actual malice "also requires proof that the statement was false").

24

APP 00067

Even if Plaintiff could identify a purported false statement of fact as to him, the actual malice

standard requires him to show that Defendants published it with "a high degree of awareness of

probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Here, Plaintiff has not alleged

(and could not plausibly allege) that Defendants subjectively had serious doubts as to the truth of the

publication. "Courts of appeals have recently dismissed defamation cases for failure to sufficiently

plead actual malice under the more robust Rule 12(b)(6) standard articulated by the Supreme Court

in *Iqbal*" and "where the allegations were conclusory and lacked plausibility." *Biro v. Conde Nast,*

963 F. Supp. 2d 255, 279–80 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) (citing cases).

Plaintiff's allegation that "Defendants published these statements with the requisite degree of

fault" (FAC ¶ 79) is entirely conclusory and inadequate, asserting "buzz words" without factual

support that "Defendants acted negligently and with reckless disregard for the truth"; had "no basis

for believing the statements true and failed to conduct a reasonable investigation"; "knew or had

reason to know that these statements were false". *Id.*[13] "This kind of conclusory allegation—a mere

recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected."

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377–78 (4th Cir. 2012)

(affirming dismissal); *Couch*, 105 F.4th at 432–33 (plaintiff alleged no "smoking-gun evidence" of

knowing falsity or "specific allegations of why [defendant] might have had "obvious reasons to doubt

the accuracy of" sources' accounts; affirming dismissal) (citations omitted).

## II.    PLAINTIFF'S REMAINING TORT CLAIMS ARE DUPLICATIVE OF HIS DEFAMATION CLAIM AND FAIL AS A MATTER OF LAW.

Plaintiff's remaining tort claims for false light invasion of privacy, intentional infliction of

emotional distress, and civil conspiracy are duplicative of his defamation claim, and fail for the same

---

[13] Of course, negligence and failure to investigate are precisely what actual malice is *not. See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

APP 00068

reasons. "A plaintiff may not attempt an end-run around First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims. . . . Rather, non-defamation torts based on speech must meet First Amendment requirements." *Keisel*, 2023 UT App 163, at ¶ 70 (tort claims for false light and emotional distress also failed because they were "based on the same statements at issue in the defamation claims") (citations omitted).

"Virtually any defamation claim may be recast as an action for false light invasion of privacy, and for that reason[,] false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims." *Id.* (citation omitted) Likewise, "where an emotional distress claim is based on the same facts as a claim for defamation, appropriate concern for the First Amendment rights of the parties must be considered." *Id.* (citation omitted); *Hustler Magazine v. Falwell*, 485 U.S. 46, 52–56 (1988). Similarly, here, all of Plaintiffs' remaining tort claims are premised on the same exact facts upon which they base their defamation claim.[14] All these claims, "based on the same statements at issue in the defamation claims," fail as a matter of law.

The emotional distress claim additionally fails because it requires Plaintiff to show Defendants' actions in creating and publishing the Series was for "the purpose of inflicting emotional distress" on Plaintiff and was "of such a nature as to be considered outrageous and intolerable" in civilized society. *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17, 30. Plaintiff's allegations as to Defendants' constitutionally protected speech do not begin to rise to the level of egregiousness required to support such a claim.[15]

---

[14] Plaintiff's false light claim also fabricates claims that the Series accuses him of "covering up rape and assault to protect abusers" and "participating in child trafficking". (FAC ¶ 105.) These statements, like many others he alleges, appear nowhere in the Series and cannot be the basis for a false light claim.

[15] *See, e.g., Porter v. Staples the Office Superstore*, 521 F. Supp. 3d 1154, 1161-62 (D. Utah 2021) (Parrish, J.) (dismissing emotional distress claim based on alleged "false and damning statements" as insufficiently "outrageous" as matter of law); *Davidson*, 2019 UT App 8, ¶ 59 ("While it is evident that the comments were critical, and perhaps even hurtful for them to endure, such speech, without more, is insufficient to constitute intentional infliction of emotional distress").

26

Finally, there can be no "civil conspiracy" without an underlying tort, *LifeVantage Corporation v. Domingo*, 2016 WL 4705540, at *8 (D. Utah Sept. 8, 2016) (Parrish, J.), and moreover, Plaintiff "fails to offer any factual allegations to support the claim," only "'unadorned, the-defendant-unlawfully-harmed-me-accusation[s].'" *D'Addabbo v. Smith*, 2018 WL 5779077, at *6 (D. Utah Sept. 13, 2018) (quoting *Iqbal*, 556 U.S. at 678) (dismissing conspiracy claim).

## III.    SINCE DISMISSAL IS IN ORDER AND THE CLAIMS ARE DIRECTED TO SPEECH ON A MATTER OF PUBLIC CONCERN, DEFENDANTS ALSO ARE ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS.

"Anti-SLAPP statutes, which have been enacted in many states (including California and Utah)," are "'designed to protect the defendant from having to litigate meritless claims aimed at chilling First Amendment expression.'" *Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, at *4 (D. Utah Feb. 17, 2016) (citation omitted). By invoking these statutes, a defendant can obtain early dismissal of meritless First Amendment-chilling litigation, and upon application, its reasonable attorneys' fees. *See* Cal. C.C.P. § 425.16(c)(1); Utah Code Ann. § 78B-25-110.[16]

The Court's first determination under the anti-SLAPP statutes is whether the plaintiff's claims arise out of "conduct in furtherance of the exercise of the . . . constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. C.C.P. § 425.16(b)(1), (e)(4); Utah Code Ann. § 78B-25-102 (statute applies to civil actions based on "exercise of the right of freedom of speech or of the press . . . on a matter of public concern"). The public interest

---

[16] Utah's new anti-SLAPP Act, the Uniform Public Expression Protection Act ("UPEPA") was adopted last year. As amended, Defendants do not believe it is any less speech-protective than California's anti-SLAPP Act—to the contrary, UPEPA's drafters relied on California's act and cases interpreting it throughout the comments on the statute. *See* Uniform Public Expression Protection Act, Nat'l Conf. of Comm'rs on Uniform State Laws (July 2020), *passim* ("UPEPA Report"). Defendants discuss both statutes herein. To the extent there was a "true conflict," California's act should apply under the *dépeçage* rule because where, as here, Defendants and their production work were based in California (FAC ¶¶ 2–3; Kubler Decl. ¶¶ 40–43), "California's strong interest in protecting its citizens' free speech activities," strongly favor applying CA's anti-SLAPP law. *Diamond Ranch Academy, Inc. v. Filer*, 117 F. Supp. 3d 1313, 1322–24 (D. Utah 2015).

APP 00070

requirement must be "construed broadly so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 23 (2007) (citation omitted).  There is no question the claims against the Series challenge speech on a matter of public interest.[17]

As such, the burden then shifts to Plaintiff to "establish, without the benefit of discovery, a probability that it will prevail on its claims." *Diamond Ranch,* 2016 WL 633351, at *4 (citing Cal. C.C.P. § 425.16(b)(2)); Utah Code Ann. § 78B-25-107(1)(c)(i). To establish a "reasonable probability" the plaintiff needs to "state[ ] and substantiate[ ] a legally sufficient claim." *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal.4th 728, 741 (2003). Plaintiff "cannot rely on allegations in the complaint, but must bring forth evidence that would be admissible at trial." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005); UPEPA Report, § 7 cmt. 4 ("prima-facie viability" under Utah Code Ann. § 78B-25-107(1)(c)(i) requires plaintiff to "produce evidence" to support causes of action).

When "an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). "[I]f Plaintiffs cannot plead a plausible cause of action under the FRCP 12(b)(6) standard, then Plaintiffs as a matter of law cannot meet the probability of success on the merits standard." *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1026 (N.D. Cal. 2017).  *See also* Utah Code Ann. § 78B-25-107(1) (case must be

---

[17] *See Diamond Ranch,* 2016 WL 633351, at *6 (use of "private for-profit teen rehabilitation programs" is "an issue of public interest") (citing, *e.g.,* U.S. GAO, Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth (Oct. 10, 2007); *Pure, Inc.*, 450 F.3d at 1137 ("[I]t is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers")).

APP 00071

dismissed if either plaintiff fails to establish a prima facie case or defendant establishes that plaintiff "failed to state a cause of action").

For the reasons set forth above, Plaintiff has not stated a plausible claim for relief under Rule 12(b)(6), and thus axiomatically flunks his anti-SLAPP law burden as a matter of law. *Id.* Defendants are therefore also entitled to relief under the Anti-SLAPP Acts. *See Resolute Forest*, 302 F. Supp. 3d at 1024 (even though motion to dismiss granted "this Court nonetheless addresses the motions to strike '[b]ecause the issue of attorneys' fees and costs is not rendered moot by a dismissal'") (quoting *Robinson v. Alameda Cnty.*, 875 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012)).

While the Court need not go further to dismiss the Complaint under 12(b)(6) and grant the motion to strike (and should do both), the Court can also find that Plaintiff could never make the necessary showing to meet his anti-SLAPP burden of substantiating with admissible evidence a prima facie case that he will probably succeed on his claims. Among other things, Plaintiff could never plausibly plead (much less substantiate with admissible evidence) that Defendants "subjectively" made any statement with a "high degree of awareness of its probable falsity". As reflected in the Kubler Declaration, given the public record regarding Plaintiff and his own admitted association with WWASP and the "troubled teen" industry, and the scope of research conducted by Ms. Kubler, including her own personal experience and first-person accounts of other students, former staff and public officials, and other footage and materials shown in the Series, no claim of actual malice could conceivably be substantiated. (*See* Kubler Decl. ¶¶ 15–24, 27–39.) As such, consistent with the strong public policy of both Utah's and California's anti-SLAPP acts, striking the Complaint and awarding fees in an action like this one, which seeks to punish constitutionally protected speech, is especially appropriate.

APP 00072

## CONCLUSION

Defendants respectfully request that Plaintiff's First Amended Complaint be dismissed with prejudice, and that this Court strike Plaintiff's Complaint pursuant to Cal. C.C.P. § 425.16, or alternatively, Utah Code Ann. § 78B-25-101, *et seq.*, and award Defendants their attorneys' fees in an amount to be determined.

Dated: August 30, 2024

David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
*david.tufts@dentons.com*
*ian.kinghorn@dentons.com*

Respectfully submitted,

*/s/ Natalie J. Spears*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

APP 00073

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 30, 2024, a true and correct copy of the foregoing

was served by CM/ECF on all counsel or parties of record on the service list.


*/s/ Natalie J. Spears*

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hoc vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L,<br><br>Defendants. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PURSUANT TO ANTI-SLAPP ACTS**<br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>Judge Jill N. Parrish |

APP 00075

Pursuant to DUCivR 7-1 and Fed. R. Evid. 201, Defendants Katherine Kubler and Netflix, Inc. (collectively, "Defendants"), by and through their undersigned counsel, request that the Court take judicial notice of certain exhibits in ruling on Defendants' Rule 12(b)(6) Motion to Dismiss and Special Motion to Strike First Amended Complaint Pursuant to Anti-SLAPP Acts (the "Motions").

Each of the exhibits Defendants request that the Court take judicial notice of are identified more specifically below. Defendants request that the Court take judicial notice of four categories of documents: (1) *The Program: Cons, Cults and Kidnapping*, which forms the basis of and is repeatedly referenced in the Amended Complaint; (2) news articles and other media pertaining to the controversy surrounding the troubled teen industry and Plaintiff's association therewith, including materials containing Plaintiff's public statements; (3) World Wide Association of Special Programs and School's ("WWASP") corporate filings with the Secretary of State, and (4) a published judicial opinion.

The Court may take judicial notice of each of the foregoing, and all the exhibits more specifically identified below, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201(b). "Judicial notice may be taken during any stage of the judicial proceeding, including on a motion to dismiss." *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192 (D.N.M. 2013); *see also Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir. 1997) (noting that "Federal Rule of Evidence 201 authorizes a federal court to take judicial notice of adjudicative facts at any stage of the proceedings," and affirming trial court's use of judicial notice in granting motion to dismiss). The exhibits are set forth in the Index below and attached hereto as Exhibits 1 – 19 (highlights in yellow or red outline added by counsel to aid the Court's review).

2

**Index of Exhibits**

| Exhibit | Document Description | Basis for Request |
|---|---|---|
| 1A – 1C (Submitted to the Court on a digital storage device) | *The Program: Cons, Cults and Kidnapping* | The Series is incorporated into the Amended Complaint by reference. *See*, *e.g.*, FAC ¶ 1 ("This is an action for defamation and false light invasion of privacy arising from knowingly false statements and attributions concerning . . . The Program: Cons, Cults, and Kidnapping.").[1] |
| 2 | Letta Taylor, *Too-Tough Love?; Authorities raid academy; owner investigated over mistreatment*, Newsday, May 25, 2003 | The Court may take judicial notice of news articles and other media establishing (a) the controversy surrounding the troubled teen industry and WWASP; and (b) Plaintiff's voluntary injunction into the controversy in order to determine Plaintiff's status as a limited purpose public figure.[2] |
| 3 | *School owner arrested in abuse case*, Tampa Bay Times, May 24, 2003 | The Court may take judicial notice of this news article to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |

---

[1] "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *see also Eliott v. Lions Gate Ent. Corp.*, 639 F. Supp. 3d 1012, 1021 (C.D. Cal. 2022) (taking judicial notice of docuseries where complaint "includes detailed descriptions of the scenes that give rise to Plaintiff's allegations").

[2] "In defamation cases, courts commonly take judicial notice of relevant publications to illustrate what 'was in the public realm at the time[.]'" *Eliott*, 639 F. Supp. 3d at 1022 (citation omitted); *see also Biro v. Conde Nast*, 963 F. Supp. 2d 255, 271 n.9 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) (courts "employ judicial notice in making determinations about whether plaintiffs are public figures at the motion to dismiss stage"); *Barbash v. STX Fin., LLC*, 2020 WL 6586155, at \*\*2, 5–6 (S.D.N.Y. Nov. 10, 2020) (taking judicial notice of Plaintiff's Vanity Fair interview and memoir to determine Plaintiff is limited purpose public figure).

District Courts within the Tenth Circuit and other Circuits regularly take notice of the contents of news articles or similar publications to determine whether a certain topic has been widely reported in the news. *See People for Pearce v. Oliver*, 2017 WL 5891763, at \*2 (D.N.M. Nov. 28, 2017) (taking judicial notice of the fact that certain "corruption scandals were widely and extensively reported in the news"); *Advocs. for Individuals with Disabilities, LLC v. MidFirst Bank*, 2018 WL 3545291, at \*7 (D. Ariz. July 24, 2018) ("The Court takes judicial notice that Strojnik gave numerous radio, television, and print media interviews . . .").

3

APP 00077

| 4 | Tim Weiner, *U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home*, The New York Times, May 27, 2003 | The Court may take judicial notice of this news article to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
|---|---|---|
| 5 | James Varney, *Tough love school sent to timeout; Academy's doors closed indefinitely*, Times-Picayune, June 25, 2003 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 6 | Adam Williams, *Costa Rica government closes controversial 'tough love' youth camp*, The Tico Times, March 22, 2011 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 7 | Tim Rogers, *'Tough Love' Teen Facility Under Fire,'* The Tico Times, October 25, 2002 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 8 | Toby Hayes, *Utah-based school owner banned; Campuses in S.C., elsewhere cited with abuse*, Deseret News, July 6, 2003 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 9 | Tim Rogers, *Owner: Dundee Will Return*, The Tico Times, July 11, 2003 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 10 | Tim Smith, *Youth home president says he's target of 'witch hunt,'* The Greenville News, August 22, 2003 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 11 | Kirk Brown, *School of Troubles: Another chance for abandoned boarding school*, Independent Mail, December 10, 2010 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |

APP 00078

| 12 | Kirk Brown, *Second-chance school in Abbeville County*, Anderson Independent-Mail, May 4, 2014 | The Court may take judicial notice of this news article, including Plaintiff's statements therein, to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
|---|---|---|
| 13 | Portions of Maia Szalavitz, *Help at Any Cost: How the Troubled Teen Industry Cons Parents and Hurts Kids* (Riverhead Books, 2006, 2020) | The Court may take judicial notice of this book to determine Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 14 (Submitted to the Court on a digital storage device) | Inside Edition Investigates Dundee Ranch Academy: A WWASP Program[3] | The Court may take judicial notice of the fact that Plaintiff's arrest was covered on Inside Edition and he gave an interview for purposes of determining Plaintiff's status as a limited purpose public figure. *See supra*, Exhibit 2. |
| 15A and 15B (Submitted to the Court on a digital storage device) | Trapped in Treatment Podcast Episodes 3 and 10, iHeart Media[4] | The Court may take judicial notice of the fact that Plaintiff made public statements admitting his association with WWASP and the troubled teen industry.[5] |
| 16 | Academy at Ivy Ridge Assurance of Discontinuance | The Court can take judicial notice of a government record.[6] |

---

[3] Available online at https://www.youtube.com/watch?v=KDr275R16LU.

[4] Available online at https://www.iheart.com/podcast/1119-trapped-in-treatment-91773544/.

[5] *See, e.g., Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) (taking judicial notice of fact that parties "made the statements attributed to them" in recorded interviews and articles, as they "can be accurately and readily determined" from a source "whose accuracy cannot reasonably be questioned"); *Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 140, 146 (D.D.C. 2017) (on motion to dismiss, taking judicial notice of "publicly available historical articles" for proposition that defamation plaintiff "openly associates himself with the Russian government"). The Court may also take judicial notice of Plaintiff's recorded public statements to determine his status as a limited purpose public figure. *See supra*, n.2.

[6] *See e.g., Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 867 n.10 (10th Cir. 2023) ("It is well-established that district courts may take judicial notice of, and consider, documents in the administrative record on a Rule 12(b)(6) motion to dismiss"; district court properly took judicial notice of Bureau of Land Management determination); *State ex rel. Balderas v. U.S. Nuclear Regul. Comm'n*, 59 F.4th 1112, 1120 & n.5 (10th Cir. 2023) (court may take judicial notice of environmental report "because

5

| 17 | World Wide Association of Special Programs and Schools Articles of Incorporation | The Court can take judicial notice of public records filed with the Secretary of State.[7] |
|---|---|---|
| 18 | World Wide Association of Special Programs and Schools Articles of Dissolution | The Court can take judicial notice of public records filed with the Secretary of State. *See supra,* Exhibit 17. |
| 19 | *World Wide Ass'n of Specialty Programs v. Pure,* Inc., 450 F.3d 1132 (10th Cir. 2006) | The Court can take judicial notice of the Tenth Circuit's opinion in determining whether a controversy exists surrounding WWASP and the troubled teen industry.[8] |

**CONCLUSION**

Based on the foregoing, Defendants request that the Court take judicial notice of the exhibits specified above.

---

it's publicly available on the Commission's website"); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) ("The contents of an administrative agency's publicly available files, after all, traditionally qualify for judicial notice, even when the truthfulness of the documents on file is another matter.").

[7] The Court may take judicial notice of "facts which are a matter of public record." *Tal v. Hogan*, 453 F.3d 1244, 1265 & n.24 (10th Cir. 2006) (public filings, including a 'Fictitious Name Certificate,'" properly considered on motion to dismiss); *see also JP Morgan Tr. Co. Nat. Ass'n v. Mid-Am. Pipeline Co.*, 413 F. Supp. 2d 1244, 1258 (D. Kan. 2006) (citing cases and explaining that "public documents filed with the secretary of state such as those at issue here generally satisfy the judicial notice standard and district courts routinely take judicial notice of such documents in resolving motions to dismiss").

[8] "[F]ederal courts may take notice of judicial proceedings in other courts if they have a direct relation to matters at issue." *Knox v. Sharp*, 818 F. App'x 817, 818 (10th Cir. 2020) (taking judicial notice of state appellate decision to show petitioner exhausted remedies) (quoting *Green v. Nottingham*, 90 F.3d 415, 418 (10th Cir. 1996) (taking judicial notice that plaintiff "had three actions or appeals in courts of the United States dismissed as frivolous or malicious")).

6

Dated: August 30, 2024

David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
*david.tufts@dentons.com*
*ian.kinghorn@dentons.com*

Respectfully submitted,

*/s/ Natalie J. Spears*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

7

APP 00081

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 30, 2024, I caused a copy of the foregoing to be filed and

served on counsel of record via the Court's electronic filing system.


/s/ Natalie J. Spears

APP 00082

(Conventionally Filed Appendix Exhibit, but referenced on Appendix as the Stamped Page No. herein; Defendants' Request for Judicial Notice Exhibits 1A - 1C)

# EXHIBITS 1A – 1C

EPISODES 1 – 3 OF "THE PROGRAM: CONS, CULTS AND KIDNAPPING"

SUBMITTED TO THE COURT ON A DIGITAL STORAGE DEVICE

APP 00084

# EXHIBIT 2

APP 00085

## *Too-Tough Love?;*
### *Authorities raid academy; owner investigated for mistreatment*

Newsday (New York)

May 25, 2003 Sunday

NASSAU AND SUFFOLK EDITION

Copyright 2003 Newsday LLC



**Section:** NEWS,

**Length:** 1553 words

**Byline:** By Letta Tayler. LATIN AMERICA CORRESPONDENT

## Body

Orotina, Costa Rica - Shortly after stealing her father's credit card for a **$2,500 shopping spree, high-school dropout Alexandra Slavis woke up before dawn in February to find strangers, a man and a woman, looming over her bed in Midwood, Brooklyn.**

"They said … 'You can go to jail or you can go to Costa Rica for a week's vacation,' " recalled Slavis, 17.

Slavis eagerly opted for the latter - but her escorts dropped her at Dundee Ranch Academy, a behavioral modification program for troubled U.S. teens whose regime was tougher than that of many New York jails.

**Like all newcomers to Dundee, which enrolled 200 youths ages 11 to 17 at a campus in the jungly hills of western Costa Rica, Slavis wasn't allowed to speak to her peers for more than 15 minutes a day, she said. She was barred from so much as glancing at a male student. She slept in a crowded dorm where the bunks were stacked three-high and most toilets were clogged. The cereal had weevils - "cornflakes con carne," staff members joked.**

Students who broke rules or complained said their punishments included essays of 12,000 words or more that they had to write before they could leave study hall,

even if it took two weeks. Some said they had to walk 500 times around the swimming pool in the hot sun or spend days standing or kneeling perfectly still, changing positions only every half-hour.

When Slavis rebelled, she said, staff members twice used a common Dundee tactic: they held her head to the floor, pulled her arms behind her back and yanked one hand toward her ear for two consecutive half-hour stretches.

"I started going crazy, screaming, 'I want to talk to my mom!' " Alexandra said of her first days at Dundee. The staff told her that before she could pick up the phone, she had to reach something they called Level 3 - a process that would take at least three months.

Costa Rican authorities raided the school Thursday and announced they were investigating its owner, Narvin Lichfield, for alleged physical and psychological mistreatment of students. Yesterday, Lichfield announced he was closing the academy.

The implosion of Dundee Ranch opens a window on the flourishing tough-love industry, which increasingly is creating programs for troubled U.S. teens in foreign countries where the dollar goes further and oversight often is far weaker. Dundee Ranch was part of a Utah-based network - the World Wide Association of Specialty Programs and Schools, or WWASP. Two other foreign WWASP schools shut down and a third dropped out of the association in recent years. WWASP still operates 10 schools in Mexico, Jamaica and the United States, including Ivy Ridge Academy, near Ogdensburg in upstate New York.

As Dundee students were flown home or to other WWASP schools, Lichfield yesterday denied wrongdoing. "I'm a sinner or a saint, depending on which side of the story you're on," he said.

WWASP president Ken Kay defended his programs as "character-building in a structured environment."

"We've helped approximately 15,000 families in crisis and have thousands of happy clients," Kay said.

APP 00086

Too-Tough Love?; Authorities raid academy; owner investigated for mistreatment

Although seven suits have been filed against WWASP affiliates, he noted none has been upheld.

The State Department, however, has warned parents to carefully monitor overseas behavior modification programs.

Thomas Burton, the California attorney who filed lawsuits against WWASP affiliates, called the programs "private prisons" that are "neither educational nor therapeutic," even though they typically cost $**30,000 a year.**

Using slick advertising and Internet sites, WWASP "preys on desperate parents" who often send their children without ever visiting the schools, Burton said. "If this were done to animals we'd have the activists out in full force saying, 'You don't treat animals this way.'"

Dundee's purpose "is not to help teens in crisis or their families. It is to make millions of dollars for the owner," wrote Amberly Knight, the academy's director for six months until August, in a January letter to Costa Rican authorities.

Knight wrote that the school for a time gave students unfiltered drinking water that she suspected was the cause of widespread intestinal problems. She said it lacked staff trained to deal with at-risk youths and improperly restrained students - in one case dislocating a teen's shoulder. It kept them far longer than necessary to rake in extra tuition payments, Knight wrote, and hushed up the rape of a female staff member by a colleague.

Despite allegations of abuse, dozens of students said last week that Dundee had changed them for the better.

"I'd be in a life of crime if I hadn't come here," said Slavis, noting that she was using drugs and rampaging against her parents before she came. She said she wanted to continue the program.

Slavis' parents, like many with children at Dundee, agreed. "My child was having a lot of problems," said Slavis' father, Scott, a surgeon. "Maybe she needed some tough love. I'm not happy about this kind of behavior modification but I'm not sure there's any other solution."

Students who complain are exaggerating the conditions in an effort to "manipulate" their parents, said several Dundee teens and staff members. "Everything is great here. It's paradise," said Peter Livak, a Dundee liaison between students and parents. He conceded that part of his job is to censor students' e-mail messages home.

Dundee's campus - papaya-colored buildings clustered gracefully around tropical gardens - suggests teens are in a country club. So do the student uniforms: starched white shirts with khaki slacks for boys or skirts for girls.

But in snippets of conversations that ended prematurely when supervisors pulled students away or simply stood nearby, youths described the school as a hell in which even laughter could take away the good-behavior points needed to win privileges and, ultimately, graduate.

Teens who have left Dundee spoke more freely.

"They made us watch torture movies," said Geoffrey Bock, 17, of Mandeville, La., who spent a year here with a twin brother until their mother removed them in October.

"A lot of it was POWs, like Chinese torture, and Holocaust stuff. I guess they were trying to show us how good we had it," Bock said. "Some of it was disgusting. But if you looked away from the screen for more than five seconds they took away points."

Kay said he didn't know if students watched torture movies but said schools might use "educational tapes that show some [historical] atrocities."

Bock spent time in the "Bat Cave" - a dorm so named because its walls hadn't been completed, allowing bats to fly in. He said he once had to spend 12 hours a day, for four days, kneeling on rocky ground with his hands behind his back, with breaks of only a few minutes at a time. His crime: putting on sneakers when he couldn't find one of his loafers.

Emily Ely, 13, of Fort Lauderdale, Fla., who left Dundee Friday, lost 28 pounds in three months because she wouldn't eat the weevil-filled cereal or the cold, lumpy rice.The showers usually were broken or so filthy that she bathed in a sink, she said.

When students asked for psychological counseling, the staff told them they didn't need it and forced them into ill-supervised group therapy sessions, Ely and other teens said. Schooling consisted of students teaching themselves with textbooks that often had missing pages, several teens said.

The program works, Ely said, but "only because you miss your parents, so you want to change so you can see them."

APP 00087

Too-Tough Love?; Authorities raid academy; owner investigated for mistreatment

"The program teaches these kids to be more angry and aggressive in the end," said Roderick S. Hall, a San Diego psychologist who has worked with WWASP alumni. "I think the kids end up shutting down. It's psychological torture."

Kay, the WWASP president, said the only torture being inflicted is by Costa Rican prosecutors, who marched into the school Tuesday and told the students they were free to go, and then left, setting off pandemonium. Dozens of students fled and staffers dragged them back.

Students went on a rampage that night and the school was forced to place dozens of them overnight in a walled compound on the campus, Lichfield said.

But several Dundee students said they'd been placed in the compound because they'd refused to sign papers saying they wanted to remain at the academy. Lichfield's attorney, Rafael Garcia, denied the allegations and said prosecutors had "terrorized" students into signing papers saying they wanted to leave.

As U.S. consular officials sort out children's documents and help them contact parents, Dundee staffers have loaded students onto buses to the airport for flights home. Some parents, like Ely's mother, Laurie Ely, didn't learn their children were headed back until getting collect calls from them at the San Jose airport.

"We blindly...believed what they told us," said Laurie Ely, who refinanced her home to send her daughter. But many other parents said the probes into Dundee hadn't shaken their faith. "I was very satisfied," said Slavis' mother, Mindy Slavis, a nurse who decided upon the WWASP programs after researching them on the Internet. "She loved it and I can prove it with her letters."

**Mindy Slavis said her daughter willingly agreed to go straight from Dundee to the Tranquility Bay program in Jamaica, the WWASP school with the harshest reputation. "We want her to continue on this good path," she said.**

week. 3) Al Dia Cover Newspaper Photo - / Jose Rivera - Allegations surround Dundee Ranch Academy. Its owner, Narvin Lichfield, before he was taken into custody by Costa Rican authorities last week.

**Load-Date:** May 25, 2003

---

**End of Document**

## Graphic

1) Newsday Photo/Letta Tayler - Alexandra Slavis 2) Al Dia /Mario Castillo - Costa Rican authorities detain Dundee Ranch Academy owner Narvin Lichfield last

APP 00088

# EXHIBIT 3

APP 00089

Menu    *Tampa Bay Times*    Subscribe

ADVERTISEMENT

ARCHIVE

# School owner arrested in abuse case

  

Published May 24, 2003 | Updated Sept. 1, 2005

The owner of an American behavior modification program in Costa Rica housing nearly 200 American youths was jailed Friday on a charge of depriving the children of their civil liberties.

The owner, Narvin Lichfield, was detained temporarily pending a judge's review of allegations brought by a local prosecutor. Those allegations include charges that children were held against their will and physically abused at the Academy at Dundee Ranch, in rural Costa Rica, said Adilia Caravaca, a Costa Rican lawyer representing the mother of a child at Dundee.

A 14-year-old California girl who fled the academy on Thursday and returned home with the help of U.S. Embassy officials said by telephone on Friday that Dundee Ranch staff members had beaten and physically restrained children who tried to leave the academy.

ADVERTISEMENT

The girl, whose mother insisted that her name be withheld, said staff members tried to make the students sign a contract saying things were fine, according to the New York Times. They were told they would be sent to Jamaica if they didn't sign the contract, the girl said.

Dundee Ranch and a similar behavior modification program in Jamaica, Tranquility Bay, are affiliated with a Utah organization, the World Wide Association of Specialty Programs and Schools, known as WWASPS.

About 30 children were sent from Costa Rica to Jamaica this week after child welfare officials visited Dundee Ranch on Tuesday and told youths there that they did not have to stay, officials said.

Costa Rican authorities said punishments at the academy included emotional abuse, isolation and physical restraints.

Narvin Lichfield is a brother of WWASPS' founder, Robert Lichfield. The association operates 11 behavior modification centers that house 2,200 youths, about half of them in Mexico, Costa Rica and Jamaica, and half in the United States _ in Utah, Montana, South Carolina and upstate New York.

Previous investigations have led to closings of WWASPS-affiliated programs in Mexico and the Czech Republic.



Donate

APP 00090

# EXHIBIT 4

**The New York Times**

https://www.nytimes.com/2003/05/27/world/us-youths-rebel-at-harsh-school-in-costa-rica-and-many-head-for-home.html

# U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home

**By Tim Weiner**

May 27, 2003

A torrent of teenage rage, hard and fast as the tropical rain on this Pacific coast, washed away the Academy at Dundee Ranch this weekend.

Dundee Ranch, the latest foreign outpost in a far-flung affiliation of behavior modification programs that promises to convert troubled American teenagers into straight arrows, lasted 19 months before the students rose up in revolt and overthrew their masters.

The rebellion erupted after Costa Rican officials visited the ranch -- an old hotel on a rutted red-dirt road -- and told the children of their rights after complaints about the program from a former director.

''They told us you have the right to speak, you have the right to speak to your parents, you have the right to leave if you feel you've been mistreated,'' said Hugh Maxwell, 17, of Rhode Island. ''Kids heard that and they started running for the door. There was elation, cheering and clapping and chaos. People were crying.''

APP 00092

Adults beat some of the children to quell the uprising, according to six people present. The academy's owner, Narvin Lichfield, was jailed for 30 hours, may face criminal charges and has been ordered by a judge to remain in Costa Rica. Four staff members feared by the children are being deported to Jamaica, government officials said. Most of the children are going home, many to an uncertain future.

About 30 youths still remain at the academy. Two of them, Sean McDevitt of North Carolina and David Saczawl of New Jersey, sat in the cafeteria and joked about a fitting sentence for Mr. Lichfield, should he be tried on human rights charges, as threatened by a local prosecutor.

''Four years here would be about right,'' said Sean, who has spent the past 11 months at the academy.

Dundee Ranch's base lay in the canyonlands of southern Utah, in a business called the World Wide Association of Specialty Programs and Schools, or Wwasps.

Wwasps, based in St. George, Utah, bills itself as the fastest-growing enterprise aimed at defiant and delinquent children. Some 2,200 children in 11 affiliated programs in the United States and abroad are charged between $30,000 to $50,000 in tuition and fees, generating yearly revenues of $60 million or more.

Wwasps disclaims ownership or direction of these affiliated programs. But Craig Barlow, a Utah State prosecutor who brought a child abuse charge against the director of one Wwasps-affiliated

school, says they are ''a lateral arabesque with no hub except for these connections in Utah.'' He cites a network of interlocking directorships based on blood and business ties.

Narvin Lichfield is a brother of Wwasps' founder. He started a Wwasps program in South Carolina, Carolina Springs Academy, then moved to Dundee Ranch, which opened in 2001.

Parents who sent their children to Wwasps-affiliated programs -- including Dundee Ranch; Casa by the Sea, in Ensenada, Mexico; and Tranquility Bay in St. Elizabeth, Jamaica -- suggest the programs meet a deep need. In many cases, a bitter divorce led to despair over a child who turned defiant. Schools, courts, and public health systems proved unable to cope.

Searching the Internet, parents found the Wwasps programs. A call to a toll-free number produced sales pitches, and offers of financial assistance helped to sell the programs, which are booming.

Dundee Ranch's enrollment increased 30 percent over the past year. According to students, as many as 15 children slept in a single room.

According to students, Narvin Lichfield was a fleeting if unforgettable presence.

Corey Martin, 17, who left Dundee Ranch in July, described Mr. Lichfield in a telephone interview last week as ''a used-car salesman.'' Hugh Maxwell said: ''There are people there who care about the kids. Narvin is not one of them. He's in it for the money.''

APP 00094

Students said Mr. Lichfield set up a system typical of Wwasps programs. Children were divided into six levels, the lower ones forbidden to speak freely or raise their eyes, the higher ones free to discipline and punish inferiors. A muscular cadre of minimum-wage staff members enforced the system. Communication between parents and children was barred or closely edited. Parents were told that complaints from children were manipulative lies.

Academy directors came and went. Amberly Knight held the job from March to August 2002. She resigned, and early in March this year wrote to the Costa Rican minister for child welfare, saying that ''Dundee Ranch Academy should not be allowed to operate because it is poorly managed, takes financial advantage of parents in crisis, and puts teens in physical and emotional risk.''

Two months later, Ms. Knight's complaint led to a confrontation. Representatives of Costa Rica's child-welfare agency -- known as PANI, its Spanish-language initials -- arrived at Dundee Ranch on May 20, backed by the police. Events were described by six witnesses, including Joel Snyder, 17, of Wisconsin, in an open letter to Dundee Ranch parents.

''When PANI told some kids they had the right to speak to their parents and the right to private mail or even not to be held in that country, kids ran for freedom,'' his account reads. Other children confirm that between 30 and 50 of them revolted, some fleeing on foot, heading for the hills or seeking a beachhead on the Pacific Ocean, 20 miles away.

APP 00095

Joel did not run. But he refused to sign a statement immediately produced by the Dundee Ranch staff saying he had been well treated. ''I was immediately forced into a High Impact facility,'' he wrote. He tried to leave, he wrote, and was beaten with a stick by the staff.

A 14-year-old girl at the academy, whose mother asked that her name be withheld, picked up the account.

''The police said those who wanted to leave could leave and we could talk to our parents,'' she said in an interview. ''The staff members tried to pull all the kids back to the dorms. It was chaotic. We were excited -- 'Oh my God, I'm going home.' We thought the school was going to shut down right there. Some of the kids started walking out.''

She said that staff members started kicking, hitting and choking children to stop them from leaving, and that the punishment continued for hours after the Costa Rican officials left. ''We wanted to talk to a higher power, the U.S. Embassy, but they would not let us,'' she said. Her mother, informed of the chaos through a parents' grapevine, reached the embassy, which sent a consular services officer, who helped reunite mother and daughter.

On Thursday afternoon, Mr. Lichfield regrouped. ''He called every kid into the cafeteria and said, 'Program's back in order. No one's leaving. Stop acting up,' and that lit a fire,'' Hugh Maxwell said. ''It was a full-fledged riot.''

Then, that night, ''Narvin got arrested and all hell broke loose,'' as one parent who was visiting at the time described the scene. Mr. Lichfield was detained on Thursday night on a local prosecutor's

complaints of physical and psychological abuse. The police seized the program's computers and files.

In Utah, Ken Kay, president of Wwasps, sought to calm parents and transfer children to Wwasps-affiliated programs inside and outside the United States. But over the weekend, even parents who passionately believe in the program found flights home for their children.

Mr. Kay kept working to persuade them to stay, saying in a weekend e-mail message -- a copy of which was made available by parents -- that programs in New York, Montana and Jamaica ''would be happy to work with your child.''

''I feel bad that you don't recognize that Narvin was trying to do what he could for your children,'' Mr. Kay wrote.

''I can't say the program did no good,'' said Dustin Sanow, 17, of Mississippi, ''but it's pretty traumatic. Parents have no idea what's going on. I feel they manipulated my folks.''

His mother, Anita Sanow, an Air Force major, did not find out that Dundee Ranch had collapsed until Sunday afternoon. ''I feel that people were less than honest with me about the program,'' she said. ''I feel they misrepresented things. I feel like the dollar mattered more than the kids.''

Dustin's friend Hugh Maxwell said: ''I support the program. It provides you with a chance to change. But it deprives you of so much, too. It's a last resort. It's desperation.''

APP 00097

A version of this article appears in print on , Section A, Page 6 of the National edition with the headline: U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home

# EXHIBIT 5

APP 00099

### *Tough love school sent to timeout;*
### *Academy's doors closed indefinitely*

Times-Picayune (New Orleans, LA)

June 25, 2003 Wednesday

Copyright 2003 The Times-Picayune Publishing Company

**Section:** NATIONAL; Pg. 1

**Length:** 1757 words

**Byline:** By James Varney; Staff Writer

## Body

OROTINA, COSTA RICA -- Now that the shouting from teenagers and police and prosecutors has faded, there is something almost pastoral about Academy Dundee, this hotel cum tough-love school near the sea.

Stone fountains gurgle among the hacienda-style buildings, the foliage is lush and green, and a brilliant sun burns on both the swimming pool and a pond with an elevated wooden walkway leading to a small island. In the cavernous dining center, some of the handful of remaining staffers eat with parrots perched on their shoulders.

But the story behind this snapshot is anything but serene. Academy Dundee never made it as the tourist spot its builder intended it to be, and it is closed not for the summer but possibly for good. The tumult began in October, when Carey Bock of Mandeville arrived and, accusing the behavior-modification program of being more brutal than beneficial, marched her twin sons out the door.

The saga grew even more bizarre at the end of May, when Costa Rican authorities invaded the campus, told the roughly 200 American teenagers enrolled there they did not have to stay, and arrested the school's owner and founder, Narvin Lichfield.

The echoes of that wild day, which Lichfield said included outdoor orgies and vandalism, are still reverberating. A criminal case is in motion against Lichfield, 41, in the nearby mountain town of Atenas, Costa Rica, an accusation of torture has been filed with the United Nations, and Dundee's supporters and critics are engaged in a battle concerning tactics at Dundee and at 10 other schools chartered by the World Wide Association of Specialty Programs, based in Utah. The brouhaha has thrust the company and its curriculum into an international spotlight.

All these developments come as no surprise to Bock.

"I think the closing of Dundee was inevitable," she said. "I believe the only reason that Dundee had remained open as long as they had was because they were operating under the radar of the Costa Rican regulatory agencies. The children at Dundee were subjected to cruel and inhumane treatment; there is no doubt about it."

Bock is not the only New Orleans-area parent in the fray, and not everyone shares her harsh view. In a recent letter to the Tico Times, a popular English-language weekly circulated in Costa Rica, Yvette Miller of Harvey said Academy Dundee had done wonders for her daughter.

"I am so happy with the school and what it has done for my child," she wrote, saying the girl had opened up in ways the mother never dreamed possible. "Dundee Ranch did this for her."

The hullabaloo has prompted both the U.S. Embassy and PANI, the local child welfare agency, to claim they were on top of the situation and had been raising red flags for months -- claims greeted with skepticism in some quarters.

"I think what we're witnessing here is a real cover-your-ass scenario," said Bruce Harris, the executive director of Casa Alianza, a children's advocacy group that last month asked the U.N. Committee on Torture to investigate Dundee.

Lichfield dismisses Casa Alianza as unqualified to pass judgment because Harris never visited Dundee or spoke with any of its staffers.

That criticism is a red herring in Harris' view. Though he conceded he hasn't seen the school personally, he said the group's complaint was made on the basis of at least three sworn statements from parents and children about what went on at Dundee, and the agency is trying to arrange for other former students to return to Costa Rica

APP 00100

Tough love school sent to timeout; Academy's doors closed indefinitely

and testify against Lichfield.

"The reports we've gotten from parents and kids relate what we regard to be cruel and unusual," Harris said, mentioning physical restraints on concrete floors, using food as coercion and lack of adequate health care. "They were breaking kids down, all right, but they weren't building them back up."

Lichfield, meanwhile, says it's his reputation that needs to be rebuilt. Barred from leaving Costa Rica for six months while the case is investigated, he is holed up in a San Jose hotel. He's no monster, he said, but rather the victim of a monstrous misunderstanding.

"As far as I'm concerned, Costa Rica came in here under spurious allegations and closed down a place that had operated without incident for two years," he said. "I know exactly what is abuse and what isn't, and there was no abuse at all at Academy Dundee. We never held any kids there against their will. I was like Uncle Buck to those kids."

Lichfield, who spent 24 hours in custody following his arrest, said he is unaware of any ongoing criminal investigation of him or his school and hopes to reopen for business within two months.

But that may be overly optimistic. Prosecutors confirmed there is an ongoing probe of activities at the school, but no date for proceedings has been set. Meanwhile, both sides are busy gathering depositions, statements known in Costa Rican law as "anticipated evidence."

"Tough-love" or "behavior-modification" programs such as Academy Dundee -- Lichfield is an owner or part-owner of similar establishments in New York state and South Carolina -- are controversial by their nature. With tuition and costs topping $2,000 a month, they're designed for troubled teenagers and make no bones about the rigors they impose on them. No one denies, for instance, that physical restraints were a part of the Dundee experience.

"But if it sounds like it was hurting people, it's not like that at all," said Antonio Cespedes, 16, a Costa Rican who essentially has been managing the school since it was shut down. "It was used only to calm people down." Cespedes credits the school with saving his life after he turned to drugs two years ago.

Dundee is not the only school chartered by the World Wide Association of Specialty Programs that is in the hot seat. In the past few years, a girl committed suicide at the Jamaica school, and authorities in both Mexico

and Czechoslovakia filed criminal charges against the couple who ran WWASP schools in those countries.

WWASP officials say most of the complaints against them come from manipulative teenagers who are proven liars, a retort that Harris and Bock dismiss as evasive.

In Dundee's case, some of the most stinging criticisms were made not by students but by a former director, Amberly Knight. Now living in Michigan, Knight wrote a detailed letter to PANI in March outlining what she said were scandalous conditions at the school, including severe overcrowding in triple-bunks; dubious medical care that included prescribing drugs without parental knowledge, double-charging for doctor visits and the like; and widespread reliance on physical punishment and restraint.

Both Ken Kay, the head of WWASP in Utah, and Lichfield have been scathing in their denunciation of Knight, whom they describe, variously, as a disgruntled former employee and a woman spurned romantically by Joe Atkin, Dundee's acting director at the time Bock appeared.

Knight insists she never meant her letter to PANI to be made public and acknowledges it may have violated the terms of a nondisclosure agreement she signed with Lichfield, but she stands by her accusations, she said, and considers Lichfield's and Kay's assaults on her character as a base smear.

"Lichfield did not care, and the children could not complain to outside authorities," she said. "The children were imprisoned in deplorable conditions that we would not tolerate for adult, death row inmates in America. The parents were manipulated and misled by this organization."

Some authorities said Knight's letter triggered PANI's investigation, but officials give different starting dates for the probe. Indeed, all the dates and claims made by groups are confused. For example, last October the U.S. embassy said it had made eight visits to the school since 2001, and that it forwarded concerns to PANI, but none of those concerns appears to have generated a response.

Whatever its starting date, the investigation's pulse quickened May 20 with the arrival at Dundee of Prosecutor Fernando Vargas and an entourage of police and PANI officials. The authorities told the roughly 200 teenagers there that, according to Costa Rican law, no

APP 00101

one could compel them to stay at Dundee and they were free to do as they pleased. Pandemonium ensued, with some kids vandalizing cars and property and others engaging in group sex around the pool, witnesses said.

"We had police officers with years of experience telling us it was the most grotesque, pornographic thing they've ever seen," Lichfield said.

Some three dozen students bolted. Though most returned by the end of the day, a handful wound up in PANI shelters. Vargas and his team slapped Dundee with citations for 15 violations of Costa Rican law, ranging from sanitation issues to staffers working without proper permits or students with expired visas. In addition, Costa Rica insisted that Dundee register itself with the Ministry of Education, something Lichfield says he was told he did not have to do when he opened his doors. With the school effectively shut down until those problems are sorted out, Lichfield said his staff worked with parents to fly students back to the states or to other WWASP schools in Mexico or Jamaica. More than two dozen of those students are reportedly enrolled at Tranquility Bay in Jamaica, which is widely regarded as the toughest WWASP institution.

Since then, another prosecutor has taken over the case from Vargas, who was substituting at the time for a prosecutor on vacation. Court officers declined to comment on the case, but the chaotic and confusing nature of the investigation has led to some finger-pointing behind the scenes. Last week, the government announced it had appointed an "ombudsman" to review the actions not only of the prosecutors and PANI, but also of the Ministries of Health and of Education.

Lichfield freely acknowledges he was not registered with any of those agencies. Though that appears to support Bock's contention the school deliberately flew under radar, Lichfield said Dundee was no secret to the government. In the past, he said, some PANI officials had dropped by Dundee and there were no problems. Had they been willing to discuss the matter, rather than appear in force on the campus, he said he would have rectified any alleged violations.

"I've got $2 million invested down here in Dundee, and do you think I'd let that all go down the drain because of some ticky-tack complaints that I could easily fix?" he said.

. . . . . . .

James Varney can be reached at *jvarney@timespicayune.com* or by international call to (506) 282-9246.

**Load-Date:** June 25, 2003

---

**End of Document**

APP 00102

# EXHIBIT 6

APP 00103

## *Costa Rica government closes controviersial 'tough love' youth camp*

The Tico Times (San Jose, Costa Rica)

March 22, 2011 Tuesday

Copyright 2011 The Tico Times

Distributed by McClatchy-Tribune Business News

**Section:** STATE AND REGIONAL NEWS

**Length:** 683 words

**Byline:** Adam Williams, The Tico Times, San Jose, Costa Rica

## Body

March 22--For the second time in the past nine years a behavior modification center run by the Utah-based World Wide Association of Specialty Programs (WWASP) was closed in Costa Rica for alleged psychological and physical mistreatment of residents.

Last Friday, the Child Welfare Office (PANI) closed the center, known as Teen Mentor, which advertises therapeutic and psychological services to 21 U.S. teenagers aged 13 to 18. Parents had placed the troubled teens in the facility to address behavioral issues and problems with substance abuse.

PANI closed the center after receiving complaints that the student residents were being subjected to physical and mental abuse from the supervisors of the program. Three PANI psychologists visited the facility to interview the students when they were alerted to the allegedly abusive conditions at the center, the daily La Nacion reported.

The organization's website, which has since been disabled, offered behavior modification services for a monthly fee. The residents had been staying at the Hotel Carara in the town of Tarcoles de Garabito, in Puntarenas, west of San Jose near the Pacific Ocean.

"They rented the entire hotel for several months," said a hotel employee who asked that his name be withheld. "The boys were downstairs, the girls were upstairs. As far as abuse or things like that, we usually only saw the kids during pool time and don't really know what went on when they went to the beach or outside. When I came to work on Friday, PANI was here and by that night everyone was gone."

Robert Walter Lichfield, the founder of the WWASP program, registered Teen Mentor as an official business in the national registry in August 2010. In the last 16 years, 15 behavioral facilities operated by WWASP have been closed due to similar allegations by child welfare organizations in the U.S. and other countries.

In 2002, Narvin Lichfield, Robert's brother, was director of the Dundee Ranch Academy in the town of Hidalgo, Orotina, west of San Jose. A Tico Times investigation that year found that many of the students who attended the academy accused Dundee staff of physical and psychological abuse. In an interview with The Tico Times in 2002, Narvin explained his "high impact" behavioral modification methods, which included tactics such as making students walk 100 miles around a track under the hot Pacific sun to earn their "freedom," or forcing them to spend up to five days in "solitary confinement" as punishment for looking out of the window during a lesson.

"I am sure 'High Impact' will be mistaken as jail, there is no doubt about it," he told The Tico Times in 2002. "But this is no different from any boarding school in England" (TT, Oct. 25, 2002).

In 2003, PANI raided the Dundee Ranch facility after a U.S. woman living in Costa Rica, Susan Flowers, reported to PANI that her daughter was being held against her will at the academy. The raid resulted in a student riot and 35 teens escaped from the site (TT, May 23, 2003).

After the raid, Narvin Lichfield was briefly arrested and charged with detaining minors against their will, coercion and international rights violations. When the case finally went to trial in early 2007, judges declared Lichfield innocent for lack of evidence (TT, Feb. 23, 2007). Judges did say they believed students' rights had been violated at the Dundee Ranch, but prosecutors had failed to prove it.

"We're happy that the law and the system actually works," Lichfield told The Tico Times after the trial in Alajuela, west of San Jose. He added that he was "very unhappy that things that have never been proven" and that judges used "hearsay" to affirm that abuse occurred

at the camp.

For more on this story, see the March 25 print edition of The Tico Times.

To see more of The Tico Times or to subscribe to the newspaper, go to *http://www.ticotimes.net/*. Copyright (c) 2011, The Tico Times, San Jose, Costa Rica Distributed by McClatchy-Tribune Information Services. For more information about the content services offered by McClatchy-Tribune Information Services (MCT), visit *www.mctinfoservices.com*.

**Load-Date:** March 23, 2011

**End of Document**

APP 00105

# EXHIBIT 7

APP 00106

# THE TICO

### CENTRAL AMERICA'S LEADING ENGLISH-LANGUAGE NEWSPAPER

Member of the Inter-American Press Association

VOL. XLVI  N° 1694 — 40 pages        San José, Costa Rica, Friday,  October 25, 2002        ₡350

LIBROS CENTROAMERICANOS ***AUTO**X3-DIGIT 923
PO BOX 5298
REDLANDS CA  92373-0751
166

## 'Tough Love' Teen Facility Under Fire

BY TIM ROGERS
Tico Times Staff

**HIDALGO, Orotina** – Secluded on a remote 40-acre campus accessible by dirt road and surrounded only by cattle farms, the controversial Dundee Ranch Academy – home to 155 troubled teenagers, mostly from the U.S. – is about to take its "tough-love" philosophy to new extremes.

The year-old behavior-modification program, the newest affiliate of the Utah-based WorldWide Association of Specialty Programs (WWASP), is already under fire by opponents who claim the facility is run more like a prison camp than a boarding school.

One distraught mother – aided by hired muscle from the U.S. – went so far last week as to lead a commando-like raid on the academy to liberate her twin sons and whisk them back to Louisiana. She claims her 16-year-old boys, who were put in the program by her ex-husband, were subject to

**(Page 13)**



Tico Times/Julio Lainez

FINISHING TOUCHES: Narvin Lichfield, owner of Dundee Ranch Academy, and wife Flora Alvarado show off "High-Impact" behavior modification compound under construction in controversial facility for troubled teens; kids assigned to compound will have to walk 100 miles around perimeter track to win their freedom.

## Authorities Clarify Probe

BY DAVID BODDIGER
Special to The Tico Times

**FOR** the first time since Costa Rican businessman Luis Enrique Villalobos on Oct. 12 unexpectedly closed the doors to his money exchange and "personal loan" businesses, authorities are speaking out, hoping to clear up the recent circulation of wild rumors and speculation among Villalobos clients, without jeopardizing the ongoing investigation into Villalobos' business dealings.

Villalobos' 20-year-old unregulated loan business – known worldwide as "The Brothers" – paid "friends" sky-high compounded monthly interest rates of 2.8-

3% on minimum investments of $10,000. Many of his mostly foreign clients lived off their interest payments, which until Oct. 12 Villalobos had never failed to pay.

Sandra Castro, spokeswoman for Prosecutor Walter Espinoza – lead investigator in the Villalobos case – reaffirmed on Thursday that numerous Villalobos business accounts remain frozen while authorities investigate the legality and source of money circulated by the loan operation.

Although the initial freeze was sparked by an investigation launched by Canadian authorities into money allegedly laundered through Ofinter, S.A. – the money exchange business operated by Luis Enrique

**(Page 6)**

## President's Popularity Skyrockets

BY TIM ROGERS AND
AMANDA SCHOENBERG
Tico Times Staff

**Amid** allegations of campaign finance improprieties, President Abel Pacheco's popularity has risen to almost-mythical proportions, according to a recent study by Unimer Research International.

Unimer, a branch of the London-based Research International, polled 1,208 Costa Rican adults from Oct. 5-8. The company found that 81.6% of those interviewed were favorable to Pacheco, who of the past 17 presidents, was second only in popularity to Nobel Prize winner Óscar Arias, who found favor with 84% of the population while in office.

The report, published Monday in the daily La Nación, said 64% of the population found Pacheco's work to date "very good," (up six points since June), with 26% of those studied calling his performance "normal" and 7% terming it "bad."

However, 75% of those interviewed think the gov-

**(Page 4)**

## High Court Gives Go-Ahead To Open-Pit Gold Mine in North

BY DAVID BODDIGER
Tico Times Staff

**"WE'RE** doing it, man!"

Jesús Carvajal didn't hide his enthusiasm over a recent decision by the nation's highest court that in effect gives a Canadian gold mining firm and its local subsidiary the legal weight it needs to move forward on a controversial mining project near the Nicaraguan border, despite an Executive moratorium earlier this year banning open-pit gold mining.

The Constitutional Chamber of the Supreme Court (Sala IV) on Aug. 20 ruled down an appeal presented July 31 by Franz Ulloa, representative of the Costa Rican Chamber of Mining Industry, against the June 5 moratorium against open-pit metal mining presented by President Abel Pacheco and Minister of Environment and Energy Carlos Manuel Rodríguez.

**BUT** the wording of the Court's ruling legally affirms concessions granted prior to

**(Page 3)**

### THIS WEEK:

C.R. Tops U.S.
in Press Freedom ... 10

**Reaction to
New Tax Plan.......** 11

Central America...... 8
World News.......... 9
**Business..........** 11-14
**Weekend.........** W1-W16

ISSN 1409-3332

9 771409 333006

APP 00107

Case 2:24-cv-00488-JNP-CBR   Document 2   Filed 06/26/24   PageID.195   Page 3
Appellate Case: 24-4104   Document: 3-1   ...





*DUNDEE leader Lichfield (left), graduate-to-be Scott say program's extreme discipline helps teens with extreme problems; at right, students receive class on facility's grounds.*

Tico Times Photos/JulioLainez

# Teen Reform Facility Blasted, Defended

**(From Page 1)**

brainwashing and inhumane punishment while at the academy.

**LEADERS** of Dundee Ranch, however, claim it's a last-stop option for troubled teens who are considered a threat to themselves and to others.

The debate over whether the academy is boot camp or boarding school may soon heat to a boil, as the facility prepares to open its new 100-square-meter walled compound – known as "High Impact" – to incarcerate "students" who habitually disregard the institution's strict laws.

The new compound – the size of a city block – will house boys' and girls' dormitories, a small classroom and a sand-and-gravel track circling the inner perimeter of the 10-foot walls. Students sent to "High Impact" will have to walk 100 miles around the track to earn their "freedom."

**THOSE** who refuse to walk the 1,600 laps under the pounding central Pacific sun will remain indefinitely inside "High Impact," said Academy Dundee owner Narvin Lichfield.

Once "High Impact" is operational next month, directors of WWASP's eight other behavior modification facilities in the U.S. and Jamaica will be able to sentence "disobedient" students to serve time at Academy Dundee's compound, which will hold as many as 50 kids.

"I am sure 'High Impact' will be mistaken as a jail, there is no doubt about it," Lichfield told The Tico Times this week. "But this is no different from any other boarding school in England."

**DUNDEE** Ranch Academy is a non-therapeutic behavior modification program for teenagers who are sent there by their parents or by court order. Segregated by sex, residents are divided into groups of 25, known as "families."

The program costs more than $2000 a month, a one-time $2000 processing fee and $295 for uniforms. The academy recently created two presidential scholarships – named in honor of President Abel Pacheco – to give to "deserving Costa Ricans, as a way of giving back to the community," Lichfield said.

Although residents are placed in individual study programs and earn high-school credit in the U.S., Dundee Ranch Academy is not registered in Costa Rica as an educational institution, and the qualifications of many of the staff members are unclear.

**LICHFIELD**, a Utah native who used to work in marketing, said the WWASP's youth programs were founded by members of the Church of Latter-Day Saints (Mormons) and receives interns from Mormon-affiliated Brigham Young University. But he claims the academy – located on the pleasant grounds of the for-mer Dundee Ranch Hotel – has no religious agenda.

Dundee Ranch's philosophy, he said, can be explained simply as: "identify your incorrect behavior, and stop doing it."

The methods the academy employs to help teens "identify their incorrect behavior," however, border on extreme forms of punishment, according to testimonies from Geoffrey and Garred Bock, the twins busted out of the academy last Wednesday.

"If you were caught looking out the window, you were given a 'CAT 4' (Category 4 offense) because they thought you were [plotting] a run plan," Garred told The Tico Times this week, from his home in Mandeville, Louisiana.

**ACCORDING** to the Bocks, a "CAT 4" or "CAT 5" offense earns students four or five days of Observational Placement (O.P.) in solitary confinement, where the teens were forced to stand, kneel or lie facing the wall for as long as 12 hours a day.

"If you looked off the wall, you were given another day of O.P.," Garred said.

After doing time in solitary, students have to write 42,000 to 55,000 words worth of essays – known as "worksheets" – explaining their behavior.

**LICHFIELD,** who has owned the local branch of the program since it opened last year, could not confirm or deny reports that teens are kept in solitary confinement for 12 hours at a time.

"To be honest, I just don't know," he told The Tico Times. "I only know that our policy and procedure call for one hour [in solitary confinement] before the kids are moved to worksheets."

Lichfield, however, does admit some of his employees sometimes "take it upon themselves to do more" than the academy's policy and procedures call for.

**JOE** Atkin, director of Dundee Ranch Academy, admits some teens have had to stay in solitary confinement for longer than 12 hours, because they could not demonstrate to the staff that they were "under control."

Offenses range from Category 1 to 5, with the first three resulting in "point losses" and the last two resulting in O.P. and worksheets.

Atkin said there are some 100 behavioral "consequences" ranging in severity from CAT 1 to 5. Minor offenses, such as burping or looking at members of the opposite sex, are punished with "point loss" (residents must achieve a certain number of points to win basic privileges). Major offenses, such as planning to run away, smoking cigarettes or doing drugs, lands the offender in solitary confinement and strips him or her of all privileges, including the right to talk.

Conversation is also prohibited in the dining hall, which provides delicious home-cooked meals for all but those who are sentenced to two weeks of rice and beans as punishment.

**OUTSIDE** the dining hall, the manicured campus is home to macaws and a crocodile who lives in the pond. Gazebos, a swimming pool and a basketball court provide students with places to rest or play during the hour of free time scheduled into each day.

However, if someone tries to run away – the last break attempt was three weeks ago, according to Lichfield – the whole "family" is punished for not reporting the "run plans" to authorities.

Reporting the misbehavior of others can earn residents the points needed to advance to the next level of privileges. Teenagers who reach Level 4 or 5 (residents enter at Level 1 and graduate at Level 7) are allowed to punish other residents.

**LICHFIELD** claims mechanisms are in place to prevent abuses of power. In addition to testing the 40-member staff every night on academy policy, Dundee Ranch has "grievance forms" for residents.

Allegations of abuse are handed over to the Costa Rican Child Welfare Office (PANI), Lichfield assured, adding that he recently fired a staff member from South Carolina who was "heavy-handed" with the kids.

PANI spokeswoman Marta Jiménez said she is not aware of any allegations of abuse from Dundee Ranch. The PANI lawyer said she was unaware there were minors at the academy, and claims her office has never investigated the facility because no complaints have ever been filed.

Atkin, who sits on the academy's grievance committee, says they receive 80 to 100 grievances each week, but there have never been allegations of abuse.

**DURING** a recent visit to the academy by The Tico Times, a "family" of teenage boys was walking laps in the sun as part of an O.P. punishment. When they stopped to talk to The Tico Times, a Costa Rican employee ordered them in Spanish to keep quiet and keep walking.

The boys, most from the U.S. East Coast, said they don't speak Spanish -- despite talking basic language courses at the academy -- and that communication with the Tico staff is difficult. One boy, a 13-year-old resident from inner-city Boston, said he was forced to walk for five hours a day, five days in a row, because his friend had jokingly put a "prison number" sticker on his bunk bed in the academy's Spartan sleeping quarters.

"This place sucks, look at us walking in the sun," he said, pacing back and forth in formation.

The young Bostonian admitted his mother sent him to Dundee Ranch three months ago, but said the academy's staff "teaches you you sent yourself here."

**U.S.** Embassy spokeswoman Marcia Bosshart said the Embassy has checked on the academy twice this year, and found no evidence of mistreatment. She said another visit is planned for this week.

While Lichfield admits his "tough-love" approach is not for everyone, he believes in the program. He notes that there is a 90 % "non-relapse" rate among WWASP graduates, although he did not say what percentage graduate.

Asked if he would send his own kids to Dundee Ranch, Lichfield, a father of four, said: "If my 15-year-old son flunks one more class, guess where he's going."

**SCOTT,** a well-mannered 18-year-old California native who has been at Dundee Ranch since it opened, is about to become its first graduate. He says the program helped him kick his multiple drug addictions and has set him on the straight-and-narrow.

"I can tell the difference in the way I act and respond to situations," he said.

The Bock twins, meanwhile, are just happy to be out.

"I am doing good," Geoffrey told The Tico Times during a phone interview from his home. "Every little thing: watching TV, opening the refrigerator, drinking water when I am thirsty – I appreciate all of these things now."



## Universidad INTERAMERICANA DE COSTA RICA

### Study Spanish in one of Costa Rica's Premier Universities

• Small groups.
• Trained instructors.
• Individual attention.
• Multimedia language lab.
• Library and Internet access.
• Spanish conversation exchange with Costa Rican students.
• Beautiful 12 acre campus

*Call now for a free placement test.*


Spanish For Success

Telephone: ( 506) 261-4242 • Fax : (506) 261-3212
• P.o.Box. 6495-1000 San José
• E-mail: s4s@uinteramericana.edu

APP 00108

# EXHIBIT 8

APP 00109

## *Utah-based school owner banned*

Deseret Morning News (Salt Lake City)

July 6, 2003, Sunday

Copyright 2003 The Deseret News Publishing Co.

**Section:** LOCAL;

**Length:** 778 words

**Byline:** By Toby Hayes Deseret Morning News

# Body

South Carolina's Department of Social Services has banned a Utah-based behavior-modification school owner from the premises of his campus there.

In a letter sent to Carolina Springs Academy recently, state officials say the ban stems from allegations of abuse at another school owned by Narvin Lichfield, the Dundee Ranch in Costa Rica, which was closed following investigations of mental and physical abuse. The letter also states corrective action needs to be taken before Oct. 30 to renew the school's license. The state cites nine breaches of state regulations, including the use of "buildings that are not approved by DSS." The school must also train its staff on how to report child-abuse cases, which has not been done recently, the letter states.

Dundee and Carolina Springs are both part of World Wide Association of Specialty Programs and Schools Inc. in St. George, a referral service for behavior modification schools. But the only facilities they refer clients to are ones owned by the corporation's founders and trustees and their relatives. An investigation by the Deseret Morning News reveals that state and federal investigations are not new to the company.

A closer look shows that five of its schools have been shut down in seven years. A school near Cancun, Mexico, called Sunrise Beach, was the first. It was shut down in 1996 after allegations of abuse, two years before the umbrella corporation was actually formed by Lichfield's brother, Robert, and SkyWest Airlines founder J. Ralph Atkin. Three other facilities were shut down in 1998, one of which was Morava Academy in the Czech Republic. The Atkin-owned facility closed just six months after opening.

He operated the Czech school in an old hotel, said John Grimes who, along with his wife, Theresa, were hired by Atkin. Upon arrival, the couple realized they were the only teachers.

"We worked seven days a week at 16 hours a day and ended up teaching all the classes," John Grimes said. "Think of something you took in high school and we taught it. It was a little much."

Weeks before Morava was closed, U.S. State Department investigators were sent to another corporation facility called Paradise Cove in Samoa. According to federal documents, investigators wrote that alleged abuses in Samoa included "solitary confinement of youths, withholding of rations, etc." They also noted that "many of the locally hired counselors and employees at Paradise Cove are not certified or qualified to do the jobs they are doing."

Ken Kay said he spoke with State Department representatives and that information is false.

"That is absolutely not what he told me," Kay said. "Were their rations monitored? Absolutely. But they weren't starving."

By the end of 1998, Paradise Cove was closed.

But most teens made their way to Samoa and the still operating Tranquility Bay in Jamaica by being routed through a St. George facility operated by Kay and Robert Lichfield.

Brightway Adolescent Hospital was a teen alcohol and treatment facility until it was voluntarily closed following a state investigation. Debra Wynkoop-Green, the licensing director for the Utah Department of Health, discovered Brightway staff was diagnosing most patients with behavioral problems that needed to be corrected at one of the corporation's other facilities. Of the teens who entered Brightway, 94 percent were shipped to either Jamaica or Samoa, Wynkoop-Green said. The investigation also netted at least one patient who had been sent to Samoa without parental knowledge. The hospital was closed, Kay said, after insurance companies refused to pay for the behavior schools, which charge up to $3,000 a month.

APP 00110

According to the Utah Department of Commerce, seven companies share the same St. George address of 1240 E. 100 South No. 9, the office next door to Atkin's. Three other youth-related businesses are headquartered at Atkin's office, suite No. 10. Atkin denies being more than the corporation's lawyer. Kay was baffled as to why so many companies, such as Teen Help, Robert Browning Lichfield Family L.P. and Dixie Contract Services all share the same address.

"Whatever it is," he said, "it has nothing to do with me or WWASPS."

Clinical psychologist Roderick Hall has spoken with five former students of the corporation's facilities and says these programs do more harm than good.

"The people I have talked to have post traumatic stress disorder and there's no question about it," he said. This is often referred to as shell-shock. "I have one kid who e-mails me who is in college and still has nightmares."

Kay said that without the programs his corporation offers "children are going to commit suicide."

E-MAIL: *thayes@desnews.com*

**Load-Date:** July 6, 2003

---

**End of Document**

APP 00111

# EXHIBIT 9

APP 00112



# THE TICO

## CENTRAL AMERICA'S LEADING ENGLISH

Member of the Inter-American Press Association

VOL. XLVII   Nº 1729 — 36 pages     San José, Costa Rica, Friday, July 11, 2003

¢350

STACK 3 OVERSI

*********AUTO**ALL FOR ADC 90190   246
LIBROS CENTROAMERICANOS
PO BOX 5503
REDLANDS CA   92373-0751

W. Wallace
... Room
The New York Public Library
Room 108



*LABOR of love: endangered Green turtle lumbers ashore at Tortuguero to lay her eggs at turtles' ancient nesting ground, now made safer by new pact.*

Tico Times/Susan Hollis

## Renewed Pacts to Save Turtles

### Private Enterprise Making a Difference

**BY AMANDA SCHOENBERG**
Tico Times Staff

AS the first turtles of the year made their way back to Tortuguero National Park on the northern Caribbean coast to lay their eggs, Environment Ministry officials highlighted links between private enterprise, the local community and the National Park, in continued efforts to protect the endangered green turtle population.

As signs advertising products waved at the Cuatro Esquinas ranger station in Tortuguero National Park, Costa Rican holding company Florida Ice and Farm, S.A., general director Pedro Dobles renewed agreements to donate funds to the National Park Foundation.

The company, which owns the national brewery, Cervecería Costa Rica, Tampico, Cristal water and Tropical fruit juice companies, will continue to donate ¢1 for each plastic bottle sold and bottle of Cristal or Tropical recycled to the National Park Foundation, with 50% of funds sent directly to Tortuguero Conservation Area and the remainder for protected area administrative costs. This year the company also promised to donate ¢160 per glass bottle recycled of its new product, Smirnoff Ice.

**ACCORDING** to spokesman Carlos Echeve-
*(Page 12)*

## Body of Missing Girl Found

**BY TIM ROGERS**
Tico Times Staff

THE grim search for 8-year-old Kattia Vanessa González, missing since last Friday, ended tragically yesterday morning, when her body was discovered buried under the floorboards of her neighbor's house. Two Costa Rican men, both with previous murder records, were detained on suspicion of murder.

Police discovered her body Thursday morning after raiding the neighbor's house, 25 meters away from González' home in the southern San José neighborhood of Quesada Durán. The Judicial Investigative Police (OIJ) reportedly received an anonymous phone tip Tuesday from a woman telling them to investigate neighbor Jorge Sánchez, 36, who reportedly had a history of trying to lure little girls into his house with the promise of giving them a pet rabbit.

After pulling Sánchez' rap sheet, which revealed a 20-year history of murder, theft and rape, the OIJ got permission from the judge to raid the home. Sánchez and his partner Rubén Antonio Delgado, 51, were detained.

Delgado also has a police record, which includes murder. He reportedly escaped from La Reforma maximum security prison in 1989, according to police records.

**GONZÁLEZ** was last seen July 4 around noon, when she allegedly left her home to walk 200 meters to a friend's house to pick up a math book. Police claim she was most likely intercepted by Sánchez, who had reportedly offered her
*(Page 4)*

# Fin Trade Sparks Questions

*(First in a Series)*

**BY DAVID BODDIGER**
Tico Times Staff

Last month, in a single night, a foreign fishing vessel reportedly landed some 30 tons of shark fins – without the carcasses attached, as required by Costa Rican fishing regulations. One month later, despite the required oversight by five government agencies, officials still have no answers as to how the ship managed to unload such a large cargo without being stopped.

A Tico Times investigation has revealed disturbing irregularities in the management, oversight and enforcement of rules guiding foreign fishing fleets landing products at Costa Rica's Pacific ports of Puntarenas and Caldera.

At 9 p.m. on May 31, Costa Rican Coast Guard officials observed the Goida Ruey No. 1, flying the Panamanian flag, unloading the enormous cargo of fins on a dock owned by Muelle de Inversiones Cruz, according to a report issued by the Costa Rican Sea
*(Page 6)*

# Owner: Dundee Will Return

**BY TIM ROGERS**
Tico Times Staff

**DETERMINED** to get things right the second time around, Utah native Narvin Lichfield told The Tico Times this week that he is changing the operational model of his embattled behavior modification facility Dundee Ranch Academy and hopes to have it up and running again by the end of August.

The controversial "tough-love" program for wayward U.S. teens was closed May 24, following a week of rioting, students running away and violent upheaval sparked by two government interventions to investigate allegations of abuse. Lichfield was jailed for 24 hours on allegations of detaining minors against their will, coercion and international rights violations.

The 200 students were returned to their homes in the U.S. or relocated to other sister-affiliated WorldWide Association of Specialty Programs
*(Page 15)*

**THIS WEEK:**

**3 Killed in Plane Crash** .................................................. 4
**Technology Minister 8th Cabinet Casualty** ..................... 3
*Central America* ................................................. 8
*World News* ................................................... 9
*Business* ................................................. 11-15

ISSN 1409-3332

REAL ESTATE & SERVICES

# Owner Hopes to Reopen, along Gentler Lines

*(From Page 1)*
(WWASP) in the U.S. and Jamaica (TT May 23, 30).

Lichfield and his Tica wife Flory are under court order to remain in the country while allegations of abuse are investigated.

AS a result of his legal problems in Costa Rica, the Department of Social Services (DSS) in South Carolina last month slapped Lichfield with a restraining order prohibiting him from returning to his other teen facility, known as Carolina Springs. The U.S. child welfare authorities notified Carolina Springs that it has to make nine changes if it hopes to renew its license to operate a residential group home.

"Mr. Narvin Lichfield shall not be allowed on the premises of Carolina Springs, nor shall he be involved in the day to day operations of the facility at this time due to the criminal and child welfare allegations surrounding his involvement in the Costa Rican facility," reads a letter sent June 19 to Carolina Springs director Elaine Davis from the Department of Social Services. "Once the allegations/charges are resolved, the Board of Directors can submit the supporting documentation to DSS for consideration to determine if Mr. Lichfield can resume his involvement with children and the managerial decision making at Carolina Springs."

The list of complaints filed by the South Carolina DSS closely mirrors the list complied by the Child Welfare Agency (PANI) here: overcrowding, unsanitary conditions, untrained staff, restricted contact with parents and the outside world, and "upper-level" students involved in the disciplining of "lower-level" students (TT, May 23).

THE DSS offered Carolina Springs a standard operating license with a waiver through Oct. 30, 2003. The agreement allows the Stateside academy to continue operating until October, on condition that the board of directors agrees to make the necessary changes to comply with the law.

However, Carolina Springs' lawyers reportedly have said that they do not agree to all the terms set by welfare authorities, which could result in the facility being closed by the state before Oct. 30, according to Virginia Williamson of the Carolina DSS office.

DESPITE facing similar problems in two countries and criminal allegations



*DUNDEE owner Lichfield: understands concerns.*

here, Lichfield this week said he remains hopeful that he can ride out the storm and get his Costa Rican facility operational again.

The Child Welfare Agency (PANI) originally notified Lichfield May 21 that he had 30 days to make 15 critical changes if he hoped to get legal and remain open. However, following the ensuing chaos, Lichfield decided to close the school three days later.

Lichfield told The Tico Times this week that he is in the process of repairing an estimated $2 million in vandalism-caused damages at his remote Costa Rican facility – formerly an eco-tourism hotel in the Pacific slope town of Orotina – and hopes to get licensed by Ministry of Health.

PANI spokeswoman Fanny Cordero this week said that Lichfield would have to comply with all the requirements of the Technical Secretariat of Protection in order to apply for a license to reopen. To date, neither Lichfield nor his lawyers have been in contact with the PANI office, she said.

The new and improved Dundee Ranch, according to Lichfield, will not employ the controversial disciplinary practices of physical restraints or solitary confinement; will be based on a therapeutic model of treatment; and will provide each student with a laptop computer with Internet access to facilitate open communication with parents. "Like Coronado," Lichfield said, referring to the model used

by the U.S.-run boarding school Coronado Academy, on the central Pacific coast north of Quepos (TT, June 6).

Lichfield, 42, said tuition will most likely increase to $2,300 a month to cover therapy costs, and admitted he is not sure Dundee will continue its affiliation with WWASP.

HE said he is not concerned that the negative media attention he and Dundee have received in recent months will hurt his operation, claiming he will be able to start again with a fresh slate because there is no such thing as bad press.

"I understand people's concerns," he said. "If I were not involved with Dundee and were on the outside looking in, I would have been concerned too."

However, he added, "Talking about abuse is like yelling 'fire' in a crowded building; it doesn't matter if there is a fire, people react as if there was."

LICHFIELD insists that a reopened Dundee would be good for the local economy, employing area residents and pumping $2 million a year into the "tourism" economy.

"If we get this thing taken care of, 90 people will return to their jobs," he said.

The Dundee owner admits that his ability to reopen depends on the outcome of the legal proceedings against him, but said he is "thankful for the legal process" because his critics will now be required to present evidence of abuse, not just e-mail allegations.

He insists that he has never abused any child entrusted to his care, and thinks

the case mounting against him will fall flat.

The prosecutor's case against Lichfield is based on abuse charges filed by former Dundee mother Robin Crawford and her son Cody, but other witnesses have yet to come forward (TT, June 6).

MEANWHILE, the long-threatened class-action lawsuit against WWASP in the U.S. has not been filed yet, despite lawyer Ed Masry's claim last month that his California-based firm Masry & Vititoe and the Huron Law Group were planning to file on June 20. The firms are reportedly still trying to unravel the spiderweb of WWASP corporate entities in the U.S. (TT, June 20).

Lichfield said he is offended that his character has been tarnished internationally, and eventually plans to pursue legal action against the Costa Rican daily Al Día, The New York Times and everyone else who dragged his name through the mud.

He said the final straw was when a classmate of his daughter's in Utah presented a news article for current events on "Narvin Lichfield abusing kids in Costa Rica."

"I want my name restored after being slandered all over the world. I have been vilified and made out to be something I'm not," Lichfield stressed.

HOWEVER, he added: "In the end it doesn't matter what is said in the papers, because it is an illusion, it is not real, and it disappears after two weeks."

## Government Finalizes School Calendar

AFTER meeting with parent and student groups concerning changes in the school calendar following a month-long teachers' strike, Minister of Education Manuel Antonio Bolaños declared Monday evening that teachers will have to make up for only 11 days missed.

High-school teachers were on strike for 26 days, while elementary school teachers missed 20 days during the strike, which began over salary issues but evolved into a national pension debate.

Bolaños rejected union proposals to hold classes on Saturdays and public holidays, and decided not to reduce July vacations by five days. Vacations in December will be cut by six days, ending

the school year on Dec. 20 for teachers who participated in the strike and Dec. 13 for those who did not, and five days of teachers' meetings held during class days will be suspended.

National exams for sixth, ninth and eleventh-grade students will be postponed by one week.

Teachers are entitled to a 168% bonus for working 200 days. The Ministry's decision entitles elementary school teachers who participated in the strike to 65% of the bonus, while high-school teachers can expect 42%.

The National Association of Educators (ANDE) filed a petition in protest of the government plan Wednesday. ANDE president Eduardo Rojas accused the government of trying to save money by not paying teacher bonuses and of noncompliance with Supreme Court mandates for a 200-day school year.

## U.S. INCOME TAX

*David G. Housman, Attorney & C.P.A.*
Specializing in all matters of concern to U.S. Taxpayers residing abroad.

Including preparation of U.S. tax returns, Assistance with back reporting, filing problems and with passport renewal applications and new mandatory disclosure information to the I.R.S. and taking advantage of the restoration of the Foreign Income Exclusion (up to $80,000 per year) for all back years.

IN COSTA RICA 22 YEARS
CAMPO VEINTIUNA, S.A.
By appointment only
Tel. 239-2005 - 389-2590

20143

## DO YOU SPEAK EXCELLENT ENGLISH?

The most stable and largest growing company in the world has positions available in San Pedro

We offer top salary, flexible schedules and an excellent working environment.

Apply at
www.bosjob.com
or call 234-4515

2501

## U.S TAX and SECURITIES ATTORNEY FORMER UNIVERSITY LECTURER

A firm specializing in U.S. taxation, U.S. securities law and U.S. business law. We represent individuals and businesses in IRS investigations, litigation in U.S. Tax Court and all other IRS matters.

We represent investors, brokerage firms and associated persons in arbitrations, investigations and disciplinary proceedings before the NASD, NYSE, AAA, SEC and other, self-regulatory organizations and arbitration tribunals throughout the United States. We also facilitate the preparation and filing of SEC

Registration Statements and periodic filing documents.

Also we establish Nevada corporations, LLCs, LPs, trusts and utilize other estate planning techniques.

*Harold P. Gewerter, Esq., Ltd.*
5440 W. Sahara Avenue, Ste. 202
Las Vegas, Nevada 89146
Phone: (702) 382-1714
Fax: (702) 382-1759
E-mail: hga@attorney.com

*Affiliated with Carballo & Carballo / Costa Rica*

7092

# EXHIBIT 10

APP 00115

## *Youth home president says he's target of 'witch hunt'*

The Greenville News (Greenville, SC)

August 22, 2003 Friday

Copyright 2003 The Greenville News (Greenville, SC) All Rights Reserved

**Section:** FRONT; Pg. 17A

**Length:** 624 words

**Byline:** Tim Smith, Staff, *tsmith@greenvillenews.com*

## Body

He denies Costa Rican allegations

By Tim Smith

STAFF WRITER

The president of a children's home in Abbeville County asked by state officials to stay away until allegations concerning a children's home in Costa Rica are resolved said Thursday he's done nothing wrong and feels persecuted.

Narvin Lichfield, 42, told The Greenville News the allegations that prompted authorities in Costa Rica to jail him for 30 hours in May are baseless and the result of a noncustodial parent's attempt to remove her child and overzealous prosecution.

He said that although the investigation remains open, he believes it will be closed by the end of the month without any charges.

"I've had my name destroyed," said Lichfield during a telephone interview from Europe. "I've reviewed every document. There is no evidence."

Lichfield, who lives in Hodges, said he is one of the owners and is president of Carolina Springs Academy near Donalds.

In June, the state Department of Social Services asked that Lichfield be kept from Carolina Springs and out of its daily operations over allegations "surrounding his involvement" in a Costa Rica children's facility, according to a DSS letter to Carolina Springs.

DSS required that Lichfield be kept away from Carolina

Springs as a condition for renewing that facility's license, the letters said.

The general counsel for DSS said there is not an attempt by the agency to persecute Carolina Springs, only an effort to make sure the operation meets state laws and regulations.

Lichfield said he is the owner of the Academy at Dundee Ranch in Orotina, Costa Rica, a youth behavioral management center. He said the trouble with Costa Rican authorities began earlier this year as the result of a disgruntled noncustodial parent who wanted to remove her child.

He said she went from official to official and finally came upon a temporary local prosecutor, who went to the ranch in May and interviewed her daughter.

Lichfield said he was subsequently jailed for 30 hours and allowed to leave Costa Rica earlier this month.

He said he has reviewed every document in the case, and "I'm not named personally in anything."

He said he plans to return to the Carolina Springs campus at the end of the month, when he said he thinks the Costa Rica matter will be closed.

"At that point, I'm walking on the campus," he said. "I'd love for them to stop me on my own property. They're making an allegation that isn't true, and they're putting punitive damages on me just like Costa Rica did."

Lichfield said while Carolina Springs wants to cooperate with DSS, he feels the home has been the victim of a "witch hunt" since it first arrived in the state in 1998. He said the facility is actually a boarding school, and he didn't believe it required a license as a children's home.

He said because it was a different type of facility than South Carolina officials had seen before, some were fearful of how it would operate, spawning unfounded allegations. In one six-month span, he said, officials investigated 21 allegations and none were founded.

"We have just felt persecuted," he said. "There were certain people in the DSS who believed e-mail allegations written by child right's activists who have a vested interest. It's a war. I want to live in peace, run our

APP 00116

business and be a benefit to the community. That's all we've ever wanted to do."

Virginia Williamson, general counsel for DSS, said, "It's just not accurate that there is any type of witch hunt going on by DSS toward Carolina Springs. All of our actions have been to do our job in making sure a facility is operating in compliance with what state laws and regulations say they need to do. We have been working, really for the most part, with Carolina Springs' administration to achieve compliance."

**Load-Date:** August 23, 2003

**End of Document**

APP 00117

# EXHIBIT 11

APP 00118

**Independent** Mail    Home   News   Sports   Orange and White   Opinion   Life   Obituaries   Weather

**LOCAL NEWS**

# School of Troubles: Another chance for abandoned boarding school



The administration building of the former Carolina Springs Academy is one of the many buildings on the site's campus that will be used in the operation of the new Magnolia Christian School.

*By Kirk Brown of the Independent Mail*

Posted: **Dec. 10, 2010**         0

Troubled teens from across the United States are expected to arrive soon at a boarding school in Abbeville County that state regulators sought to close last year.

The former Carolina Springs Academy will open in early 2011 as Magnolia Christian School.

"We're not backing away from our mission," owner Narvin Lichfield said.

Lichfield said classifying Magnolia as a Christian boarding school will exempt it from the licensing and staffing rules that created years of problems for him after Carolina Springs opened more than a decade ago.

In April 2009 the South Carolina Department of Social Services revoked Carolina Springs Academy's license. The agency said its decision was based on numerous violations found during 19 unannounced visits over 18 months.

According to DSS records, students were subjected to methods of discipline and punishment prohibited by state regulations. One example: A child was reportedly handcuffed and threatened with a Taser on his first night at Carolina Springs in January 2009. DSS officials also reported seeing staff members cursing at and degrading boys enrolled in the boarding school.

Lichfield said there were no handcuffs or Tasers at Carolina Springs.

"It's a fairy tale," Lichfield said, adding that no abuse claims have ever been substantiated at his school.

Since a majority of the teens sent to Carolina Springs had behavior problems, Lichfield said, strict discipline was a necessity. He also said some students were restrained when they acted out.

"These are kids who have beaten up their parents," Lichfield said. "These are kids who are out of control."

APP 00119

Case 2:24-cv-00458-JNP-CMR    Document 29-11    Filed 08/30/24    PageID.207    Page
Appellate Case: 25-4135    Document: 28    Date Filed: 01/20/2026    Page: 120

**A spider's nest and staffing ratios**

DSS officials accused Carolina Springs of failing to maintain a clean and safe environment for students whose parents paid up to $3,000 per month in tuition.

Besides moldy and outdated food, inspectors saw flies and a large black widow spider's nest in the dining hall kitchen. DSS officials said there was poor plumbing and the boys' dormitory lacked adequate heating. Carolina Springs had a history of fire code violations and DSS officials said the school didn't conduct fire drills, even after a building burned in June 2008.

Lichfield said he didn't mind eating meals at Carolina Springs. He blamed vandalism by unruly students for most of the plumbing problems.

Carolina Springs also was cited for repeatedly failing to comply with state-mandated staffing levels of one employee per 10 students during the day and one employee per 14 students at night.

When three boys ran away on a rainy night in November 2008, a single employee was watching 38 male students, DSS records show. One of the runaways stayed away for a week before turning up 20 miles away in Anderson.

Here is a glance at the history of Carolina Springs Academy for unruly youths and it's planned reopening as a Christian school.

**1998**

- Narvin Lichfield moves from Utah to Abbeville County to open Carolina Springs Academy.
- Two state agencies contend that Carolina Springs is an unlicensed residential treatment center.

**1999**

- The South Carolina Department of Social Services licenses Carolina Springs as a child-caring institution for 58 students.

**2001**

- Lichfield opens Academy at Dundee Ranch in Costa Rica.

**2003**

- Costa Rican officials raid Academy at Dundee Ranch, sparking a student riot. Lichfield is briefly jailed on charges of coercion, holding minors against their will and crimes of an international character. As a result of those charges, South Carolina officials bar him from the Carolina Springs campus.

**2004**

APP 00120

- The permitted capacity at Carolina Springs is raised to 162 students after a new dormitory is built.

**2007**

- Lichfield is acquitted of all charges in Costa Rica.

**2008**

- Fire destroys a dorm-itory at Carolina Springs.
- Three boys run away from Carolina Springs. One of the runaways is gone for a week before turning up 20 miles away in Anderson.

**2009**

- Citing numerous violations, the Department of Social Services revokes Carolina Springs Academy's operating license.
- Lichfield closes Carolina Springs. It then reopens as a Christian boarding school for girls.

**2010**

- The girls' school closes.
- Lichfield announces plans to open Magnolia Christian School in early 2011. He says the school will be exempt from state licensing and staffing rules.

Lichfield called the state's staffing requirements unreasonable for a boarding school.

"It put us out of business," he said.

After initially appealing the revocation of its license, Carolina Springs closed in September 2009. It then reopened as a Christian boarding school for girls, which shut down in June.

Magnolia Christian School will enroll coed students. The monthly tuition has been reduced to $2,495.

"We have plenty of demand for our services," Lichfield said.

After learning about Lichfield's plans to reopen the school, DSS officials visited its campus Friday. They said they were seeking information from Elaine Davis, the former director at Carolina Springs who also will be in charge of Magnolia Christian School.

**In the beginning: church, court and evening visits**

Lichfield, 49, was raised in Utah as the ninth of 13 children in his family. Looking to step out of his oldest brother's shadow, he moved to Abbeville County to open

APP 00121

Carolina Springs Academy in 1998.

"I felt inspired to go out and start this school," Lichfield said.

The boarding school features dormitories, a dining hall and barn on 450 acres of pastures and woods on Green Acres Lane near Due West.

Lichfield marketed Carolina Springs as an educationally accredited specialty boarding school where defiant teens would be taught "respect, honor and integrity in the Old South traditions."

Two South Carolina state agencies were at odds with Lichfield soon after Carolina Springs opened. The Department of Health and Environmental Control and DSS each contended that Carolina Springs was an unlicensed residential treatment center.

Lichfield said state officials harassed him because he was a member of the Church of Jesus Christ of Latter-day Saints.

"Rumors were going around about how the Mormons are coming to South Carolina," said Lichfield, who stressed that the church was not involved with Carolina Springs. "There was a firestorm of religious prejudice."

With the licensing dispute simmering in court, Lichfield hired Davis to replace the school's first director. Female students had complained to investigators about comments her predecessor made regarding a girl's breasts and how often he stopped by their rooms at night, DHEC records show.

DSS eventually licensed Carolina Springs as a child-caring institution for 58 students in September 1999. Its permitted capacity was raised to 162 students after a new dormitory was built in 2004.

**Points and privileges**

To deal with violence-prone youths who were addicted to drugs or engaging in illicit sex, Carolina Springs used a six-level behavior modification program. Lichfield said his oldest brother, Robert, had fine-tuned the program at a pair of boarding schools in Utah.

"We are going to get you to change who you are by changing your habits," Lichfield said.

Students entered the program at the lowest level. They earned points for good behavior, which enabled them to gain privileges as they moved to higher levels. Bad behavior carried the consequence of point deductions. Those who committed serious infractions were taken to an area called Observation Placement.

"A lot of kids done real good ? it was all up to the student," Davis said.

APP 00122

Many parents praised Carolina Springs for righting their wayward children.

"After a few weeks there, I had my daughter back," proclaimed one father who is an Anderson native.

Former Carolina Springs Academy student Philip DiPaolo was 16 years old when he offered a less glowing assessment of the school in an affidavit.

"Carolina Springs felt like an institution instead of a school or program to help kids," said DiPaolo, who now serves in the U.S. Marine Corps. His grandmother said DiPaolo was sent to the boarding school from Florida after taking money from her and his grandfather.

DiPaolo described the Observation Placement area as a "skinny building next to the boys' dorm and near the basketball hoop."

"I heard girls screaming out at the OP room all the time," DiPaolo said in his affidavit.

Staff members frequently threatened to send students to a tougher boarding school in Jamaica, DiPaolo said.

"Staff told us that Carolina Springs was like a 5-star hotel compared to Jamaica," he said.

In his affidavit, DiPaolo fondly recalls leaving Carolina Springs.

"I saw my grandparents and started crying," he said. "I felt a huge weight was lifted off my shoulders."

"It was the happiest moment of my time there."

**Charged then cleared in Costa Rica**

With Carolina Springs filled to capacity by 2001, Lichfield opened a boarding school in Costa Rica called Academy at Dundee Ranch.

Several months after quitting her job, the academy's former director told Costa Rican officials in March 2003 that she was concerned about the well-being of Dundee Ranch students.

Authorities raided Academy at Dundee Ranch a few weeks later and notified 210 students that they were free to go. Dozens of the youths celebrated their liberation by ransacking the school.

Lichfield was briefly jailed on charges of coercion, holding minors against their will and crimes of an international character. As a result of those charges, South Carolina officials barred him from the Carolina Springs campus. He was acquitted of all the charges in 2007.

APP 00123

"I went to jail over nothing," said Lichfield. "I spent four years going through the joke of the judicial system in Costa Rica."

Lichfield blamed a student's mother who was embroiled in a custody dispute, an overzealous child advocate, disgruntled employees and an opportunistic constable for orchestrating the Dundee Ranch raid.

"Our staff was taken out at gunpoint," he said. "This was South America at its worst."

**Dorm fire, other woes**

Carolina Springs, which had managed to stay under the media radar, was thrust into the headlines by a fire on June 25, 2008. No one was hurt, but the midday blaze destroyed a dormitory that housed 57 boys.

The fire was far from the school's only problem at that point.

In December 2007 a former student filed a lawsuit alleging that the staff at Carolina Springs had kept him from seeing a doctor for several months after he hurt his wrist playing basketball.

Upon learning about the case, Lexington Insurance Company successfully sued Carolina Springs in federal court to rescind its $1 million liability policy. The insurer said school officials had made "false or intentionally evasive and incomplete" representations about violations, physical and sexual abuse and other incidents that could lead to claims.

More recently, another former student won a $200,000 judgment against Carolina Springs. The girl fractured her arm after falling off a horse at the boarding school in 2008.

Besides mounting legal woes, Lichfield said, his oldest brother raised his consulting fees for the school just as the economic downturn began to affect enrollment. DSS officials also were ratcheting up the pressure about staffing levels after a report that six boys at the school had tattooed themselves.

"It's been a nightmare," Lichfield said during a recent interview. "All we have tried to do is help kids and we've been crucified."

"I know I have a bit of a persecution complex," he added. "But after everybody starts shooting at you, you learn to duck your head."

**A new business plan**

Lichfield said he spent close to $3 million covering losses at Carolina Springs. He said he was ready to make a change by September 2009. To avoid continued

APP 00124

Case 2:24-cv-00458-JNP-CMR   Document 29-11   Filed 08/30/24   PageID.212   Page

Appellate Case: 25-4135   Document: 28   Date Filed: 01/20/2026   Page: 125

scrutiny from DSS, Lichfield closed Carolina Springs and converted it into a Christian boarding school for girls.

But that endeavor was doomed, Lichfield said, by the bad economy, overhead expenses and an employee who embezzled $200,000.

Lichfield said he closed the girls' school in June so he could sever financial ties with relatives and catch his breath.

With a new business plan in place for Magnolia Christian School, Lichfield predicted he will be able to provide "better services for my children."

"We're here because we believe in what we do," he said.

| 0 | Share | Tweet | Email | Print |

Help · Terms of Service · Subscription Terms & Conditions · Privacy Policy · Site Map · Accessibility · Our Ethical Principles · Responsible Disclosure · ☑☒ Your Privacy Choices

 

© Copyright Gannett 2024

APP 00125

# EXHIBIT 12

APP 00126

## *Second-chance school in Abbeville County*

Anderson Independent-Mail (South Carolina)

May 4, 2014 Sunday

Copyright 2014 Independent Publishing Company All Rights Reserved

**Section:** EDUCATION

**Length:** 1531 words

**Byline:** Kirk Brown

# Body

DUE WEST — Narvin Lichfield is back in the business of treating troubled teens, and he's using an alias to market his latest venture.

Lichfield is the former owner of Carolina Springs Academy, which at one time housed dozens of teens from around the nation. Carolina Springs closed in 2009 after its state license was revoked for numerous violations.

Now Lichfield and his wife are running Seneca Ranch at the same site in rural Abbeville County. A 20-year-old diagnosed with Asperger syndrome and three teens are enrolled in the faith-based boarding school that is exempt from most state regulations.

Lichfield refers to himself as Nate Browning on websites promoting Seneca Ranch, which charges students up to $4,695 a month for short-term stays. He says the alias is akin to a performer's stage name.

"I use this just like an actor does because my name has been destroyed on the Internet," Lichfield said in a recent interview.

The Independent Mail published a series of articles in 2010 about allegations involving the mistreatment of children, neglected animals and other problems at Carolina Springs. The series mentioned a 2003 raid at Lichfield's boarding school in Costa Rica that resulted in his arrest on charges that were later dropped. It also detailed Carolina Springs' affiliation with a now-defunct business founded by Lichfield's older brother that once oversaw a network of facilities for adolescents that reached from California to the Czech Republic.

The newspaper's stories, other media accounts and negative remarks from former students at Carolina Springs have been widely disseminated on an array of websites.

Lichfield insists that he has been wrongfully maligned.

"There is no way to get any justice," he said. "I have done nothing but to do my very best to help the kids."

Second Chances

On one of its websites, Seneca Ranch is described as a second-chance youth ranch that serves as "an island of hope for the families seeking to help their children."

The school, which accepted its first student in June 2012 and a handful of others last summer, also represents a second chance for Lichfield. He has spent five years struggling to overcome financial losses stemming from the collapse of Carolina Springs.

Harold Dabel is listed as the founder and educational director of Seneca Ranch. A former Spanish professor at Lander University in Greenwood who served as a consultant at Carolina Springs, Dabel currently works as an elementary school substitute teacher in the Salt Lake City area. He makes quarterly visits to Seneca Ranch.

Lichfield, a 52-year-old Utah native, and his wife, Flory, are the only staff members staying at the boarding school with its four students and their teen son.

The school occupies a large home festooned with mounted deer heads and a Brigham Young University football helmet. The rustic quarters sit behind empty dormitories that previously housed students at Carolina Springs and its short-lived successor, Magnolia Christian School. The collection of buildings is tucked away on more than 400 acres of forest and pastures where horses and cattle graze about two miles north of Due West.

Affable and gregarious, Lichfield often punctuates his comments by saying "to make a long story short" before rambling on for several minutes. He agreed to talk to the Independent Mail even though he said his wife and

APP 00127

Second-chance school in Abbeville County

attorney warned him that it was a bad idea.

Lichfield said he and Dabel have embraced a family- and faith-focused approach at the boarding school that is the "antithesis" of the treatment model employed at Carolina Springs.

To foster this sense of family, the four Seneca Ranch students recently accompanied Lichfield and wife and son on a cross-country trek that included stops in New York, Salt Lake City and Yellowstone National Park. Seneca Ranch students also have traveled to Costa Rica with the Lichfields.

According to Dabel, these trips are beneficial for the students because "the educational value of travel is irreplaceable."

Fewer students, Better staff

Lichfield said his goal is to cap enrollment at Seneca Ranch at about 60 students. At its peak, Carolina Springs had 160 troubled teens.

He said he wants to hire dedicated staff members who will earn as much as $50,000 annually, which is twice as much as Carolina Springs paid its staff.

"We are going to be able to get some good people, I believe," Lichfield said. "The people that are going to be here are going to be the people that believe in what we are doing, believe that we can really make a difference with kids."

The staff at Carolina Springs was at the root of many of its problems with the South Carolina Department of Social Services. Agency officials saw staff members cursing at and degrading boys enrolled there. According to one report, a child was handcuffed and threatened with a Taser on his first night at Carolina Springs in January 2009.

There were no allegations that Lichfield personally mistreated students at Carolina Springs.

Carolina Springs was cited repeatedly for failing to adhere to state-mandated staffing levels. A single employee was watching 38 male students on a night when three boys ran away in November 2008. One of the runaways was gone for a week before being found 20 miles away in Anderson.

The social services department sent one of its employees to Seneca Ranch last month after being notified by the Independent Mail that children were staying there.

Lichfield and Dabel said they were assured that Seneca Ranch is exempt from state regulations other than fire-safety rules because of its status as a faith-based boarding school that does not remain open all year. According to its Facebook page, Seneca Ranch closes from Dec. 20 to Jan. 30.

Unlike Carolina Springs, which was licensed as a child-caring institution, Department of Social Services spokeswoman Marilyn Matheus confirmed that her agency's rules do not apply to Seneca Ranch.

While the boarding school is not subject to state regulation, Lichfield said students at Seneca Ranch are seen by an independent therapist, social worker Jim Rosenberger of the Family Counseling Center of Anderson, who also acts as their advocate.

Under South Carolina law, Rosenberger said, he would be required to report any cases of suspected abuse at Seneca Ranch to authorities.

Rosenberger said students are often angry at their parents for sending them away when the arrive at Seneca Ranch. But eventually they accept responsibility for their own actions.

"The structure and consistency that kids get here really makes a difference," Rosenberger said.

He also said a "break from the dysfunction" in their homes is good for troubled teens.

Eric's story

When he came to Seneca Ranch nearly two years ago, Eric Avant was overweight and taking numerous psychoactive prescriptions for Asperger syndrome, which is considered a higher functioning form of autism.

Now approaching his 21st birthday, Avant has lost about 100 pounds and takes far less medication. He said his comprehension of the virtual school classes offered to students at Seneca Ranch has improved dramatically.

"I can dig deeper into my mind to remember," he said.

APP 00128

Second-chance school in Abbeville County

Jan Avant said her son has thrived at Seneca Ranch in a way that he never did during repeated stays at hospitals and other facilities.

"I think the biggest change that I have seen in Eric is that he has learned to like himself," she said.

She lauded Lichfield and his wife and Rosenberger for the improvements that her son has made.

"They never gave up on Eric," Jan Avant said. "They outlasted him with their patience, their love and their determination."

Jan Avant said she was aware of the past problems at Carolina Springs when she and her husband brought their son to Seneca Ranch.

"You don't judge a book by its cover," she said. "We knew it was right."

Growing Pains

While he uses an alias for marketing purposes, Lichfield said he reveals his identity to parents before they enroll their teens at Seneca Ranch.

His pseudonym is not the only online information about the school that is fictional.

A brochure for Seneca Ranch posted on the Internet lists three members of its management team who are not currently employed by the school. The same brochure indicates that teens receive psychological evaluations upon enrolling, which allows the school's staff to "address the individual needs of each student." Dabel acknowledged in an email that these evaluations are not being performed.

"We do not pretend to be a clinic or hospital for troubled teens," he wrote. "But rather we provide a family orientated environment with faith based ideals."

A related website touting the school as a treatment option for troubled teens belonging to The Church of Jesus Christ of Latter Day Saints includes five stock photos under the heading Our Staff, including an image of a handsome man identified as Kay Stratton.

"We are still undergoing a lot of growing pains," Dabel said a telephone interview.

He addressed the issue further in his email: "Our current web pages are under constant editing and change and will continue to do so as we grow and build the vision that is to be Seneca Ranch."

Follow Kirk Brown on Twitter @KirkBrown_AIM

## Graphic

Anderson Independent Mail, S.C. Therapist Jim Rosenberger, left, of Anderson, waits for Eric Avant, 20, a resident at Seneca Ranch boarding school for troubled youth in Due West, before an afternoon walk. Avant said he has lost weight and learned more while living at the boarding school. Photos by Ken Ruinard/Independent Mail Narvin Lichfield, owner of Seneca Ranch boarding school for troubled youth in Due West, reflects on scaling it down to a smaller number of children. Therapist Jim Rosenberger, left, of Anderson, waits for Eric Avant, 20, a resident at Seneca Ranch boarding school for troubled youth in Due West, before an afternoon walk. Avant said he has lost weight and learned more while living at the boarding school. Narvin Lichfield, owner of Seneca Ranch boarding school for troubled youth in Due West, reflects on scaling it down to a smaller number of children. Therapist Jim Rosenberger, left, of Anderson, waits for Eric Avant, 20, a resident at Seneca Ranch boarding school for troubled youth in Due West, before an afternoon walk. Avant said he has lost weight and learned more while living at the boarding school. Therapist Jim Rosenberger, right, of Anderson, talks with a resident at Seneca Ranch boarding school for troubled youth in Due West. The children in the program stay in the large home on more than 400 acres, where they can live around horses and cows. Narvin Lichfield checks on Spanish thoroughbreds at the Seneca Ranch boarding school, which covers more than 400 acres near Due West. Eric Avant, 20,says his life has improved since he came to the Seneca Ranch boarding school near Due West almost two years ago.

**Load-Date:** May 4, 2014

**End of Document**

APP 00129

# EXHIBIT 13

APP 00130



# Help at Any Cost

## How the Troubled-Teen Industry Cons Parents and Hurts Kids

## MAIA SZALAVITZ

Author of New York Times Bestseller *Unbroken Brain*

APP 00131

decided to write to Costa Rican authorities.

Her letter, and an earlier visit by a mother of twin boys trying to pull them from Dundee after their father had placed them there without her permission, brought the program to the attention of both local authorities and local U.S. State Department officials.  The State Department had taken its usual hands-off approach while Amberly had been director, despite the High Impact raid in Mexico and its knowledge of the connections between the WWASP programs.

But with some prodding from the press and local government, U.S. and Costa Rican officials began an official investigation in early 2003.  Costa Rican child-welfare authorities first cited Dundee for fifteen unacceptable practices.[55] These included holding teens in the program against their will, which is illegal in Costa Rica; providing "no privacy"; overly restricting communication with parents; and "inadequate food and meal portions."  The investigators further said that staff were "unqualified to attend to needs of children" and that "some punishments qualify as physical and psychological abuse."[56]

While Costa Rica's child-welfare agency had planned to move slowly, as did the U.S. embassy, a local prosecutor, Fernando Vargas, decided that more immediate action was needed.  He raided the facility on May 20, 2003.  About 200 teens were there at the time.  When Vargas announced what the youths' rights were under Costa Rican law, chaos erupted.  Seventeen-year-old Hugh Maxwell told the *New York Times*, "They told us you have the right to speak, you have the right to speak to your parents, you have the right to leave if you feel you have been mistreated . . . kids heard that and they started running for the door.  There was elation, cheering and clapping and chaos.  People were crying."[57]

About thirty to fifty teens left on foot, heading for the beach or the nearest town.  According to a witness quoted in the *Times*, staff "started kicking, hitting and choking children to [try to] stop them from leaving."[58]  Although child-welfare officials urged the kids to accompany them in vehicles they'd brought for this purpose, most refused, apparently fearing they'd be placed in a dangerous homeless shelter.  Staffers tried to make the remaining kids sign a statement saying that they'd been treated well at the school and would stay voluntarily, but some refused this as well.  Most signed, however, convinced by staff that they would be sent to the tougher Tranquility Bay if they didn't.

Over the next several days, the facility swung between periods of calm and utter chaos.  Some girls lit a fire in their dorm.  Teens trashed staffers' cars and hit vehicles and buildings with sticks.  They rampaged through the facility, destroying property, breaking whatever they could.  Torn textbooks and papers flew everywhere.  Child-welfare officials tried to take control at some times—at

144

APP 00132

others, Dundee staff tried to reestablish order.

After the raid, Lichfield was arrested and charged with human rights violations, some of which carry a ten-to-fifteen-year prison term for each count.[59] Speaking about Dundee's disciplinary tactics, prosecutor Fernando Vargas told the press, "In Costa Rica, we don't even allow that kind of punishment for our prison inmates. We are conducting a criminal investigation for systematic violations of human rights."[60]

Lichfield has denied all of Amberly Knight's claims and says he knew of no abuse. He told the *Tico Times* in May 2003, "I am scared crapless. I am afraid because they are going to try and make me the poster child for rights abuses that didn't happen."[61] By September, he was telling the same reporter, "What did we do wrong? I am still confused about this I never worked with kids, so how could I abuse them? I heard rumors about what staff did, but I can't say because I wasn't there. . . . In Narvin's world, we will have a facility set up where [child welfare officials have] oversight and if the staff goes on its own and abuses kids, the government will prosecute the individual and not hold the facility guilty."[62]

Costa Rica banned him from leaving the country for six months, pending legal proceedings. It corroborated the accounts of abuse from former staffers and teen participants. The investigation also found that Dundee was distributing psychiatric medications without a license and that most of the staff were unqualified.

Narvin Lichfield owns another WWASP program, Carolina Springs Academy in South Carolina, that has been under close scrutiny from regulators there for a familiar litany of violations: overcrowding, accepting teens it is not equipped to serve, allowing students to discipline and restrain each other, failure to report child abuse and fire-code violations.[63] When he was charged with human rights violations in Costa Rica, South Carolina regulators barred him from Carolina Springs until the case was resolved. As of October 2004, he was still barred from involvement in day-to-day operations of the program and from having contacts with the teenage residents.[64]

IN LATE 2003, I went to Cross Creek Manor to interview two principals in WWASP: Ken Kay, President of WWASP, and Karr Farnsworth, who runs Cross Creek Manor, their most expensive residential treatment center and the only one to employ licensed therapists for the primary care of the teens. I wanted to see and hear for myself the other side of the story. If they had just given me a tour of the facility and allowed me to interview the staff therapists they'd hand-selected, as originally planned, I would have come away with a much more positive impression than I'd ever have thought possible. But instead, they confronted me

145

APP 00133

[55] Rogers, "Chaos Hits U.S. Reform Facility," Tico Times, 5/23/2003.

[56] Ibid.

[57] Weiner, "U.S. Youths Rebel."

[58] Ibid.

[59] Sullivan, Tim, "Dundee Ranch Students Head Back to U.S.," Salt Lake Tribune; 5/24/2003.

[60] Campbell, Duncan, "Costa Rican Authorities Raid U.S.-Run 'Boot Camp,'" The Guardian, 5/23/2003.

[61] Rogers, Tim, "Dundee's Future Uncertain," Tico Times, 5/30/2003.

[62] Rogers, Tim, "Students' Complaints Add to Academy's Woes," Weekly Edition, 9/5– 9/11/2003.

[63] Kilzer, "Desperate Measures" series.

[64] Confirmed by Marilyn Matheus, South Carolina Department of Social Services.

[65] Peterson's Guide to Secondary Schools, www.petersons.com (accessed July 2005).

[66] Miller, W. R., and Sovereign, R. G., "The Checkup: A Model for Early Intervention in Addictive Behaviors," in Loberg, T., et al., eds., Addictive Behaviors: Prevention and Early Intervention, Amsterdam, Swets & Zeitlinger, 1989. For summary of research on confrontation (not one study found a positive effect): Miller, W., and Hester, R., Handbook of Alcoholism Treatment Approaches: Effective Alternatives, 3rd edition, Allyn and Bacon, 2003, pp. 34–35.

[67] Miller, W. R., Benefield, R. G., and Tonigan, J. S., "Enhancing motivation for change in problem drinking: a controlled comparison of two therapist styles," J Consult Clin Psychol, 1993 Jun; 61(3): 455–61.

[68] Additional sources for Chapter Six: Interviews with Kyrsten Bean, Acken*, Nina*, Doreen* and her mother, Ken Kay, two unnamed Cross Creek therapists, Paradise Cove student and parent; teens from Dundee Ranch, Casa by the Sea, Tranquility Bay, Academy at Ivy Ridge, Spring Creek Lodge, Brightway Adolescent Hospital, Paradise Cove, Provo Canyon School; and parents of teens who attended all of the above except Provo Canyon.

# Chapter Seven

[1] Rogers, Tim, "Parents to Sue Association," Tico Times, 6/26/2003.

[2] See Weiner, Tim, "Youths Rebel at Harsh School in Costa Rica and Many Head for Home," New York Times, 5/27/2003; Weiner, Tim, "Parents Divided Over Jamaica Disciplinary Academy," New York Times, 6/17/03; Weiner, Tim, "Parents, Shopping for Discipline, Turn to Harsh Programs Abroad," New York Times, 5/9/2003.

APP 00134

"*Help at Any Cost* shines a bright light on the urgent need for reforms of the so-called 'teen help' industry. This book is a must-read for any parents considering sending their children away from home to a residential program." — Representative George Miller, former Chair of the House Committee on Education and Labor, who held Congressional hearings on this issue after this book was originally released and proposed legislation, which, unfortunately, has yet to be made into law.

"*Help at Any Cost* is the fascinating, disturbing story of an American Abu Ghraib that preys on troubled teens and their unwitting parents. Maia Szalavitz's meticulously researched account lays bare one of the most underreported injustices in America today. It is a chilling portrait of the dehumanizing effects of the war on drugs and of lives wasted by a teen-help industry run amuck." —Evan Wright, author of *Generation Kill*

"In this long-awaited study of the booming 'teen help' industry, Szalavitz bravely takes on an important issue affecting teens more today than ever before. With this thorough and riveting example, she calls for parents, educators and mentors to take a closer look as the 'help' their teens are receiving. The lives of many teenagers may depend on it!" Lynn Ponton, MD, author of *The Romance of Risk: Why Teenagers Do the Things They Do*.

"In this riveting and deeply troubling book, Maia Szalavitz shows that we don't have to go to Guantanamo Bay to find examples of harsh violations of human rights; frighteningly similar abuses are inflicted on American teenagers today, in programs ostensibly established to help them. Help at Any Cost vividly illuminates the human costs of these 'treatment' programs and the urgency of challenging their misleading claims before more of our children are irreparably harmed."— Elliot Currie, author of *The Road to Whatever: Middle Class Culture and the Crisis of Adolescence*.

"This powerful book describes— with sensitivity and clarity— how fear, ignorance, greed and inhumanity converge to create a 'therapy' industry that humiliates, degrades, deprives and tortures our children, sometimes to death. This amazing sad, hopeful book is a clarion call to all who value children. Every parent and every professional working with adolescents should read it."— Bruce Perry, MD, PhD., Senior Fellow, Child Trauma Academy and lead author of *The Boy Who Was Raised as a Dog*.

"How much of the industry that provides residential treatment for teenagers consists of institutionalized child abuse? I don't know, but Maia Szalavitz makes a strong case that the answer is 'too much of it' and that no system is now in place to detect and remedy these abuses."
— Mark Kleiman, Professor of Public Policy at the NYU/Marron Institute of Urban Management.



ISBN 9798662922778

90000

9 798662 922778

APP 00135

(Conventionally Filed Appendix Exhibit, but referenced on Appendix as the Stamped Page No. herein; Defendants' Request for Judicial Notice Exhibit 14)

# EXHIBIT 14

INSIDE EDITION INVESTIGATES DUNDEE RANCH ACADEMY: A WWASP PROGRAM

SUBMITTED TO THE COURT ON A DIGITAL STORAGE DEVICE

APP 00137

(Conventionally Filed Appendix Exhibit, but referenced on Appendix as the Stamped Page No. herein; Defendants' Request for Judicial Notice Exhibits 15A - 15B)

# EXHIBITS 15A – 15B

TRAPPED IN TREATMENT EPISODES 3 AND 10

SUBMITTED TO THE COURT ON A DIGITAL STORAGE DEVICE

APP 00139

# EXHIBIT 16

APP 00140

ATTORNEY GENERAL OF THE STATE OF NEW YORK
WATERTOWN REGIONAL OFFICE

---

In The Matter of

THE ACADEMY AT IVY RIDGE

---

### ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW
### SECTION 63, SUBDIVISION 15

Pursuant to the provisions of Executive Law Section 63 (12), General Business Law Sections 349 and 350, Section 216 of the Education Law, Section 104 (e) of the Business Corporation Law, and Section 100.2 (p) of the Regulations of the Commissioner of Education, Eliot Spitzer, Attorney General of the State of New York, caused an inquiry to be made into the organization and business practices of the Academy at Ivy Ridge, a boarding school located near Ogdensburg, New York. Upon such inquiry, the Attorney General has determined as follows:

### ATTORNEY GENERAL'S FINDINGS OF FACT

1.      The Academy at Ivy Ridge ("Ivy Ridge") is a for profit private boarding school and behavior modification facility operated by a business partnership whose articles of partnership were filed in the Office of the Clerk of St. Lawrence County on December 17, 2001 ("Partnership"). The Partnership is comprised of two domestic general purpose business corporations: the Jason G. Finlinson Corporation and the Joseph and Alyn Mitchell Corporation. The corporations were formed November 7, 2001, and were created for the express purpose of being the partners in the aforementioned partnership, whose purpose was to operate the Academy at Ivy Ridge.

2.      Ivy Ridge began admitting students in 2001. By the Spring of 2005 enrollment was at 460 students. Ivy Ridge currently offers tuition options ranging from $3,490 to $3,990 per month. Additional money is required for medical care, counseling, and other expenses, including uniforms.

3.      Most, if not all, of Ivy Ridge's students are teenagers who have a significant history of bad behavior. Ivy Ridge advertises that its pristine and isolated setting, strict code of discipline and academic program will both educate students and set them on the path to productive citizenship.

4.      Over the course of its existence, the informational and advertising material concerning Ivy Ridge has emphasized that its educational offerings distinguishes it from many of the boarding schools that serve "troubled teens". At Ivy Ridge academic credit is earned for courses mastered. Students earning the requisite amount of credits were issued high school diplomas. Ivy Ridge offered two types of diplomas, a general diploma, and a "college prep" diploma.

APP 00141

5.      The representation that Ivy Ridge issued diplomas to its graduates was contained in its written promotional material, on various web sites maintained by the school, and in direct marketing of the school to parents of prospective students  Since its formation, Ivy Ridge has issued one hundred and thirteen (113) diplomas to its graduates.

6.      Ivy Ridge stated in its promotional materials that it was accredited by the Northwest Association of Schools and Colleges.  In fact, however, Ivy Ridge was only a candidate for accreditation, working its way through the multi-year process for becoming accredited by the Northwest Association of Accredited Schools (NWAAS), formerly known as the Northwest Association of Schools and Colleges, headquartered in Boise Idaho.

7.      In order to be accredited by NWAAS, the by-laws of that organization require that a school be licensed, certificated, or registered in the state in which it is located.  Because Ivy Ridge has never been licensed, certificated, or registered in New York State, the school never should have been considered for accreditation by NWAAS.  In March of 2005, after receiving information that the school was not licensed, certified, or registered in the State of New York, NWAAS suspended Ivy Ridge's candidacy for accreditation. That candidacy has not been restored.

8.      Under New York State law, a corporation may not operate an educational institution without the consent of the Board of Regents.  Similarly, two corporations may not form a partnership to operate an educational institution without the consent of the Board of Regents.  It is the position of the Attorney General that the formation of the Partnership between the Jason G. Finlinson Corporation and the Joseph and Alyn Mitchell Corporation to own and operate Ivy Ridge violates Section 216 of the Education Law and Section 104 (e) of the Business Corporation Law.

9.      The Regulations of the Commissioner of Education Section 100 2(p) prohibit high schools in New York State, whether public or nonpublic, from issuing diplomas without first obtaining a Certificate of High School Registration from the Board of Regents.  Ivy Ridge awarded 113 of its graduates with high school diplomas despite not having nor ever applying for a Certificate of High School Registration.

10.      Ivy Ridge, by stating in its promotional material that it awarded its graduates high school diplomas and that it was accredited by the Northwest Association of Schools and Colleges, violated GBL 349 (deceptive acts and practices), and Section 350 (false advertising).

11.      The actions, representations and conduct of Ivy Ridge as described herein constitute repeated and persistent fraudulent and illegal conduct actionable by the Attorney General pursuant to Executive Law, Section 63(12).

APP 00142

## AGREEMENT

12.    It now appears that The Academy at Ivy Ridge is willing to enter into this Assurance of Discontinuance ("Assurance") and the Attorney General is willing to accept this Assurance in lieu of commencing legal action with respect to the issues of the organizational structure of Ivy Ridge, the past issuance of diplomas by Ivy Ridge, and representations by Ivy Ridge as to its accreditation status.

13.    This Assurance shall be binding upon The Academy at Ivy Ridge, the Jason G. Finlinson Corporation, the Joseph and Alyn Mitchell Corporation, Jason G. Finlinson, Joseph Mitchell and Alyn Mitchell, and/or their directors, members, partners, principals, employees, representatives, administrators, agents, successors and assigns, or any other individual or entity through whom they may act (hereinafter "Respondents").

14.    Respondents agree to forthwith reconstitute the organizational structure of Ivy Ridge by re-organizing in such manner as is statutorily allowed.  The successor entity shall be formed within thirty (30) days from the execution of this Assurance.

15.    Respondents agree that Ivy Ridge shall cease awarding any diplomas and cease advertising that Ivy Ridge is a diploma granting entity, until such time as Ivy Ridge is granted a Certificate of High School registration from the New York State Education Department.

16.    Respondents agree that they shall affirmatively represent in Ivy Ridge's website, for a period of 180 days following the execution of this Assurance, that Ivy Ridge is not registered in any manner by the State of New York until such time as Ivy Ridge is granted a Certificate of High School Registration from the New York State Department of Education.

17.    Respondents agree that they will not represent in any of Ivy Ridge's informational, advertising and promotional material, websites, and recruitment activities that Ivy Ridge is accredited by an accrediting agency, unless and until an accrediting agency entitled to accredit high schools in New York State confers accreditation upon the school.

18.    Respondents agree that within 30 days of the execution of this Assurance, a letter, approved by the Attorney General and in the form annexed hereto as Exhibit "A", on Ivy Ridge letterhead, will be sent to the parents or financially responsible persons for each student enrolled at Ivy Ridge as of the date this agreement is signed, advising the recipient that: (1) Ivy Ridge is not registered in any manner by the State of New York or the New York State Department of Education, (2) Ivy Ridge is not currently accredited by any academic accrediting organization, and (3) Ivy Ridge is not authorized by the New York State Department of Education to grant high school diplomas to its students.

19.    Respondents agree that within 60 days of the execution of this Assurance, Respondents shall pay to the Attorney General an amount equal to 15% of the total tuition paid for each of 113 students issued diplomas by Ivy Ridge.  Respondents agree that concurrently with making this payment, they shall provide to the Attorney General the names of these 113 graduates, the names and last known

APP 00143

addresses of those who were financially responsible for them, and the total sum paid on behalf of each student. This information shall be provided in affidavit form. Upon receipt of the payment and the specified information, the Attorney General shall remit an amount equal to 15% of the total tuition paid to those persons financially responsible for each of the 113 graduates, together with a letter in the form annexed hereto as Exhibit "B".

20.    Respondents agree that within 100 days of the execution of this Assurance, Respondents shall provide to the Attorney General, in affidavit form, the following information concerning current or former students at Ivy Ridge with the following characteristics:

A.    Information to be supplied: name of student, name(s) and last known address(es) of person(s) financially responsible for the student, total amount of tuition paid to Ivy Ridge on behalf of the student.

B.    Students: current or former Ivy Ridge students who:

1.    Did not receive a diploma from Ivy Ridge, and
2.    While at Ivy Ridge held eighteen or more credits toward graduation on or before the date this Assurance was signed, and
3.    Withdrew from Ivy Ridge between April 15th and the 60th day after the letters referenced in paragraph 18 are sent out, inclusive; and
4.    Did not enroll at Ivy Ridge on or after April 15, 2005.

21.    For each of the students identified in paragraph 20 (B), the Attorney General shall send a letter to the student and to his or her parent or guardian inquiring as to the reason for the student's withdrawal, in the form annexed hereto as Exhibit "C". Where, within 30 days of mailing, the Attorney General receives a written response that the indicated reason for withdrawal is either Ivy Ridge's lack of accreditation or its inability to confer a high school diploma, Respondents shall pay to the Attorney General an amount equal to 15% of the total tuition paid to Ivy Ridge on behalf of each of the withdrawing students. Such payments shall be made on or before the 60th day following notification to Ivy Ridge by the Attorney General of the total amount due, together with a copy of all written responses. Ivy Ridge may present to the Attorney General any equitable or other reasons why an otherwise qualifying student should not receive the offered restitution. The Attorney General's decision that a student withdrew from Ivy Ridge due to Ivy Ridge's lack of accreditation or its inability to confer a high school diploma, or should not otherwise be disqualified from receiving restitution, shall be final.

## PENALTY

22.    Respondents agree to pay to the Attorney General $250,000 as a civil penalty and $2,000 for the costs of this investigation within 60 days from the date set forth below

## MISCELLANEOUS

23.     Nothing in this Assurance shall be construed to deprive any person of any right or remedy under the law.

24.     Pursuant to Executive Law Section 63(15), violation of this Assurance hereafter shall constitute _prima_ _facie_ proof of a violation of the applicable statutes in any civil action or proceeding hereafter commenced by the Attorney General.

25.     Acceptance of this Assurance by the Attorney General shall not be deemed or construed as an approval of the Attorney General of any of the activities or business practices of Ivy Ridge, and Ivy Ridge shall make no representation to the contrary.  Acceptance of this Assurance shall not be deemed or construed as an admission by Ivy Ridge as to any of the claims set forth in this Assurance of Discontinuance or any admission of liability therefore.

WHEREFORE, the following signatures are offered hereto this 17ᵗʰ day of August,

2005.

The Academy at Ivy Ridge, a New York Partnership

**Jason G. Finlinson, Corporation Partner**

By: _____
Name: _____
Title: _____

**Joseph and Alyn Mitchell Corporation, Partner**

By: _____
Name: _____
Title: _____

**Jason G. Finlinson Corporation**

By: _____
Name: _____
Title: _____

APP 00145

**Joseph and Alyn Mitchell Corporation**

By: _____

Name: Joseph E. Mitchell

Title: President


**Jason G. Finlinson, Individually**

_____


**Joseph Mitchell, Individually**

_____


**Alyn Mitchell, Individually**

_____

ELIOT SPITZER
Attorney General of the
State of New York

By: _____

JOHN T. SULLIVAN, JR.
Assistant Attorney General In Charge
Watertown Regional Office
317 Washington Street
Watertown, New York 13601

APP 00146

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK        )
                                 )SS
COUNTY OF ST. LAWRENCE )

       Jason G. Finlinson, the undersigned, being duly sworn, deposes and says:   I am President of Jason G. Finlinson Corporation, the respondent described in and which executed the foregoing Assurance of Discontinuance.  I have executed the aforesaid instrument with the consent and authority of Jason G. Finlinson Corporation and those responsible for the acts of said entity and duly acknowledge the same.

Jason G. Finlinson

Sworn to before me this
10 day of August , 2005

STEVEN M. LASHOMB
NOTARY PUBLIC, STATE OF NEW YORK
No. 01LA6110613
QUALIFIED IN ST. LAWRENCE COUNTY
MY COMMISSION EXPIRES JUNE 1, 2008

APP 00147

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK           )
                           )SS
COUNTY OF ST. LAWRENCE )


_Joseph E Mitchell_ , the undersigned, being duly sworn, deposes and says:  I am President of Joseph and Alyn Mitchell Corporation, the respondent described in and which executed the foregoing Assurance of Discontinuance.  I have executed the aforesaid instrument with the consent and authority of Joseph and Alyn Mitchell Corporation and those responsible for the acts of said entity and duly acknowledge the same.


Sworn to before me this
_10_ day of _August_ , 2005


STEVEN M. LASHOMB
NOTARY PUBLIC, STATE OF NEW YORK
No. 01LA6110613
QUALIFIED IN ST. LAWRENCE COUNTY
MY COMMISSION EXPIRES JUNE 12, 08

**EXHIBIT A**

APP 00149

[Date]

[Name]
[Address 1]
[Address 2]

Re:    The Academy at Ivy Ridge

Dear [Name]:

As you are aware, your son or daughter is currently enrolled as a student at the Academy at Ivy Ridge ("Ivy Ridge").

Pursuant to an agreement entered into by the Academy and the Office of the Attorney General of the State of New York, I am writing to inform you that (1) Ivy Ridge is not registered in any manner by the State of New York or the New York State Department of Education, (2) Ivy Ridge is not currently accredited by any academic accrediting organization, and (3) Ivy Ridge is not authorized by the New York State Department of Education to grant high school diplomas to its students.

Thank you for your attention in this matter.

Very truly yours,

Jason Finlinson, Director

APP 00150

**EXHIBIT  B**

APP 00151

[Date]

[Name]
[Address 1]
[Address 2]

Re:    The Academy at Ivy Ridge

Dear [Name]:

As you are aware, your son or daughter was formerly enrolled as a student at the Academy at Ivy Ridge ("Ivy Ridge") and received a diploma of high school graduation.

Pursuant to an agreement entered into by Ivy Ridge and the Office of the Attorney General of the State of New York, the text of which can be found on our website (www.oag.state.ny.us), every student who received a diploma, which at the time was unauthorized, is entitled to a refund of 15% of the total amount of tuition paid.

Consequently, we enclose herewith a refund check in the amount of $_____ , representing 15% of the total tuition paid in connection with your child's attendance, as reported to us by Ivy Ridge officials.

Thank you for your attention in this matter, and should you have any questions, feel free to contact the undersigned..

Very truly yours,

ELIOT SPITZER, ATTORNEY GENERAL

By:

John T. Sullivan Jr.
Assistant Attorney General-In -Charge
Watertown Regional Office
Ph. 315-785-2444

APP 00152

**Exhibit C**

APP 00153

[Date]

[Name]
[Address 1]
[Address 2]

Re:     The Academy at Ivy Ridge

Dear [Name]:

This letter is being sent to you with the understanding that your son or daughter used to be a student at the Academy at Ivy Ridge ("Ivy Ridge") in Ogdensburg, New York.

The Office of the Attorney General of the State of New York and The Academy at Ivy Ridge recently entered into an agreement under the terms of which certain former students may be eligible for a partial refund of tuition paid. f you wish to be considered for this partial refund, it is necessary that you complete and return the form printed at the bottom of this page within thirty days. A stamped, self-addressed envelope is enclosed for your use.

Thank you in advance for your assistance in this matter. Should you have any questions, feel free to contact the undersigned.

Very truly yours,

ELIOT SPITZER, ATTORNEY GENERAL

By:

John T. Sullivan Jr.
Assistant Attorney General-In-Charge
Watertown Regional Office
Ph. 315-785-2444

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Name: _____

Current Address: _____

Name of Student: _____

Reason for Withdrawal:

_____

_____

APP 00154

# EXHIBIT 17

APP 00155

# ARTICLES OF INCORPORATION
## OF
# WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS, INC.

### (A Non-Profit Corporation)

The undersigned, for the purpose of forming a corporation pursuant to the Utah Non-Profit Corporation and Cooperative Association Act, Utah Code Annotated 16-6-18, et.seq., in the capacity of Incorporator, adopts the following Articles of Incorporation.

1. **Name.**

The name of this Corporation shall be as indicated in the title of this instrument. This Corporation shall hereinafter be referred to as the "Association", these Articles of Incorporation as the "Articles," and the By-Laws as the "By-Laws."

2. **Purpose.**

The purpose for which the Association as organized is to form an association of youth programs around the world to ensure high standards of training, education and behavior in youth.

3. **Powers.**

The powers of the Association shall include, and the Association shall be governed by the following:

3.1 **General.** The Association shall have all of the common law and statutory powers of a corporation not for profit under the laws of the State of Utah that are not in conflict with the provisions of these Articles, the By-Laws, and the Declaration.

3.2 **Enumeration.** The Association shall have the powers and duties set forth in the Declaration. It shall further have all of the powers and duties reasonably necessary to operate pursuant to its purposes, as they may be amended from time to time, including, but not limited to, the following:

3.2.1 To operate an airport for private use by the members of the Association for the purpose of providing for convenience of access to its members and to maintain all necessary landing fields, wind socks and other ground

3.2.2 To fix, levy and collect assessments against members of the Association to defray the common expense of the Association and other charges as provided in the Declaration, these Articles, and the By-Laws, including the power to levy and collect assessments for the

1

APP 00156

purpose of paying assessments levied against the members by the Association.

      3.2.3 To borrow money and, with the assent of three-fourths (3/4) of its members, to mortgage, pledge, or otherwise hypothecate any or all of its real or personal property as security for money borrowed or debts incurred.

      3.2.4 To buy, own, operate, lease, sell and trade both real and personal property as may be necessary or convenient in the administration of the Association.

      3.2.5 To maintain, repair, replace, reconstruct, add to, and operate the property acquired or leased by the Association for use by or for the benefit of the Members.

      3.2.6 To purchase insurance upon the property of the Association, and insurance for the protection of the Association, its Officers, Directors, and members.

      3.2.7 To make and amend reasonable rules and regulations for the maintenance, conservation and use of the property of the Association and for the health, comfort, safety and welfare of the Members, and to enforce the same.

      3.2.8 To enforce by legal means the provisions of the Declaration, these Articles, the By-Laws, and the rules and regulations.

      3.2.9 To contract for the management and maintenance of the Property owned by the Association and to authorize the Association or a management agent to assist the Association in carrying out its powers and duties by performing such functions as the submission of proposals, collection of assessments, preparation of records, enforcement of rules, and maintenance, repair and replacement of Property belonging to the Association with funds as shall be made available by the Association for such purposes.

      3.2.10 The Association and its Board of Trustees and Officers shall, however, retain at all times the powers and duties granted by the Declaration including, but not limited to, the making of assessments, promulgation of rules, and execution of contracts on behalf of the Association, and the employment of personnel to perform the services required for proper operation of the Association.

      3.3    **Property.** All funds and the titles of all properties acquired by the Association and their proceeds shall be held in trust for the benefit and use of the members in accordance with the provisions of the Declaration, these Articles and the By-Laws.

      3.4    **Distribution of Income.** The Association does not contemplate pecuniary gain or

APP 00157

profit to its members and is deemed a corporation not for profit. The Association will make no distributions of income to its members or Directors, unless it is dissolved pursuant to Utah law.

## 4. **Membership.**

Membership shall be made by application. Acceptance into membership shall be evidenced in writing and shall not be withheld by reason of sex, religion or national origin.

## 5. **Voting Rights.**

The Association shall have one (1) class of voting membership to be voted in accordance with the Bylaws.

## 6. **Term of Existence.**

The Association shall have perpetual existence.

## 7. **Board of Trustees.**

7.1    **Number.**    The initial Board of Trustees shall consist of not less than three (3) nor more than seven (7) trustees who shall be elected during the organizational meeting as directed by the incorporator. The initial trustees are:

Brent M. Facer
704 South Anasazi Circle
Washington, Utah 84780

Robert B. Lichfield
317 Lichfield Lane
Toquerville, Utah 84774

J. Ralph Atkin
1240 East 100 South #10
St. George, Utah 84790

7.2    **Term.**    These Committee Members or their successors shall serve until their successors are elected by the membership.

7.3    **Duties and Powers.**    All of the duties and powers of the Association shall be exercised exclusively by the Board of Trustees, the Officers, their agents or employees, subject only to approval by Members when that is specifically required.

7.4    **Election and Removal.**    Board of Trustees of the Association (other than that initial Committee) shall be elected at the annual meeting of the members in the manner determined by the By-Laws. Committee Members may be removed and vacancies on the Board of Trustees shall be filled in the manner provided by the By-Laws.

3

APP 00158

## 8. **Indemnification.**

Every Committee Member and Officer of the Association shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed on him in connection with any proceeding or settlement of any proceeding to which he may be a party or to which he may become involved by reason of his being or having been a Committee Member or Officer of the Association, whether or not he is a Committee Member or Officer at the time such expenses are incurred, except with regard to expenses and liabilities incurred for any of the following:

8.1   **Breach.**   Breach of any fiduciary duty owed by such Committee Member or Officer to the Association.

8.2   **Willful and Knowing Failure.**   Willful and knowing failure to comply with the provisions of the Property Owner Association's By-Laws, the Association's Articles of Incorporation, the Association's Rules and Regulations, provided that in the event of a settlement, the indemnification shall apply only when the Board of Trustees approves such settlement and reimbursement as being for the best interest of the Association.   The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Committee Member or Officer may be entitled.

## 9. **By-Laws.**

The first By-Laws of the Association shall be adopted by the Board of Trustees and may be altered, amended or rescinded by the Committee and members in the manner provided in the By-Laws.

## 10. **Amendments.**

Amendments to these Articles shall require the affirmative vote of seventy-five percent (75%) of the total votes of the Association.

## 11. **Principal Place of Business.**

The principal place of business of the Association shall be at 1240 East 100 South #10, St. George, Utah 84790, or such other place as may be subsequently designated by the Board of Trustees.

4

APP 00159

12. **Initial Registered Office and Agent.**

The name and address of the registered office and agent of the Association J. RALPH ATKIN, 390 Del Mar Drive, St. George, Utah 84790, or such other person as may be subsequently designed by the Board of Trustees.

13. **Incorporator.**

The name and address of the incorporator of these Articles of Incorporation is as follows:

> J. Ralph Atkin
> 390 Del Mar Drive
> St. George, Utah 84790

**IN WITNESS WHEREOF,** the Incorporator has affixed his signature this $3/$ day of December, 1997.

_____
J. RALPH ATKIN

I hereby accept appointment as the registered agent of **WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS, INC.,** this $3/$ day of December, 1997.

_____
J. RALPH ATKIN

**STATE OF UTAH** )
                    : ss.
**COUNTY OF WASHINGTON** )

State of Utah
Department of Commerce
Division of Corporations and Commercial Code

I Hereby certify that the foregoing has been filed and approved on the 7TH day of JANUARY 19 98 in the office of this Division and hereby issue this Certificate thereof.

Examiner _____ Date 1/7/98

_____
KORLA T. WOODS
Division Director

The foregoing instrument was sworn to and acknowledged before me by J. Ralph Atkin this $3/$ day of December, 1997.

_____
NOTARY PUBLIC

CAROLEE HALL
NOTARY PUBLIC • STATE of UTAH
50 EAST 100 SOUTH NO. 205
ST. GEORGE, UT 84770
COMM. EXP. 8-2-2000

5

APP 00160

# EXHIBIT 18

APP 00161

# EXHIBIT 19

APP 00162

# EXHIBIT 20

APP 00163

# EXHIBIT 21

APP 00164

# EXHIBIT 22

APP 00165

# EXHIBIT 23

APP 00166

# EXHIBIT 24

APP 00167

# EXHIBIT 25

APP 00168

# EXHIBIT 26

APP 00169

# EXHIBIT 27

APP 00170

# EXHIBIT 28

SEP 2 '16 AM8:03

This form must be type written or computer generated.



**State of Utah**
**Department of Commerce**
**Division of Corporations & Commercial Code**
**Articles of Dissolution (After Issuance of Shares)**

Entity Number: 1390373-0140

☐ Profit Corporation     ☑ Nonprofit Corporation (Skip Number 4)

**RECEIVED**

**SEP 0 2 2016**

Utah Div. of Corp. & Comm. Code

**Pursuant to the provisions of the Utah Revised Business Corporation Act, the undersigned directors or incorporators adopt the following Articles of Dissolution.**

1): Corporation Name: World Wide Association of Specialty Programs and Schools, Inc.

2): The address of the Corporation's principal office or other address where service of process may be mailed:

50 South State Street                                          LaVerkin        UT        84745

Street Address                                                City          State       Zip
(A Street Address Required, PO Boxes can be listed after the street address)

3): The date of the dissolution was authorized by the Shareholders/Member(s) on: 08/30/2016

4): The total number of votes cast *for* dissolution was: _____ 3 _____

The total number of votes cast *against* dissolution was: _____ 0 _____
OR

The total number of votes cast for dissolution by each voting group was _____
This was sufficient for approval.

**Under penalties of perjury I declare that these Articles of Dissolution have been examined by me and are, to the best of my knowledge and belief, true, correct and complete.**

By: _____     Title: President _____     Date: 08/30/2016

If the filer requests a copy of the **Articles of Dissolution** an additional exact copy of the filed document along with a return-addressed envelope with adequate first-class postage must also be submitted.

Under GRAMA (63-2-201), all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

Mailing/Faxing Information: www.corporations.utah.gov/contactus.html   Division's website: www.corporations.utah.gov

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this 2nd day of Sept 20 16
in this office of this Division and hereby issued
This Certificate thereof

KSW

Examiner _____     Date 9.2.16

Kathy Berg
Kathy Berg
Division Director

01/14

APP 00172

# EXHIBIT 19

APP 00173

450 F.3d 1132
United States Court of Appeals,
Tenth Circuit.

WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS, a Utah corporation, Plaintiff–Appellant,

v.

PURE, INC., Pure Foundation, Inc.; Sue Scheff; Jeff Berryman, Defendants–Appellees.

No. 04–4312.
|
June 13, 2006.

**Synopsis**
**Background:** Association of residential treatment programs for troubled and at-risk teenagers brought defamation action against competitor and an individual critic of the association for defamation and civil conspiracy. The United States District Court for the District of Utah, Paul G. Cassell, J., entered judgment in favor of defendants, and plaintiff appealed.

**Holdings:** The Court of Appeals, Tacha, Chief Judge, held that:

plaintiff was a limited purpose public figure with respect to the public controversy on how to deal with troubled teens, and thus was required to show actual malice to support its defamation claim;

nondefamatory media accounts regarding association of residential treatment programs for troubled and at-risk teenagers were admissible character evidence;

any error in requiring plaintiff to prove all elements of its defamation claim under Utah law by clear and convincing evidence, rather than by a preponderance of the evidence, was harmless; and

evidence was insufficient to support civil conspiracy claim against the individual defendant under Utah law.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

 **\*1135** Spencer C. Siebers (Fred R. Silvester, with him on the briefs), Silvester & Conroy, L.C., Salt Lake City, Utah, appearing for Appellant.

C. Richard Henriksen, Jr. (James E. Seaman, with him on the brief), Henriksen & Henriksen, P.C., Salt Lake City, Utah, appearing for Appellees.

Before TACHA, Chief Circuit Judge, McWILLIAMS, Senior Circuit Judge, and O'BRIEN, Circuit Judge.

**Opinion**

TACHA, Chief Circuit Judge.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff–Appellant World Wide Association of Specialty Programs and Schools ("World Wide") filed suit in federal district court against Defendants–Appellees Jeff Berryman and Sue Scheff, as well as Ms. Scheff's business, Parents Universal Resource Experts, Inc., and its successor, PURE Foundation, Inc., after Mr. Berryman and Ms. Scheff made negative remarks about World Wide on various internet sites. Prior to trial, the District Court granted summary judgment in favor of Mr. Berryman on all claims. A three-day jury trial against Ms. Scheff ended with a verdict in her favor. World Wide then moved for a new trial based on multiple claims of error. The District Court denied the motion and entered judgment against World Wide. World Wide now appeals both judgments. We take jurisdiction under ⚑ 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

World Wide is an association of residential treatment programs for troubled and at-risk teenagers. It does not own or operate schools; rather, it markets its members' schools to parents who might be interested in them. Ms. Scheff was one such parent. Her daughter attended a World Wide member school for nine months before Ms. Scheff decided to remove her from the program. Less than a year later, Ms. Scheff founded PURE. Like World Wide, PURE provides information about programs for families seeking help for their children; PURE-affiliated schools compete with the schools associated with World Wide. PURE schools pay Ms. Scheff a substantial sum whenever a child enrolls in its program based on her recommendation.

After the creation of PURE, Ms. Scheff used various fictitious names to post negative messages about schools for at-risk teenagers on an internet forum. Several of the schools Ms. Scheff disparaged were schools affiliated with World Wide. Mr. Berryman also posted messages that were critical of World Wide schools. Unlike Ms. Scheff, however, Mr. Berryman never posted messages under a false name, and his career is unrelated to helping troubled teenagers and their families. Instead, he is a self-described "activist" and is simply interested in issues involving troubled teens.

Ms. Scheff and Mr. Berryman were also both members of an e-mail listserve whose members spread unfavorable information about World Wide schools to parents searching for programs for troubled teens. According to the District Court, members of the group would alert each other when they became aware of a parent considering a World Wide school, and the members would then e-mail the parent with negative messages about World Wide.

Ms. Scheff and Mr. Berryman were not the only critics of World Wide programs. Around this time, television programs and print articles were describing abuse and neglect at World Wide schools. For example, the news magazine 48 Hours reported **\*1136** a child's allegation that he had been handcuffed for two consecutive days and had his mouth covered in duct tape. The Miami Herald ran an article describing a mother's report that her teenager came home from a World Wide school with ringworm scars and chemical burns. Forbes Magazine reported that children were punched, kicked, thrown, and forced to sit on cement floors for twelve hours at a time. The teenager quoted in the article also claimed that students who tried to flee from such punishment were locked in a small cell for days.

After discovering the postings and e-mails sent by Ms. Scheff and Mr. Berryman, World Wide filed this suit against them seeking damages and an injunction for defamation per se, civil conspiracy, intentional interference with prospective economic advantage, and unfair business practices under the Lanham Act, *see* ⚑ 15 U.S.C. § 1125(a). The District Court granted Mr. Berryman's motion for summary judgment and dismissed the entire complaint against him. Ms. Scheff stood trial, and the jury returned a unanimous verdict for her on every claim. World Wide then filed this appeal, arguing that the District Court erred in four ways: (1) designating World Wide as a limited purpose public figure for purposes of the defamation claim; (2) admitting into evidence media reports about abuse and neglect at World Wide schools; (3) requiring World Wide to prove all elements of the defamation claim by clear and convincing evidence; and (4) granting summary judgment to Mr. Berryman on the civil conspiracy claim.

## II. DISCUSSION

A. *Limited Purpose Public Figure*

Under Utah law, a defamation claim requires the plaintiff to show "that defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers,* 872 P.2d 999, 1007–08 (Utah 1994) (footnote omitted). But the First Amendment circumscribes liability for state defamation. *See New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Specifically, if the plaintiff is a public figure, he must demonstrate by a standard of clear and convincing evidence that the defamatory statement was made with "actual malice." *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510–11, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Actual malice is defined as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 280, 84 S.Ct. 710.

This rigorous standard also applies to a "limited-purpose public figure." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246 & n. 3, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In contrast to so-called "all-purpose public figures," who "occupy positions of such persuasive power and influence that they may hold sway on any issue with which they choose to become involved," *see Wayment v. Clear Channel Broadcasting, Inc.,* 116 P.3d 271, 279–80 (Utah 2005) (quotations omitted), a limited-purpose public figure is only a public figure with respect to a specific issue, *see id.* at 280. Indeed, the Supreme Court has described a limited-purpose public figure as one who "voluntarily injects himself ... into a particular public controversy and thereby becomes a public figure for a limited range of issues." *See Liberty Lobby,* 477 U.S. at 246 n. 3, 106 S.Ct. 2505 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Utah employs a two-part test **\*1137** to determine whether the plaintiff is a limited-purpose public figure. First, the court must isolate the specific public controversy related to the defamatory remarks. *Wayment,* 116 P.3d at 283. Next, the court should examine the type and extent of the plaintiff's participation in that public controversy to determine whether, under *Gertz,* he has "thrust [himself] to the forefront of [the] controvers[y] in order to influence the resolution of the issues involved." *Id.*

In this case, the District Court held that World Wide was a limited purpose public figure with respect to the public controversy of "how to deal with troubled teens." The court further noted that "World Wide's principals have given dozens of interviews to media including L.A. Times, 48 Hours, New York Times, Deseret News, Denver Rocky News, and the Miami Herald, in support of its programs." The District Court also noted that World Wide's function is to promote the "unique use of behavior modification techniques" by its affiliated schools. As the marketing arm for the various programs that it promotes, World Wide "chose to place itself in the national spotlight advocating this method."

The District Court's determination that World Wide is a limited-purpose public figure is a question of law, which we review de novo. *See Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1551 (4th Cir.1994); *see also Mid–America Pipeline Co. v. Lario Enters., Inc.,* 942 F.2d 1519, 1524 (10th Cir.1991) (stating that federal standards of appellate review apply to diversity actions). We agree that World Wide is a limited-purpose public figure. To begin, it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers. Indeed, the record includes numerous news accounts about the public debate surrounding this question and the use of particular behavior modification programs associated with World Wide. Second, World Wide's participation in this public controversy is extensive. As the District Court pointed out, World Wide's mission as a marketing company is to take an active role in this debate by both promoting its members' programs and defending those programs that are marred by scandal. But more than merely advocating for its individual members, World Wide has injected itself into the debate by promoting itself and all programs associated with it. For example, one article specifically centers on

Case 2:24-cv-00458-JNP-CMR   Document 29-19   Filed 08/30/24   PageID.262   Page
5 of 8

Appellate Case: 25-4135   Document: 28   Date Filed: 01/20/2026   Page: 177

World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132 (2006)
210 Ed. Law Rep. 111, 70 Fed. R. Evid. Serv. 457

whether World Wide programs are effective and quotes the president of World Wide as saying, "Parents are ... very much in support [of World Wide programs]." Michelle Ray Ortiz, *Behavior Modification: Salvation or Brainwashing? Programs for Troubled Teens get Mixed Reviews,* Miami Herald, June 13, 1999, at 4B. Additionally, World Wide's public comments frequently refer to satisfied parents in response to charges of abuse. Accordingly, it is clear that World Wide "thrust [itself] to the forefront of [this] public controvers[y] in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997. The District Court did not err in deeming World Wide a limited-purpose public figure.

B. *Media Account Evidence*

The District Court permitted Ms. Scheff to introduce the 48 Hours report, the Miami Herald article, and a Forbes magazine article in order to mitigate any damages attributable to her. In other words, the District Court allowed the news accounts for the limited purpose of demonstrating that World Wide's claims of damages in the form of lost profits could have been due to those sources rather than Ms. Scheff's statements. World Wide argues that this evidence constitutes "specific instances **\*1138** of conduct" and that such evidence is inadmissible in this case.

The admission of evidence is a matter within the discretion of the district court and this Court will not reverse the district court's decision except for an abuse of discretion. *Praseuth v. Rubbermaid, Inc.,* 406 F.3d 1245, 1253 (10th Cir.2005). The District Court did not abuse its discretion here. The Federal Rules of Evidence permit the introduction of opinion evidence, reputation evidence, and specific instances of conduct when the character of a person is an element of the claim or defense or is otherwise at issue. *See* Fed.R.Evid. 405(b); *Schafer v. Time, Inc.,* 142 F.3d 1361, 1372 n. 14 (11th Cir.1998) ("The plain language of Rule 405(b) ... expressly permit[s] the admission of specific acts when character is an essential element of the case."). Although Utah has never so stated, it is well-established in other jurisdictions that the character of the plaintiff in a defamation case is at issue. *See, e.g.,* *Gov't of Virgin Islands v. Grant,* 775 F.2d 508, 511 & n. 4 (3d Cir.1985); *Longmire v. Ala. State Univ.,* 151 F.R.D. 414, 419 (M.D.Ala.1992); *Daniels by Glass v. Wal–Mart Stores, Inc.,* 634 So.2d 88, 93 (Miss.1993).

Nevertheless, World Wide cites this Court's decision in *Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.,* 198 F.2d 20, 24–25 (10th Cir.1952), as support for the proposition that specific instances of conduct are inadmissible for the purpose of mitigation of damages in a defamation per se case. [1] *Utah State Farm Bureau,* however, is distinguishable. In that case, the defendant publicly stated that the plaintiff was associated with communism. The statement was repeated by several news sources at the behest of the defendant, and the plaintiff filed suit for libel per se. At trial, the defendant sought to introduce the very news reports the defendant sought to be published in order to demonstrate that the plaintiff's reputation had been tarnished by the reports rather than by the defendant's statement. We upheld the exclusion of the evidence, holding that publication by others of the same libelous matters charged by the defendant is generally not admissible to mitigate damages for libel per se; in so doing, we adopted the reasoning of the trial court that "it would be unfair to allow the [plaintiff] to avail [itself] of a publication which [its] agent had prepared and submitted for delivery" to the public. 198 F.2d at 25.

In this case, however, World Wide does not argue that the media accounts are of a similar nature to the defamation it argues Ms. Scheff allegedly committed—indeed, it does not argue that the media accounts are defamatory at all. Moreover, there is no indication that Ms. Scheff was in any way involved in the publication of the disputed media evidence. Accordingly, the rationale underlying this Court's decision in *Farm Bureau* is not present here. We also note that Utah permits a jury to award only "those damages which flow from the false and defamatory statement of the defendant" and explicitly prohibits the jury from awarding "damages that are the result of the plaintiff's own activities or any other person's activities." *See* Model Utah Jury Instructions 10.11. As such, we cannot conclude that the District Court abused its discretion on this basis.

Finally, World Wide argues that the media evidence should have been **\*1139** excluded because its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues. *See* Fed.R.Evid. 403. "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable

   APP 00177   4

prejudicial value." *Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262, 1274 (10th Cir.2000) (internal quotations omitted). "[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *United States v. Tan,* 254 F.3d 1204, 1211 (10th Cir.2001) (internal quotations omitted). Moreover, absent a clear abuse of discretion, we defer to the trial judge on the issue of Rule 403 balancing because of his familiarity with the full array of evidence in the case. *United States v. Keys,* 899 F.2d 983, 987 (10th Cir.1990).

We find no abuse of discretion here. The District Court ruled that the evidence was relevant to show World Wide's damages. We also note that it was relevant to whether Ms. Scheff acted with actual malice because the reports, if relied on by Ms. Scheff, support a finding that she had a reasonable belief when making the statements. As to the question of whether the evidence was unfairly prejudicial under Rule 403, the District Court observed that in the context of the entire trial, during which both parties offered media evidence (including a television program praising World Wide programs), the media evidence "largely cancelled each other out." In addition, the court instructed the jury that the evidence was not to be considered for its truth, but was instead relevant only to the issue of determining the quantum of damages. We conclude that the potential for prejudice and confusion was not so substantial that the District Court abused its discretion in allowing these media accounts.

C. *Jury Instructions*

As explained in Part A above, because the District Court held that World Wide was a limited purpose public figure, World Wide had to establish that Ms. Scheff acted with actual malice when she made the allegedly defamatory statements—in other words, that she acted with "knowledge that [the statements were] false or with reckless disregard of whether [they were] false or not." *New York Times,* 376 U.S. at 280, 84 S.Ct. 710. Although Supreme Court precedent requires a plaintiff to prove actual malice by clear and convincing evidence, *see Masson,* 501 U.S. at 510, 111 S.Ct. 2419, the Court has specifically declined to decide whether the remaining elements of a defamation claim require the same level of proof or instead may be established by the lower preponderance of the evidence standard, *see Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). World Wide argues that the District Court erred by instructing the jury that Utah requires all five elements to be demonstrated by clear and convincing evidence.

"We review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Grace United Methodist Church v. City of Cheyenne,* 427 F.3d 775, 793 (10th Cir.2005). Even if the district court erred, we will affirm as long as the error is harmless in the context of the trial as a whole. *See id.; Lusby v. T.G. & Y. Stores, Inc.,* 796 F.2d 1307, 1310 (10th Cir.1986) (stating that harmless error analysis applies to faulty jury instructions). "The error is harmless when the erroneous instruction could not have changed the result of the case." *Lusby,* 796 F.2d at 1310.

 **\*1140** In this case, the District Court, after noting that Utah has not specifically determined which standard of proof applies in defamation suits when the plaintiff is a public figure, *see* Model Utah Jury Instruction § 10.2 (acknowledging that the correct standard of proof "remains unresolved"), and noting that there is a split in the circuits that have addressed the issue,[2] overruled World Wide's objection in favor of the clear and convincing standard for all of the elements. World Wide renewed this objection when it made its motion for a new trial. The District Court, in denying the motion for a new trial, held that mandating the heightened standard of proof for several elements of the defamation did not prejudice World Wide. The court reasoned that because the jury did not find in favor of World Wide on its claim for unfair business practices under the Lanham Act, which contains similar elements and only requires the plaintiff to meet the lower preponderance of the evidence standard of proof, the jury would not have found in World Wide's favor on the defamation claim even had it been instructed that only a preponderance was required.

   APP 00178   5

**World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132 (2006)**
210 Ed. Law Rep. 111, 70 Fed. R. Evid. Serv. 457

We need not decide what standard of proof Utah courts would require because a review of the record as a whole satisfies us that even if the jury instruction was erroneous, it did not affect the outcome of the trial. As the District Court pointed out, in order for World Wide to succeed on claim under the Lanham Act, it was required to demonstrate the following elements by a preponderance of the evidence:

> (1) that the defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 980 (10th Cir.2002). Given that World Wide failed to prove the element of falsity and injury under the lower standard of proof required for the false advertising claim, we agree with the District Court that:

> Even assuming that this instruction was inaccurate, it plainly had no bearing on the outcome of this case. World Wide's case on false advertising was significantly stronger than its defamation case. The elements of the Lanham Act are simpler and more directly connected to the evidence in this case. Moreover, the standard of proof on all the elements of the Lanham Act claim was the lower—preponderance of the evidence. If the jury could not find for World Wide on the easier-to-prove Lanham Act claim, a jury instruction on a peripheral part of the defamation claim could not have affected the outcome of the trial.

D. *Jeff Berryman*

World Wide next argues that the District Court erred by granting defendant Jeff Berryman summary judgment as to its state law claim of civil conspiracy. "We review grants of summary judgment de novo to determine whether any genuine issue of material fact exists, viewing all evidence and any reasonable inferences **\*1141** that might be drawn therefrom in the light most favorable to the non-moving party." *Croy v. Cobe Labs., Inc.,* 345 F.3d 1199, 1201 (10th Cir.2003). "The nonmovant must establish, at a minimum, an inference of the existence of each element essential to the case." *Id.* (quotations and citation omitted).

In order to prove a civil conspiracy, World Wide must establish the following five elements: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *See Alta Indus. Ltd. v. Hurst,* 846 P.2d 1282, 1290 n. 17 (Utah 1993) (quotations omitted). Each of these elements must be demonstrated by evidence that is clear and convincing. *Israel Pagan Estate v. Cannon,* 746 P.2d 785, 790 (Utah Ct.App.1987). While it is not necessary to provide direct evidence of a formal agreement in order to demonstrate a meeting of the minds, "there must be substantial proof of circumstances from which it reasonably follows, or at least may be reasonably inferred, that the conspiracy existed." *Id.* at 791. "[C]onjecture and speculation alone" are not sufficient to establish that the conspiracy existed. *Id.*

The District Court found that World Wide failed to offer any evidence supporting a reasonable inference that Mr. Berryman and Ms. Scheff conspired to defame World Wide. Specifically, World Wide's evidence that Mr. Berryman, through his internet postings, agreed with Ms. Scheff that parents should be discouraged from sending their children to World Wide schools does not give rise to a reasonable inference of a meeting of the minds as to a specific object to be accomplished—namely, the defamation

Case 2:24-cv-00458-JNP-CMR    Document 29-19    Filed 08/30/24    PageID.265    Page

World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132 (2006)

Appellate Case: 25-4135    Document: 28    Date Filed: 01/20/2026    Page: 180

210 Ed. Law Rep. 111, 70 Fed. R. Evid. Serv. 457

of World Wide. Indeed, the court observed that if any reasonable inferences were to be drawn from the evidence, it is that Mr. Berryman and Ms. Scheff operated separately, rather than in concert.

World Wide's assertion that the District Court failed to draw the most favorable inferences from the facts is without merit. World Wide fails to point to any evidence in the record that provides substantial proof of circumstances that support a reasonable inference that Mr. Berryman and Ms. Scheff had reached an agreement as to a common objective. The record does include evidence that Ms. Scheff and Mr. Berryman shared the conviction that parents should not send their troubled teens to World Wide schools, but no jury could reasonably infer from this alone that Mr. Berryman and Ms. Scheff conspired to do an unlawful act.

### III. CONCLUSION

Because we conclude that World Wide's claims of error are insufficient to justify a new trial, and because we agree that summary judgment was warranted as to the claim of civil conspiracy against Mr. Berryman, we AFFIRM.

**All Citations**

450 F.3d 1132, 210 Ed. Law Rep. 111, 70 Fed. R. Evid. Serv. 457

### Footnotes

1    A claim of defamation per se requires the defamatory words to fall into one of four charges: (1) of criminal conduct; (2) of a loathsome disease; (3) of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office; or (4) the unchastity of a woman. *Allred v. Cook,* 590 P.2d 318, 320 (Utah 1979). The third charge is relevant to this case.

2    The Second Circuit recently observed that the majority of state and federal courts apply the heightened clear and convincing standard to the element of falsity. *See DiBella v. Hopkins,* 403 F.3d 102, 114–15 (2d Cir.2005); *see also* 1 Robert. D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 3.4, at 3–13 & n. 46 (3d ed.2003) (observing that most courts have required the higher standard of proof as to the element of falsity); *but see Rattray v. City of National City,* 51 F.3d 793, 801 (9th Cir.1994) (holding that a plaintiff need only demonstrate falsity by a preponderance of the evidence).

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L,<br><br>Defendants. | **DECLARATION OF KATHERINE KUBLER**<br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>Judge Jill N. Parrish |

I, Katherine Kubler, declare as follows:

1.     I submit this declaration solely in support of my Special Motion to Strike First Amended Complaint Pursuant to Anti-SLAPP Acts.  I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.      I am a writer, director and editor.  I created and directed, and was one of the executive producers of, the three-part docuseries *The Program: Cons, Cults and Kidnapping* ("The Series" or "The Program") which premiered on Netflix's streaming service on March 5, 2024.

3.     The Series is based on my experience attending The Academy at Ivy Ridge ("Ivy Ridge") as a teenager and my research and opinions regarding the "troubled teen industry."

**My Experience at The Academy at Ivy Ridge**

4.     As discussed in the Series, in 2004, at the age of 16, my dad enrolled me at Ivy Ridge in Ogdensburg, New York.  Ivy Ridge, at the time, was a boarding school and behavior modification center.  (Episode 1 at 6:55–7:35.)

1

APP 00181

5.     As I shared in the documentary, I was forcibly transported to Ivy Ridge against my will by two strangers.  (*Id*. at 7:05–7:35.)

6.     As detailed in Episode 1 of the Series, when I attended Ivy Ridge it was structured as a levels system, and students needed to gain points (and not lose points) in order to progress through the system and graduate.  This was known as "the Program".  (*Id*. at 15:12– 16:16.)

7.     In my experience, students were forced to follow strict rules and were not allowed to conduct basic activities such as go outside, talk to each other, look out the window, make eye contact, or even smile.  If students engaged in any of these prohibited activities, and many, many others, they would lose points.  The longer it took a student to gain points, the longer they would be in the Program.  (*Id*.; *see also id.* at 8:05–8:55, 12:45–14:50.)

8.     While I was at Ivy Ridge, students were also forced to attend a series of seminars in order to progress through the levels and graduate.  (*See generally*, Episode 2.)

9.     I spent 15 months at Ivy Ridge until my dad pulled me out when I was 17.  (*Id*. at 46:45.)

10.     My time at Ivy Ridge was one of the most difficult times of my life.  Nearly 20 years later, I still suffer from complex post-traumatic stress disorder from my time at Ivy Ridge.

**<u>Research into the Troubled Teen Industry and Development of the Series</u>**

11.     After leaving Ivy Ridge, I was determined to learn more about Ivy Ridge and its program.  I moved to Los Angeles to attend film school, and began researching Ivy Ridge in my spare time.

12.     I discovered that Ivy Ridge was only one of a number of programs throughout the United States and the world which were part of the "troubled teen industry."

2

13.    The "troubled teen industry" is the name given to these types of youth residential facilities aimed at struggling teens.  These programs seek to rehabilitate "troubled" teens.

14.    After graduating from film school I began my career in the media and entertainment industry, while continuing to conduct research into the troubled teen industry and beginning to make my documentary, which ultimately became the Series.

15.    At the time, I was working full-time for William Morris Endeavor (a talent and media agency) in Los Angeles, and spent much of my free time researching the troubled teen industry.  I read published books and news articles and reports, met with experts on the subject and spoke with countless survivors of Ivy Ridge and other similar programs.  Much of this research, including my early footage and filmed interviews, was later used in the Series.

16.    Based on my research, I learned that Ivy Ridge was part of an association of behavior modification centers under the umbrella of the World Wide Association of Specialty Programs and Schools ("WWASP").

17.    WWASP was formed in Utah in 1997 by three trustees—Robert B. Lichfield, Brent M. Facer and J. Ralph Atkin.  (Ex. A, WWASP Articles of Incorporation.)

18.    It is my understanding based on the totality of my research that WWASP had a number of member facilities, including among many others, Ivy Ridge, Casa by the Sea in Mexico, Tranquility Bay in Jamaica, Carolina Springs Academy in South Carolina, and Dundee Ranch Academy in Costa Rica.  (*See*, *e.g.*, Ex. B, Tim Weiner, *U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home*, The New York Times, May 27, 2003; Ex. C, *School owner arrested in abuse case*, Tampa Bay Times, May 24, 2003.)

19.    Among other things, I later came to learn, as discussed in the Series, that Ivy Ridge was fined by the New York Attorney General in 2005 for falsely marketing to parents that it

3

awarded accredited high school diplomas when it had received no such accreditation. (Ex. D, Assurance of Discontinuance; *see also* Episode 3 at 10:45–12:54 (interview with John Sullivan, former Regional Director, NY Office of Attorney General).)

20. I made my first visit back to Ivy Ridge in early 2020, nearly 15 years after my enrollment there. It was extremely emotional for me to return to the place that caused me so much trauma.

21. When I began working on the documentary again, I received copies of thousands of paper and electronic records that were left at Ivy Ridge after its closure. I reviewed paper records, emails, security footage and many other documents from Ivy Ridge as part of my research for the Series. A number of these documents, emails, and videos were included in the documentary.

22. After receiving copies of my own files from Ivy Ridge, I decided that the documentary should focus on my experience at Ivy Ridge. The documentary is a deeply personal reflection on a painful period of my life and it was important for me to share so I could shed light on what I viewed as the injustices that I faced and so many others have faced in these types of programs.

23. Several other survivors of Ivy Ridge agreed to have their stories and experiences featured in the Series alongside my own.

24. I also spoke with former employees of Ivy Ridge, several of whom are featured in the Series.

25. The documentary was greenlit by Netflix in Los Angeles at the end of 2021.

26. Ultimately, the documentary became a three-part Series. Episode 1 focuses on my experience at Ivy Ridge as well as the experiences of other survivors. Episode 2 focuses on the

APP 00184

seminars at Ivy Ridge and other tactics the program used to keep teens enrolled. Episode 3 focuses on the troubled teen industry more broadly and the WWASP organization, including who was involved in the organization and profited from running WWASP-affiliated schools.

**<u>Narvin Lichfield</u>**

27.     I first learned of Narvin Lichfield as part of my research into the ownership of Ivy Ridge and other WWASP affiliated programs.

28.     Narvin Lichfield is the brother of Robert B. Lichfield.

29.     I came to learn through my research and interviews that Narvin Lichfield, among other things, owned both Dundee Ranch Academy in Costa Rica and Carolina Springs Academy in South Carolina—two WWASP member schools. (*See, e.g.,* Ex. C, Tampa Bay Times; Ex. E, Toby Hayes, *Utah-based school owner banned; Campuses in S.C., elsewhere cited with abuse*, Deseret News, July 6, 2003.)

30.     Based on my research, I learned that Dundee Ranch Academy in Costa Rica was closed in 2003 following investigations of mental and physical abuse, and owner Narvin Lichfield was arrested. (*Id.*) The documentary includes a clip from an Inside Edition news report showing Narvin's arrest. (Episode 3 at 30:44–30:58.)

31.     It was reported that Narvin Lichfield was subsequently banned from his facility in South Carolina pending the Costa Rica investigation. (Ex. C, Tampa Bay Times; Ex. E, Hayes.)

32.     In March 2021, while I was working on the Series, I came across a message from Nathaniel Lichfield, Narvin's son, in on an online forum discussing his father Narvin's programs. (Episode 3 at 26:34–26:56.)

33.     I then spoke with Nathaniel Lichfield about his experience with WWASP and his father Narvin's involvement with the organization, and in the summer of 2022 I interviewed him

5

in person as shown in the Series. (*Id*. at 26:56–34:30.) My interviews with Nathaniel provided me with a deeper understanding of Narvin's background and involvement in WWASP.

34.    While I was working on the Series, I came across an Instagram post from Narvin Lichfield inviting people to join him for karaoke at a local bar in Utah. (Episode 3 at 47:32–47:39.)

35.    I was in Utah with Nathaniel at the time of the karaoke event, so I attended with my producers and film crew. Portions of that evening are shown in Episode 3 of the Series.

36.    The karaoke event was a public event at a public bar, open to anyone who wanted to attend. In addition, prior to filming, we received permission from the venue to film, and everyone in attendance at the karaoke event, including Narvin Lichfield, was made aware of the filming and signed a release for the filming.

37.    Seeing Narvin in person for the first time was surreal after I had spent years researching the troubled teen industry and WWASP and speaking to survivors.

38.    It was jarring for me to see this man living a carefree life while I knew, among other things, that there are hundreds of people out there who were negatively impacted and who feel they were abused by WWASP programs, and I expressed my feelings about that in this part of the Episode.

39.    Based on my research, Narvin Lichfield was an influential player in the world of WWASP for many years as Robert Lichfield's brother and profited from his WWASP affiliations as the owner of multiple facilities. I also learned through my research, including discussions with Nathaniel and survivors of other programs, that Narvin Lichfield is still very much active in the troubled teen industry.

APP 00186

**Production of the Series**

40.     The creation, planning, preparation and development of the Series occurred in Los Angeles, California.

41.     While I filmed the Series in various locations across the U.S., including the old Ivy Ridge building in Ogdensburg, New York, my home in California, and multiple locations in Utah, among others, all pre-production and post-production on the Series occurred in Los Angeles where I resided.

42.     The production and post-production of the Series occurred in Los Angeles, including the editing of the Series and ultimately publication.

43.     My work with Netflix occurred at Netflix's headquarters in the Los Angeles office.

44.     I lived in Los Angeles from the time I began film school in 2006 through the entirety of my work on the Series.  I still maintain my creative marketing agency in Los Angeles.


Executed on August 30, 2024

Signed by:

0A4CF71C05BC468...

Katherine Kubler

7

APP 00187

# EXHIBIT A

APP 00188

# ARTICLES OF INCORPORATION
## OF
# WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS, INC.

### (A Non-Profit Corporation)

The undersigned, for the purpose of forming a corporation pursuant to the Utah Non-Profit Corporation and Cooperative Association Act, Utah Code Annotated 16-6-18, et.seq., in the capacity of Incorporator, adopts the following Articles of Incorporation.

### 1. **Name.**

The name of this Corporation shall be as indicated in the title of this instrument. This Corporation shall hereinafter be referred to as the "Association", these Articles of Incorporation as the "Articles," and the By-Laws as the "By-Laws."

### 2. **Purpose.**

The purpose for which the Association as organized is to form an association of youth programs around the world to ensure high standards of training, education and behavior in youth.

### 3. **Powers.**

The powers of the Association shall include, and the Association shall be governed by the following:

3.1    **General.**    The Association shall have all of the common law and statutory powers of a corporation not for profit under the laws of the State of Utah that are not in conflict with the provisions of these Articles, the By-Laws, and the Declaration.

3.2    **Enumeration.**    The Association shall have the powers and duties set forth in the Declaration. It shall further have all of the powers and duties reasonably necessary to operate pursuant to its purposes, as they may be amended from time to time, including, but not limited to, the following:

3.2.1    To operate an airport for private use by the members of the Association for the purpose of providing for convenience of access to its members and to maintain all necessary landing fields, wind socks and other ground

3.2.2    To fix, levy and collect assessments against members of the Association to defray the common expense of the Association and other charges as provided in the Declaration, these Articles, and the By-Laws, including the power to levy and collect assessments for the

1

APP 00189

purpose of paying assessments levied against the members by the Association.

3.2.3 To borrow money and, with the assent of three-fourths (3/4) of its members, to mortgage, pledge, or otherwise hypothecate any or all of its real or personal property as security for money borrowed or debts incurred.

3.2.4 To buy, own, operate, lease, sell and trade both real and personal property as may be necessary or convenient in the administration of the Association.

3.2.5 To maintain, repair, replace, reconstruct, add to, and operate the property acquired or leased by the Association for use by or for the benefit of the Members.

3.2.6 To purchase insurance upon the property of the Association, and insurance for the protection of the Association, its Officers, Directors, and members.

3.2.7 To make and amend reasonable rules and regulations for the maintenance, conservation and use of the property of the Association and for the health, comfort, safety and welfare of the Members, and to enforce the same.

3.2.8 To enforce by legal means the provisions of the Declaration, these Articles, the By-Laws, and the rules and regulations.

3.2.9 To contract for the management and maintenance of the Property owned by the Association and to authorize the Association or a management agent to assist the Association in carrying out its powers and duties by performing such functions as the submission of proposals, collection of assessments, preparation of records, enforcement of rules, and maintenance, repair and replacement of Property belonging to the Association with funds as shall be made available by the Association for such purposes.

3.2.10 The Association and its Board of Trustees and Officers shall, however, retain at all times the powers and duties granted by the Declaration including, but not limited to, the making of assessments, promulgation of rules, and execution of contracts on behalf of the Association, and the employment of personnel to perform the services required for proper operation of the Association.

3.3 **Property.** All funds and the titles of all properties acquired by the Association and their proceeds shall be held in trust for the benefit and use of the members in accordance with the provisions of the Declaration, these Articles and the By-Laws.

3.4 **Distribution of Income.** The Association does not contemplate pecuniary gain or

APP 00190

profit to its members and is deemed a corporation not for profit.  The Association will make no distributions of income to its members or Directors, unless it is dissolved pursuant to Utah law.

## 4. **Membership.**

Membership shall be made by application.  Acceptance into membership shall be evidenced in writing and shall not be withheld by reason of sex, religion or national origin.

## 5. **Voting Rights.**

The Association shall have one (1) class of voting membership to be voted in accordance with the Bylaws.

## 6. **Term of Existence.**

The Association shall have perpetual existence.

## 7. **Board of Trustees.**

7.1    **Number.**   The initial Board of Trustees shall consist of not less than three (3) nor more than seven (7) trustees who shall be elected during the organizational meeting as directed by the incorporator.  The initial trustees are:

Brent M. Facer                                    Robert B. Lichfield
704 South Anasazi Circle                  317 Lichfield Lane
Washington, Utah 84780                  Toquerville, Utah 84774

J. Ralph Atkin
1240 East 100 South #10
St. George, Utah 84790

7.2    **Term**.  These Committee Members or their successors shall serve until their successors are elected by the membership.

7.3    **Duties and Powers.**   All of the duties and powers of the Association shall be exercised exclusively by the Board of Trustees, the Officers, their agents or employees, subject only to approval by Members when that is specifically required.

7.4    **Election and Removal.**  Board of Trustees of the Association (other than that initial Committee) shall be elected at the annual meeting of the members in the manner determined by the By-Laws. Committee Members may be removed and vacancies on the Board of Trustees shall be filled in the manner provided by the By-Laws.

APP 00191

## 8. **Indemnification.**

Every Committee Member and Officer of the Association shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed on him in connection with any proceeding or settlement of any proceeding to which he may be a party or to which he may become involved by reason of his being or having been a Committee Member or Officer of the Association, whether or not he is a Committee Member or Officer at the time such expenses are incurred, except with regard to expenses and liabilities incurred for any of the following:

8.1    **Breach.**    Breach of any fiduciary duty owed by such Committee Member or Officer to the Association.

8.2    **Willful and Knowing Failure.**    Willful and knowing failure to comply with the provisions of the Property Owner Association's By-Laws, the Association's Articles of Incorporation, the Association's Rules and Regulations, provided that in the event of a settlement, the indemnification shall apply only when the Board of Trustees approves such settlement and reimbursement as being for the best interest of the Association.    The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Committee Member or Officer may be entitled.

## 9. **By-Laws.**

The first By-Laws of the Association shall be adopted by the Board of Trustees and may be altered, amended or rescinded by the Committee and members in the manner provided in the By-Laws.

## 10. **Amendments.**

Amendments to these Articles shall require the affirmative vote of seventy-five percent (75%) of the total votes of the Association.

## 11. **Principal Place of Business.**

The principal place of business of the Association shall be at 1240 East 100 South #10, St. George, Utah 84790, or such other place as may be subsequently designated by the Board of Trustees.

APP 00192

12. **Initial Registered Office and Agent.**

The name and address of the registered office and agent of the Association J. RALPH ATKIN, 390 Del Mar Drive, St. George, Utah 84790, or such other person as may be subsequently designed by the Board of Trustees.

13. **Incorporator.**

The name and address of the incorporator of these Articles of Incorporation is as follows:

> J. Ralph Atkin
> 390 Del Mar Drive
> St. George, Utah 84790

**IN WITNESS WHEREOF**, the Incorporator has affixed his signature this _3/_ day of December, 1997.

J. RALPH ATKIN

I hereby accept appointment as the registered agent of **WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS, INC.,** this _3/_ day of December, 1997.

J. RALPH ATKIN

| | |
|---|---|
| **STATE OF UTAH** | ) |
| | : ss. |
| **COUNTY OF WASHINGTON** | ) |

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I Hereby certify that the foregoing has been filed and approved on the 07th day of January 1998 in the office of this Division and hereby issue this Certificate thereof.
Examiner _____ Date 1/7/98
KORLA T. WOODS
Division Director

The foregoing instrument was sworn to and acknowledged before me by J. Ralph Atkin this _3/_ day of December, 1997.

Carolee Hall
NOTARY PUBLIC

CAROLEE HALL
NOTARY PUBLIC · STATE of UTAH
50 EAST 100 SOUTH NO. 205
ST. GEORGE, UT 84770
COMM. EXP. 8-2-2000

5

# EXHIBIT B

APP 00194

**The New York Times**

https://www.nytimes.com/2003/05/27/world/us-youths-rebel-at-harsh-school-in-costa-rica-and-many-head-for-home.html

# U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home

**By Tim Weiner**

May 27, 2003

A torrent of teenage rage, hard and fast as the tropical rain on this Pacific coast, washed away the Academy at Dundee Ranch this weekend.

Dundee Ranch, the latest foreign outpost in a far-flung affiliation of behavior modification programs that promises to convert troubled American teenagers into straight arrows, lasted 19 months before the students rose up in revolt and overthrew their masters.

The rebellion erupted after Costa Rican officials visited the ranch -- an old hotel on a rutted red-dirt road -- and told the children of their rights after complaints about the program from a former director.

''They told us you have the right to speak, you have the right to speak to your parents, you have the right to leave if you feel you've been mistreated,'' said Hugh Maxwell, 17, of Rhode Island. ''Kids heard that and they started running for the door. There was elation, cheering and clapping and chaos. People were crying.''

APP 00195

Adults beat some of the children to quell the uprising, according to six people present. The academy's owner, Narvin Lichfield, was jailed for 30 hours, may face criminal charges and has been ordered by a judge to remain in Costa Rica. Four staff members feared by the children are being deported to Jamaica, government officials said. Most of the children are going home, many to an uncertain future.

About 30 youths still remain at the academy. Two of them, Sean McDevitt of North Carolina and David Saczawl of New Jersey, sat in the cafeteria and joked about a fitting sentence for Mr. Lichfield, should he be tried on human rights charges, as threatened by a local prosecutor.

''Four years here would be about right,'' said Sean, who has spent the past 11 months at the academy.

Dundee Ranch's base lay in the canyonlands of southern Utah, in a business called the World Wide Association of Specialty Programs and Schools, or Wwasps.

Wwasps, based in St. George, Utah, bills itself as the fastest-growing enterprise aimed at defiant and delinquent children. Some 2,200 children in 11 affiliated programs in the United States and abroad are charged between $30,000 to $50,000 in tuition and fees, generating yearly revenues of $60 million or more.

Wwasps disclaims ownership or direction of these affiliated programs. But Craig Barlow, a Utah State prosecutor who brought a child abuse charge against the director of one Wwasps-affiliated

APP 00196

school, says they are ''a lateral arabesque with no hub except for these connections in Utah.'' He cites a network of interlocking directorships based on blood and business ties.

Narvin Lichfield is a brother of Wwasps' founder. He started a Wwasps program in South Carolina, Carolina Springs Academy, then moved to Dundee Ranch, which opened in 2001.

Parents who sent their children to Wwasps-affiliated programs -- including Dundee Ranch; Casa by the Sea, in Ensenada, Mexico; and Tranquility Bay in St. Elizabeth, Jamaica -- suggest the programs meet a deep need. In many cases, a bitter divorce led to despair over a child who turned defiant. Schools, courts, and public health systems proved unable to cope.

Searching the Internet, parents found the Wwasps programs. A call to a toll-free number produced sales pitches, and offers of financial assistance helped to sell the programs, which are booming.

Dundee Ranch's enrollment increased 30 percent over the past year. According to students, as many as 15 children slept in a single room.

According to students, Narvin Lichfield was a fleeting if unforgettable presence.

Corey Martin, 17, who left Dundee Ranch in July, described Mr. Lichfield in a telephone interview last week as ''a used-car salesman.'' Hugh Maxwell said: ''There are people there who care about the kids. Narvin is not one of them. He's in it for the money.''

APP 00197

Students said Mr. Lichfield set up a system typical of Wwasps programs. Children were divided into six levels, the lower ones forbidden to speak freely or raise their eyes, the higher ones free to discipline and punish inferiors. A muscular cadre of minimum-wage staff members enforced the system. Communication between parents and children was barred or closely edited. Parents were told that complaints from children were manipulative lies.

Academy directors came and went. Amberly Knight held the job from March to August 2002. She resigned, and early in March this year wrote to the Costa Rican minister for child welfare, saying that ''Dundee Ranch Academy should not be allowed to operate because it is poorly managed, takes financial advantage of parents in crisis, and puts teens in physical and emotional risk.''

Two months later, Ms. Knight's complaint led to a confrontation. Representatives of Costa Rica's child-welfare agency -- known as PANI, its Spanish-language initials -- arrived at Dundee Ranch on May 20, backed by the police. Events were described by six witnesses, including Joel Snyder, 17, of Wisconsin, in an open letter to Dundee Ranch parents.

''When PANI told some kids they had the right to speak to their parents and the right to private mail or even not to be held in that country, kids ran for freedom,'' his account reads. Other children confirm that between 30 and 50 of them revolted, some fleeing on foot, heading for the hills or seeking a beachhead on the Pacific Ocean, 20 miles away.

APP 00198

Joel did not run. But he refused to sign a statement immediately produced by the Dundee Ranch staff saying he had been well treated. ''I was immediately forced into a High Impact facility,'' he wrote. He tried to leave, he wrote, and was beaten with a stick by the staff.

A 14-year-old girl at the academy, whose mother asked that her name be withheld, picked up the account.

''The police said those who wanted to leave could leave and we could talk to our parents,'' she said in an interview. ''The staff members tried to pull all the kids back to the dorms. It was chaotic. We were excited -- 'Oh my God, I'm going home.' We thought the school was going to shut down right there. Some of the kids started walking out.''

She said that staff members started kicking, hitting and choking children to stop them from leaving, and that the punishment continued for hours after the Costa Rican officials left. ''We wanted to talk to a higher power, the U.S. Embassy, but they would not let us,'' she said. Her mother, informed of the chaos through a parents' grapevine, reached the embassy, which sent a consular services officer, who helped reunite mother and daughter.

On Thursday afternoon, Mr. Lichfield regrouped. ''He called every kid into the cafeteria and said, 'Program's back in order. No one's leaving. Stop acting up,' and that lit a fire,'' Hugh Maxwell said. ''It was a full-fledged riot.''

Then, that night, ''Narvin got arrested and all hell broke loose,'' as one parent who was visiting at the time described the scene. Mr. Lichfield was detained on Thursday night on a local prosecutor's

complaints of physical and psychological abuse. The police seized the program's computers and files.

In Utah, Ken Kay, president of Wwasps, sought to calm parents and transfer children to Wwasps-affiliated programs inside and outside the United States. But over the weekend, even parents who passionately believe in the program found flights home for their children.

Mr. Kay kept working to persuade them to stay, saying in a weekend e-mail message -- a copy of which was made available by parents -- that programs in New York, Montana and Jamaica ''would be happy to work with your child.''

''I feel bad that you don't recognize that Narvin was trying to do what he could for your children,'' Mr. Kay wrote.

''I can't say the program did no good,'' said Dustin Sanow, 17, of Mississippi, ''but it's pretty traumatic. Parents have no idea what's going on. I feel they manipulated my folks.''

His mother, Anita Sanow, an Air Force major, did not find out that Dundee Ranch had collapsed until Sunday afternoon. ''I feel that people were less than honest with me about the program,'' she said. ''I feel they misrepresented things. I feel like the dollar mattered more than the kids.''

Dustin's friend Hugh Maxwell said: ''I support the program. It provides you with a chance to change. But it deprives you of so much, too. It's a last resort. It's desperation.''

APP 00200

A version of this article appears in print on , Section A, Page 6 of the National edition with the headline: U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home

# EXHIBIT C

APP 00202

8/26/24, 9:29 AM

School owner arrested in abuse case

Case 2:24-cv-00458-JNP-CMR  Document 31-3  Filed 08/30/24  PageID.291  Page 2
Appellate Case: 25-4135  Document: 32  Date Filed: 01/20/2026  Page: 203

Menu

*Tampa Bay Times*

Subscribe

ADVERTISEMENT

ARCHIVE

# School owner arrested in abuse case

  

Published May 24, 2003 | Updated Sept. 1, 2005

The owner of an American behavior modification program in Costa Rica housing nearly 200 American youths was jailed Friday on a charge of depriving the children of their civil liberties.

The owner, Narvin Lichfield, was detained temporarily pending a judge's review of allegations brought by a local prosecutor. Those allegations include charges that children were held against their will and physically abused at the Academy at Dundee Ranch, in rural Costa Rica, said Adilia Caravaca, a Costa Rican lawyer representing the mother of a child at Dundee.

A 14-year-old California girl who fled the academy on Thursday and returned home with the help of U.S. Embassy officials said by telephone on Friday that Dundee Ranch staff members had beaten and physically restrained children who tried to leave the academy.

ADVERTISEMENT

The girl, whose mother insisted that her name be withheld, said staff members tried to make the students sign a contract saying things were fine, according to the New York Times. They were told they would be sent to Jamaica if they didn't sign the contract, the girl said.

Dundee Ranch and a similar behavior modification program in Jamaica, Tranquility Bay, are affiliated with a Utah organization, the World Wide Association of Specialty Programs and Schools, known as WWASPS.

About 30 children were sent from Costa Rica to Jamaica this week after child welfare officials visited Dundee Ranch on Tuesday and told youths there that they did not have to stay, officials said.

Costa Rican authorities said punishments at the academy included emotional abuse, isolation and physical restraints.

Narvin Lichfield is a brother of WWASPS' founder, Robert Lichfield. The association operates 11 behavior modification centers that house 2,200 youths, about half of them in Mexico, Costa Rica and Jamaica, and half in the United States _ in Utah, Montana, South Carolina and upstate New York.

Previous investigations have led to closings of WWASPS-affiliated programs in Mexico and the Czech Republic.

 Donate

APP 00203

# EXHIBIT D

APP 00204

ATTORNEY GENERAL OF THE STATE OF NEW YORK
WATERTOWN REGIONAL OFFICE

---

In The Matter of

THE ACADEMY AT IVY RIDGE

---

## ASSURANCE OF DISCONTINUANCE
## PURSUANT TO EXECUTIVE LAW
## SECTION 63, SUBDIVISION 15

Pursuant to the provisions of Executive Law Section 63 (12), General Business Law Sections 349 and 350, Section 216 of the Education Law, Section 104 (e) of the Business Corporation Law, and Section 100.2 (p) of the Regulations of the Commissioner of Education, Eliot Spitzer, Attorney General of the State of New York, caused an inquiry to be made into the organization and business practices of the Academy at Ivy Ridge, a boarding school located near Ogdensburg, New York. Upon such inquiry, the Attorney General has determined as follows:

## ATTORNEY GENERAL'S FINDINGS OF FACT

1.      The Academy at Ivy Ridge ("Ivy Ridge") is a for profit private boarding school and behavior modification facility operated by a business partnership whose articles of partnership were filed in the Office of the Clerk of St. Lawrence County on December 17, 2001 ("Partnership"). The Partnership is comprised of two domestic general purpose business corporations: the Jason G. Finlinson Corporation and the Joseph and Alyn Mitchell Corporation. The corporations were formed November 7, 2001, and were created for the express purpose of being the partners in the aforementioned partnership, whose purpose was to operate the Academy at Ivy Ridge.

2.      Ivy Ridge began admitting students in 2001. By the Spring of 2005 enrollment was at 460 students. Ivy Ridge currently offers tuition options ranging from $3,490 to $3,990 per month. Additional money is required for medical care, counseling, and other expenses, including uniforms.

3.      Most, if not all, of Ivy Ridge's students are teenagers who have a significant history of bad behavior. Ivy Ridge advertises that its pristine and isolated setting, strict code of discipline and academic program will both educate students and set them on the path to productive citizenship.

4.      Over the course of its existence, the informational and advertising material concerning Ivy Ridge has emphasized that its educational offerings distinguishes it from many of the boarding schools that serve "troubled teens". At Ivy Ridge academic credit is earned for courses mastered. Students earning the requisite amount of credits were issued high school diplomas. Ivy Ridge offered two types of diplomas, a general diploma, and a "college prep" diploma.

APP 00205

5.     The representation that Ivy Ridge issued diplomas to its graduates was contained in its written promotional material, on various web sites maintained by the school, and in direct marketing of the school to parents of prospective students  Since its formation, Ivy Ridge has issued one hundred and thirteen (113) diplomas to its graduates.

6.     Ivy Ridge stated in its promotional materials that it was accredited by the Northwest Association of Schools and Colleges.  In fact, however, Ivy Ridge was only a candidate for accreditation, working its way through the multi-year process for becoming accredited by the Northwest Association of Accredited Schools (NWAAS), formerly known as the Northwest Association of Schools and Colleges, headquartered in Boise Idaho.

7.     In order to be accredited by NWAAS, the by-laws of that organization require that a school be licensed, certificated, or registered in the state in which it is located.  Because Ivy Ridge has never been licensed, certificated, or registered in New York State, the school never should have been considered for accreditation by NWAAS.  In March of 2005, after receiving information that the school was not licensed, certified, or registered in the State of New York, NWAAS suspended Ivy Ridge's candidacy for accreditation. That candidacy has not been restored.

8.     Under New York State law, a corporation may not operate an educational institution without the consent of the Board of Regents.  Similarly, two corporations may not form a partnership to operate an educational institution without the consent of the Board of Regents.  It is the position of the Attorney General that the formation of the Partnership between the Jason G. Finlinson Corporation and the Joseph and Alyn Mitchell Corporation to own and operate Ivy Ridge violates Section 216 of the Education Law and Section 104 (e) of the Business Corporation Law.

9.     The  Regulations of the Commissioner of Education Section 100 2(p) prohibit high schools in New York State, whether public or nonpublic, from issuing diplomas without first obtaining a Certificate of High School Registration from the Board of Regents.  Ivy Ridge awarded 113 of its graduates with high school diplomas despite not having nor ever applying for a Certificate of High School Registration.

10.     Ivy Ridge, by stating in its promotional material that it awarded its graduates high school diplomas and that it was accredited by the Northwest Association of Schools and Colleges, violated GBL 349 (deceptive acts and practices), and Section 350 (false advertising).

11.     The actions, representations and conduct of Ivy Ridge as described herein constitute repeated and persistent fraudulent and illegal conduct actionable by the Attorney General pursuant to Executive Law, Section 63(12).

APP 00206

## AGREEMENT

12.    It now appears that The Academy at Ivy Ridge is willing to enter into this Assurance of Discontinuance ("Assurance") and the Attorney General is willing to accept this Assurance in lieu of commencing legal action with respect to the issues of the organizational structure of Ivy Ridge, the past issuance of diplomas by Ivy Ridge, and representations by Ivy Ridge as to its accreditation status.

13.    This Assurance shall be binding upon The Academy at Ivy Ridge, the Jason G. Finlinson Corporation, the Joseph and Alyn Mitchell Corporation, Jason G. Finlinson, Joseph Mitchell and Alyn Mitchell, and/or their directors, members, partners, principals, employees, representatives, administrators, agents, successors and assigns, or any other individual or entity through whom they may act (hereinafter "Respondents").

14.    Respondents agree to forthwith reconstitute the organizational structure of Ivy Ridge by re-organizing in such manner as is statutorily allowed.  The successor entity shall be formed within thirty (30) days from the execution of this Assurance.

15.    Respondents agree that Ivy Ridge shall cease awarding any diplomas and cease advertising that Ivy Ridge is a diploma granting entity, until such time as Ivy Ridge is granted a Certificate of High School registration from the New York State Education Department.

16.    Respondents agree that they shall affirmatively represent in Ivy Ridge's website, for a period of 180 days following the execution of this Assurance, that Ivy Ridge is not registered in any manner by the State of New York until such time as Ivy Ridge is granted a Certificate of High School Registration from the New York State Department of Education.

17.    Respondents agree that they will not represent in any of Ivy Ridge's informational, advertising and promotional material, websites, and recruitment activities that Ivy Ridge is accredited by an accrediting agency, unless and until an accrediting agency entitled to accredit high schools in New York State confers accreditation upon the school.

18.    Respondents agree that within 30 days of the execution of this Assurance, a letter, approved by the Attorney General and in the form annexed hereto as Exhibit "A", on Ivy Ridge letterhead, will be sent to the parents or financially responsible persons for each student enrolled at Ivy Ridge as of the date this agreement is signed, advising the recipient that: (1) Ivy Ridge is not registered in any manner by the State of New York or the New York State Department of Education, (2) Ivy Ridge is not currently accredited by any academic accrediting organization, and (3) Ivy Ridge is not authorized by the New York State Department of Education to grant high school diplomas to its students.

19.    Respondents agree that within 60 days of the execution of this Assurance, Respondents shall pay to the Attorney General an amount equal to 15% of the total tuition paid for each of 113 students issued diplomas by Ivy Ridge.  Respondents agree that concurrently with making this payment, they shall provide to the Attorney General the names of these 113 graduates, the names and last known

APP 00207

addresses of those who were financially responsible for them, and the total sum paid on behalf of each student. This information shall be provided in affidavit form. Upon receipt of the payment and the specified information, the Attorney General shall remit an amount equal to 15% of the total tuition paid to those persons financially responsible for each of the 113 graduates, together with a letter in the form annexed hereto as Exhibit "B".

20.    Respondents agree that within 100 days of the execution of this Assurance, Respondents shall provide to the Attorney General, in affidavit form, the following information concerning current or former students at Ivy Ridge with the following characteristics:

    A.    <u>Information to be supplied:</u> name of student, name(s) and last known address(es) of person(s) financially responsible for the student, total amount of tuition paid to Ivy Ridge on behalf of the student.

    B.    <u>Students:</u> current or former Ivy Ridge students who:

        1.    Did not receive a diploma from Ivy Ridge, and
        2.    While at Ivy Ridge held eighteen or more credits toward graduation on or before the date this Assurance was signed, and
        3.    Withdrew from Ivy Ridge between April 15th and the 60th day after the letters referenced in paragraph 18 are sent out, inclusive; and
        4.    Did not enroll at Ivy Ridge on or after April 15, 2005.

21.    For each of the students identified in paragraph 20 (B), the Attorney General shall send a letter to the student and to his or her parent or guardian inquiring as to the reason for the student's withdrawal, in the form annexed hereto as Exhibit "C". Where, within 30 days of mailing, the Attorney General receives a written response that the indicated reason for withdrawal is either Ivy Ridge's lack of accreditation or its inability to confer a high school diploma, Respondents shall pay to the Attorney General an amount equal to 15% of the total tuition paid to Ivy Ridge on behalf of each of the withdrawing students. Such payments shall be made on or before the 60th day following notification to Ivy Ridge by the Attorney General of the total amount due, together with a copy of all written responses. Ivy Ridge may present to the Attorney General any equitable or other reasons why an otherwise qualifying student should not receive the offered restitution. The Attorney General's decision that a student withdrew from Ivy Ridge due to Ivy Ridge's lack of accreditation or its inability to confer a high school diploma, or should not otherwise be disqualified from receiving restitution, shall be final.

## PENALTY

22.    Respondents agree to pay to the Attorney General $250,000 as a civil penalty and $2,000 for the costs of this investigation within 60 days from the date set forth below

## MISCELLANEOUS

23.    Nothing in this Assurance shall be construed to deprive any person of any right or remedy under the law.

24.    Pursuant to Executive Law Section 63(15), violation of this Assurance hereafter shall constitute prima facie proof of a violation of the applicable statutes in any civil action or proceeding hereafter commenced by the Attorney General.

25.    Acceptance of this Assurance by the Attorney General shall not be deemed or construed as an approval of the Attorney General of any of the activities or business practices of Ivy Ridge, and Ivy Ridge shall make no representation to the contrary. Acceptance of this Assurance shall not be deemed or construed as an admission by Ivy Ridge as to any of the claims set forth in this Assurance of Discontinuance or any admission of liability therefore.

WHEREFORE, the following signatures are offered hereto this 17th day of August,

2005.

The Academy at Ivy Ridge, a New York Partnership

Jason G. Finlinson, Corporation Partner

By: _____
Name: _____
Title: _____

Joseph and Alyn Mitchell Corporation, Partner

By: _____
Name: Joseph E. Mitchell
Title: President

Jason G. Finlinson Corporation

By: _____
Name: _____
Title: _____

APP 00209

**Joseph and Alyn Mitchell Corporation**

By: _____

Name: Joseph E. Mitchell

Title: President


**Jason G. Finlinson, Individually**

_____


**Joseph Mitchell, Individually**

_____


**Alyn Mitchell, Individually**

_____

ELIOT SPITZER
Attorney General of the
State of New York

By: _____
     JOHN T. SULLIVAN, JR.
     Assistant Attorney General In Charge
     Watertown Regional Office
     317 Washington Street
     Watertown, New York 13601

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK            )
                            )SS
COUNTY OF ST. LAWRENCE  )


Jason G. Finlinson, the undersigned, being duly sworn, deposes and says:    I am President of Jason G. Finlinson Corporation, the respondent described in and which executed the foregoing Assurance of Discontinuance.  I have executed the aforesaid instrument with the consent and authority of Jason G. Finlinson Corporation and those responsible for the acts of said entity and duly acknowledge the same.

Jason G. Finlinson

Sworn to before me this
10  day of August , 2005


STEVEN M. LASHOMB
NOTARY PUBLIC, STATE OF NEW YORK
No. 01LA6110613
QUALIFIED IN ST. LAWRENCE COUNTY
MY COMMISSION EXPIRES JUNE 1, 2008

APP 00211

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK          )
                          )SS
COUNTY OF ST. LAWRENCE )


Joseph E Mitchell , the undersigned, being duly sworn, deposes and says: I am President of Joseph and Alyn Mitchell Corporation, the respondent described in and which executed the foregoing Assurance of Discontinuance. I have executed the aforesaid instrument with the consent and authority of Joseph and Alyn Mitchell Corporation and those responsible for the acts of said entity and duly acknowledge the same.

Sworn to before me this
10 day of August , 2005

STEVEN M. LASHOMB
NOTARY PUBLIC, STATE OF NEW YORK
No. 01LA6110613
QUALIFIED IN ST. LAWRENCE COUNTY
MY COMMISSION EXPIRES JUNE 1, 2008

APP 00212

**EXHIBIT A**

APP 00213

[Date]

[Name]
[Address 1]
[Address 2]

Re:    The Academy at Ivy Ridge

Dear [Name]:

As you are aware, your son or daughter is currently enrolled as a student at the Academy at Ivy Ridge ("Ivy Ridge").

Pursuant to an agreement entered into by the Academy and the Office of the Attorney General of the State of New York, I am writing to inform you that (1) Ivy Ridge is not registered in any manner by the State of New York or the New York State Department of Education, (2) Ivy Ridge is not currently accredited by any academic accrediting organization, and (3) Ivy Ridge is not authorized by the New York State Department of Education to grant high school diplomas to its students.

Thank you for your attention in this matter.

Very truly yours,

Jason Finlinson, Director

APP 00214

**EXHIBIT B**

APP 00215

[Date]

[Name]
[Address 1]
[Address 2]

Re:    The Academy at Ivy Ridge

Dear [Name]:

As you are aware, your son or daughter was formerly enrolled as a student at the Academy at Ivy Ridge ("Ivy Ridge") and received a diploma of high school graduation.

Pursuant to an agreement entered into by Ivy Ridge and the Office of the Attorney General of the State of New York, the text of which can be found on our website (www.oag.state.ny.us), every student who received a diploma, which at the time was unauthorized, is entitled to a refund of 15% of the total amount of tuition paid.

Consequently, we enclose herewith a refund check in the amount of $_____ , representing 15% of the total tuition paid in connection with your child's attendance, as reported to us by Ivy Ridge officials.

Thank you for your attention in this matter, and should you have any questions, feel free to contact the undersigned..

Very truly yours,

ELIOT SPITZER, ATTORNEY GENERAL

By:

John T. Sullivan Jr.
Assistant Attorney General-In -Charge
Watertown Regional Office
Ph. 315-785-2444

APP 00216

**Exhibit C**

APP 00217

[Date]

[Name]
[Address 1]
[Address 2]

Re:    The Academy at Ivy Ridge

Dear [Name]:

This letter is being sent to you with the understanding that your son or daughter used to be a student at the Academy at Ivy Ridge ("Ivy Ridge") in Ogdensburg, New York.

The Office of the Attorney General of the State of New York and The Academy at Ivy Ridge recently entered into an agreement under the terms of which certain former students may be eligible for a partial refund of tuition paid. f you wish to be considered for this partial refund, it is necessary that you complete and return the form printed at the bottom of this page within thirty days. A stamped, self-addressed envelope is enclosed for your use.

Thank you in advance for your assistance in this matter. Should you have any questions, feel free to contact the undersigned.

Very truly yours,

ELIOT SPITZER, ATTORNEY GENERAL

By:

John T. Sullivan Jr.
Assistant  Attorney General-In-Charge
Watertown Regional Office
Ph. 315-785-2444

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Name:                    _____
Current Address:         _____
Name of Student:         _____
Reason for Withdrawal:

_____

_____

APP 00218

# EXHIBIT E

## *Utah-based school owner banned*

Deseret Morning News (Salt Lake City)

July 6, 2003, Sunday

Copyright 2003 The Deseret News Publishing Co.

**Section:** LOCAL;

**Length:** 778 words

**Byline:** By Toby Hayes Deseret Morning News

# Body

South Carolina's Department of Social Services has banned a Utah-based behavior-modification school owner from the premises of his campus there.

In a letter sent to Carolina Springs Academy recently, state officials say the ban stems from allegations of abuse at another school owned by Narvin Lichfield, the Dundee Ranch in Costa Rica, which was closed following investigations of mental and physical abuse. The letter also states corrective action needs to be taken before Oct. 30 to renew the school's license. The state cites nine breaches of state regulations, including the use of "buildings that are not approved by DSS." The school must also train its staff on how to report child-abuse cases, which has not been done recently, the letter states.

Dundee and Carolina Springs are both part of World Wide Association of Specialty Programs and Schools Inc. in St. George, a referral service for behavior modification schools. But the only facilities they refer clients to are ones owned by the corporation's founders and trustees and their relatives. An investigation by the Deseret Morning News reveals that state and federal investigations are not new to the company.

A closer look shows that five of its schools have been shut down in seven years. A school near Cancun, Mexico, called Sunrise Beach, was the first. It was shut down in 1996 after allegations of abuse, two years before the umbrella corporation was actually formed by Lichfield's brother, Robert, and SkyWest Airlines founder J. Ralph Atkin. Three other facilities were shut down in 1998, one of which was Morava Academy in the Czech Republic. The Atkin-owned facility closed just six months after opening.

He operated the Czech school in an old hotel, said John Grimes who, along with his wife, Theresa, were hired by Atkin. Upon arrival, the couple realized they were the only teachers.

"We worked seven days a week at 16 hours a day and ended up teaching all the classes," John Grimes said. "Think of something you took in high school and we taught it. It was a little much."

Weeks before Morava was closed, U.S. State Department investigators were sent to another corporation facility called Paradise Cove in Samoa. According to federal documents, investigators wrote that alleged abuses in Samoa included "solitary confinement of youths, withholding of rations, etc." They also noted that "many of the locally hired counselors and employees at Paradise Cove are not certified or qualified to do the jobs they are doing."

Ken Kay said he spoke with State Department representatives and that information is false.

"That is absolutely not what he told me," Kay said. "Were their rations monitored? Absolutely. But they weren't starving."

By the end of 1998, Paradise Cove was closed.

But most teens made their way to Samoa and the still operating Tranquility Bay in Jamaica by being routed through a St. George facility operated by Kay and Robert Lichfield.

Brightway Adolescent Hospital was a teen alcohol and treatment facility until it was voluntarily closed following a state investigation. Debra Wynkoop-Green, the licensing director for the Utah Department of Health, discovered Brightway staff was diagnosing most patients with behavioral problems that needed to be corrected at one of the corporation's other facilities. Of the teens who entered Brightway, 94 percent were shipped to either Jamaica or Samoa, Wynkoop-Green said. The investigation also netted at least one patient who had been sent to Samoa without parental knowledge. The hospital was closed, Kay said, after insurance companies refused to pay for the behavior schools, which charge up to $3,000 a month.

APP 00220

Utah -based school owner banned

According to the Utah Department of Commerce, seven companies share the same St. George address of 1240 E. 100 South No. 9, the office next door to Atkin's. Three other youth-related businesses are headquartered at Atkin's office, suite No. 10. Atkin denies being more than the corporation's lawyer. Kay was baffled as to why so many companies, such as Teen Help, Robert Browning Lichfield Family L.P. and Dixie Contract Services all share the same address.

"Whatever it is," he said, "it has nothing to do with me or WWASPS."

Clinical psychologist Roderick Hall has spoken with five former students of the corporation's facilities and says these programs do more harm than good.

"The people I have talked to have post traumatic stress disorder and there's no question about it," he said. This is often referred to as shell-shock. "I have one kid who e-mails me who is in college and still has nightmares."

Kay said that without the programs his corporation offers "children are going to commit suicide."

E-MAIL: *thayes@desnews.com*

**Load-Date:** July 6, 2003

---

**End of Document**

APP 00221

Michael K. Hepworth (UT-15157)
Christoffer T. Binning (UT-17942)
**HEPWORTH LEGAL**
320 W 500 S, Ste. 200
Bountiful, Utah 84010
Phone: (801) 872-2222
michael@hepworthlegal.com
cbinning@hepworthlegal.com

*Counsel for Plaintiff*

---

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **NARVIN LICHFIELD**, <br><br> *Plaintiff*, <br><br> *vs.* <br><br> **KATHERINE KUBLER**, **NETFLIX, INC.**, and **JOHN DOES A-L**, <br><br> *Defendants*. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE** <br><br> **Case No.:** 2:24-cv-00458-CMR <br><br> **Judge:** *Honorable* Cecilia M. Romero |

APP 00222

# TABLE OF CONTENTS

**RELIEF SOUGHT** --------------------------------------------------------------------------------- 1

**INTRODUCTION** -------------------------------------------------------------------------------- 1

    Motion to Dismiss Under Rule 12(B)(6) --------------------------------------------------- 4

    Anti-SLAPP Motion to Strike-------------------------------------------------------------- 4

    Defamation Standards-------------------------------------------------------------------------- 5

**FACTUAL BACKGROUND** ------------------------------------------------------------------- 6

    Lichfield's Career in Youth Programs------------------------------------------------------ 6

    The Series and Its False Portrayals ------------------------------------------------------- 6

    Manipulation of Content and Context ------------------------------------------------- 6

    Destruction of Evidence and Misrepresentation------------------------------------ 7

    Impact on Lichfield-------------------------------------------------------------------------- 7

    Defendants' Reach and Impact ------------------------------------------------------------ 7

    Additional Context from the Series --------------------------------------------------- 7

**ARGUMENT**----------------------------------------------------------------------------------------- 8

    Plaintiff's Claims Are Actionable and Specifically Concern Lichfield ------------------ 8

        *The Series Repeatedly Singles Out Lichfield for Defamatory Treatment*----------------------------------- 8

        *The "Of and Concerning" Standard is Clearly Met* ------------------------------------------------------ 9

        *Defendants' Statements Go Beyond Mere Criticism of the Industry* ------------------------------------10

    Plaintiff's Allegations Accurately Reflect the Series' Content and Implications  11

        *The Series' Implications are as Damaging as Direct Statements* -------------------------------------12

        *The Series' Overall Narrative Creates False Impressions*----------------------------------------------13

        *Omissions and Contextual Manipulation Contribute to Defamation*-------------------------------13

        *Reasonable Viewers Would Understand the Series' Implications*-----------------------------------14

    The Statements Made About Lichfield are Actionable and Not Protected by the

    First Amendment or any Anti-SLAPP Statute------------------------------------------------- 15

        *The Utah Uniform Public Expression Protection Act (U.C.A. § 78B-25-101 et seq.) Applies* --------------15

        *The Statements About Lichfield are Materially False and Damaging*----------------------------------17

        *The Statements are not Protected Opinion*--------------------------------------------------------18

        *The Statements are not Rhetorical Hyperbole*---------------------------------------------------19

        *The Fair Report Privilege Does Not Apply* ---------------------------------------------------20

        *The Statements are not Substantially True* -------------------------------------------------21

        *Lichfield Has Sufficiently Pled Actual Malice* -----------------------------------------------21

**CONCLUSION**------------------------------------------------------------------------------------- 22

# TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ------------------------------------------------------------4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)------------------------------------------------4

*Dixson v. Newsweek, Inc.*, 563 F.2d 626 (10th Cir. 1977) ----------------------------------- 12

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)--------------------------------------------- 16

*Fairstein v. Netflix, Inc. et al.*, No. 20-cv-8042 (PKC) (S.D.N.Y. Aug. 9, 2021)-------------------------- 13

*Hogan v. Winter*, 762 F.3d 1096 (10th Cir. 2014) ----------------------------------------- 4, 12, 14

*In re Steffensen*, 511 B.R. 149 (Bankr. D. Utah 2014) -------------------------------------------4

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990) ------------------------------------------------- 19

*Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010)-------------------------------------------------- 20

*Netflix, Inc. v. Barina*, No. 04-21-00327-CV (Tex. App. Aug. 31, 2022) --------------------------------- 13

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ------------------------------------------5

*Nunes v. Rushton*, 299 F.Supp. 3d 1216 (D. Utah 2018) -------------------------------------------5

*O'Connor v. Burningham*, 165 P.3d 1214 (Utah 2007) -------------------------------------------4

*Pratt v. Nelson*, 164 P.3d 366 (Utah 2007) ---------------------------------------------------9

*Project Veritas v. Leland Stanford Junior Univ.*, No. C21-1326 TSZ (W.D. Wash. May 17, 2022) -------- 17

*Time, Inc. v. Firestone*, 424 U.S. 448 (1976) ------------------------------------------------ 20

*TMJ Implants, Inc. v. Aetna, Inc.*, 405 F. Supp. 2d 1242 (D. Colo. 2005) ------------------------------- 19

*UHS of Provo Canyon, Inc., v. Robert Bliss*, No. 2:24-CV-163-DAK-CMR (D. Utah Sept. 24, 2024) 5, 15, 16, 17

*West v. Thompson Newspapers*, 872 P.2d 999 (Utah 1994) --------------------------------------- 5, 19

### STATUTES

*Cal. C.C.P. § 425.16(b)*-----------------------------------------------------------------------5

Utah Uniform Public Expression Protection Act (U.C.A. § 78B-25-101 *et seq.*) --------------1, 5, 15, 16

### RULES

Federal Rule of Civil Procedure 12(b)(6)------------------------------------------------------ 4, 16

### TREATISES

Restatement (Second) of Torts § 566 (1977) ----------------------------------------------------14, 19

The Law of Torts § 526 (2d ed.2014)----------------------------------------------------------- 12

**RELIEF SOUGHT**

Plaintiff Narvin Lichfield ("Lichfield") respectfully requests that this Court deny Defendants' *Rule 12(b)(6) Motion to Dismiss and Special Motion to Strike* ("Motion") in its entirety. The Amended Complaint states valid claims for relief, including defamation per se, defamation, false light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy. These claims are well-pleaded, factually supported, and meet the applicable legal standards for each cause of action.

Furthermore, Lichfield opposes Defendants' Motion to strike under the Anti-SLAPP Acts.[1] Lichfield's claims do not arise from protected activity under these statutes, and even if they did, Lichfield has demonstrated a probability of prevailing on the merits of his claims. The Anti-SLAPP argument is without merit and should be denied.

Additionally, Lichfield requests that the Court deny Defendants' request for attorneys' fees, as their motion is unwarranted, and Lichfield's claims are meritorious.

Alternatively, if the Court is inclined to grant any part of Defendants' Motion, Lichfield requests leave to amend the Complaint further to address any deficiencies the Court may identify.

**INTRODUCTION**

This case arises from a calculated and malicious campaign by Defendants Katherine Kubler ("Kubler") and Netflix, Inc. ("Netflix") (collectively "Defendants") to defame Lichfield through their documentary series "The Program: Cons, Cults and Kidnapping" (the "Series"). Far from being a truthful exposé, the Series is a sensationalized hit piece that repeatedly and falsely accuses Lichfield of serious criminal conduct, including child abuse, fraud, and even being complicit in or getting away with murder. These accusations are patently false and have caused severe and lasting damage to Lichfield's reputation, business interests, and personal life.

---

[1] As further discussed herein, Lichfield argues that the Utah Uniform Public Expression Protection Act (U.C.A. § 78B-25-101 *et seq.*) ("UPEPA") should be applied to all claims in this matter.

Defendants' Motion fundamentally mischaracterizes the Series' content and Lichfield's claims. Contrary to Defendants' assertions, the Amended Complaint meticulously details numerous false and defamatory statements unambiguously "of and concerning" Lichfield. These statements are not protected opinions or mere hyperbole but assertions of fact that can be proven false. Moreover, the Amended Complaint provides ample factual context demonstrating that these statements were made with actual malice – that is, with knowledge of their falsity or reckless disregard for the truth.

The Series goes beyond mere criticism of the troubled teen industry, a topic of legitimate public concern, and instead launches a personal attack on Lichfield. It falsely portrays him as a central figure in an abusive system despite his limited role as an Association Member of the World Wide Association of Specialty Programs and Schools ("WWASP").[2] The Series deliberately omits crucial exculpatory information, such as when Defendants accuse Narvin of abusing many teens, the Facts show Narvin has never been convicted of any abuse or any crime for that matter, even the charges against Narvin in Costa Rica were dropped, but failure to mention the dropped charges creates a false impression that he is guilty. These editorial choices and manipulative filmmaking techniques intend to defame rather than inform and are indicative of malice rather than an intent for fair reporting. A simple disclaimer telling the viewers that "these are allegations but are not supported by any law enforcement reviews or actions" would leave the viewer with an entirely different impression of Narvin based on the facts, fair reporting, and proper regard for the truth.

Defendants' attempt to shield themselves behind the First Amendment and Anti-SLAPP statutes is misplaced. While the First Amendment unquestionably protects legitimate journalistic endeavors and matters of public concern, it does not give Defendants license to broadcast knowing falsities that destroy an individual's reputation. The Series goes far beyond protected speech, crossing

---

[2] WWASP operated as an association of independent schools and entities akin to a trade association, whereby entities receive access to promotional materials, services, and resources they may otherwise be unable to obtain. For convenience, this relationship between Lichfield and WWASP will be referred to as that of an Association Member herein.

2

the line into defamation through its reckless disregard for readily available exculpatory information and its deliberate manipulation of facts to fit a pre-conceived false narrative.

Furthermore, Defendants' characterization of Lichfield as a public figure is erroneous. Lichfield has not thrust himself into the vortex of this public controversy, nor does he have regular and continuing access to the media. His limited public statements over the years were primarily in response to false allegations, not an attempt to influence public debate. Even if the Court were to find Lichfield to be a limited-purpose public figure, the Amended Complaint sufficiently alleges actual malice to survive a motion to dismiss.

Lichfield's claims for false light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy are not merely repackaging his defamation claims. Instead, they address distinct harms caused by Defendants' egregious conduct, including the severe emotional distress inflicted by their relentless character assassination campaign and the coordinated efforts of multiple parties to amplify these falsehoods to a global audience. The Series' intrusion into Lichfield's private life, including secretly filming him at a karaoke event, goes beyond the bounds of responsible journalism and supports these additional claims.

Defendants' Anti-SLAPP argument is equally without merit. Lichfield's lawsuit is not an attempt to chill protected speech but rather a legitimate effort to seek redress for demonstrable falsehoods that have caused actual harm. The Amended Complaint provides more than sufficient evidence to establish a probability of prevailing on the merits as required to defeat these arguments.

As detailed in the following sections, Lichfield has stated valid claims for relief that easily surpass the plausibility standard required at this stage of the proceedings. The Amended Complaint provides specific, factual allegations that, when taken as true, state plausible claims for relief. Defendants' Motion should be denied in its entirety, allowing this case to proceed to discovery where

the full extent of Defendants' malicious conduct can be brought to light, and Lichfield can have his day in court to clear his name and seek just compensation for the harm he has suffered.

**APPLICABLE LEGAL STANDARDS**

Motion to Dismiss Under Rule 12(b)(6)

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See In re Steffensen*, 511 B.R. 149, 158 (Bankr. D. Utah 2014). The Court's task is to determine whether the complaint contains enough facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim "has facial plausibility" if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted)).

In defamation claims, the Court must conduct "a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation." *Hogan v. Winter*, 762 F.3d 1096, 1106 (10th Cir. 2014) (quoting *O'Connor v. Burningham*, 165 P.3d 1214, 1222 (Utah 2007)). However, this does not mean the Court should disregard well-pleaded factual allegations or indulge in inferences favoring Defendants.

Anti-SLAPP Motion to Strike

Under the California Anti-SLAPP Act, the analysis involves two steps:[3]

---

[3] As further argued herein, Lichfield maintains UPEPA should apply to this matter. However, Lichfield addresses the requirements of both UPEPA and the California Anti-SLAPP Act, as both have been raised in the Motion.

1. The moving party must first establish that the challenged claims arise from activity protected by the statute.

2. If the moving party makes this showing, the burden shifts to the non-moving party to demonstrate a probability of prevailing on the claim.

*Cal. C.C.P. § 425.16(b).*

Under Utah's Uniform Public Expression Protection Act ("UPEPA"), the analysis involves the following two steps:

1. The moving party bears the burden of establishing that UPEPA applies in this case.

2. If the moving party makes this showing, the moving party must also prove whether Plaintiff failed to state a cause of action upon which relief can be granted.

*UHS of Provo Canyon, Inc., v. Robert Bliss*, No. 2:24-CV-163-DAK-CMR, 2024 WL 4279243 (D. Utah Sept. 24, 2024).

Defamation Standards

To state a claim for defamation under Utah law, a plaintiff must show that defendants published statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage. *See Nunes v. Rushton*, 299 F.Supp. 3d 1216, 1229-30 (D. Utah 2018) (quoting *West v. Thompson Newspapers*, 872 P.2d 999, 1007-08 (Utah 1994)).

For public figures or matters of public concern, the plaintiff must also demonstrate that the defendant acted with "actual malice" – that is, knowing that the statement was false or with reckless disregard of whether it was false. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964).

These standards guide the Court's analysis of both a Motion to Dismiss and an Anti-SLAPP Motion to Strike.

5

## FACTUAL BACKGROUND

Lichfield's Career in Youth Programs

Narvin Lichfield has dedicated over three decades to operating programs for troubled youth. Throughout his career spanning more than thirty-two (32) years, Lichfield has helped thousands of students. His programs have maintained a remarkably low rate of abuse claims and suicide attempts compared to the broader U.S. population of similar demographics. Contrary to the Series' portrayal, Lichfield's association with WWASP was essentially that of an Association Member. His programs paid membership dues to WWASP, but he did not share in WWASP's profits. It is crucial to note that Lichfield was neither a founder, owner, nor mastermind of WWASP, despite the Series' implications.

The Series and Its False Portrayals

In March 2024, Netflix released the Series, a three-episode special purporting to be a documentary about the troubled teen industry. In reality, the Series was a sensationalized and defamatory attack on Lichfield and others associated with WWASP-affiliated programs. The Series made numerous false and defamatory statements about Lichfield, including claims that he had "gotten away with this for so long," referring to alleged child abuse, fraud, and other unspecified crimes. It also presented Lichfield as complicit in murder by juxtaposing his picture with a news article about a death at an unrelated youth program. The Series falsely claimed that Lichfield exercised direct control in youth programs with the aim or understood purpose of abusing children, a claim that is categorically false and unsupported by evidence.

Manipulation of Content and Context

The Series employed manipulative techniques to create a false and defamatory narrative about Lichfield. These included the use of suggestive graffiti to inflate the perception of widespread child abuse, selective editing of incidents to falsely claim staff abused students, and the use of ominous music and imagery to create a false impression of hidden secrets. Perhaps most egregiously, the Series

6

included footage of Lichfield secretly filmed at a private karaoke event, an evident invasion of privacy, which, when combined with the overlayed commentary, is designed to portray him in a false light.

Destruction of Evidence and Misrepresentation

The Series depicts Defendant Kubler and others burning program files and destroying evidence that could disprove their allegations. This destruction of confidential student files, which are private property of the programs and appear to have been obtained through breaking into program facilities, demonstrates a reckless disregard for the truth and an intent to manipulate the narrative at the expense of accuracy and fairness.

Impact on Lichfield

The consequences of the Series on Lichfield's life have been severe and far-reaching. He has suffered significant reputational harm and emotional distress. Since the Series' release, Lichfield has been subjected to anonymous online threats of violence, targeted harassment campaigns, and even death threats. The Series has irreparably damaged Lichfield's standing in his local community and tarnished his reputation on a global scale.

Defendants' Reach and Impact

Netflix, a media giant with 238.3 million paid subscribers and annual revenues of $33.7 billion as of 2023, provided critical funding and support for the production and distribution of the Series. The reach and impact of the Series were substantial, with Forbes reporting that it accumulated 22.7 million viewing hours in just the first five days after its premiere. This massive exposure amplified the defamatory content to a global audience, exponentially increasing the harm to Lichfield.

Additional Context from the Series

The Series reveals further evidence of Defendants' malicious intent and reckless disregard for the truth. It misrepresents Lichfield's role in WWASP, falsely portraying him as a central figure despite his limited involvement. The Series manipulates interviews, including those with Lichfield's estranged

7

son, to paint Lichfield in a false light. It makes unsubstantiated claims about Lichfield's finances and misrepresents the conditions of his programs. The Series also exaggerates suicide rates among program participants, directly contradicting Lichfield's documented record. Furthermore, it presents Lichfield's arrest in Costa Rica without proper context, omitting the crucial fact that charges were dropped and he was exonerated. These manipulations and emotionally charged filmmaking techniques demonstrate a clear intent to defame rather than inform.

## ARGUMENT

Plaintiff's Claims Are Actionable and Specifically Concern Lichfield

Defendants' assertion that Lichfield's complaints about the Series are not actionable fundamentally mischaracterizes both the nature of the Series and the specific allegations in the Amended Complaint. Contrary to Defendants' claims, Lichfield's allegations are not mere generalized grievances about the troubled teen industry but specific and actionable claims directly related to false statements about and portrayals of Lichfield himself.

### *The Series Repeatedly Singles Out Lichfield for Defamatory Treatment*

While the Series purports to be a broader examination of the troubled teen industry, it repeatedly and specifically targets Lichfield with false and defamatory statements. The Amended Complaint meticulously details numerous instances where Lichfield is personally accused of serious misconduct. The Series directly claims that Lichfield had "gotten away with this for so long," referring to alleged child abuse, fraud, and other unspecified crimes. This statement unambiguously accuses Lichfield of criminal conduct and is clearly "of and concerning" him. It goes beyond mere implication, directly attributing criminal behavior to Lichfield without any factual basis.

Furthermore, the Series presents Lichfield as complicit in murder through a carefully crafted visual and verbal juxtaposition. By placing Lichfield's picture next to a news article about a death at an unrelated youth program, while simultaneously stating that people in the "higher ups" "get away

8

with murder," the Series creates a false and defamatory connection between Lichfield and alleged murders. This manipulative editing technique implicates Lichfield in serious crimes, far exceeding the bounds of general industry criticism or protected speech.

The Series also falsely claims that Lichfield exercised direct control in youth programs with the aim or understood purpose of abusing children. This accusation strikes at the heart of Lichfield's personal conduct and program management. It is not a general statement about industry practices but a specific allegation of intentional misconduct by Lichfield. Such a claim, made without any supporting evidence and in direct contradiction to Lichfield's well-documented record of helping troubled youth, is quintessentially defamatory.

These examples, among others detailed in the Amended Complaint, demonstrate that the Series goes beyond general criticism of the troubled teen industry. Instead, it crafts a narrative that repeatedly makes specific, false, and defamatory claims about Lichfield as an individual, attacking both his personal character and professional conduct.

### *The "Of and Concerning" Standard is Clearly Met*

Defendants' argument that many statements in the Series are not "of and concerning" Lichfield is without merit. The standard for determining whether a statement is "of and concerning" a plaintiff is whether readers or viewers would understand the statement as referring to the plaintiff. *See, e.g., Pratt v. Nelson*, 164 P.3d 366, 382 (Utah 2007) ("Before defamatory statements may be regarded as actionable, a party must show that the statements "refer to some ascertained or ascertainable person. A party may show this by directly being named, or so intended from the extrinsic facts and circumstances."). In this case, the Series leaves no doubt that its accusations are directed at Lichfield.

Throughout the Series, Lichfield is repeatedly named and visually identified, leaving no ambiguity about who is being accused. The Series goes to great lengths to present Lichfield as a critical figure in the WWASP organization, even though this portrayal is false and exaggerated. This deliberate

9

positioning of Lichfield as a central character in the false narrative ensures that viewers personally associate the Series' broader accusations with Lichfield.

The Series highlights and misrepresents specific incidents involving Lichfield, such as his arrest in Costa Rica. By focusing on these personal events and distorting their context, the Series further cements its accusations, specifically about Lichfield. The deliberate omission of exculpatory information, such as the fact that charges against Lichfield were dropped, demonstrates a clear intent to portray him in a false and defamatory light.

Perhaps most egregiously, the Series manipulates statements from Lichfield's son to create a false narrative about Lichfield's character and actions. This exploitation of a family relationship to craft damaging statements about Lichfield leaves no doubt that the Series' accusations are personally directed at him.

Given this context, a reasonable viewer would undoubtedly understand that the Series' accusations of abuse, fraud, and criminal conduct are directed at Lichfield personally, not just at the industry in general. The Series' relentless focus on Lichfield, its use of his name and image, and its presentation of distorted personal anecdotes all clearly identify him as a primary subject of its defamatory claims.

### *Defendants' Statements Go Beyond Mere Criticism of the Industry*

Defendants attempt to shield themselves by arguing that statements about the troubled teen industry, in general, are not actionable. However, this argument ignores the specific and personal nature of the accusations against Lichfield. While the Series does include broader commentary on the industry, Lichfield's claims focus on the false and defamatory statements explicitly made about him.

The Series makes false accusations of Lichfield's involvement in child abuse and fraud. These are not general criticisms of industry practices but specific allegations of criminal conduct by Lichfield. The Series also grossly misrepresents Lichfield's role in and profit from WWASP, painting him as a

mastermind of an abusive system when, in reality, his involvement was limited to that of an Association Member. This false portrayal goes beyond industry criticism and directly attacks Lichfield's professional reputation and integrity.

Moreover, the Series falsely implies Lichfield's involvement in, or cover-up of, deaths at youth programs. This is not a general statement about industry risks but a specific and unfounded accusation of serious misconduct by Lichfield. The Series further manipulates portrayals of Lichfield's character and motivations, using selective editing and out-of-context statements to create a false impression of his personality and intentions. These claims go far beyond general industry criticism and directly attack Lichfield's personal and professional reputation. They are specific, personalized accusations that have caused tangible and quantifiable harm to Lichfield's standing in his community, his business interests, and his personal life.

In conclusion, Lichfield's claims are not generalized complaints about the troubled teen industry but specific and actionable allegations of defamation and false light. The Series repeatedly singles out Lichfield for defamatory treatment, meets the "of and concerning" standard, and goes beyond mere criticism of the industry. The Defendants' attempts to characterize Lichfield's claims as general grievances ignore the profoundly personal and specific nature of the Series' attacks on Lichfield. As such, Lichfield's claims are adequately pleaded and should be allowed to proceed to discovery, where the full extent of Defendants' malicious conduct can be brought to light.

Plaintiff's Allegations Accurately Reflect the Series' Content and Implications

Defendants' contention that Lichfield's allegations are based on statements never made in the Series is a disingenuous attempt to evade responsibility for their production's clear implications and overall message. This argument fails to account for the totality of the Series' content, its manipulative editing techniques, and the unmistakable implications drawn from the juxtaposition of images, sounds, and statements throughout the documentary.

11

***The Series' Implications are as Damaging as Direct Statements***

While Defendants may argue that certain specific phrases were not uttered verbatim, the law recognizes that defamation can occur through implication and direct statements. *See Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014) (citing *Dixson v. Newsweek, Inc.*, 563 F.2d 626, 631 (10th Cir. 1977) ("a publisher may be liable when it takes words out of context and uses them to convey a false representation of fact.") Under this evaluation of the context, courts should examine, "(1) the words themselves and their implications; (2) the entire article or message; (3) the events or disputes that gave rise to the article; and (4) the likely effect of the reasonable reader." *See Id.* (citing Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, The Law of Torts § 526 (2d ed.2014)). Through its careful arrangement of information, selective editing, and suggestive juxtapositions, the Series creates clear and damaging implications about Lichfield that are as harmful as direct accusations.

For instance, Defendants claim they never explicitly stated that Lichfield "exercised direct control" over programs like Ivy Ridge. However, the Series goes to great lengths to portray Lichfield as a central figure in the WWASP organization, repeatedly associating his name and image with descriptions of abusive practices and systemic misconduct. By consistently placing Lichfield in this context, the Series clearly implies his direct involvement and control, even if it does not use those exact words.

Moreover, the Series' portrayal of Lichfield's involvement in programs in Costa Rica and South Carolina goes beyond mere factual reporting. The Series creates a false impression of his culpability by selectively presenting information about these programs, omitting crucial exculpatory details, and framing Lichfield's role negatively. This carefully crafted narrative implies a level of control and responsibility that Lichfield never had, effectively defaming him without making an explicit statement.

### *The Series' Overall Narrative Creates False Impressions*

Defendants' argument ignores the cumulative effect of the Series' narrative structure and storytelling techniques. While individual statements, taken in isolation, might not rise to the level of explicit accusations, the overall narrative weaves together a tapestry of implications that unmistakably paint Lichfield as a villain.

The Series uses emotionally manipulative filmmaking techniques, such as ominous background music, dramatic reenactments, and selective use of archival footage, to create a sinister atmosphere around Lichfield. These techniques, combined with the carefully curated statements from interviewees and the narrator, create a clear implication of Lichfield's guilt and involvement in abusive practices, even when not stating it outright.

Furthermore, the Series' structure, which places discussions of Lichfield alongside descriptions of the worst alleged abuses in the troubled teen industry, creates a false association in viewers' minds. This guilt-by-association technique is a form of defamation by implication, suggesting Lichfield's culpability for actions in which he had no involvement.

### *Omissions and Contextual Manipulation Contribute to Defamation*

Defendants' focus on what was explicitly stated ignores the equally damaging effects of what was omitted or taken out of context. The Series consistently fails to provide crucial context for its allegations against Lichfield, omitting information that would exonerate him or present a more balanced picture of his involvement in youth programs.[4]

For example, the Series' treatment of Lichfield's arrest in Costa Rica deliberately omits the crucial fact that all charges were dropped and Lichfield was fully exonerated. This omission, coupled

---

[4] Other courts have found that the omission and manipulation of information to portray a party in a negative light and provide an otherwise false narrative of the individual or the underlying events give rise to potential liability for defamation. *See, e.g., Fairstein v. Netflix, Inc. et al.*, No. 20-cv-8042 (PKC) (S.D.N.Y. Aug. 9, 2021); *Netflix, Inc. v. Barina*, No. 04-21-00327-CV (Tex. App. Aug. 31, 2022).

with the Series' suggestive presentation of the arrest, creates a false impression of Lichfield's guilt. Such selective presentation of facts, designed to lead viewers to a false conclusion, is a form of defamation through omission. *See* Restatement (Second) of Torts § 566 (1977).

Similarly, the Series manipulates statements from Lichfield's estranged son, presenting them without proper context and exploiting family tensions to create a damaging portrayal of Lichfield's character. This manipulation of personal relationships to craft a narrative goes beyond mere reporting and enters the realm of defamation.

### *Reasonable Viewers Would Understand the Series' Implications*

In assessing whether statements are defamatory, courts consider how a reasonable viewer would understand them. *See, e.g., Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014). Given the Series' consistent portrayal of Lichfield as a central figure in an abusive system, its selective presentation of facts, and its use of manipulative filmmaking techniques, a reasonable viewer would undoubtedly come away with a false and defamatory impression of Lichfield.[5]

The Series' repeated visual and verbal associations between Lichfield and allegations of abuse, fraud, and criminal conduct create a clear implication of his guilt. A reasonable viewer, presented with this carefully crafted narrative, would naturally conclude that Lichfield was directly responsible for the abuses described, even if the Series does not make this accusation in so many words. Moreover, the Series' global reach and presentation as a factual documentary lend credibility to its implications in viewers' eyes. The average Netflix subscriber, watching what is presented as a truthful exposé, would likely accept the Series' implications about Lichfield as fact, causing real and lasting damage to his reputation.

---

[5] A simple search of Google, Reddit, or other social media supports the conclusion that the Series has indeed led to such impressions.

In conclusion, Defendants' argument that certain statements were never explicitly made misses the point and ignores the realities of modern media consumption. Through its overall narrative, selective presentation of facts, and manipulative techniques, the Series creates clear and damaging implications about Lichfield that are as harmful as direct accusations. These implied statements, omissions, and contextual manipulations form the basis of Lichfield's well-pleaded defamation claims. To dismiss these claims based on a narrow, literal reading of the Series' script would be to ignore the true nature of the harm inflicted on Lichfield and the realities of how defamation occurs in contemporary media.

<u>The Statements Made About Lichfield are Actionable and Not Protected by the First Amendment or any Anti-SLAPP Statute</u>

Defendants' assertion that the statements made about Lichfield are not actionable fundamentally mischaracterizes their nature, ignores their context, and misapplies First Amendment protections and Utah law. The statements go far beyond protected speech and squarely into actionable defamation.

***The Utah Uniform Public Expression Protection Act (U.C.A. § 78B-25-101 et seq.) Applies***

Under Utah's Uniform Public Expression Protection Act ("UPEPA"), the analysis involves the following two steps:

1. The moving party bears the burden of establishing that UPEPA applies in this case.

2. If the moving party makes this showing, the moving party must also prove whether Plaintiff failed to state a cause of action upon which relief can be granted.

*UHS of Provo Canyon, Inc., v. Robert Bliss*, No. 2:24-CV-163-DAK-CMR, 2024 WL 4279243 (D. Utah Sept. 24, 2024).

Defendants argue that California's Anti-SLAPP statute should apply to this case, while Lichfield contends that UPEPA is the appropriate law. This presents a conflict of laws issue that must

15

be resolved before proceeding with the anti-SLAPP analysis as provided above. Given that this case was filed in federal court in Utah, the defamatory statements related to a Utah resident, at least some portion of the statements and footage occurred in Utah, and Utah has enacted its anti-SLAPP statute in UPEPA, Lichfield maintains that UPEPA should apply rather than California's statute. The *Provo Canyon* court applied UPEPA to a case filed in federal court in Utah. Generally, federal courts sitting in diversity apply the forum state's substantive law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). This would suggest that Utah's UPEPA should apply as the default. Accordingly, while the choice of law issue is complex, the *Provo Canyon* case suggests that Utah's UPEPA should apply in federal court in Utah. However, applying UPEPA does not automatically dismiss Lichfield's claims. The court must still conduct a claim-by-claim analysis under the Rule 12(b)(6) standard.

Under UPEPA, the court must consider whether the statute applies to Defendants' conduct. The critical question is whether Lichfield's claims arise from Defendants' exercise of the right of freedom of speech on a matter of public concern. The court should consider whether Defendants' conduct - gathering information and speaking about Lichfield's involvement in the alleged abuse - constitutes protected speech under the First Amendment, even if some of that conduct may have violated agreements or laws. Notably, the *Provo Canyon* court recognized that even if UPEPA applies generally, it does not protect all Defendants' conduct. The court distinguished between the defendants' right to speak about *Provo Canyon* generally versus disclosing confidential patient information. Accordingly, the court could find that UPEPA applies to some, but not all, Defendants' conduct. If the Court determines UPEPA applies, it should then analyze each of Lichfield's causes of action under the Rule 12(b)(6) standard to determine if he has stated a claim upon which relief can be granted. The *Provo Canyon* court conducted this claim-by-claim analysis.

Under the first element, Defendants, as the moving party, "must establish that UPEPA applies for one of the reasons stated in Utah Code Ann. § 78B-25-102(2)." *Provo Canyon*, No. 2:24-CV-163-

16

DAK-CMR, 2024 WL 4279243 at *4. Defendants rely on subsection (c): "[T]his chapter applies to a cause of action asserted in a civil action against a person based on the person's exercise of the right of freedom of speech or of the press … on a matter of public concern." (Defendants' Motion p. 27).

In this case, there is a fundamental disagreement about Lichfield's conduct. Defendants focus on the various news articles portraying Lichfield in the news regarding allegations of child abuse in Costa Rica, his association with the WWASP organization, and podcast discussions about his career in the TTI. In contrast, Lichfield focuses on how Defendants negatively portrayed him in the Series, leaving viewers questioning his honesty, integrity, virtue, and reputation. While Defendants assert that Lichfield was involved or knew about the alleged abuse that occurred at these troubled youth facilities, there is no evidence to support Defendants' arguments that Lichfield knew of or participated in any alleged abuse at these facilities. Although it may be recognized that the creation of speech could protect Defendants' collection of resource data, Defendants' use of that information to cast Lichfield in a negative light with the sole purpose of causing reputational harm should not be protected.

Under the second element, Defendants "must establish that Lichfield has failed to state a cause of action upon which relief can be granted. *Id.* at *6. "UPEPA essentially mimics the language of Rule 12(b)(6) in stating the standards for courts to use when analyzing a special motion for expedited relief to dismiss based on only the legal sufficiency of the complaint." *Project Veritas v. Leland Stanford Junior Univ.*, No. C21-1326 TSZ, 2022 WL 1555047, *4 (W.D. Wash. May 17, 2022). Therefore, the Court must analyze each of Lichfield's five causes of action to determine whether Lichfield has stated a claim upon which relief may be granted.

### *The Statements About Lichfield are Materially False and Damaging*

Contrary to Defendants' claims, the statements about Lichfield in the Series are not substantially factual or mere expressions of opinion. The Amended Complaint meticulously details numerous false and defamatory statements presented as facts in the Series.

17

For instance, the Series claims that Lichfield had "gotten away with this for so long," referring to alleged child abuse, fraud, and unspecified crimes (Am. Compl. ¶ 77a). This statement is not a mere opinion or hyperbole but an explicit accusation of criminal conduct. It is demonstrably false, as Lichfield has never been convicted of such crimes, and the Amended Complaint provides ample evidence of his long-standing commitment to helping troubled youth.

The Series also presents Lichfield as somehow being complicit in murder by juxtaposing his image with news about deaths at youth programs (Am. Compl. ¶ 77b). This visual and verbal association creates a false implication of Lichfield's involvement in deaths that have no connection to him or his programs. Such a grave accusation, made without any factual basis, goes well beyond protected speech and into defamation.

Furthermore, the Series falsely claims that Lichfield exercised direct control in youth programs with the aim or understood purpose of abusing children (Am. Compl. ¶ 77c). This statement is false and deeply damaging to Lichfield's personal and professional reputation. The Amended Complaint clearly states that Lichfield's role was essentially that of an Association Member, not the mastermind or direct controller of these programs, as the Series implies.

These statements, among others detailed in the Amended Complaint, are specific, factual assertions that can be proven false. They are not mere opinions or general criticisms of the troubled teen industry but targeted accusations against Lichfield personally.

### *The Statements are not Protected Opinion*

Defendants' attempt to shield themselves behind the opinion defense is misplaced. While it's true that pure expressions of opinion are protected under the First Amendment, the statements at issue here go far beyond mere opinion.

Federal courts have held that "a defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of

undisclosed defamatory facts as the basis for the opinion." *TMJ Implants, Inc. v. Aetna, Inc.*, 405 F. Supp. 2d 1242 (D. Colo. 2005), *aff'd*, 498 F.3d 1175 (10th Cir. 2007) (citing Restatement (Second) of Torts § 566 (1977)). The statements in the Series about Lichfield "getting away" with crimes and abuses are presented in the context of what purports to be a factual documentary. They are not framed as mere personal beliefs but as conclusions drawn from an ostensibly thorough investigation.

Moreover, the Utah Supreme Court has outlined factors to consider in distinguishing fact from opinion, including the common usage of the specific language, whether the statement can be objectively verified as true or false, and the broader context in which the statement appears. *West v. Thompson Newspapers*, 827 P.2d 999, 1018 (Utah 1994). Applying these factors, the statements about Lichfield fall on the side of factual assertions:

1. The language, such as accusing Lichfield of "getting away" with crimes, implies factual wrongdoing, not mere opinion.

2. These statements can be objectively verified. Either Lichfield committed these alleged crimes and abuses, or he did not.

3. The broader context of a Netflix documentary series presented as an investigative exposé lends an air of factuality to these statements.

Therefore, the statements cannot be dismissed as protected opinions.

### The Statements are not Rhetorical Hyperbole

Defendants may argue that certain statements, such as claiming Lichfield "got away with murder," are mere hyperbole. However, this argument fails to consider the context and presentation of these statements within the Series. "To determine whether a statement purports to state actual facts about an individual, the Court scrutinizes the meaning of the statement in context." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). Context is crucial, and the "test of what a particular statement could

19

reasonably be understood to have asserted is what a *reasonable [viewer]* would understand the author to be saying, considering the kind of language used and the context in which it is used." *See Id.* at 16-20.

While rhetorical hyperbole can be protected speech in specific contexts, such as heated political debates or obvious parody[6], the statements here are presented in what purports to be a serious, factual documentary. The reasonable viewer would not interpret these statements as mere exaggeration or figurative speech but as factual conclusions drawn from the Series' investigation.

Moreover, even if some statements could be considered hyperbolic in isolation, their repetition and reinforcement throughout the Series, coupled with the presentation of selective "evidence," transform them from mere hyperbole into factual accusations in viewers' minds.

### *The Fair Report Privilege Does Not Apply*

Defendants' invocation of the fair report privilege is misplaced. While this privilege protects fair and accurate reports of official proceedings, it does not give media outlets carte blanche to distort or misrepresent such proceedings. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976). The Series' treatment of Lichfield's arrest in Costa Rica goes far beyond fair reporting. The Series creates a false impression of guilt by omitting the crucial fact that all charges were dropped and Lichfield was exonerated. This selective presentation of facts, designed to lead viewers to a false conclusion, falls outside the scope of the fair report privilege. Furthermore, the Series does not merely report on official proceedings but weaves these events into a broader narrative that implies Lichfield's guilt and complicity in abusive practices. This goes beyond the bounds of fair reporting and into defamation.

---

[6] *See Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010) ("As to the constitutional limits on the *type* of speech which may be the subject of state defamation actions," *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695 (1990), "the *Bresler-Letter-Carriers-Falwell* line of cases provides protection for statements,' such as parody, fantasy, rhetorical hyperbole, and imaginative expressions, 'that cannot reasonably [be] interpreted as stating actual facts' about an individual." *Id.* at 20 (internal citations omitted).

### *The Statements are not Substantially True*

Defendants' claim that the gist of their statements about Lichfield is substantially true is belied by the facts presented in the Amended Complaint. While Lichfield acknowledges his involvement in youth programs, the Series grossly misrepresents the nature and extent of this involvement.

The Series portrays Lichfield as a central figure and mastermind of an abusive system when his role was limited to an Association Member. This is not a minor inaccuracy but a fundamental misrepresentation of Lichfield's role and responsibilities.

Moreover, the Series' implications of Lichfield's involvement in child abuse, fraud, and even getting away with murder are not "substantially true" by any reasonable measure. These serious accusations are demonstrably false and go to the heart of Lichfield's character and conduct.

### *Lichfield Has Sufficiently Pled Actual Malice*

Even if the Court were to find Lichfield to be a public figure for purposes of this case (which Lichfield disputes), the Amended Complaint sufficiently pleads actual malice to survive a motion to dismiss.

The Amended Complaint details numerous instances where Defendants either knew their statements were false or acted with reckless disregard for the truth. For example:

1. The Series omits crucial exculpatory information about Lichfield's arrest in Costa Rica, demonstrating a reckless disregard for the truth.

2. Defendants manipulated statements from Lichfield's estranged son, exploiting family tensions to create a false narrative.

3. The Series consistently misrepresents Lichfield's role in WWASP, portraying him as a central figure despite readily available information about the organization's structure.

These allegations, among many others, which the Court takes as true at this stage of the proceedings, are more than sufficient to establish a plausible claim of actual malice. Additionally, and

21

crucially regarding this point, Defendant Kubler's reference to <u>The Count of Monte Cristo</u> in the Series further supports Lichfield's position regarding actual malice. The story's premise is based on an individual with a personal grudge engaging in a meticulous and calculated campaign of malice to exact revenge against an individual. As stated explicitly in the Series, Defendant Kubler views the content and the statements regarding Lichfield and the various programs as tied to her views and her need to play out the story of <u>The Count of Monte Cristo</u>, with her playing the protagonist. However, and in direct contravention of this position, if such position forms any reasonable basis for the smear campaign under law, it is that Lichfield has never met Defendant Kubler. Therefore, the statements made by Defendant Kubler regarding <u>The Count of Monte Cristo</u> show apparent and actual malice toward Lichfield.

In conclusion, the statements about Lichfield in the Series are not protected by the First Amendment or Utah law. They are specific, factual assertions that can be proven false, not mere opinions or hyperbole. They go beyond fair reporting of official proceedings and are not substantially true. Lichfield has sufficiently pled the falsity of these statements and, where necessary, actual malice. These claims are appropriately pleaded and should be allowed to proceed to discovery.

## CONCLUSION

For the foregoing reasons, Defendants' *Motion to Dismiss and Special Motion to Strike* should be denied. Lichfield has presented well-pleaded, factually supported claims that easily surpass the plausibility standard required at this stage of the proceedings. The arguments presented by the Defendants fundamentally mischaracterize both the content of the Series and the nature of Lichfield's claims, attempting to shield demonstrably false and defamatory statements behind inapplicable First Amendment protections.

First, Lichfield's claims are not, as Defendants suggest, mere generalized complaints about the troubled teen industry. The Amended Complaint meticulously details numerous instances where the

22

Series singles out Lichfield for defamatory treatment, making specific and damaging claims about his conduct and character. These statements meet the "of and concerning" standard, leaving no doubt in the mind of a reasonable viewer that Lichfield is the target of these accusations.

Second, Defendants' argument that certain statements were never explicitly made ignores the realities of modern media and the power of implication. Through its narrative structure, selective presentation of facts, and manipulative filmmaking techniques, the Series creates clear and damaging implications about Lichfield that are as harmful as direct accusations. The law recognizes that defamation can occur through implication, and the Series' carefully crafted narrative falls squarely within this category.

Third, the statements made about Lichfield are not protected opinion or rhetorical hyperbole. They are presented as factual conclusions in the context of what purports to be a serious, investigative documentary. The average viewer would not interpret these statements as mere exaggeration or figurative speech but as factual assertions based on the Series' ostensible investigation.

Fourth, the fair report privilege does not shield Defendants from liability. Their treatment of events such as Lichfield's arrest in Costa Rica goes far beyond fair and accurate reporting, omitting crucial exculpatory information and weaving these events into a broader defamatory narrative.

Fifth, Lichfield has sufficiently pled the falsity of the statements at issue. The Series' portrayal of Lichfield as a mastermind of an abusive system is not "substantially true" by any reasonable measure but a gross misrepresentation of his actual role and conduct.

Finally, even if the Court were to find Lichfield to be a public figure, which he disputes, the Amended Complaint contains sufficient allegations of actual malice to survive a motion to dismiss. When taken as true at this stage, the numerous instances of omitted exculpatory information, manipulated statements, and misrepresentations detailed in the Amended Complaint more than meet the plausibility standard for actual malice.

23

Defendants' anti-SLAPP motion is equally without merit. Lichfield's lawsuit is not an attempt to chill protected speech but a legitimate effort to seek redress for demonstrable falsehoods that have caused real and lasting harm. The Amended Complaint provides more than sufficient evidence to establish a probability of prevailing on the merits as required to defeat an anti-SLAPP motion.

The harm alleged by Lichfield is severe and ongoing. The Series has tarnished his reputation on a global scale, subjected him to threats and harassment, and caused significant emotional distress. These are not theoretical or speculative harms but tangible and quantifiable damages that deserve their day in court.

To dismiss this case at this early stage would be to deny Lichfield his right to seek redress for the serious harm inflicted upon him. It would also send a dangerous message that media companies can escape liability for even the most egregious defamation simply by couching their accusations in careful language and claiming the shield of the First Amendment.

The First Amendment is a cornerstone of our democracy, protecting free speech and a free press. Lichfield deeply respects and fully supports these fundamental constitutional protections, recognizing their vital role in fostering open dialogue and a thriving democratic society. However, it's crucial to understand that the First Amendment was never intended to provide blanket immunity for knowingly false and defamatory statements.[7] While protecting a wide range of expression, including unpopular or controversial views, the Constitution does not shield individuals from the consequences of making false and damaging allegations. The type of calculated character assassination alleged in this case is precisely the kind of speech defamation laws are designed to address. These laws exist not to

---

[7] Indeed, there are many ways in which a party could take affirmative steps to prevent injury of this nature, including but not limited to independent verification of the statements and allegations made prior to distribution, the use of notices or other language specifically identifying the statements contained in the footage as the views of those making the statements and not necessarily representative of the views of the distributor, or seeking a statement regarding the allegations from the parties the statements are made about.

24

stifle free expression but to maintain a balance between protecting free speech and safeguarding individuals and organizations from unwarranted harm caused by deliberate falsehoods.

Allowing this case to proceed to discovery is not only just for Lichfield but serves the broader public interest. It will allow for a thorough examination of the methods and practices used in creating this type of documentary, potentially shedding light on important issues of media ethics and responsibility.

In conclusion, Lichfield has stated valid claims for relief that easily surpass the plausibility standard required at this stage of the proceedings. The Amended Complaint provides specific, factual allegations that, when taken as true, state plausible claims for defamation, false light, intentional infliction of emotional distress, and civil conspiracy. Defendants' motion to dismiss should be denied in its entirety, allowing this case to proceed to discovery where the full extent of Defendants' conduct can be brought to light, and Lichfield can have his day in court to clear his name and seek just compensation for the harm he has suffered.

**DATED:** October 18, 2024

*/s/ Michael K. Hepworth*
Michael K. Hepworth (UT-15157)
Christoffer T. Binning (UT-17942)
**HEPWORTH LEGAL**
*Counsel for Plaintiff*

| **CERTIFICATE OF SERVICE** | |
|---|---|
| I hereby certify that on 18 October 2024, I caused a true and correct copy of the foregoing document to be served, via the method indicated below, upon the following: | |
| David W. Tufts (UT-8736) <br> Ian M. Kinghorn (UT-17717) <br> **DENTONS DURHAM JONES PINEGAR P.C.** <br> david.tufts@dentons.com <br> ian.kinghorn@dentons.com <br><br> Natalie J. Spears (Pro Hac Vice) <br> Gregory R. Naron (Pro Hac Vice) <br> Jacqueline A. Giannini (Pro Hac Vice) <br> **DENTONS US LLP** <br> natalie.spears@dentons.com <br> gregory.naron@dentons.com <br> jacqui.giannini@dentons.com <br><br> *Counsel for Defendants Katherine Kubler & Netflix, Inc.* | *Via Electronic Filing Notification* |

26

APP 00250

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L,<br><br>Defendants. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PURSUANT TO ANTI-SLAPP ACTS**<br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>Judge Jill N. Parrish |

APP 00251

## TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................... 2

I.     PLAINTIFF'S OPPOSITION CONFIRMS THAT NOTHING IN THE SERIES STATES A VIABLE CAUSE OF ACTION FOR DEFAMATION. ................................... 3

       A.     Plaintiff Admits What the Series Said About His Involvement With WWASP Is True, and a Claim Cannot Be Based On Statements the Series Did Not Make. ........................................................................................... 3

       B.     Plaintiff Has No Answer to The Law Barring Claims Based On Ms. Kubler's Hyperbolic "Getting Away With" Expressions of Opinion. ................... 4

       C.     Plaintiff Has No Answer to the Law Requiring Dismissal of Any Claim Based On the Series' True and Privileged Report of Plaintiff's Costa Rica Arrest. ........................................................................................................ 8

       D.     Plaintiff Concedes That He Cannot Base a Defamation Complaint On Generalized Comments About WWASP or the Troubled Teen Industry. ............ 10

       E.     Plaintiff Cannot Skirt His Complaint's Fatal and Unconstitutional Flaws By Arguing Defamation By "Omission" or "General Impression". ......................... 11

II.    PLAINTIFF DOES NOT PLAUSIBLY PLEAD ACTUAL MALICE. .............................. 13

III.   THE DUPLICATIVE TORT CLAIMS MUST BE DISMISSED TOO. ............................ 14

IV.   DEFENDANTS ARE ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS. ............................................................................................................................. 15

CONCLUSION .............................................................................................................. 15

i

APP 00252

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blatty v. N.Y. Times Co.*,
42 Cal.3d 1033 (1986) ...............................................................................................11

*Brokers' Choice of Am. v. NBC Universal*,
861 F.3d 1081 (10th Cir. 2017) ........................................................... *passim*

*CACI Premier Technology, Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) .......................................................................8

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014)............................................................................5

*Coleman v. Grand*,
523 F. Supp. 3d 244 (E.D.N.Y. 2021) .........................................................13

*Davidson v. Baird*,
2019 UT App 8 ...............................................................................................7

*Deripaska v. Assoc. Press*,
282 F. Supp. 3d 133 (D.D.C. 2017)...............................................................7

*Diamond Ranch Academy, Inc. v. Filer*,
2016 WL 633351 (D. Utah Feb. 17, 2016)...................................................15

*Dorsey v. Nat'l Enquirer*,
973 F.2d 1431 (9th Cir. 1992) .......................................................................9

*Eliott v. Lions Gate Ent'mnt Corp.*,
639 F. Supp. 3d 1012 (S.D. Cal. 2022)........................................................12

*Fairstein v. Netflix, Inc.*,
553 F. Supp. 3d 48 (S.D.N.Y. 2021)............................................................12

*Ferlauto v. Hamsher*,
74 Cal. App. 4th 1394 (1999) ........................................................................7

*Greenbelt Coop. Publ'ng Assn., Inc. v. Bresler*,
398 U. S. 6 (1970).....................................................................................6, 13

*Hogan v. Winder*,
762 F. 3d 1096 (10th Cir. 2014) .............................................................2, 8, 12

APP 00253

*Immanuel v. Cable News Network, Inc.*,
618 F. Supp. 3d 557 (S.D. Tex. 2022) ...................................................................14

*Janklow v. Newsweek*,
788 F.2d 1300 (8th Cir. 1986) .............................................................................11

*Lopez v. Brennan*,
2018 WL 4688352 (D. Utah Sept. 28, 2018) ......................................................5, 9

*Love v. Simmons*,
2024 WL 809107 (N.D. Ill. Feb. 27, 2024) ..........................................................14

*Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*,
810 F.3d 1161 (10th Cir. 2016) .............................................................................2

*Martineau v. Currutt*,
2022 WL 180735 (D. Utah Jan. 19, 2022) (Parrish, J.) .........................................3

*Masson v. New Yorker Mag.*,
501 U.S. 496 (1991) ..............................................................................................4

*Mauldin v. Worldcom, Inc.*,
263 F.3d 1205 (10th Cir. 2001) .............................................................................9

*Miami Herald Publ'ng v. Tornillo*,
418 U.S. 241 (1974) .............................................................................................12

*Milkovich v. Lorain Jour.*,
497 U.S. 1 (1990) ........................................................................................5, 6, 8

*Nat'l Ass'n of Letter Carriers v. Austin*,
418 U.S. 264 (1974) ..............................................................................................6

*NBC Subsidiary (KCNC–TV), Inc. v. Living Will Ctr.*,
879 P.2d 6 (Colo. 1994) .......................................................................................11

*Netflix, Inc. v. Barina*,
2022 WL 3908540 (Tex. App. Aug. 31, 2022) .......................................................12

*Nexus Pharm., Inc. v. Central Admixture Pharm. Servs.*,
48 F.4th 1040 (9th Cir. 2022) ...............................................................................4

*Nunes v. Rushton*,
299 F. Supp. 3d 1216 (D. Utah 2018) ...............................................................2, 7

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) .................................................................................5

iii

*Peterson v. Grisham*,
  2008 WL 4363653 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir.
  2010) ..................................................................................................................5, 7

*Phila. Newsp., Inc. v. Hepps*,
  475 U.S. 767 (1986)....................................................................................................4

*Pratt v. Nelson*,
  164 P.3d 366 (Utah 2007)........................................................................................10

*Resolute Forest Prods. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) ...............................................................15

*Rinsley v. Brandt*,
  700 F.2d 1304 (10th Cir. 1983) ......................................................................5, 8, 12

*Time, Inc. v. Firestone*,
  424 U.S. 448 (1976)....................................................................................................9

*TMJ Implants, Inc. v. Aetna, Inc.*,
  498 F.3d 1175 (10th Cir. 2007) ...............................................................................11

*UHS of Provo Canyon, Inc. v. Bliss*,
  2024 WL 4279243 (D. Utah Sept. 24, 2024)........................................................15

*Westmont Residential LLC v. Buttars*,
  2014 UT App 291 .......................................................................................................3

**Statutes**

California Civil Code
  § 47(d)...........................................................................................................................9

California Code of Civil Procedure
  § 425.16.......................................................................................................................15

Utah Code Ann.
  § 78B-25-107(1).........................................................................................................15
  § 78B-25-110 .............................................................................................................15

**Rules and Regulations**

Federal Rules of Civil Procedure Rule 12(b)(6) ...........................................................15

iv

APP 00255

Plaintiff's Opposition offers nothing new and ignores the wealth of First Amendment case law cited in Defendants' Motion. His Opposition makes clear that based on the actual content and context of the three-part Netflix documentary series, *The Program: Cons, Cults and Kidnapping* (the "Series"), Plaintiff's claims fail as a matter of law.

While Plaintiff's Complaint goes on at length about countless parts of the Series that do not mention or involve him, his Opposition now confirms that he has identified only a few purported statements in the Series on which he bases his claims: (1) Plaintiff's allegation that the Series purportedly claims he "exercised direct control in" Ivy Ridge or was the "mastermind or direct controller of" the WWASP youth programs (the "Control" statements); (2) Ms. Kubler's remarks that Plaintiff had "gotten away with this for so long" and that "people in the 'higher ups' '[seem to] get away with murder'" while a photo of Plaintiff and other images appear on screen (the "Getting Away With" statements); and (3) "the Series' treatment of [Plaintiff's] arrest in Costa Rica" (the "Costa Rica arrest" statement). *See* ECF No. 35 ("Opp.") at 8–9, 13, 18, 20, 23; FAC ¶¶ 77(a)–(e). None of these statements are actionable as defamation as a matter of law.

The "Control" statements simply do not exist, as Plaintiff concedes (*e.g.,* Opp. at 12); and what was *actually said* in the Series about his connection with WWASP he admits is true. The "Getting Away With" statements are constitutionally protected opinion and hyperbole; Plaintiff does not address the dispositive case law, much less distinguish it. The Costa Rica arrest statement is admittedly true; Plaintiff cannot meet his constitutional burden of proving falsity and has no substantive response to the fair report privilege that also bars his claim.

While Plaintiff admits "certain statements" were "never explicitly made," in an attempt to salvage his fatally flawed claims, he opines that this "misses the point and ignores the realities of modern media consumption." *Id.* at 15. To that end, his Opposition repeats a slew of generalities and adjectives purporting to describe the Series. *See, e.g., id.* at 6, 8, 11, 13, 15, 23 (repeatedly

referring to what he calls use of "suggestive graffiti"; "ominous music and imagery"; "juxtaposition of images, sounds, and statements"; and "emotionally manipulative filmmaking techniques, such as ominous background music . . . to create a sinister atmosphere"). Plaintiff's rhetoric and self-serving interpretation of the Series gets him nowhere.[1]

Plaintiff cannot transform nonactionable and protected speech into a viable claim based on his conclusory assertions that, taken as a whole, the Series reflects badly on him, and the filmmakers should have edited it differently, or added material to make him look better. Such editorial interference is anathema to the First Amendment. The Series presents Ms. Kubler's personal story and strongly held opinions that WWASP and similar programs are abusive and ruined lives. Plaintiff concedes that the "troubled teen industry [is] a topic of legitimate public concern." Opp. at 2. He was undeniably part of that industry and profited from it. Ms. Kubler had the constitutional right to make him part of her film. What Plaintiff pejoratively calls "emotionally manipulative filmmaking techniques" is what the best documentary filmmaking is supposed to do—bring to light injustices in a captivating, compelling way. This was an emotional and dramatic story bravely told from Kubler's perspective. Plaintiff's argument for liability is a straightforward attempt to censor that constitutionally protected point of view.

## ARGUMENT

Dismissal of Plaintiff's Complaint is in order because, as his Opposition confirms, none of the identified statements or "implications" he claims are actionable defamation as a matter of law.[2]

---

[1] As Plaintiff concedes (Opp. at 4) the Court may not accept Plaintiff's interpretation of the Series on this Motion; the First Amendment demands "a context-driven assessment" of the alleged defamatory statement's "susceptibility to a defamatory interpretation without 'indulging inferences in favor of the nonmoving party.'" Mot. at 2, quoting *Nunes v. Rushton,* 299 F. Supp. 3d 1216, 1233 (D. Utah 2018).

[2] Courts review claims arising from challenged speech with particular care given the constitutional protections and routinely dismiss. *See, e.g., Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081 (10th Cir. 2017) (affirming dismissal on truth and other grounds); *Hogan v. Winder*, 762 F. 3d 1096, 1105–1110 (10th Cir. 2014) (affirming dismissal on opinion and other grounds); *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1185 (10th Cir. 2016) (affirming dismissal where plaintiff failed to

APP 00257

## I.    PLAINTIFF'S OPPOSITION CONFIRMS THAT NOTHING IN THE SERIES STATES A VIABLE CAUSE OF ACTION FOR DEFAMATION.

### A.    Plaintiff Admits What the Series Said About His Involvement With WWASP Is True, and a Claim Cannot Be Based On Statements the Series Did Not Make.

At the outset, neither of Plaintiff's "Control" statements actually appear in the Series. First, Plaintiff claims the Series states that he "exercised direct control" in youth programs—namely, Ivy Ridge—in which he claims he had no "actual executive control over the staffing and day-to-day operation." Opp. at 12, 18; FAC ¶¶ 13, 32, 77c. But the Series never says that Plaintiff operated Ivy Ridge, or staffed or supervised Ivy Ridge. Plaintiff concedes as much. *See* Opp. at 12, 15. Second, Plaintiff argues that the Series "misrepresents the nature and extent of this involvement," in purportedly portraying him "as a central figure and mastermind of an abusive system when his role was limited to an Association Member." Opp. at 21; *see also* FAC ¶ 77e. The Series says no such thing. *Robert*, not Narvin Lichfield, is presented as the WWASP mastermind; the Series highlights how *Robert* set up the whole web of WWASP entities and profited from them.[3] Plainly put, the "Control" statements do not exist.

To the extent the Series makes *factual* assertions relating to Plaintiff—as opposed to protected expressions of opinion and hyperbole, *see infra* I.B.—their gist is that he was associated

---

allege facts supporting falsity); *Westmont Residential LLC v. Buttars,* 2014 UT App 291, ¶¶ 21–25 (affirming dismissal on opinion and hyperbole grounds); *Martineau v. Currutt,* 2022 WL 180735, at *4–5 (D. Utah Jan. 19, 2022) (Parrish, J.) (dismissing where statements "would necessarily be taken with a grain of salt" and complaint's "contradictory factual assertions" rendered claim "inherently implausible"). "Unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage. He or she may assess it upon a motion to dismiss, firsthand and in context." 2 Robert D. Sack, Sack on Defamation § 16:2.1 (5th ed. 2017).

[3] *See, e.g.,* Ex. 1C, Episode 3 at 17:30–18:00 (repeating Robert Lichfield's name in connection with WWASP's formation a number of times and describing Robert as "Founder and Owner"); *id.* at 25:39 ("Here's our main villain, Robert Litchfield"); *id.* at 33:40–34:30 ("we were always going out to visit Bob's property. It was just insane. They called this the 'Millionaire's Junkyard.' . . . This is where all that parent money went to die. It all went into this. Just one man's . . . ego project"); *id.* at 35:02–35:19 ("Bob's gonna die someday, and this will all just pass on. And like, what was the point of any of it? . . . Like, he set up WWASP in a way that shielded him from any liability. And it's not fair that he gets away with that"); *id.* at 35:20–35:40 (referring to Robert as "the guy who created it all").

3

APP 00258

with WWASP and made money from controversial WWASP programs in Costa Rica and South Carolina that faced allegations of abuse, and were shut down. That gist is unassailably true. Plaintiff cannot meet his constitutional burden of proving the material falsity of those statements. Plaintiff bears that burden because, as he concedes, the statements involve matters of public concern. *Phila. Newsp., Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1107 (10th Cir. 2017). Material falsity means that the gist or sting of the statement is not substantially true. *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991).

Plaintiff admits he has been "involved in operating programs for troubled youth for over thirty-two (32) years" that were "associat[ed] with WWASP" and in which he was involved in "staffing, supervision, or directing" the programs. FAC ¶¶ 8, 14, 27, 44, 55; Opp. at 6 (admits "operating programs for troubled youth" associated with WWASP for "over three decades"). Plaintiff does not dispute that he began his career in the troubled teen business working for WWASP's marketing arm (Ex. 15A, Trapped in Treatment Episode 3 at 15:33–18:54)[4]; he opened his first facility, Carolina Springs Academy, in South Carolina as a "franchisee" of his brother Robert's enterprise (FAC ¶ 44; Ex. 15B, Trapped in Treatment Episode 10 at 5:47–7:59), and later opened Dundee Ranch Academy in Costa Rica (Ex. 2). Plaintiff admits that his Costa Rica facility was closed and he was arrested by the authorities there. FAC ¶¶ 61–63, 77d. No defamation claim can lie for the Series' truthful statements about Plaintiff's admitted involvement with WWASP. Nor can Plaintiff base a claim on statements that do not exist in the Series.

**B.      Plaintiff Has No Answer to The Law Barring Claims Based On Ms. Kubler's Hyperbolic "Getting Away With" Expressions of Opinion.**

Defendants' Motion discussed the applicable Utah and First Amendment authority under

---

[4] Plaintiff *does not dispute* that the material appended to Defendants' Request for Judicial Notice (ECF No. 29) is properly before the Court and has waived any objection thereto. *See, e.g., Nexus Pharm., Inc. v. Central Admixture Pharm. Servs.*, 48 F.4th 1040, 1042 n.1 (9th Cir. 2022) ("Because Nexus did not object to the motion for judicial notice before the district court, the objection was waived").

APP 00259

which the "Getting Away With" comments, when considered in context, are textbook examples of rhetorical hyperbole and nonactionable opinion. *See* Mot. at 14–20. Plaintiff's Opposition has no answer. Instead, he pronounces that "the statements at issue here go far beyond mere opinion" (Opp. at 18) without engaging with, much less distinguishing any of Defendants' cited authority.[5] Plaintiff concedes that under the First Amendment, "[c]ontext is crucial," and the court must "consider[] the kind of language used and the context in which it is used." *Id.* at 19–20 (citing *Milkovich v. Lorain Jour.*, 497 U.S. 1, 16–20 (1990)). However, he then asserts that since "[t]he statements in the Series about Lichfield 'getting away' with crimes" appear in a documentary, they **"**are not framed as mere personal beliefs." Opp. at 19. That is simply wrong.

"Where the tone of a piece is 'pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage,' readers are notified 'to expect speculation and personal judgment.'" *Peterson v. Grisham*, 2008 WL 4363653, at *3 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir. 2010) (citation omitted) (dismissal of defamation claim based on non-fiction book). The Series is a personal story told passionately from Ms. Kubler's perspective. Read in that context, a reasonable viewer would not take Ms. Kubler's emotional reaction and figurative language in the "Getting Away With" comments as a "factual conclusion[]" that Plaintiff committed a crime. Opp. at 20. Contrary to what Plaintiff suggests, the constitution's protection for rhetorical hyperbole is not limited to "heated political debates or obvious parody." *Id*. Indeed, the cases Defendants cited in their motion involve other non-fiction publications with a similarly strong point of view.[6]

---

[5] Arguments not raised in an Opposition are waived. *Lopez v. Brennan*, 2018 WL 4688352, at *7 n. 4 (D. Utah Sept. 28, 2018) (plaintiff waived argument by not disputing defendant's assertion in opposition.)

[6] *See, e.g., Peterson*, 2008 WL 4363653 (books about wrongful conviction case); *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir. 1983) (book about treatment of patients in mental institutions); *Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014) (book about origins of the 2008 financial crisis); *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) (book and film about murder trial).

5

Plaintiff alleges as defamatory a segment where "Kubler claims Plaintiff had 'gotten away with this for so long'" and that "it was surreal to see Plaintiff in person '[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with.'" FAC ¶ 77a.; Opp. at 18. In this segment, Ms. Kubler is commenting, *in the context of a story told from her point of view and based on facts previously discussed*, that Plaintiff has escaped accountability for the harm she believes the WWASP programs have caused. This is the essence of non-actionable hyperbole and opinion.

Plaintiff declares that "[t]he language, such as accusing Lichfield of 'getting away' with crimes, implies factual wrongdoing, not mere opinion." Opp. at 19. The cases he ignores, and the one he cites (*e.g., Milkovich*) hold just the opposite. Even where they appear to accuse the plaintiff of crimes, hyperbolic statements expressing a speaker's subjective beliefs are not actionable. *Milkovich* strongly reaffirmed the First Amendment's protection for rhetorical hyperbole couched in terms of crime, citing cases such as *Greenbelt Coop. Publ'ng Assn., Inc. v. Bresler*, 398 U. S. 6 (1970), which "[r]eject[ed] a contention that liability could be premised on the notion that the word 'blackmail' implied" that plaintiff "had committed the actual crime of blackmail," and held that "the imposition of liability on such a basis was constitutionally impermissible"; and *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86 (1974), holding "traitor" used "in a loose, figurative sense" was "merely rhetorical hyperbole." 497 U.S. at 16–17; *see also* cases cited in Mot. at 16–17. Like those cases, in context, a reasonable viewer would not interpret Ms. Kubler's use of the word "crime" as an accusation of a specific and literal prosecutable offense, but rather as figurative rhetorical hyperbole.

Contrary to Plaintiff's contention otherwise (Opp. at 18–19), the premises for Ms. Kubler's opinion are disclosed, *e.g.,* that the troubled teen programs are *not* illegal, and an ineffectual legal and regulatory system has permitted those who profit from them to escape accountability; and that Plaintiff profited from running two of these programs (as a WWASP "franchisee") and from doing

6

marketing for WWASP, and continues to run programs. Mot. at 16–17. Based on these disclosed premises, Ms. Kubler expressed her constitutionally protected opinion that programs that are part of the WWASP network abuse children and dupe parents, and Plaintiff, through his admitted involvement with WWASP programs, likewise "abused" children and "conned" their parents. Ms. Kubler's "opinions about the legal significance of [Plaintiff's] actions, even opinions that are questionable, are not actionable as defamation." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1232 (D. Utah 2018); cases cited in Mot. at 17.

Further, these comments are made in a segment where Ms. Kubler describes her emotional reaction ("surreal") to finally seeing Plaintiff in person. In this context, viewers would understand the comments to be a visceral expression of her subjective viewpoint. Particularly where—as here—the storyteller was personally involved in the controversy, viewers fully expect he or she is biased, and "language which generally might be considered as statements of fact may well assume the character of opinion." *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1401–03 (1999); *Peterson*, 2008 WL 4363653, at *3 ("Even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view"); *Davidson v. Baird,* 2019 UT App 8, ¶ 32.

Plaintiff even goes out of his way to misrepresent the Series to try to suggest wrongdoing. He asserts that the Series "[p]resent[s] Plaintiff" as a murderer "by saying people in the 'higher ups' '[***seem to***] get away with murder' while showing Plaintiff's picture next to a news article about a murder at a youth program." FAC ¶ 77b; Opp. at 8–9, 19. Both in the FAC and his Opposition, Plaintiff inexcusably excises the prefatory words "seem to"—equivocal language that clearly signals that what follows is opinion. *See* Ex. 1C, Episode 3 at 00:00:19–00:00:33 for the actual language used. *See Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) ("[T]he word 'basically'" is "a red flag that [speaker] is using 'loose' or 'hyperbolic' language"). The "news article" to which Plaintiff refers is fleetingly shown as part of a larger bulletin board that is filled

7

with clippings, photos, and other material; the clipping does not refer to "murder". The hyperbolic, idiomatic expression "seem to get away with murder" belies any factual accusation of an actual "murder." As the Tenth Circuit explained, "[w]e all know of colloquial or hyperbolic uses" of phrases like "extortion" and it does not "always refer[] to a crime or similarly heinous conduct. Like with other words, context matters." *Hogan,* 762 F. 3d at 1107–08 (affirming dismissal).

Plaintiff has ***nothing to say*** about the holdings in *Hogan*, or *CACI Premier Technology, Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008), which *specifically* ruled that the idiomatic phrase "that's how you *get away with murder*"—used in reference to a government contractor that provided interrogation services in Iraq—amounted to protected "hyperbole and exaggeration" and could not "support[] a claim for defamation." *Id.* at 300–302. Plaintiff also ignores *Rinsley v. Brandt*, where the author's non-fiction book excoriated the plaintiff's treatment of a patient who died in his care: "overwhelmed by 'anger and rage at the unbelievable arrogance of this man's methods,' [author] asks, 'What does it take to put a stop to such a man? How many more children must die?'" 700 F.2d 1304, 1306–07 (10th Cir. 1983). Plaintiff's silence on this law is telling.

Ms. Kubler's speech in both of the "Getting Away With" statements is no less protected as "exaggerated expressions of criticism. They are the type of statement that our society, interested in free and heated debate about matters of social concern, has chosen to protect." *Id.* at 1308; *see also Milkovich*, 497 U.S. at 20 (reaffirming that the "imaginative expression" and "rhetorical hyperbole" that has "traditionally added much to the discourse of our Nation" is insulated from liability).

### C.    Plaintiff Has No Answer to the Law Requiring Dismissal of Any Claim Based On the Series' True and Privileged Report of Plaintiff's Costa Rica Arrest.

The only other statement about Plaintiff that he identifies as potentially defamatory is the truthful statement that Plaintiff was arrested in Costa Rica. Plaintiff *admits* he was arrested, but asserts that the charges were eventually dropped. *See* FAC ¶ 63; Opp. at 8, 10, 20. The statement is not just substantially but *literally* true. And it is not rendered "false" because it doesn't include

APP 00263

additional information favorable to Plaintiff. Incredibly, Plaintiff ignores the Tenth Circuit's controlling decision in *Brokers' Choice:*

> [T]he omission of additional favorable information from an otherwise true publication does not render a statement materially false. '[T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light.'

861 F.3d at 1108 (citations omitted); *see* Mot. at 21, citing *Brokers' Choice* and other cases specifically holding that reports of a plaintiff's arrest are not rendered "false" because the plaintiff was subsequently acquitted or charges were dropped or expunged.

The truthful report of Plaintiff's arrest also is subject to the privilege for fair reports of official proceedings. For the reasons discussed in Defendants' motion, California law on fair report, codified at Cal. Civil Code § 47(d) applies here (*see* Mot. at 21–22); Plaintiff's opposition brief does not address this point and waives objection to application of California law.[7]

Plaintiff also does not address the law applying the privilege, instead making the conclusory pronouncement that "[t]he Series' treatment of Lichfield's arrest in Costa Rica goes far beyond fair reporting," creating a "false impression of guilt by omitting the crucial fact that all charges were dropped and Lichfield was exonerated." Opp. at 20. Plaintiff cites no authority for this assertion, and the law (cited in Defendants' motion and ignored) is the opposite: the privilege "does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts." *Dorsey v. Nat'l Enquirer,* 973 F.2d 1431, 1436 (9th Cir. 1992).[8] For this additional

---

[7] *See Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211-12 (10th Cir. 2001) ("[P]arties may waive choice of law arguments by failing to adequately brief them"); *see also Lopez*, 2018 WL 4688352, at *7 n. 4.

[8] *See* other cases cited in Mot. at 22-23. Plaintiff cites *Time, Inc. v. Firestone*, 424 U.S. 448 (1976) (Opp. at 20), which held "Florida's limited privilege for accurate reports of judicial proceedings" did not apply to report that a divorce court found wife "guilty of adultery" when it was "indisputable that these were not the facts." *Id.* at 458. There is no such error here, and *Firestone* certainly does not support Plaintiff's legally void argument that Defendants had to include *additional* facts to tell his version of the story.

9

reason, any claim based on the Costa Rica arrest must be dismissed.

### D. Plaintiff Concedes That He Cannot Base a Defamation Complaint On Generalized Comments About WWASP or the Troubled Teen Industry.

Plaintiff concedes that "to state a claim for defamation," he must show that statements were "*concerning him*" specifically (Opp. at 5 (emphasis added)) and that "[w]hile the Series does include broader commentary on the industry, [his] claims focus on the false and defamatory statements explicitly made about him" (*id.* at 10). Yet, in contravention of the "of and concerning" rule and the First Amendment, Plaintiff improperly seeks to impose defamation liability based on elements of the Series that are clearly *not* "explicitly made about him".[9] That is exactly what he cannot do. Instead, based on independent review of the Series—free of Plaintiff's spin—there is no plausible claim that Plaintiff was personally defamed by the Series' broader critique of WWASP and the specific, documented instances of abuse at Ivy Ridge.

Plaintiff cites *Pratt v. Nelson*, 164 P.3d 366 (Utah 2007) for the proposition that a statement is "of and concerning" a plaintiff if "readers or viewers would understand the statement as referring to the plaintiff." But *Pratt* holds that if "the defamatory matter has no special application" to Plaintiff "and is so general that no individual damages can be presumed," then "no private suit can be maintained." *Id.* at 382. Here, content in the Series that does not refer to Plaintiff, such as the experiences of Ms. Kubler and others at Ivy Ridge, has no "special application" to Plaintiff. Plaintiff cannot ask the court, in the guise of a defamation claim, to silence the viewpoints and experiences of Ms. Kubler and other youths at Ivy Ridge who feel strongly that their lives were ruined by WWASP "youth programs". That is the definition of "vexatio[us] and oppress[ive]"—

---

[9] For example, he contends that viewers would "associate the Series' broader accusations" with him, "not just at the industry in general" because it "paint[s] him as a mastermind of an abusive system." Opp. at 10–11, 21. As noted, the Series neither states nor implied implies any such thing. That is just made up. In truth, the Series explicitly names and focuses on his brother Robert as the founder and mastermind behind WWASP. *See supra* Section I.A.

APP 00265

and is contrary to the First Amendment. *See* Mot. at 9, citing *Blatty v. N.Y. Times Co.*, 42 Cal.3d 1033, 1042, 1044 (1986) (of and concerning rule deters "vexatious lawsuits" that would "seriously interfere with public discussion of issues, or groups, which are in the public eye").

**E.      Plaintiff Cannot Skirt His Complaint's Fatal and Unconstitutional Flaws By Arguing Defamation By "Omission" or "General Impression".**

Unable to dispute that his Complaint improperly sought to impose liability based on invented and non-actionable statements, Plaintiff resorts to claiming defamation based on what was *unsaid* in the Series. Plaintiff's reliance on purported "omissions" of "exculpatory" information is improper (and unconstitutional). Contrary to what Plaintiff asserts, the Tenth Circuit has rejected any claim based on "the omission of additional favorable information from an otherwise true publication." *Brokers' Choice*, 861 F.3d at 1108 (affirming dismissal). *See supra*, Section I.C.

Indeed, one of the few cases Plaintiff cites, *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175 (10th Cir. 2007), actually *affirmed dismissal* of a claim that a defendant's "literally true" statement about plaintiff's product was "nonetheless defamatory because it omits a relevant material fact." *Id.* at 1196. In so holding the court followed *NBC Subsidiary (KCNC–TV), Inc. v. Living Will Ctr.*, 879 P.2d 6 (Colo. 1994), which held broadcaster's "providing limited, though accurate, information" in a story about plaintiff's product was not defamatory, and declined to interfere with "the editorial judgments of NBC in determining the scope and specificity of these broadcasts." *Id.* at 15 (citing *Janklow v. Newsweek*, 788 F.2d 1300, 1306 (8th Cir. 1986) ("Courts must be slow to intrude into the area of editorial judgment . . . Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors.")). Here, Plaintiff's quarrel with the Kubler's "*editorial choices*" is a direct assault on the First Amendment and does not salvage his non-existent defamation claim.

Similarly, and equally futile, Plaintiff asserts that notwithstanding the absence of actionable defamatory statements about him, he should be able to base a claim on his own subjective, nebulous

11

assessment of the Series' "overall message," "implications drawn from juxtaposition of images, sounds, and statements" and use of "emotionally manipulative filmmaking techniques, such as ominous background music. . . ." Opp. at 11, 13. The plaintiff in *Rinsley v. Brandt* made the same argument: the district court should have "read for a general impression rather than focusing on the truth or falsity of each statement or on its status as opinion or factual assertion," and "would have concluded" upon such reading that the book "as a whole unmistakedly provides the average reader with a 'picture' of Dr. Rinsley . . . as an irresponsible throwback to the middle ages." 700 F.2d at 1310. The Tenth Circuit emphatically *rejected* that argument. Affirming dismissal, *Rinsley* held that reading allegedly defamatory statements in context "does not relieve a plaintiff from identifying particular statements or passages that are false" and actionable. *Id.*[10] Plaintiff's claims fail for the same reasons here.[11]

And, again, Plaintiff's second-guessing Kubler's exercise of editorial and aesthetic judgments like choice of background music and images is intolerable under the constitution. *Miami Herald Publ'ng v. Tornillo*, 418 U.S. 241, 255 (1974) ("[W]e reaffirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial.") (citation omitted).

---

[10] Ignoring *Rinsley*, Plaintiff cites without discussion two cases that have no bearing on this case. Opp. at 13 n. 4. *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48 (S.D.N.Y. 2021) granted and denied in part a motion to dismiss claims directed against a dramatization of historical events; it did not involve defamation "by omission" or "as a whole." The unreported decision in *Netflix, Inc. v. Barina*, 2022 WL 3908540 (Tex. App. Aug. 31, 2022) addressed a defamation by overall "gist" theory under Texas law. *Id.* at *2. Plaintiff cites no Utah case adopting that theory and the Tenth Circuit rejected it in *Rinsley*.

[11] Plaintiff's "defamation per se" and "defamation" claims (Counts I and II) did not plead defamation "by implication," but relabeling them in his brief gets him nowhere. "A 'Plaintiff may not construct an actionable statement by reading whatever implication it wishes' into [a] defendant's work." *Eliott v. Lions Gate Ent'mnt Corp.*, 639 F. Supp. 3d 1012, 1026 (S.D. Cal. 2022) (citation omitted). As discussed *supra* Section I.A, any purported implication that Plaintiff was the "mastermind" of WWASP, or was "in charge" and "responsible for" the abuses shown at Ivy Ridge is not reasonably drawn from the specific statements he cites in the Series. *Hogan*, 762 F.3d at 1105-10 (affirming dismissal); *Keisel*, 2023 UT App 163, ¶ 50 ("no basis for concluding that" claimed implication could be drawn as matter of law).

12

## II.    PLAINTIFF DOES NOT PLAUSIBLY PLEAD ACTUAL MALICE.

Though the Court need not reach this issue, in light of the foregoing grounds, dismissal is also in order because Plaintiff is a limited purpose public figure and has not plausibly pled the "actual malice" that the First Amendment requires him to prove. *See* Mot. at 23–25.

Plaintiff argues that Defendants' "characterization of [him] as a public figure is erroneous" because he "has not thrust himself into the vortex of this public controversy, nor does he have regular and continuing access to the media." Opp. at 3. But this unsupported argument ignores the *undisputed evidence* that he *has* inserted himself into an admittedly important public controversy "in order to influence the resolution of the issues involved." *See* Mot., Factual Background, § D and Arg. at 23–24. On that, he is completely silent. *See also* Opp., *passim*; Req. for Judicial Notice at 3–6 (as to which Plaintiff offered no objections).

Plaintiff disclaims responsibility to plead actual malice (FAC ¶ 102), has not done so, and as a matter of law could not do so. Actual malice requires, at the threshold, "proof that the statement was false" (*Brokers' Choice*, 861 F.3d at 1106), and as discussed, there is no false statement of fact about Plaintiff. Even if there were, his bare-bones allegations simply assert the kind of "buzz words" parroting the legal standard that courts find inadequate on a motion to dismiss. Mot. at 24–25.[12]

---

[12] Aside from Plaintiff's recycled arguments as to the statements discussed in Section I above and his apparent estrangement with his own son (Opp. at 21), the only purported "evidence" of actual malice Plaintiff cites is Ms. Kubler's use of a clip from the 1934 film version of "The Count of Monte Cristo" because that novel involved a revenge story. Even if Ms. Kubler's artistic use of that clip was somehow specific to Plaintiff (which it is not), the fact that she understandably has strong views about the troubled teen industry she wants to bring to light as a means of healing for herself and others—or even dislike for Plaintiff based on what she learned about him in her research—is definitively not actual malice. *See, e.g., Coleman v. Grand*, 523 F. Supp. 3d 244, 261 (E.D.N.Y. 2021) (that defendant "was motivated by revenge" does not "show actual malice" because "[t]he actual malice standard focuses not 'on the defendant's attitude toward the plaintiff,' but rather 'on the defendant's attitude toward the truth'"); *Greenbelt Coop. Publ'ng*, 398 U.S. at 10–11 (basing actual malice on "the 'language' of the publication itself," and "on the basis of a combination of falsehood and general hostility," is "error of constitutional magnitude").

APP 00268

### III.    THE DUPLICATIVE TORT CLAIMS MUST BE DISMISSED TOO.

Plaintiff's remaining tort claims for false light, intentional infliction of emotional distress, and civil conspiracy are duplicative of his defamation claim, and fail along with it. "A plaintiff may not attempt an end-run around First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims." *Keisel*, 2023 UT App 163, ¶ 70; Mot. at 25–27. Once again, Plaintiff has no answer to the cases cited in Defendants' motion, and simply proclaims that his tag-along claims "are not merely repackaging his defamation claims," adding his usual strident rhetoric about "Defendants' egregious conduct" and "character assassination campaign". Opp. at 3.  But Plaintiff does not dispute the simple fact that all his claims are "based on the same statements at issue in the defamation claims," and as such they cannot stand if the defamation claim falls. *Keisel*, 2023 UT App 163, ¶¶ 69–70.

Equally untenable is Plaintiff's attempt to bolster his claim by arguing that "the Series included footage of Lichfield secretly filmed at a private karaoke event, an evident invasion of privacy, which, when combined with the overlayed commentary, is designed to portray him in a false light." Opp. at 6–7; FAC ¶ 34. The "karaoke event" was open to the public, which Plaintiff does not deny, nor does he deny it is true footage of him. A defamation or false light claim cannot be premised on the use of true footage. "Holding up a mirror isn't defamation," or false light. That the video footage "might have been unflattering doesn't mean that it was false. It's a false light claim, not an unflattering light claim." *Love v. Simmons*, 2024 WL 809107, at *5, *7 (N.D. Ill. Feb. 27, 2024) (dismissing defamation and false light claims). *See also Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 564 (S.D. Tex. 2022) (reports "primarily using [plaintiff's] own words and videos, . . . cannot be the basis of a claim for defamation.").

APP 00269

## IV.    DEFENDANTS ARE ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS.

The Anti-SLAPP statutes of either Utah or California apply to Plaintiff's meritless First Amendment-chilling litigation. Mot. at 27, citing Cal. C.C.P. § 425.16(c)(1); Utah Code Ann. § 78B-25-110 ("UPEPA"); *Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, at \*4 (D. Utah Feb. 17, 2016). Plaintiff concedes the Utah UPEPA applies here, and he also acknowledges that under either statute, "[t]he critical question is whether Lichfield's claims arise from Defendants' exercise of the right of freedom of speech on a matter of public concern." Opp. at 16. There is no question his claims do just that. *Provo Canyon* recently held an expose of a "troubled teen" facility was "speech" of public concern subject to UPEPA. *UHS of Provo Canyon, Inc. v. Bliss*, 2024 WL 4279243 (D. Utah Sept. 24, 2024) (applying UPEPA though denying relief given unique contract and tort claims related to confidentiality of patient and HIPPA information).

That being so, "the Court must analyze each of Lichfield's five causes of action to determine whether Lichfield has stated a claim upon which relief may be granted." Opp. at 17. "[I]f Plaintiffs cannot plead a plausible cause of action under the FRCP 12(b)(6) standard, then Plaintiffs as a matter of law cannot meet the probability of success on the merits standard." *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1026 (N.D. Cal. 2017); Utah Code Ann. § 78B-25-107(1). For the reasons set forth above, Plaintiff has not stated a plausible claim for relief under Rule 12(b)(6), and thus fails his Anti-SLAPP law burden as a matter of law. *Id.* Defendants are therefore also entitled to relief under the Anti-SLAPP Acts.

## CONCLUSION

Defendants respectfully request that Plaintiff's First Amended Complaint be dismissed with prejudice, and that this Court strike Plaintiff's Complaint pursuant to Cal. C.C.P. § 425.16, or alternatively, Utah Code Ann. § 78B-25-101, *et seq.*, and award Defendants their attorneys' fees in an amount to be determined.

15

Dated: November 12, 2024

Respectfully submitted,

David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
*david.tufts@dentons.com*
*ian.kinghorn@dentons.com*

*/s/ Natalie J. Spears*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

16

APP 00271

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 12, 2024, a true and correct copy of the foregoing

was served by CM/ECF on all counsel or parties of record on the service list.


*/s/ Natalie J. Spears*

APP 00272

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NARVIN LICHFIELD,<br><br>       Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER and NETFLIX, INC.,<br><br>       Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS AND FOR RELIEF UNDER ANTI-SLAPP ACTS<br><br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>District Judge Jill N. Parrish |

Narvin Lichfield sued Katherine Kubler and Netflix, Inc. (collectively, the defendants), alleging that a documentary series created by Kubler and streamed on Netflix defamed him. Lichfield asserts claims for defamation per se, defamation, false light, intentional infliction of emotional distress, and civil conspiracy. Before the court is the defendants' motion to dismiss this action and for relief under the Anti-SLAPP Act of either California or Utah. ECF No. 28. The motion is GRANTED.

APP 00273

## BACKGROUND[1]

During her sophomore year of high school, Kubler's parents enrolled her in a private Christian boarding school in Long Island, New York. A few months after she arrived, the school expelled her under its zero-tolerance policy because she had been caught with an alcoholic beverage. Due to her expulsion, Kubler's parents decided to place her in a lockdown behavior modification program located in Upstate New York called The Academy at Ivy Ridge, which was marketed to parents as a boarding school for troubled teens. Kubler spent the next 15 months at Ivy Ridge without being allowed to go home.

Kubler later went to film school and began a career in the entertainment industry. She decided to create a documentary series about Ivy Ridge. Kubler produced and directed a three-part series called *The Program: Cons, Cults, and Kidnapping*, which streamed on Netflix.

The first episode of *The Program* describes the experiences of Kubler and other teenagers at Ivy Ridge. Kubler recounted being strip searched upon arrival and then introduced to the facility's strict regime of rules, including: no talking at all unless directed to do so, no going outside, no looking outside the windows, no eye contact with other students, no touching other students, no looking in the mirror, and no smiling. One of the most important rules was that detainees could not ask their parents to bring them home, which was labeled as manipulation.

---

[1] "Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion." *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013). But a court may consider a document submitted by a defendant if (1) "the document is referred to in the complaint," (2) it "is central to the plaintiff's claim," and (3) the defendant submits "an indisputably authentic copy to the court." *Id.* In this case, the basis for all of the Lichfield's claims is the Netflix documentary series entitled *The Program: Cons, Cults, and Kidnapping*, which is explicitly referred to in the operative complaint. The defendants have submitted an undisputably authentic copy of the series to the court. Accordingly, the court considers the content of this series in reciting the facts of the case and in resolving the motion to dismiss.

APP 00274

These rules were enforced 24 hours a day. Teenagers detained at Ivy Ridge could earn some privileges by advancing through its level system, which was called "working the program." Detainees gained points by complying with all of the rules, and if enough points were earned, teens could advance to the next level. Conversely, even minor infractions would result in the loss of points or levels. A detainee who reached level three could have a 15-minute monitored phone call with his or her parents once a month. At level four, the detainee could talk and look out of windows. But these upper-level detainees were required to become enforcers by reporting infractions committed by other detainees. Detainees were not allowed to leave Ivy Ridge until they reached level six. Kubler opined that the leaders of Ivy Ridge intentionally made it nearly impossible to advance to level six in order to keep the detainees in the program for as long as possible.

If the point system failed to induce compliance, Kubler alleged that more drastic measures were taken. Detainees would be violently taken to the floor and then transported to a small isolation room where they were required to hold stress positions or lay face down on the floor for hours. Some detainees in the isolation rooms were physically assaulted or given only two pieces of bread and eight ounces of milk for their meals.

The primary theme of the second episode of *The Program* is Kubler's contention that Ivy Ridge employed time-tested mind control techniques on teenagers detained in the facility. Kubler asserted, for example, that every six weeks detainees were required to participate in a seminar that lasted between two and four days. Some of the seminar activities included requiring participants to crawl on the floor like a baby for an hour and forcing them to scream and beat the floor as hard as they could with towels wrapped in duct tape until complete exhaustion. Detainees who stopped participating before time was called were sent to an alternative seminar called "breakpoint" because the intent of the seminar was to break the detainee. Breakpoint participants were required

APP 00275

to perform tasks such as chanting a meaningless mantra in unison for eight hours straight until they entered a dissociative trance. Kubler asserted that these activities—in conjunction with inadequate food, sleep deprivation, and the weaponization of embarrassing personal history details or coerced confessions—were intended to break down all resistance and to convince them that their only option was to surrender themselves to "the program."

Parents were also put through a separate series of seminars held about once a month. In these seminars, parents participated in guided meditation and engaged in group activities designed to get them outside of their comfort zone. Kubler contended that the central message of the parent seminars was not to give in to their children's requests to come home and not to remove their children from the facility before they completed the program.

In the third episode of *The Program*, entitled "Follow the Money," Kubler examines the larger troubled-teen industry. In particular, she focuses on the history and structure of the World Wide Association of Specialty Programs (WWASP), which was founded by Robert Lichfield. In 1988, Robert Lichfield founded his first facility for troubled teens in La Verkin, Utah. He later created WWASP, which acted as an umbrella organization for numerous other troubled teen facilities that were established across the United States and around the world, including Ivy Ridge. WWASP provided the template for running a troubled teen program to each member facility. It also provided services, such as supervising media relations, and putting on seminars. In exchange, the member facilities paid WWASP a fee for each teen detained in the facility. Kubler asserted that Robert Lichfield accumulated a great deal of personal wealth through WWASP by charging parents exorbitant fees while spending as little as possible on staffing and other expenses.

The third episode also examined other figures associated with WWASP, including Robert's brother, plaintiff Narvin Lichfield. Kubler asserted that Narvin Lichfield created the original

APP 00276

marketing materials for WWASP and pioneered the use of search engine optimization to ensure that parents searching for help with their teenagers on the internet would be directed to a WWASP website. Narvin Lichfield later opened and operated three troubled teen facilities under the WWASP umbrella: one in South Carolina and two in Costa Rica.

After *The Program* began streaming on Netflix, Narvin Lichfield sued Kubler and Netflix, asserting claims for defamation per se, defamation, false light, intentional infliction of emotional distress, and civil conspiracy. Lichfield alleged that the following statements found in the third episode of the documentary series were actionable:

(1) In the opening scene of the third episode, the camera focuses on several sections of a bulletin board with photographs of individuals, news articles, and biographical information about the pictured individuals attached to it. The first and second shots depicted low-level workers at Ivy Ridge and its director. The third shot showed pictures of individuals with ownership stakes in troubled teen facilities along with well-known politicians. The fourth shot depicted a picture of Narvin Lichfield next to a news article with the headline: "As Therapy Hikes Reviewed, Another Teen Dies in Program." While the camera progresses through these shots, Kubler provides the following voiceover: "It bothers me how people low on the totem pole end up taking the fall, and the people at the top seem to get away with murder. I knew if I really wanted to go after these places, I need to follow the money."

(2) In one scene of the third episode, Kubler went to a karaoke night at a public nightclub after seeing Narvin Lichfield's social media post inviting people to come. Kubler filmed both Lichfield and herself singing at the nightclub. During this scene, Kubler narrated the following voiceover:

5

> It was surreal to see Narvin in person—knowing everything I know about this guy, the children he abused, the parents he conned, all of the crimes he's gotten away with. . . . You know, all these people, they've gotten away with this stuff for so long. So, I think a lot of them really do think they got away with it. I think Narvin, I think Robert, they've gotten away with it for so long.

(3) Referring to the first Costa Rican troubled teen facility opened by Narvin Lichfield, called Dundee, Kubler stated: "Dundee was only open for 19 months before authorities were alerted to abuse, raided the facility, and Narvin was arrested."

Lichfield also alleged that the juxtaposition of his picture and the news article about the death of a teen during the opening scene of episode three implied that he was somehow involved with the death. And although Lichfield did not identify any specific statements made in the documentary series, the complaint also asserted that the series defamed him by "[c]laiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children" and by "[p]resenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." ECF No. 5 at ¶ 77.

Defendants Kubler and Netflix filed the instant motion seeking two forms of relief. First, they seek dismissal of Lichfield's action under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. Second, the defendants move to either strike Lichfield's claims pursuant to California's Anti-SLAPP statute or to dismiss the claims under Utah's Uniform Public Expression Protection Act (UPEPA). The defendants also request an award of fees and costs under these two statutes.

APP 00278

## ANALYSIS

### I.   MOTION TO DISMISS UNDER RULE 12(b)(6)

#### A.   *Legal Standard*

Rule 12(b)(6) provides that a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss, a court "accept[s] as true all well-pleaded factual allegations in the complaint." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). Although courts normally view these allegations "in the light most favorable to the plaintiff," *id.*, there are two caveats to this rule when determining whether a defamation claim brought under Utah law is subject to dismissal. To uphold constitutional protections of speech, courts do not draw inferences in favor of the plaintiff when determining (1) whether an allegedly defamatory statement is capable of a defamatory meaning or (2) whether the statement is one of fact or opinion. *Mathews v. McCown*, 2025 UT 34, ¶¶ 6, 98, --- P.3d ---.

#### B.   *Defamation and Defamation Per Se*

Lichfield asserts claims for defamation and defamation per se against the defendants based on statements and alleged inferences found in *The Program*. To state a claim for defamation, he must show that the defendants "published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994). To state a claim for defamation per se, Lichfield must also show that the defamatory statements were "on their face, and without the aid of intrinsic

proof, . . . unmistakably recognized as injurious." *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 977 n.7 (Utah 1981). If the statements are deemed defamatory per se, the plaintiff need not prove damages. *Id.*

The defendants argue that the court should dismiss the defamation and defamation per se claims. Because the defendants' arguments center on elements that are common to both of these causes of action, the court analyzes them jointly.

    1)    Statements about seeming "to get away with murder" and getting away with abuse, conning parents, and unspecified crimes

In *The Program*, Kubler makes the following allegedly defamatory statements: (1) "It bothers me how people low on the totem pole end up taking the fall, and the people at the top seem to get away with murder" and (2) "the children he [Lichfield] abused, the parents he conned, all of the crimes he's gotten away with." The defendants argue that these statements are not actionable because they are constitutionally protected opinions rather than assertions of fact. The court agrees.

The free speech protections found in the Federal and Utah Constitutions limit liability for defamation. *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005) ("Defamation claims always reside in the shadow of the First Amendment."); *West*, 872 P.2d at 1015 (holding that the Utah Constitution limits liability for defamation). Specifically, the Utah Constitution protects expressions of opinion from liability for defamation. "Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability." *West*, 872 P.2d at 1015. In contrast, "[a]ssertions of fact, being objectively verifiable and much more capable of harming reputation, are not entitled to the same degree of protection afforded expressions of opinion." *Id*. Thus, in order to prove a defamation claim, a plaintiff must show that the defendant stated or implied facts that are both

APP 00280

false and defamatory. *Id.* Courts consider four non-exhaustive factors to distinguish facts from opinions:

> (i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears.

*Id.* at 1018. "Whether a statement is one of fact or opinion is a question of law for the court to decide." *Mathews*, 2025 UT 34, ¶ 96.

Applying the *West* factors, the court determines that the "seem to get away with murder" statement is an expression of opinion rather than fact. This statement employs the common idiom "to get away with murder" to figuratively describe Kubler's view that the individuals who had profited from troubled teen programs had avoided any negative consequences for owning or operating them. Kubler's use of the introductory phrase "seem to" emphasizes that the statement is used metaphorically, and not to literally accuse leaders and owners of these programs of being culpable of the crime of murder. The broader context of the documentary series as a whole reinforces this understanding of the phrase. Throughout the series, Kubler accuses these leaders of profiting from an abusive system. But she does not accuse them of murder. Finally, this statement, taken in context, is an expression of moral disapprobation that is not capable of being proved true or false. Accordingly, Kubler's statement that leaders like Lichfield "seem to get away with murder" is a constitutionally protected opinion.

The phrase "the children he abused, the parents he conned" also expresses an opinion. Throughout the three-episode series, Kubler consistently expressed her view that the tactics employed in WWASP-associated facilities were abusive and psychologically damaging. She also opined that WWASP programs used manipulative techniques to encourage parents to keep their

9

children in facilities for as long as possible. And given her assessment that these programs were abusive and ineffective, she expressed her belief that the monthly fees were a waste of money. In the context of these expressed viewpoints, statements about the children Lichfield abused and the parents he conned are protected opinions. There is no way to objectively verify whether the WWASP methodology should be considered abusive or merely tough love for troubled teens. *See Rinsley v. Brandt*, 700 F.2d 1304, 1306–07,  (10th Cir. 1983) (holding that strong criticisms of a psychiatrist, including "God knows what other cruelties he calls treatment" and "What does it take to put a stop to such a man? How many more children must die?" were protected opinions). Nor is it possible to definitively ascertain whether parents were conned out of their money or whether it was well spent. *See Rizzuto v. Nexxus Prods. Co.*, 641 F. Supp. 473, 481 (S.D.N.Y. 1986) (holding that the phrase "don't be conned" was "no more than rhetorical hyperbole").

Similarly, Kubler's reference to "all of the crimes [Lichfield has] gotten away with" expresses a protected opinion. Accusing an individual of committing a specific criminal act is typically an assertion of fact. *See Mathews*, 2025 UT 34, ¶¶ 99–101 (holding that an accusation that a plaintiff "defrauded the entire community" was not a protected opinion because, in context, the best understanding of the statement "is that [the defendant] was accusing [the plaintiffs] of committing crimes and not offering opinions about their character or conduct"); *Hogan v. Winder*, 762 F.3d 1096, 1107 (10th Cir. 2014) (applying Utah law and holding that "[f]alse accusations of criminal conduct can be defamatory, of course"). But a speaker's use of words that may carry criminal connotations do not always constitute assertions of fact. In *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, for example, the Supreme Court held that the use of the term "blackmail" during a heated city council meeting did not amount to a criminal accusation. 398 U.S. 6, 13–14 (1970). The Court analyzed the elements of the crime of blackmail and reasoned

10

that the defendants never indicated that the plaintiff had engaged in conduct approximating criminal blackmail. *Id.* at 14 n.7. Instead, "the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Id.* at 14.

In *The Program*, Kubler does not accuse Lichfield of specific criminal conduct. Indeed, her generic statement about unspecified crimes Lichfield had gotten away with provides no temporal or other limitation that would hint at a particular crime. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1232 (D. Utah 2018) (finding that a statement that the plaintiff should investigate whether she was "guilty of harassment" was a protected opinion because the defendant did "not allege or imply that [the plaintiff] committed any specific criminal acts"). Absent any indication as to what crimes Lichfield may have committed, it is difficult to conceive of what specific assertion of fact could be examined in a trial or how the statement could be proven true or false. In light of the generality of Kubler's statement, it is best understood as rhetorical hyperbole emphasizing Kubler's opinions regarding the tactics employed at WWASP faculties. *See Westmont Residential LLC v. Buttars*, 340 P.3d 183, 189 (Utah Ct. App. 2014) (holding that the defendant's use of the term "crooks" was "no more than rhetorical hyperbole" (citation omitted)). In other words, Kubler's statement amounts to an expression of a strong negative opinion akin to accusing Lichfield of "crimes against humanity" and not an assertion of provable fact.

The context in which the statement was made further emphasizes that it is no more than rhetorical hyperbole. In *The Program*, Kubler tells a personal story about her traumatic experiences as a teenager at Ivy Ridge and how that event strained her relationship with her father for many years thereafter. In the scene of the documentary where Kubler makes the "crimes" statement, she describes her reaction to seeing Lichfield in person in light of those personal experiences and her

11

investigation of the troubled-teen industry, stating: "It was surreal to see Narvin in person—knowing everything I know about this guy . . . ." Because Kubler's reference to "crimes" Lichfield "had gotten away with" was couched as a description of her visceral response in light of her personal experiences, a viewer would take the statement as a hyperbolic expression of strong opinion rather than an accusation of specific criminal conduct. *See Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1402–03 (1999) (holding that in the context of a book describing the author's personal experiences and feeling regarding a lawsuit against her, a reasonable reader would take the author's statements as "highly partisan opinions" rather than assertions of fact); *West*, 872 P.2d at 1020 (holding that the fact that the allegedly defamatory statements appeared in editorial columns "as opposed to 'hard news'" indicated that they constituted protected opinions). Indeed, Kubler indicated that she was expressing her opinion by stating that she was articulating her personal thoughts about Lichfield getting away with it: "So, I think a lot of them really do think they got away with it."

In short, none of the statements regarding getting away with murder or getting away with unspecified crimes are actionable because they are protected opinions.

2)    Alleged defamatory implication from the image of the news article

Lichfield also alleges that the image showing his picture adjacent to a news article with the headline "As Therapy Hikes Reviewed, Another Teen Dies in Program" is defamatory. He argues that this juxtaposition would cause reasonable viewers to believe he was involved with or somehow responsible for the death referenced in the headline. Thus, Lichfield asserts a defamation-by-implication claim rather than by a direct statement. *See West*, 872 P.2d at 1011 (holding that under a defamation-by-implication claim, "it is the implication arising from the statement and the context in which it was made, not the statement itself, which forms the basis of

12

[the] claim"). When a plaintiff asserts a claim for defamation by implication, the court must first determine whether a reasonable factfinder could conclude that the underlying statement (or in this case, the underlying image) "conveys the allegedly defamatory implication." *Id* at 1019. In making this determination, courts must examine the context in which the underlying statement was made. *Id*. at 1011 n.18; *Hogan*, 762 F.3d at 1105–06 (10th Cir. 2014) (applying Utah law).

Here, the context in which Lichfield's picture and the article were presented would not lead a reasonable viewer to believe that the documentary series implied that Lichfield was responsible for the death referenced in the headline. First, the scene in which the image appears does not lend itself to the alleged defamatory implication. During the introduction to episode three, Kubler employed the well-worn trope of an investigator pinning evidence to a bulletin board in an attempt to solve a case—or here, to "follow the money." She depicted a board covered with pictures of individuals who worked at Ivy Ridge, individuals who financed or owned troubled teen facilities, politicians, and leaders of WWASP and WWASP facilities. Interspaced between the pictures were various news articles about the troubled teen industry, LinkedIn profiles, and a variety of other documents. These disparate pictures and documents are crowded together on the board so that they overlap. At the center of the board is a map of the United States with red string attached to pins linking locations on the map with various documents on the board. For approximately fifteen seconds, the camera zooms in on various sections of the board. And for about two seconds, the camera focuses on a picture of Lichfield next to the article. Because the board represents a jumble of pictures and other documents mixed together that reference the troubled-teen industry as a whole, a reasonable viewer would not assign significance to the juxtaposition of Lichfield's picture and the article. Indeed, at this point in the documentary series, the viewer is unaware of who Narvin Lichfield is because the series does not even mention him until later in episode three.

13

Viewing this two-second shot in context of episode three as a whole also demonstrates that viewers would not draw the alleged defamatory inference. Later on in the episode, Kubler describes in detail Lichfield's role in the troubled-teen industry, including working on the marketing for WWASP and later opening and operating three WWASP facilities. Because episode three specified Lichfield's role in the industry, which had nothing to do with "therapy hikes" or other wilderness therapy programs, viewers would not infer that Lichfield had anything to do with a death during a therapy hike. Although episode three briefly addresses wilderness programs for troubled teens, it does not tie these programs in any way to Lichfield.

For these reasons, no reasonable factfinder could conclude that the image of Lichfield's picture next to an article about therapy hikes conveys a defamatory implication. Accordingly, the court dismisses the defamation and defamation per se claims to the extent that they are based on allegations of this defamatory inference. *See Keisel v. Westbrook*, 542 P.3d 536, 552–53 (Utah Ct. App 2023) (affirming summary judgment in favor of a defendant on a defamation-by-implication claim because a reasonable fact finder could not have drawn the alleged defamatory inference).

3)    Statement that Lichfield had been arrested in Costa Rica

Lichfield claims that Kubler defamed him when she stated that Costa Rican authorities raided one of his facilities and arrested him. He acknowledges that this statement is true. But Lichfield argues that Kubler may nonetheless be held liable for stating the truth because she did not also say that Costa Rican authorities later dropped the charges against him. He contends that Kubler defamed him by "omitting information that would exonerate him or present a more balanced picture of his involvement in youth programs." ECF No. 35 at 13.

This claim fails as a matter of law because "truth is an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). "The omission of additional

14

favorable information from an otherwise true publication does not render a statement materially false." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017). Lichfield asserts that the Restatement (Second) of Torts supports his incomplete truth argument. The provision he cites provides that a statement of opinion may be actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566 (1977); *accord Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("[E]xpressions of 'opinion' may often imply an assertion of objective fact."). On its face, this provision does not apply to true statements of fact. Accordingly, the court dismisses Lichfield's defamation and defamation per se claims to the extent that they rely on the arrest statement.

4)       Allegations that the series stated that he was a "mastermind"

In his complaint, Lichfield alleges that the defendants defamed him by "[c]laiming Plaintiff had exercised direct control in youth programs" and by "[p]resenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." ECF No. 5 at ¶ 77. In his briefing on this motion to dismiss, Lichfield does not specify the foundation for these claims, merely asserting that "the Series goes to great lengths to portray Lichfield as a central figure in the WWASP organization."

These allegations are not specific enough to support a defamation claim. When pleading a defamation claim, the plaintiff "must describe the nature or substance of the acts or words complained of." *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 971 (Utah 1982). Specifically, the complaint "must set forth 'the language complained of . . . in *words* or *words* to that effect.'" *Id.* (citation omitted). Lichfield did not identify which declarations allegedly stated or implied that Lichfield was a "mastermind or architect" of WWASP. Nor is it evident from reviewing the documentary series what statements are being referenced in the complaint. Due to this complete

15

lack of specificity, the court dismisses the defamation and defamation per se claims to the extent that Lichfield alleges he was defamed by statements that he was a mastermind of an abusive system.

### 5)   Conclusion

The statements that Lichfield claims to be defamatory are either constitutionally protected opinions or absolutely privileged as true. Moreover, a reasonable viewer would not draw the alleged defamatory implication alleged in the complaint. Accordingly, the court dismisses the defamation and defamation per se claims.

### C.   *False Light*

Lichfield asserts a false light claim based on the same statements and alleged inferences discussed above for the defamation and defamation per se claims. False light claims are very similar to defamation claims. *SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1246 (Utah 2016). Accordingly, "false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims." *Id*. The same principles that limit liability under defamation law also apply to false light claims. *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005); *Keisel v. Westbrook*, 542 P.3d 536, 556–57 (Utah Ct, App. 2023). Accordingly, the court dismisses the false light claim for the same reasons that it dismisses the defamation claims.

### D.   *Intentional Infliction of Emotional Distress*

Lichfield also asserts a claim for intentional infliction of emotional distress (IIED) based on the allegedly defamatory statements and inferences. Similar to a false light claim, constitutional protections of free speech also restrict liability for IIED claims. *Keisel v. Westbrook*, 542 P.3d 536, 556–57 (Utah Ct. App. 2023). In other words, "[a] plaintiff may not attempt an end-run around

APP 00288

First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims." *Id.* at 556 (citation omitted). Thus, the court dismisses the IIED claim for the same reasons that the false light claim must be dismissed.

The IIED claim must also be dismissed because the statements that allegedly cause emotional distress are not egregious enough to support liability. In order to state a claim for IIED, the plaintiff must show that the defendant's "actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality." *Mackey v. Krause*, 2025 UT 37, ¶ 86, ---P.3d---. "It is difficult to satisfy the 'outrageous conduct' element," which requires "extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Id.* ¶ 87 (citation omitted). Applying this outrageous conduct standard to allegations that a defendant falsely published statements that a teacher (1) threw a rock at a student, striking the student on the stomach and (2) threw a student across the room into a wall, the Utah Supreme Court recently held that, as a matter of law, these allegedly false publications did not meet the "high bar" for outrageous conduct to support an IIED claim. *Id.* ¶ 93; *accord Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 31 (Utah 2003) (affirming dismissal of IIED claim because allegations of abusive litigation tactics were not sufficiently outrageous or intolerable); *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 207 (Utah 2001) (affirming dismissal of IIED claim because an allegation that a church referred a parishioner to an unlicensed counselor was not sufficiently outrageous or intolerable).

In this case, the defendants published opinions about higher-ups seeming to get away with murder and that it was surreal for Kubler to finally see Lichfield in person in light of "the children he abused, the parents he conned, all of the crimes he's gotten away with." These assertions of

APP 00289

opinion are milder than the specific allegations of abuse in *Mackey*. Thus, Lichfield's IIED claim

similarly fails to clear the "high bar" for outrageous conduct. The court, therefore, dismisses the

IIED claim for this additional reason.

> E.    Civil Conspiracy

"To prove civil conspiracy, five elements must be shown: '(1) a combination of two or

more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course

of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'"

*Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993). Lichfield based his civil

conspiracy claim on the alleged unlawful acts of defamation and portraying him in a false light.

Because these claims fail as a matter of law, Lichfield cannot satisfy the unlawful acts element.

Accordingly, the court dismisses the civil conspiracy claim as well.

## II.    MOTION FOR ANTI-SLAPP RELIEF

In addition to their motion to dismiss under Rule 12(b)(6), the defendants also move to

strike Lichfield's action under California's Anti-SLAPP statute, CAL. CIV. PROC. CODE

§ 425.16(b), or, in the alternative, to dismiss the action under Utah's UPEPA, UTAH CODE

§ 78B-25-103. The defendants assert that California's statute should control this analysis, while

Lichfield argues that the court should apply Utah's statute.

In diversity jurisdiction cases, federal courts apply the forum state's choice-of-law rules.

*Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014).

Under Utah law, courts typically first determine whether there is a meaningful difference between

the relevant laws of the different states before engaging in a choice of law analysis. *Volonte v.*

*Domo, Inc.*, 528 P.3d 327, 339 (Utah Ct. App. 2023). Because, as discussed below, the outcome of

APP 00290

the defendants' motion is the same under either the California or the Utah statute, the court need not engage in a choice of law analysis at this juncture.

In determining whether to grant a motion to strike or to dismiss under either state's Anti-SLAPP statute, the court must first determine whether the statute applies to the plaintiff's claims. *Serova v. Sony Music Entm't*, 515 P.3d 1, 8 (Cal. 2022) (holding that a court must first determine whether California's anti-SLAPP statute applies); *Mackey v. Krause*, 2025 UT 37, ¶ 38 ---P.3d--- (holding that the first step of analyzing a motion to dismiss under UPEPA "requires the court to determine whether UPEPA applies to all or part of the challenged causes of action"). California's statute applies if the conduct that forms the basis of the Lichfield's claims furthers the exercise of the defendants' free speech rights "in connection with a public issue or an issue of public interest." CAL. CIV. PROC. CODE § 425.16(e). Similarly, Utah's statute applies to Lichfield's claims if they are based on the defendants' exercise of free speech "on a matter of public concern." UTAH CODE § 78B-25-102(2)(c).

There is no real difference (or at least no difference that matters in this case) between the California and Utah standards for determining the applicability of the relevant Anti-SLAPP statute. The defendants have satisfied both standards. The Tenth Circuit has found that "it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006). And one district court has specifically found that "the licensing and use of private for-profit teen rehabilitation programs . . . is an issue of public interest" under the California standard. *Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-cv-751-TC, 2016 WL 633351, at *6 (D. Utah Feb. 17, 2016). Moreover, anther court in this district analyzed the "matter of public concern" standard under Utah's UPEPA and found that a troubled teen facility's "actions, business model, tactics, and

19

treatment of vulnerable populations are matters of public concern, as is evident from the repeated news coverage, public documentaries, and recent legislation related to alleged past abuses at" the facility. *UHS of Provo Canyon, Inc. v. Bliss*, No. 2:24-cv-163-DAK-CMR, 2024 WL 4279243, at *5 (D. Utah Sept. 24, 2024). The court finds these cases to be persuasive. Under the standard applicable to either California's Anti-SLAPP statute or Utah's UPEPA, the statements and alleged inferences that form the basis of Lichfield's claims involve both an "an issue of public interest" and "a matter of public concern." Accordingly, both statutes apply to the claims in this action.[2]

Under both the California and Utah statutes, courts employ the traditional Rule 12(b)(6) standard to determine whether to grant the motion to strike or to dismiss. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) ("[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated."); UTAH CODE § 78B-25-107(1)(c)(ii) (providing that a court shall dismiss an action under the UPEPA if "the moving party establishes that . . . the responding party failed to state a cause of action upon which relief can be granted"). Thus, for the same reasons that the court granted the defendants' motion to dismiss under Rule 12(b)(6), the court also grants the defendants' motion under California's Anti-SLAPP statute and Utah's UPEPA.

Because the defendants prevailed on their Anti-SLAPP motion, they are entitled to an award of attorney fees and costs. CAL. CIV. PROC. CODE § 425.16(c)(1) ("[A] prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and

---

[2] Although Lichfield argued that Kubler's speech did not touch on a matter of public concern in his briefing, he conceded at oral argument that it did.

20

APP 00292

costs."); UTAH CODE § 78B-25-110 ("[T]he court shall award court costs, reasonable attorney fees, and reasonable litigation expenses related to the motion . . . to the moving party if the moving party prevails on the motion."). The defendants may file a motion for fees and costs that specifies the amount requested.

## CONCLUSION AND ORDER

The court grants the defendants' motion (1) to dismiss pursuant to Rule 12(b)(6) and (2) to strike under California's Anti-SLAPP statute or to dismiss under Utah's UPEPA. Accordingly, the court grants the defendants' request for reasonable attorney fees and costs for bringing its motion.

DATED September 29, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

21

APP 00293

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NARVIN LICHFIELD,<br><br>     Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER and NETFLIX, INC.,<br><br>     Defendants. | JUDGMENT<br><br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>District Judge Jill N. Parrish |

IT IS ORDERED AND ADJUDGED that plaintiff Narvin Lichfield's action is dismissed.


DATED September 29, 2025.


BY THE COURT                    .

_____
Jill N. Parrish
United States District Court Judge

# UNITED STATES DISTRICT COURT

for the

DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:24-cv-00458-JNP-CMR |
| | ) |
| KATHERINE KUBLER, | ) |
| an individual, and | ) |
| NETFLIX, INC., | ) |
| a Delaware corporation, | ) |
| | ) |
| Defendants. | ) |

**NOTICE OF APPEAL**

Narvin Lichfield appeals to the United States Court of Appeals for the Tenth Circuit from the final judgment entered in this action on September 29, 2025. Appellant intends to appeal any subsequent order on attorneys' fees and will file an amended notice if necessary under Fed. R. App. P. 4(a)(4)(B)(ii).


Dated: October 24, 2025         /s/ Michael K. Hepworth
                                Michael K. Hepworth (UT Bar # 15157)
                                Attorney for Plaintiff Narvin Lichfield
                                HEPWORTH LEGAL
                                320 West 500 South Suite 200
                                Bountiful, UT 84010
                                michael@hepworthlegal.com
                                801-872-2222


APP 00295

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hoc vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hoc vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L,<br><br>Defendants. | **DEFENDANTS' FEE PETITION**<br><br>Case No. 2:24-cv-00458-CMR |

APP 00296

## **TABLE OF CONTENTS**

RELIEF SOUGHT ........................................................................................................ 1

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 1

    A.   *The Program* and Plaintiff's Lawsuit ................................................................ 1

    B.   The Dentons Attorneys Representing Defendants ............................................. 3

ARGUMENT ............................................................................................................... 3

    A.   An Award of Attorneys' Fees is Mandatory Under the Anti-SLAPP Acts ........ 3

    B.   Dentons' Attorneys' Fees Were Reasonable and Necessary ............................. 4

        1.   Dentons' Rates Are Reasonable ................................................................... 4

        2.   The Amount of Hours Expended Is Reasonable ........................................... 5

    C.   Defendants' Are Entitled to Attorneys' Fees Incurred in Connection with this Petition ... 7

CONCLUSION ............................................................................................................. 7

APP 00297

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aston v. Chronicle-Progress, LLC*,
    No. 230700053, 2024 WL 5286400 (Utah Dist.Ct. Dec. 23, 2024) ..........................................6

*Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud.*
    *Model Curriculum Consortium*,
    No. CV 22-3243 FMO (EX), 2025 WL 1549995 (C.D. Cal. May 23, 2025).......................5, 6

*Ketchum v. Moses*,
    24 Cal. 4th 1122, 17 P.3d 735 (2001) ....................................................................................4, 7

*In re Miniscribe Corp.*,
    309 F.3d 1234 (10th Cir. 2002) ..................................................................................................4

*Nelson v. Bridgers*,
    No. 21STCV35635 (Los Angeles Sup. Ct., April 10, 2025) ......................................................5

*Robinson v. City of Edmond*,
    160 F.3d 1275 (10th Cir. 1998) ..................................................................................................4

**Statutes**

Cal. C.C.P. § 425.16 ........................................................................................................................4

Utah Code Ann. § 78B-25-110 .........................................................................................................4

APP 00298

**RELIEF SOUGHT**

Defendants Katherine Kubler and Netflix, Inc. (collectively, "Defendants"), by and through their undersigned counsel, submit this Fee Petition pursuant to the California Anti-SLAPP Act, Cal. C.C.P. § 425.16 and the Uniform Public Expression Protection Act, Utah Code Ann. § 78B-25-101, et seq. (the "Anti-SLAPP Acts") for recovery of their attorneys' fees in the amount of $356,418.50.

**INTRODUCTION**

Defendants bring this Fee Petition to recover their attorneys' fees incurred in defending against Plaintiff's meritless lawsuit that was intended to chill Defendants' constitutionally protected speech. Plaintiff, unhappy with his inclusion in Ms. Kubler's documentary *The Program: Cons, Cults and Kidnapping,* which shines a light on the controversial troubled teen industry and Plaintiff's admitted association with the industry, brought this lawsuit to punish Ms. Kubler for voicing her opinions and sharing her concerns on these matters of public concern. The California and Utah Anti-SLAPP Acts are intended to prevent exactly this type of abuse of the judicial process. Having succeeded on their Motion to Dismiss and Motion to Strike, Defendants are entitled to the recovery of reasonable attorneys' fees.

**FACTUAL BACKGROUND**

**A.    *The Program* and Plaintiff's Lawsuit**

Defendant Katherine Kubler's documentary series, *The Program: Cons, Cults and Kidnapping* ("The Program" or the "Series"), which streams on Netflix, describes the first-hand experiences of Ms. Kubler and others who were interned in facilities for "troubled teens" that were part of a network known as the "World Wide Association of Specialty Programs and Schools" ("WWASP"). WWASP was founded, owned and operated by Plaintiff Narvin Lichfield's brother.

The three-part Series discusses the controversial methods used by WWASP programs and expresses Ms. Kubler's and others' opinions about the efficacy these methodologies and the perceived impact on the teens and their families.  In an effort to bring to light WWASP and similar programs, the Series discusses the founders and owners of various programs, including Plaintiff.

Plaintiff filed his original Complaint on June 25, 2024. (ECF No. 1).  He filed his Amended Complaint two days later.  (ECF No. 5.)  The Amended Complaint alleges five causes of action against Netflix and Ms. Kubler: (1) defamation per se; (2) defamation; (3) false light invasion of privacy; (4) intentional infliction of emotional distress; (5) injunctive relief; and (5) civil conspiracy.  (*Id.*)  The Amended Complaint contains pages upon pages complaining about numerous different aspects of the three-part Series and matters not relevant to Plaintiff, and at the end, recites five statements (or categories of statements) on which Plaintiff actually bases his claims.  *See* Am. Compl., *passim* and, e.g., ¶¶ 77 (a)–(e).

Defendants filed a combined Rule 12(b)(6) Motion to Dismiss an Special Motion to Strike Pursuant to Anti-SLAPP Acts on August 30, 2024.  (ECF No. 28.)  In connection with their Motion, Defendants filed a Request for Judicial Notice attaching 19 exhibits (ECF No. 29) and the Declaration of Katherine Kubler (ECF No. 31).  Plaintiff filed an Opposition on October 18, 2024 (ECF No. 35), and Defendants filed a Reply on November 12, 2024 (ECF No. 36).

The Court held oral argument on Defendants' Motion on September 18, 2025.  (ECF No. 43.)  On September 29, 2025, the Court issued a Memorandum Decision and Order granting Defendants' Motion to Dismiss and Motion to Strike in its entirety finding that "[t]he statements that Lichfield claims to be defamatory are either constitutionally protected opinions or absolutely privileged as true" and "a reasonable viewer would not draw the alleged defamatory implication"

2

asserted in the Complaint.  (ECF No. 44 at 16.)  In granting Defendants' Motion, the Court also granted the request for reasonable attorneys' fees pursuant to the anti-SLAPP Acts.  (*Id.* at 21.)

**B.      The Dentons Attorneys Representing Defendants**

Netflix and Ms. Kubler hired Dentons US LLP ("Dentons US") and Dentons Durham Jones Pinegar P.C. ("DDJP") (collectively, "Dentons") to defend them in this action.  Led by partner Natalie Spears, Dentons US and Ms. Spears are nationally-recognized for their First Amendment, Media and Entertainment practice.  (Spears Decl. ¶ 4.)  Ms. Spears has 30 years' experience in First Amendment and media law and has defended numerous defamation actions nationwide.  (*Id.* ¶ 5.)  As national counsel, the team at Dentons US also has successfully defended Netflix in other defamation lawsuits involving documentaries and dramatizations.  (*Id.* ¶ 6.)  Ms. Spears was aided by her colleagues Jacqui Domenella, a junior partner with 10 years' experience in complex litigation including major defamation cases, and Gregory Naron, counsel with more than 30 years experience specializing in drafting and research in the media and First Amendment area, including for important motions and pleadings.  (*Id.* ¶ 12.)

Shareholder David Tufts and associate Ian Kinghorn of DDJP's Salt Lake City office served as local counsel and provided expertise on the local practices and procedures of this court.  (Spears Decl. ¶ 7; Tufts Decl. ¶ 6.)  In Mr. Tufts' experience, it is common in high-profile cases for Defendants to hire national counsel with subject matter expertise in addition to local Utah counsel.  (*Id.*)

<u>**ARGUMENT**</u>

**A.      An Award of Attorneys' Fees is Mandatory Under the Anti-SLAPP Acts**

In granting Defendants' Motion to Dismiss the Amended Complaint in its entirety, the Court correctly found that either the California Anti-SLAPP Act or Utah's Uniform Public

3

Expression Protection Act applies.  (ECF No. 44 at 18-21.)  The Court further recognized that Defendants are "entitled to an award of attorney fees and costs" under either Anti-SLAPP Act. (Id. at 21-22.)  Indeed, the award of reasonable attorneys' fees to a prevailing defendant on a Motion to Strike is mandatory under both statutes.  *See* Cal. C.C.P. § 425.16(c)(1); Utah Code Ann. § 78B-25-110.

**B.     Defendants' Attorneys' Fees Were Reasonable and Necessary**

Under either the California or Utah Anti-SLAPP Act, reasonable attorneys' fees are calculated using the lodestar method.  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131–32, 17 P.3d 735, 741 (2001); *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (applying lodestar method to statutory attorneys' fees award).  "The lodestar calculation is the product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'"  *Id.*  The moving party is entitled to the presumption that the lodestar reflects a "reasonable" fee.  *Id.*; *see also In re Miniscribe Corp.*, 309 F.3d 1234, 1245 (10th Cir. 2002) (affirming the use of lodestar calculation with a multiplier to adequately compensate counsel).  As set forth below, and supported by the Declarations of Natalie J. Spears and David W. Tufts, the amounts sought by Defendants are reasonable.

**1.     The Rates Are Reasonable For This Matter**

As set forth in Ms. Spears Declaration, Dentons US seeks fees based on its rates of $865 for Ms. Spears (partner with 30 years experience focused on First Amendment and media work), $725 for Ms. Domenella (partner with 10 years experience, including defamation litigation); and $695 for Mr. Naron (counsel with more than 30 years experience specializing in researching and drafting on First Amendment related issues).  (Spears Decl. ¶¶ 3, 4, 11, 12.)  These rates are heavily discounted from Dentons US' standard rates.  (Spears Dec. ¶¶ 11, 12.)

4

APP 00302

Given the complexity of Plaintiff's lawsuit—challenging multiple parts of a three-part documentary series—and the specialized nature of the action involving constitutional free speech issues, Defendants hiring of lead counsel outside of the Salt Lake City area who specialize in First Amendment and media defense was both commonplace and reasonable.  Based on a review of other decisions awarding fees under anti-SLAPP Acts, it is clear that Dentons US' rates are substantially lower than rates approved for lawyers with similar experience, skill and qualifications practicing in the First Amendment space.  *See*, *e.g*., *Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud. Model Curriculum Consortium*, No. CV 22-3243 FMO (EX), 2025 WL 1549995, at *3 (C.D. Cal. May 23, 2025) (approving rates of $800 to $1050 for partners and on motion for fees pursuant to California anti-SLAPP Act); *Nelson v. Bridgers*, No. 21STCV35635 (Los Angeles Sup. Ct., April 10, 2025) (attached hereto as Exhibit A) (approving partner rates up to $1,150 per hour).

Further, the rates charged by DDJP for Mr. Tufts ($795), a shareholder with 30 years experience, and Mr. Kinghorn ($460), a mid-level associate, are within the range charged by local Utah counsel with similar experience, skill and qualifications.  (Tufts Decl. ¶ 9.)

**2.    The Amount of Hours Expended Was Reasonable**

Defendants' fee request represents a total of 491.8 hours expended on the Motion to Dismiss and Motion to Stike as detailed in the Spears and Tufts Declarations and their respective exhibits.  The amount of time expended on the Motions was reasonable considering the scope and complexity of the case, the constitutional importance and the successful outcome of the early disposition of the case.

As explained by Ms. Spears, Plaintiff's Amended Complaint asserted wide-ranging defamation and other claims complaining about the entirety of the three-part Series.  (Spears Decl.

5

¶ 16.) Defending against Plaintiff's sprawling Amended Complaint required extensive time and effort to wade through and assess Plaintiff's nebulous allegations, as well as structure the motion papers in a way that the Court could efficiently address the actual substantive claims. (*Id.*) Further, unlike a defamation action challenging a single news article or statement, Plaintiff's claims challenged multiple portions and episodes of the three-part documentary and required careful examination of the entire three-hour series. (*Id.*)

Further, Dentons represented both Netflix and individual Defendant Ms. Kubler, which required additional communications and coordination of the defense. (*Id.*) Finally, given the nature of Plaintiff's claims and defenses, preparation of the motions entailed research and review of news stories, broadcasts, and public records, covering Plaintiff's activities in the troubled teen industry and Plaintiff's statements and admissions. (*Id.*)

In addition to exercising their billing judgment throughout the work on the case, both Ms. Spears and Mr. Tufts exercised careful judgment in removing from the request any time that could be viewed as duplicative, excess or unnecessary. (Spears Decl. ¶¶ 17-18; Tufts Decl. ¶¶ 11-12.)

Other courts have recognized that Motions to Strike require considerable time and effort, and have found even more hours that Defendants seek recovery for here (491.8) to be reasonable. *See*, *e.g.*, *Concerned Jewish Parents & Tchrs. of Los Angeles*, 2025 WL 1549995, at *4 (finding 556.8 hours expended on a Motion to Strike reasonable); *Aston v. Chronicle-Progress, LLC*, No. 230700053, 2024 WL 5286400, at *1 (Utah Dist.Ct. Dec. 23, 2024) (awarding nearly $400,000 in fees and costs representing over 600 hours expended); *see also Aston v. Chronicle-Progress, LLC*, Defendants' Motion for Attorney Fees, 2024 WL 5293840 (Utah Dist.Ct.).

APP 00304

**C.      Defendants' Are Entitled to Attorneys' Fees Incurred in Connection with this Petition**

In addition to the time spent on the Motion to Dismiss and Motion to Strike, Defendants also are entitled to recover their fees for bringing this Petition. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1141, 17 P.3d 735, 747 (2001) (holding that "an award of fees may include not only the fees incurred with respect to the underlying claim, but also the fees incurred in enforcing the right to mandatory fees under Code of Civil Procedure section 425.16."). Defendants will submit an updated fee schedule reflecting the time spent on this Petition with their Reply brief.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court award $356,418.50 in reasonable attorneys' fees for defending against Plaintiff's lawsuit.

Dated:  October 27, 2025                   /s/ *Natalie J. Spears*

**DENTONS DURHAM JONES PINEGAR P.C.**
David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

**DENTONS US LLP**
Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2025, I caused a copy of the foregoing to be filed and

served on counsel of record via the Court's electronic filing system.


*/s/ Natalie J. Spears*

APP 00306

# EXHIBIT A

APP 00307

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                    April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                         8:30 AM

Judge: Honorable Joseph Lipner          CSR: None
Judicial Assistant: G. Morales          ERM: None
Courtroom Assistant: Eva Sanchez        Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Tiffany B. Hunter , Via LACC

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Hearing on Motion for Attorney Fees

The matter is called for hearing.

The Court posted its tentative ruling online in advance of this hearing.

The Court and counsel confer in open court.

Cause is argued.

The Motion for Attorney Fees filed by Phoebe Bridgers on 03/04/2025 is Granted in Part.

Defendant Phoebe Bridgers ("Defendant") moves for an order awarding (1) post-judgment
attorney's fees and costs incurred in enforcing the April 18, 2023 judgment of attorney's fees in
Defendant's favor; (2) interest on the judgment and on post-judgment fees and costs; and (3) fees
and costs on appeal, against Plaintiff Chris Nelson ("Plaintiff").

Defendant seeks a total additional award of $498,458.66, consisting of:

  (a)  $143,527.21 in post-judgment fees (following adjustment in the Reply; compare
  Strub Decl. ¶ 2 with Streisand Decl. ¶ 2);

  (b)  $2,166.87 in post-judgment costs;

  (c)  $117,013.72 in interest on the judgment and post-judgment fees and costs
  together;

  (d)  $206,170.09 in fees on appeal;

---

Minute Order                                                        Page 1 of 9

APP 00308

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                        April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                    8:30 AM

| | |
|---|---|
| Judge: Honorable Joseph Lipner | CSR: None |
| Judicial Assistant: G. Morales | ERM: None |
| Courtroom Assistant: Eva Sanchez | Deputy Sheriff: None |

(e)  $5,286.77 in costs on appeal; and

(f)  $25,644.00 in fees incurred on this motion (following adjustment in the Reply; compare Strub Decl. ¶ 2 with Streisand Decl. ¶ 2).

The Court GRANTS the motion in part, with reductions as set forth in this order. The Court orders that defense counsel recalculate the requested fee in light of these reductions. The Court additionally orders that defense counsel recalculate the requested interest in light of these reductions.

The Court continues the hearing to May 8, 2025 at 8:30 a.m. for a final calculation of these amounts.  Within one week of today, Defendant shall provide Plaintiff with a recalculated fee and interest amount.  If the parties agree that this recalculated amount accords with the order, they may file a proposed order that so indicate in the filing.  In that event, the May 8 hearing will go off calendar.  If they do not agree, Defendant shall file its calculations with the Court no later than April 25, 2025.  Plaintiff shall file any objection by May 2, 2025.

## Background

On November 9, 2022, the Court granted Defendant's anti-SLAPP motion as to all of Plaintiff's causes of action against Defendant.

Defendant subsequently moved for an award of attorney's fees pursuant to the anti-SLAPP statute. On March 9, 2023, the Court granted Defendant's motion. On April 18, 2023, the Court entered a judgment in Defendant's favor in the amount of $490,608.32 in attorney's fees.

On May 9, 2023, Plaintiff filed a notice of appeal.

Plaintiff has since refused to pay the judgment. (Strub Decl. ¶ 3.)

On October 31, 2023, Defendant served discovery on Plaintiff seeking information to ascertain whether there is any property of Plaintiff that should be applied to the payment of the judgment. (Strub Decl. ¶ 4.) This discovery resulted in Defendant filing a motion to compel further on January 30, 2024. (Strub Decl. ¶ 5.) On February 27, 2024, the Court granted the motion to compel and granted sanctions against Plaintiff in the amount of $5,000.00, representing a discounted portion of Defendant's attorney's fees stipulated to by Defendant.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                            April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                         8:30 AM

Judge: Honorable Joseph Lipner          CSR: None
Judicial Assistant: G. Morales          ERM: None
Courtroom Assistant: Eva Sanchez        Deputy Sheriff: None

---

On April 19, 2024, Plaintiff made his initial production. Counsel for the parties met and conferred several times regarding the adequacy of the responses. On July 12, 2024, Plaintiff produced supplemental responses. (See Strub Decl. ¶ 6.)

On April 25, 2024, Defendant filed a judgment lien against Plaintiff. On April 26, 2024, Defendant filed a writ of execution against Plaintiff. (Strub Decl. ¶ 7.)

On October 30, 2024, the Court of Appeal issued an order affirming the Court's judgment and orders, including the award of attorneys fees. (Remittitur at p. 23.) The Court of Appeal awarded Defendant her costs on appeal. (Remittitur at p. 23.) Remittitur was filed on January 23, 2025.

Defendant filed this motion on March 4, 2025. Plaintiff filed an opposition and Defendant filed a reply.

## Post-Judgment Fees and Costs

### *Legal Standard*

"The judgment creditor is entitled to the reasonable and necessary costs of enforcing a judgment. Attorney's fees incurred in enforcing a judgment are not included in costs collectible under this title unless otherwise provided by law. Attorney's fees incurred in enforcing a judgment are included as costs collectible under this title if the underlying judgment includes an award of attorney's fees to the judgment creditor pursuant to subparagraph (A) of paragraph (10) of subdivision (a) of Section 1033.5." (Code Civ. Proc., § 685.040.) Code of Civil Procedure, section 1033.5, subd. (a)(10)(A) allows attorney's fees to be collected as costs where authorized by statute. (Code Civ. Proc., § 1033.5, subd. (a)(10)(A).)

A defendant who prevails on an anti-SLAPP motion is generally entitled to recover attorney fees and costs. (Code Civ. Proc., § 425.16, subd. (c)(1).)

Thus, "attorney fees incurred in an effort to enforce a fee judgment obtained under the anti-SLAPP law do qualify as recoverable costs under section 685.040[.]" (*York v. Strong* (2015) 234 Cal.App.4th 1471, 1477.)

Attorney's fees in anti-SLAPP motions are determined using the lodestar method. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) "Under the lodestar method, the trial court must first determine the lodestar figure—the reasonable hours spent multiplied by the reasonable hourly

---

APP 00310

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                                   April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                                8:30 AM

Judge: Honorable Joseph Lipner          CSR: None
Judicial Assistant: G. Morales          ERM: None
Courtroom Assistant: Eva Sanchez        Deputy Sheriff: None

---

rate—based on a careful compilation of the time spent and reasonable hourly compensation of each attorney involved in the presentation of the case." (*Glaviano v. Sacramento City Unified School Dist.* (2018) 22 Cal.App.5th 744, 751.)

The trial court has broad authority to determine the amount of a reasonable fee. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

The moving party bears the burden of proof as to "reasonableness" of any fee claim. (Code Civ. Proc., § 1033.5, subd. (c)(5).) The party seeking fees has the burden of documenting the appropriate hours expended and hourly rates. (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 784.) This burden requires competent evidence as to the nature and value of the services rendered. (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559.) A plaintiff's verified billing invoices are prima facie evidence that the costs, expenses, and services listed were necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)

"In challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice." (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 488, quoting *Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee Ass'n* (2008) 163 Cal.App.4th 550, 564.) When items are properly objected to, the burden of proof is on the party claiming them as costs. (*Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 623-624.)

### *Post-Judgment Fees*

" 'The reasonable market value of the attorney's services is the measure of a reasonable hourly rate. [Citations.] This standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel…' [Citation.]" (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1260.) Thus, even though defense counsel represented defendant on a partial pro bono basis, defense counsel is entitled to the reasonable value of their services.

"As a threshold matter, the Court finds that the hourly rates claimed by defendant counsel are reasonable. However, the Court notes that such relatively high billing rates must necessarily correlate with reduced time spent completing tasks due to the greater experience that such rates indicate." (3/9/2023 Minute Order [granting Defendant's Motion for Attorney's Fees] at p. 1.)

---

APP 00311

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                                          April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                                        8:30 AM

| | |
|---|---|
| Judge: Honorable Joseph Lipner | CSR: None |
| Judicial Assistant: G. Morales | ERM: None |
| Courtroom Assistant: Eva Sanchez | Deputy Sheriff: None |

Here, the Court notes that the lion's share of the hours billed are by lead counsel Michael H. Strub, who is the highest biller on Defendant's legal team. Strub billed various rates of $1,150.00 per hour, $959.35 per hour, and $900.00 per hour, although most of his hours are at the highest rate of $1,150.00 per hour. Given these rates, there is a concurrent expectation that the time billed be spent highly efficiently.

The Court finds that while most of the hours spent by Defendant's counsel are reasonable, the Court reduces certain of the requested hours. While the rates charged by the lawyers are reasonable, the time expended at that billing rate for particular tasks should reasonably have been lower.

## Legal Research

Plaintiff objects to 37.2 hours billed by defense counsel for legal research relating to enforcement of the judgment. The Court has reviewed the submitted billing records and finds that the time expended was reasonable. These entries do not result from obscure block billing; rather, they represent a series of reasonably-sized items over the two-year period when the judgment has been outstanding. The entries demonstrate research into various collection methods and into Plaintiff's assets and controlled entities to determine avenues by which the judgment could be collected. While the final number is high, it appears that it does, in fact, result from long-term efforts that are ongoing as a result of Plaintiff's failure to pay the judgment.

The Court finds that these amounts were generally warranted, but reduces the time spent by 8 hours for Strub.

## Motion to Compel Further Discovery

Defendant requests fees for the January 30, 2024 discovery motion in addition to the Court's previous award of $5,000.00 in attorney's fees for that motion.

On that motion, Defendant agreed to limit her requested fees to $5,000.00 in spite of her contention that the actual fees were much higher. Defendant contends that she can now recover the fees in excess of $5,000.00 as post-judgment costs under section 685.040.

The Court's determination that the requested sanctions on the discovery motion were reasonable was a result of Defendant's limitation of the request to $5,000.00. The motion in question was a routine discovery motion that did not involve complicated questions of law or fact. The Court

| | |
|---|---|
| Minute Order | Page 5 of 9 |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                      April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                    8:30 AM

Judge: Honorable Joseph Lipner          CSR: None
Judicial Assistant: G. Morales          ERM: None
Courtroom Assistant: Eva Sanchez        Deputy Sheriff: None

---

approved Michael H. Strub's hourly rate of $1,195.00 for that motion in part because the higher hourly fee was then correlated with fewer hours requested. But the Court does not believe that the excess time would be reasonable at the hourly rate billed by Strub.

The Court does not approve additional fees for the January 30, 2024 discovery motion.

## Miscellaneous Items

Plaintiff objects to 5.5 hours billed by David T. Shackelford at $765.00 per hour for an ex parte application for an order directing levy officer to enter private place, which was never filed. While the fact that an avenue of recovery was not ultimately pursued does not necessarily make work on that avenue unreasonable per se, the Court reduces this time to 3.5 hours in light of the rate charged by Shackelford and the fact that this route was ultimately not pursued.

Shackelford billed 1.5 hours preparing an outline for a debtor examination that never occurred. Defendant raises the issue of the debtor examination in her initial motion (Motion at 8:12-20), and argues that Plaintiff repeatedly resisted complying with discovery requests. Nevertheless, the reason the examination was not ordered was because no party appeared for the hearing. (See 6/6/2023 Minute Order re Application for Order for Appearance and Examination.) The Court strikes this item.

Plaintiff objects to 2 hours spent by Strub drafting a motion for OSC re contempt that was never filed. The Court reduces this time to 1 hour.

Plaintiff objects to 15 hours spent by Strub on April 2, 2024 opposing Plaintiff's ex parte application for an extension to file discovery responses, which was ultimately granted. The Court reduces this time to 5 hours given the relatively routine nature of the motion.

Plaintiff objects to 7.7 hours spent by Strub and Streisand in June 2024 for drafting a 1.5-page meet and confer letter regarding the discovery requests. This time includes entries for 5.3 hours billed by Strub for drafting a meet and confer letter and 1.5 hours billed by Strub for research regarding the 45-day rule as it applies to a motion to compel compliance. The Court reduces the time spent on discovery meet and confer by 3 hours for Strub.

## *Post-Judgment Costs*

Plaintiff does not object to the post-judgment costs other than attorney's fees. Defendant

---

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                    April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                    8:30 AM

Judge: Honorable Joseph Lipner            CSR: None
Judicial Assistant: G. Morales            ERM: None
Courtroom Assistant: Eva Sanchez          Deputy Sheriff: None

provides a memorandum of costs evidencing her non-attorney fee costs to which Strub attests under penalty of perjury. The Court approves these costs.

# Interest

## Legal Standard

A judgment creditor is entitled to recover interest on the principal amount of a judgment that remains unsatisfied at the rate of ten percent per annum. (Code Civ. Proc., § 685.010, subd. (a)(1).)

Interest on a judgment continues to accrue during the pendency of an appeal – "[t]he only way in which [an] appellant could have avoided or terminated [their] liability to pay interest during pendency of the appeal was to have made an actual tender." (*Beeler v. American Trust Co.* (1946) 28 Cal.2d 435, 438.)

## Interest on Judgment

Plaintiff does not object to the requested interest on the underlying April 18, 2023 judgment of attorney's fees. Under the applicable law, Defendant is unambiguously entitled to this interest at the statutory rate of 10 percent, and the Court approves it.

Here, the interest on the underlying judgment is rolled into Plaintiff's interest calculations for interest on post-judgment fees and costs. Because the Court requests that Plaintiff recalculate interest for post-judgment fees and costs, the Court requests that Defendant separate out the interest on the underlying judgment for the sake of clarity.

## Interest on Post-Judgment Fees and Costs

Although Plaintiff objects to various underlying items of post-judgment fees and costs, Plaintiff does not object to the availability of interest where the underlying fees and costs are themselves appropriate. The Court agrees with Defendant that interest at the rate of 10 percent is appropriate here.

Because the Court strikes certain portions of the underlying post-judgment fees and costs, the Court requests that Defendant submit the recalculated interest following these changes.

Minute Order                                              Page 7 of 9

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                          April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                       8:30 AM

Judge: Honorable Joseph Lipner              CSR: None
Judicial Assistant: G. Morales              ERM: None
Courtroom Assistant: Eva Sanchez            Deputy Sheriff: None

---

# Fees and Costs on Appeal

## Legal Standard

"A statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise." (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499.)

"Section 425.16, subdivision (c), does not preclude recovery of appellate attorney fees; hence attorney fees recoverable under the statute include appellate fees." (*Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 461.)

## Fees on Appeal

Defendant requests $206,170.09 in fees on appeal.

Plaintiff objects to a number of categories of time spent on appeal, including more than 50 hours spent on the opening papers and over 30 hours in addition on legal research. Plaintiff similarly objects to 19 hours for conferring internally, 27 hours for supplemental briefing, 15 hours opposing Plaintiff's request for judicial notice, and 48 hours spent preparing for oral argument.

The Court has reviewed the billing records in question. In light of the complexity of the issues involved in this anti-SLAPP case and the resulting appeal, the Court believes that a high time expenditure on appeal is to be expected. Further, the heavy use of the lead counsel is more warranted on appeal.

The Court reduces Strub's time spent opposing the request for judicial notice by 6 hours. The Court reduces Strub's time spent preparing for oral argument by 15 hours. The Court also reduces the time by 3 additional hours set forth in the entry on May 7, 2024. That entry does not contain sufficient information. The Court approves the remaining time spent on appeal.

## Costs on Appeal

The Court of Appeal ruled that Defendant would be entitled to her costs on appeal.

Defendant requests $5,286.77 in costs on appeal and provides a memorandum of costs to which Strub attests under penalty of perjury.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**21STCV35635**                                                    April 10, 2025
**CHRIS NELSON vs PHOEBE BRIDGERS**                                   8:30 AM

Judge: Honorable Joseph Lipner          CSR: None
Judicial Assistant: G. Morales          ERM: None
Courtroom Assistant: Eva Sanchez        Deputy Sheriff: None

---

Plaintiff does not object to these costs. The Court approves the requested costs on appeal.

## Fees Incurred on This Motion

Defendant requests $25,644.00 in fees incurred on this motion (following adjustment in the Reply; compare Strub Decl. ¶ 2 with Streisand Decl. ¶ 2). This fee represents 29.5 hours of attorney time to draft the motion, plus 7.5 hours to draft the reply and 2.5 hours to appear at the hearing. The time requested here is primarily from Lena G. Streisand at $635.00 per hour.

The Court acknowledges that this fee motion involved aggregating fee records from two law firms which cover the span of roughly two years. However, the Court views only a portion of the fees as reasonable.

The Court reduces the fees incurred for this motion to $15,000.00.

On the Court's own motion, the Hearing on Motion for Attorney Fees scheduled for 04/10/2025 is continued to 05/08/2025 at 08:30 AM in Department 72 at Stanley Mosk Courthouse.

Plaintiff is to give notice.

---

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hoc vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hoc vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual, <br><br> Plaintiff, <br><br> v. <br><br> KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L, <br><br> Defendants. | **DECLARATION OF NATALIE J. SPEARS IN SUPPORT OF DEFENDANTS' FEE PETITION** <br><br> Case No. 2:24-cv-00458-CMR |

APP 00317

I, Natalie J. Spears, hereby state as follows under penalty of perjury:

1.      I am over the age of twenty-one years and am otherwise competent to make this declaration.  I submit this declaration in support of Defendants' Fee Petition Pursuant to the Anti-SLAPP Acts.  The statements contained herein are within my personal knowledge or are based upon reliable records of my law firm compiled and maintained in the ordinary course of business.

2.      Since the outset of this lawsuit, I have served as lead counsel for the Defendants Netflix, Inc. ("Netflix") and Katherine Kubler ("Ms. Kubler").

3.      I am a partner in the law firm of Dentons US LLP ("Dentons US") in Chicago, Illinois, where I have practiced since 1996 after I graduated in 1995 from University of Michigan Law School.  I have been in private practice my entire career with a focus on media law and complex commercial litigation.

4.      I am a Chambers-ranked lawyer for Media and Entertainment Litigation in Illinois (since 2007) and in First Amendment Litigation - Nationwide, and have been named to Best Lawyers in America for First Amendment Litigation since 2008. Last year in 2024, I was named a *Law360* MVP in the Media and Entertainment Law category.  I have served two terms in the past decade on the Governing Board of the ABA Forum on Communications Law, and have been called upon to speak to various bar and industry groups about media law.

5.      I have represented various media entities in defending defamation actions throughout the entirety of my career in state and federal courts across the country.  *See*, *e.g.*, *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149 (S.D.N.Y. 2021), *affirmed*, No. 22-875, 2023 WL 4072929 (2d Cir. June 20, 2023) (transferred from M.D. Florida); *Straka v. NBC Universal Media, LLC*, No. 8:22CV434, 2023 WL 50416141 (D. Neb. Aug. 8, 2023); *Sandmann*

APP 00318

*v. New York Times Co.*, 78 F.4th 319, 321 (6th Cir. 2023) (affirming summary judgment entered by E.D. Ky.).

6.  In the last several years, my colleagues and I have successfully defended Netflix in other defamation lawsuits involving documentaries and dramatizations. *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, No. 19 CV 6781, 2020 WL 1330657 (N.D. Ill. Mar. 23, 2020); *Love v. Simmons*, No. 23-CV-2392, 2024 WL 809107 (N.D. Ill. Feb. 27, 2024); *Fairstein v. Netflix, Inc.*, No. 20-cv-8042 (S.D.N.Y.) (originally filed in M.D. Florida).

7.  In addition to my colleagues at Dentons US, who are discussed in more detail below, I worked with colleagues in the Salt Lake City office of our member firm, Dentons Durham Jones Pinegar ("DDJP"), for their expertise on the local practices and procedures of this Court. David Tufts, a shareholder in the Salt Lake City office of DDJP, has provided herewith a separate declaration with an exhibit (the "Tufts Declaration").

8.  As identified in the Petition for fees, Defendants are seeking the amount of $329,550.50, representing Dentons US' attorney time of 446.5 hours worked to represent Defendants in this matter. Defendants are also seeking $26,868.00 for DDJP's fees in this matter.

9.  A breakdown of all Dentons US' fees sought in Defendants' Petition is attached hereto as Exhibit 1. Exhibit 1 is a true and correct copy of a schedule which contains the time, amount, and narrative description of the services performed by Dentons US personnel in this litigation. This schedule was generated from Dentons US' time-keeping records system, which contains the daily time records entered by Dentons US' lawyers and personnel at or near the time the work was performed in this case, and created and maintained in the ordinary course of Dentons US' business.

APP 00319

10.     I assisted with the preparation of and have reviewed Exhibit 1.  Based on my knowledge of the work performed on this case, the time reflected is a true and accurate account of work actually performed for Defendants by Dentons US lawyers in connection with the above-captioned case.

11.     My discounted billing rate on this case was $865 per hour from 2024-2025.  This rate represented a 30% discount off of my standard rate in 2024.

12.     In addition to myself, the Dentons US lawyers who billed significant time to this matter, as reflected in Exhibit 1, are as follows:

- Jacqui (Giannini) Domenella[1] is a 2015 graduate of University of Chicago Law School and was promoted to partner at Dentons US shortly before the commencement of this action.  Ms. Domenella practices in the litigation and media law groups, including defending defamation lawsuits.  Her discounted billing rate for this case was $725 per hour, which represents over a 30% discount off of her standard rate for her time in 2024.

- Gregory Naron is a 1991 graduate of Columbia University School of Law and is counsel at Dentons US, specializing in drafting and research for major briefs and pleadings. He has over 30 years of experience in media, First Amendment, and complex commercial litigation, including defending defamation lawsuits.  Mr. Naron's discounted billing rate for this case was $695 per hour.  This rate reflects a 25% discount off of Mr. Naron's standard rate.

- Our team also utilized Ian Kinghorn for associate level assistance in Dentons' Salt Lake City office, as discussed in the Tufts Declaration.

13.     The fee schedule attached hereto as Exhibit 1 does not include the additional time spent by Dentons US since October 1, 2025 preparing this Fee Petition.

14.     Based on my professional experience in the area of civil litigation and my knowledge of what my peers in the legal community charge for defamation litigation, these rates are consistent with, if not less than, prevailing market rates charged in comparable cases by attorneys with similar national media practices and of similar qualifications to those of myself and the other Dentons attorneys.

---

[1] The majority of the invoices reflected in Exhibit 1 refer to her maiden name, Ms. Giannini.

- 4 -

15.     With respect to the time entries in Exhibit 1 hereto for this matter, I have personally reviewed all of the time recorded.  I believe that the amount of time spent on each task, as reflected in Exhibit 1, was reasonable and necessary to litigate this case, including consideration of the relevant tasks required to pursue and prevail in this case.  I also have reviewed the Tufts Declaration and time recorded in the exhibit thereto, and believe the amount of time spent on each task also was reasonable and necessary to assist us in the defense of this case.

16.     Specifically, Plaintiff's Amended Complaint asserted wide-ranging defamation and other claims complaining about the entirety of the three-part Netflix documentary, *The Program: Cons, Cults and Kidnapping*.  Defending against Plaintiff's sprawling Amended Complaint required extensive time and effort to wade through and assess Plaintiff's nebulous allegations, and structure the motion papers in a way that the Court could efficiently address the actual substantive claims.  Unlike a defamation action challenging a single news article or statement, Plaintiff's claims challenged multiple portions and episodes of the three-part documentary and required careful examination of the entire three-hour series.  Further, Dentons represented both Netflix and individual Defendant Ms. Kubler, which required additional communications and coordination of the defense.  Finally, given the nature of Plaintiff's claims and defenses, preparation of the motions entailed research and review of news stories, broadcasts, and public records, covering Plaintiff's activities in the troubled teen industry and Plaintiff's statements and admissions.

17.     Based upon the above, I believe that the attorneys' fees requested to be reimbursed are reasonable in this matter.  All of the fees identified on Exhibit 1 and the Tufts Declaration were invoiced at the rates noted and paid by Defendants during the pendency of this litigation.  My normal practice involves monitoring my team's work, reviewing invoices before

APP 00321

they are billed, and removing any duplicative or unnecessary time in advance.  I assigned tasks to other lawyers when it was more efficient and prudent for work to be handled by an attorney with a lower billing rate, thus reducing overall fees incurred.

18.    In addition, I have exercised my judgment to remove (and not include) additional time entries that could be viewed as excessive or unnecessary.

I hereby declare, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

October 27, 2025                                          /s/ *Natalie J. Spears*

                                                         Natalie J. Spears

APP 00322

# EXHIBIT 1

APP 00323

| Work Date | Timekeeper Name | Hours | Amount | Narrative |
|---|---|---|---|---|
| 7/8/2024 | Gregory R. Naron | 1.1 | $764.50 | Review, analysis of Ep. 1 (1.1). |
| 7/8/2024 | Natalie J. Spears | 0.8 | $692.00 | Review with J. Giannini preliminary issues w/ complaint, counsel, next steps (.50); call w/D. Tufts re court, judge, local process (.30). |
| 7/8/2024 | Jacqueline A. Giannini | 6 | $4,350.00 | Review Complaint and create chart of allegations (1.8); review Episodes 1 and 2 of the Series and take notes on allegations (2.6); meet with N. Spears to discuss initial case strategy (.5); call with David Tufts regarding Salt Lake City counsel and procedures (.3); begin researching Plaintiff (.8). |
| 7/9/2024 | Gregory R. Naron | 6 | $4,170.00 | Research, review cases, statutes re Utah anti-SLAPP laws (3.0); draft analysis of research (2.8); correspond with N. Spears, J. Giannini re same, strategy (.2). |
| 7/9/2024 | Jacqueline A. Giannini | 2.5 | $1,812.50 | Watch Episode 3 and take notes (1.4); draft and revise notes on allegations in Complaint (.8); correspond with N. Spears and G. Naron regarding case strategy and analysis (.3). |
| 7/10/2024 | Gregory R. Naron | 4.7 | $3,266.50 | Research, review Utah/Tenth Circuit anti-SLAPP cases, statutes (1.6); draft analysis of issues re same (1.4); review J. Giannini chart re complained of scenes (.2); correspond with N. Spears, J. Giannini re chart, anti-SLAPP issues (.2); review series, notes on same (1.3). |
| 7/10/2024 | Jacqueline A. Giannini | 4.2 | $3,045.00 | Review news articles on Plaintiff for research on public figure status (2.6); review G. Naron's research on application of anti-SLAPP law in Tenth Circuit (.4); review cases on anti-SLAPP law in Tenth Circuit (.5); review overview of Utah defamation law (.4); draft email to Netflix client on preliminary issues (.3). |
| 7/11/2024 | Gregory R. Naron | 5.8 | $4,031.00 | Review complaint, J Giannini chart re complained of scenes (.2); research, review cases re defamation issues, defenses (2.8); draft analysis, arguments re same for possible motions (2.8). |
| 7/11/2024 | Jacqueline A. Giannini | 0.7 | $507.50 | Send email to Netflix client on preliminary items (.2); analyze and develop strategy for defense and on motions to dismiss with N. Spears (.5). |
| 7/12/2024 | Gregory R. Naron | 6.9 | $4,795.50 | Research, review case law re defamation issues, defenses, anti-SLAPP (3.2); draft analysis, arguments re same for possible motions (3.7). |
| 7/12/2024 | Natalie J. Spears | 3.5 | $3,027.50 | Watch Series episode 1 and 3 (2.0); take notes on same, re-review key parts and assess potential motions, defenses (1.50). |
| 7/12/2024 | Jacqueline A. Giannini | 0.4 | $290.00 | Review G. Naron's memo on Utah defamation law (.4). |
| 7/15/2024 | Gregory R. Naron | 4 | $2,780.00 | Research, review case law re defamation defenses, anti-SLAPP cases (2.0); draft analysis, arguments re same (1.2); call with N. Spears, J. Giannini re defenses, motions, strategy (.8). |
| 7/15/2024 | Natalie J. Spears | 1 | $865.00 | Calls w/ J. Giannini and G, Naron re Narvin Lichfield's claims, overall defenses and motion to dismiss, information needed. |

| 7/15/2024 | Jacqueline A. Giannini | 1.6 | $1,160.00 | Call with N. Spears and G. Naron regarding case strategy (.8); call with Netflix client regarding background and case strategy (.3); call with N. Spears regarding motion strategy (.2); research procedure for filing anti-SLAPP motions under Utah and California law (.2); email D. Tufts regarding case status and extension of time (.1). |
| --- | --- | --- | --- | --- |
| 7/16/2024 | Gregory R. Naron | 3.8 | $2,641.00 | Research re anti-SLAPP cases (2.8); draft analysis, arguments for motions (1.0). |
| 7/16/2024 | Jacqueline A. Giannini | 1.5 | $1,087.50 | Review key anti-SLAPP cases and pleadings (1.1); review draft Motion for Extension of Time (.2); call with Plaintiff's counsel regarding Extension of Time to respond to Complaint (.2). |
| 7/17/2024 | Gregory R. Naron | 4.3 | $2,988.50 | Research, review anti-SLAPP case law (2.7); draft analysis re anti-SLAPP motion (1.6). |
| 7/17/2024 | Jacqueline A. Giannini | 1.4 | $1,015.00 | Review briefing analogous anti-SLAPP cases (.9); email Netflix client regarding call with Plaintiff's counsel (.2); compare Amended Complaint to Original Complaint (.3). |
| 7/18/2024 | Gregory R. Naron | 4.6 | $3,197.00 | Research, review Utah case law for defamation in analogous cases (2.8); draft analysis, arguments for motions (1.8). |
| 7/18/2024 | Natalie J. Spears | 1.4 | $1,211.00 | Call w/ clients re background, initial questions, strategy and next steps. |
| 7/18/2024 | Jacqueline A. Giannini | 3 | $2,175.00 | Call with Netflix client, K. Kubler regarding case background and strategy (1.4); assess next steps for case strategy (.4); research procedures for filing anti-SLAPP motions under California and Utah law (.6); revise chart of allegations in Amended Complaint (.6). |
| 7/19/2024 | Gregory R. Naron | 5.2 | $3,614.00 | Research, review Utah and analogous case law for defamation defenses, motions (3.2); draft analysis, arguments re same (2.0). |
| 7/19/2024 | Jacqueline A. Giannini | 3.2 | $2,320.00 | Draft email to Netflix client regarding case updates (.4); revise Motion for Extension of Time (.3); rewatch Episodes 1 and 3 and draft chart of allegations to fill in sources (2.5). |
| 7/22/2024 | Gregory R. Naron | 6.8 | $4,726.00 | Review orders, briefs on recent Utah anti-SLAPP motions, [draft] notes re same (1.8); research, review Utah and analogous opinion case law (2.0); review episode 3 scenes, complaint, summaries of allegations (.8); draft analysis of claims, arguments for motions (2.2). |
| 7/22/2024 | Natalie J. Spears | 0.8 | $692.00 | Read G. Naron research summary update re Utah anti-SLAPP act and re fact development (.80). |
| 7/22/2024 | Jacqueline A. Giannini | 1.4 | $1,015.00 | Assess motions and case strategy (.3); review Season 2, Episode 1 of Trapped in Treatment podcast featuring interview with Narvin Lichfield (.7); review Narvin Lichfield's social media [for potential use in motions] (.4). |
| 7/23/2024 | Gregory R. Naron | 5.4 | $3,753.00 | Research, analysis of fair report privilege, other defenses and draft arguments re same (2.1); review complaint, draft summary of admissions, items for further factual development, review articles re same (2.0); draft arguments for motion to dismiss/anti-SLAPP (1.3). |

APP 00325

| 7/23/2024 | Jacqueline A. Giannini | 3.1 | $2,247.50 | Review and make notes on G. Naron's summary of arguments and points for SLAPP motion/motion to dismiss strategy (2.0); email G. Naron and N. Spears regarding strategy for motions (.6); listen to Episodes 2 and 3 of Trapped in Treatment and take notes (.5). |
|---|---|---|---|---|
| 7/24/2024 | Gregory R. Naron | 5.8 | $4,031.00 | Review complaint, prior briefs, emails re grounds for motion to dismiss (.9); draft outline for motion to dismiss/anti-SLAPP motion (2.8); further research, review case law, draft analysis re fair report issues (2.1). |
| 7/25/2024 | Gregory R. Naron | 2.2 | $1,529.00 | Research, review dockets, complaints, other documents federal cases involving WWASP and Narvin Lichfield (2.0); review J. Giannini comments on outline for motion to dismiss/anti-SLAPP motion (.2). |
| 7/25/2024 | Jacqueline A. Giannini | 4 | $2,900.00 | Review dockets and pleadings for cases against WWASP (2.6); review and edit G. Naron's outline for Motion to Dismiss/Motion to Strike and notes on factual development issues (.8); email N. Spears and G. Naron regarding case strategy (.3); correspond with I. Kinghorn regarding review of Narvin Lichfield news articles [for use in Motion to Dismiss/Strike] (.3). |
| 7/26/2024 | Gregory R. Naron | 5.1 | $3,544.50 | Research, review cases, statutes, prior briefing in other cases for motion to dismiss/anti-SLAPP motion (1.6); draft argument inserts for motion (3.5). |
| 7/26/2024 | Jacqueline A. Giannini | 1.9 | $1,377.50 | Continue reviewing dockets and pleadings for cases against WWASP and Teen Help (1.9). |
| 7/27/2024 | Gregory R. Naron | 0.4 | $278.00 | Draft sections of motion to dismiss/anti-SLAPP motion. |
| 7/28/2024 | Jacqueline A. Giannini | 0.7 | $507.50 | Listen to Episode 10 of Trapped in Treatment featuring interview with Narvin Lichfield [for use in motions] (.7). |
| 7/29/2024 | Gregory R. Naron | 4.5 | $3,127.50 | Draft sections of motion to dismiss/anti-SLAPP motion. |
| 7/29/2024 | Jacqueline A. Giannini | 0.9 | $652.50 | Watch television special [for potential use in motions] (.5); research state court cases against Narvin Lichfield (.4). |
| 7/30/2024 | Gregory R. Naron | 4.1 | $2,849.50 | Draft sections of motion to dismiss/anti-SLAPP motion (3.6); draft notes and correspond with J. Giannini re factual development, review articles, other documents (.5). |
| 7/30/2024 | Jacqueline A. Giannini | 2.9 | $2,102.50 | Draft memo on potential exhibits for Request for Judicial Notice (2.7); correspond with G. Naron on motion strategy (.2). |
| 7/31/2024 | Gregory R. Naron | 6.1 | $4,239.50 | Research, review case law, statutes, articles re public figure status (1.6), draft sections of motion to dismiss/anti-SLAPP motion (4.5). |
| 7/31/2024 | Jacqueline A. Giannini | 3.9 | $2,827.50 | Begin drafting Factual Background section of Motion to Dismiss/Motion to Strike (1.6); review additional research on Narvin Lichfield (1.7); research Narvin and Robert Lichfield business entities (.6). |
| 8/1/2024 | Gregory R. Naron | 3 | $2,085.00 | Review articles, outline, notes, briefs from other cases for strategy and analysis of issues for motion to dismiss/anti-SLAPP (.8), review N. Spears comments on Motion to Dismiss outline (.2); further research and analysis regarding fair report (2.0). |

APP 00326

| 8/1/2024 | Natalie J. Spears | 1.9 | $1,643.50 | Analyze and develop strategy for anti-SLAPP motion and motion to dismiss, and related factual background (1.0); finish draft of big picture next steps/issues (.90). |
|---|---|---|---|---|
| 8/1/2024 | Jacqueline A. Giannini | 2.2 | $1,595.00 | Analyze and develop strategy for Motion to Dismiss and anti-SLAPP Motion (2.0); draft and send email to Netflix client regarding judicial assignment (.2). |
| 8/2/2024 | Gregory R. Naron | 5.3 | $3,683.50 | Review N. Spears comments on Motion to Dismiss/anti-SLAPP Motion outlines and respond to comments (.7); draft outlines of motion to dismiss and anti-SLAPP motion (3.1); review cases, dockets, briefs from other cases to develop strategy for responsive pleadings (1.5). |
| 8/2/2024 | Natalie J. Spears | 0.7 | $605.50 | Review revised anti-SLAPP motion and motion to dismiss detailed outlines and edit same. |
| 8/2/2024 | Jacqueline A. Giannini | 0.5 | $362.50 | Review and edit revised outlines for Motion to Dismiss and anti-SLAPP Motion (.5). |
| 8/3/2024 | Gregory R. Naron | 0.6 | $417.00 | Review comments on outlines for Motion to Dismiss/Motion to Strike and respond to comments (.3); review cases and edit outline for Motion to Dismiss/Motion to Strike (.3). |
| 8/4/2024 | Natalie J. Spears | 0.5 | $432.50 | Review detailed outlines on motion to dismiss and anti-SLAPP motion and edit same. |
| 8/5/2024 | Gregory R. Naron | 6.1 | $4,239.50 | Review cases for motion to dismiss and anti-SLAPP motion (1.2); draft motion to dismiss and anti-SLAPP motion (3.8); review comments, further edits to anti-SLAPP analysis (1.1). |
| 8/5/2024 | Natalie J. Spears | 1.5 | $1,297.50 | Review and edit draft email [to clients] framing and summarizing motion strategy (.50); review and edit brief outlines for client on motions (.50); review and edit memo on anti-SLAPP law in 10th Cir and Utah and CA SLAPP laws (.50); |
| 8/5/2024 | Jacqueline A. Giannini | 3.6 | $2,610.00 | Draft email to Netflix client summarizing strategy for Motion to Dismiss/anti-SLAPP Motion (1.3); draft summary outlines for Motion to Dismiss/anti-SLAPP Motion for Netflix client (1.2); revise memo on anti-SLAPP law (1.1). |
| 8/6/2024 | Gregory R. Naron | 6.9 | $4,795.50 | Draft motion to dismiss. |
| 8/6/2024 | Natalie J. Spears | 0.4 | $346.00 | Review Lichfield public statements [for use in motion to dismiss] (.40). |
| 8/6/2024 | Jacqueline A. Giannini | 4.1 | $2,972.50 | Revise and send strategy email with memo and brief outlines Netflix client (.6); continue drafting factual background section for Motion to Dismiss/anti-SLAPP Motion (1.3); begin drafting declaration for K. Kubler for anti-SLAPP Motion (2.2). |
| 8/7/2024 | Gregory R. Naron | 5.3 | $3,683.50 | Review draft statement of facts [for motion to dismiss] (.2); further research, review cases re actual malice, fair report for motions (2.0); continue to draft motion to dismiss, anti-SLAPP motion (3.1). |
| 8/7/2024 | Natalie J. Spears | 1 | $865.00 | Call w/ Netflix client re: strategy for motion to dismiss, motion to strike under SLAPP and related issues for research, fact gathering (0.5); review draft of statement of facts for motions and comment on related needs for same (.50). |
| 8/7/2024 | Jacqueline A. Giannini | 2 | $1,450.00 | Call with Netflix client regarding case updates and strategy (.5); meet with N. Spears regarding motion strategy (.3); finish drafting Factual Background section for Motion to Dismiss/Motion to Strike (1.2). |

APP 00327

| 8/8/2024 | Gregory R. Naron | 3.8 | $2,641.00 | Further research and review of cases re defenses and judicial notice for motions (1.5); draft motion to dismiss (2.3). |
|---|---|---|---|---|
| 8/8/2024 | Jacqueline A. Giannini | 0.7 | $507.50 | Correspond with N. Spears regarding Narvin Lichfield research (.3); coordinate transcription of all three Episodes of Series (.4). |
| 8/9/2024 | Gregory R. Naron | 4.4 | $3,058.00 | Further research and review of cases re actual malice, truth, and judicial notice for motions (1.6); draft motion to dismiss, anti-SLAPP motion (2.8). |
| 8/9/2024 | Jacqueline A. Giannini | 0.3 | $217.50 | Draft K. Kubler declaration. |
| 8/10/2024 | Gregory R. Naron | 4 | $2,780.00 | Review cases and local rules and examples from local counsel for guidelines on motion to dismiss in D. Utah (.7); draft motion to dismiss, anti-SLAPP motion (3.3). |
| 8/11/2024 | Gregory R. Naron | 4.2 | $2,919.00 | Research and review cases, statutes, and statutory notes for motions (1.5); draft motion to dismiss, anti-SLAPP motion (2.7). |
| 8/11/2024 | Jacqueline A. Giannini | 2.1 | $1,522.50 | Review research for Kubler declaration and draft same. |
| 8/12/2024 | Gregory R. Naron | 2.5 | $1,737.50 | Review and analyze cases for motions (1.6); draft motion to dismiss, anti-SLAPP motion (.9). |
| 8/12/2024 | Natalie J. Spears | 0.4 | $346.00 | Debrief from J. Giannini re call w/ K. Kubler et al and next steps (.40). |
| 8/12/2024 | Jacqueline A. Giannini | 4.5 | $3,262.50 | Call with K. Kubler regarding her declaration in support of Motion to Strike (.8); review drafts of Motion to Dismiss and anti-SLAPP Motion and edit Motion to Dismiss (3.1); revise Kubler declaration following call (.6). |
| 8/13/2024 | Gregory R. Naron | 2.9 | $2,015.50 | Review N. Spears and J. Giannini comments on draft motions (.6); research Utah defamation cases and draft notes analyzing same (2.3). |
| 8/13/2024 | Natalie J. Spears | 4.8 | $4,152.00 | Read draft briefs in support of motion to dismiss and motion to strike and edit same including discussing with J. Giannini (3.20); call w/ local counsel D. Tufts re local experience and strategy for motion practice, discovery and related issues (.60); read next round of edits on brief and assess combining with motion to strike (1.0). |
| 8/13/2024 | Jacqueline A. Giannini | 5.7 | $4,132.50 | Meet with N. Spears to review and strategize edits to Motion to Dismiss (.8); revise Motion to Dismiss based on discussion with N. Spears (3.4); email I. Kinghorn regarding drafting of Request for Judicial Notice (.3); call with D. Tufts regarding information on local practice (.6); draft and send update to clients on Judge local practice (.4); review Judge Parrish's standing order (.2). |
| 8/14/2024 | Gregory R. Naron | 5.7 | $3,961.50 | Further research, review cases for motion to dismiss/strike (1.8); review N. Spears and J. Giannini comments, edits to motion (.3); further revisions to combined motion to dismiss/motion to strike (3.1); review, edit Kubler declaration, emails re same (.5). |
| 8/14/2024 | Natalie J. Spears | 2.5 | $2,162.50 | Read and edit Kubler declaration and assess strategy for same and purpose (2.0); develop strategy for Kubler Declaration and anti-SLAPP motion with J. Giannini (.50). |

| 8/14/2024 | Jacqueline A. Giannini | 1.2 | $870.00 | Develop Kubler Declaration and anti-SLAPP motion and facts for inclusion with N. Spears (.5); review revised draft of Motion to Dismiss/Motion to Strike (.7). |
|---|---|---|---|---|
| 8/15/2024 | Gregory R. Naron | 1.6 | $1,112.00 | Further research, analysis re issues for motion to dismiss/anti-SLAPP motion to strike (1.0); review draft motion for judicial notice (.2) review draft Kubler declaration (.2); review comments on draft motion to dismiss/strike (.2). |
| 8/15/2024 | Natalie J. Spears | 5 | $4,325.00 | Edit revised draft of combined motion to dismiss and motion to strike (3.20); discuss same with J. Giannini (.30); review judicial notice issues and law related to arguments in motion to dismiss (1.0); confer, emails w/ J. Giannini, G. Naron re same and edits to brief, request for judicial notice, and Kubler declaration (.50). |
| 8/15/2024 | Jacqueline A. Giannini | 5.8 | $4,205.00 | Revise Kubler declaration (2.6); discuss edits to Motion to Dismiss/Motion to Strike with N. Spears (.3); review Utah Supreme Court case cited in Motion to Dismiss and correspond with N. Spears re same (.5); review draft Request for Judicial Notice (.4); review cases cited in Request for Judicial Notice (1.6); correspond with N. Spears and G. Naron regarding Request for Judicial Notice (.4). |
| 8/16/2024 | Gregory R. Naron | 5.1 | $3,544.50 | Review further research and cases re actual malice, judicial notice on 12b6 motion (2.5); review comments on draft motion to dismiss/strike (.3); revise draft motion to dismiss/strike (2.0); review draft Kubler declaration, motion for judicial notice, and provide comments on same (.3). |
| 8/16/2024 | Natalie J. Spears | 2.4 | $2,076.00 | Review and edit updated judicial notice request (.80); review revised Kubler declaration and further edit same (.80); call w/ Utah counsel D. Tufts for high level comments on brief and strategy per local custom (0.80). |
| 8/16/2024 | Jacqueline A. Giannini | 5.6 | $4,060.00 | Review N. Spears' edits to Motion to Dismiss/Motion to Strike and make additional edits (1.0); call with N. Spears, D. Tufts regarding Motion to Dismiss/Motion to Strike (.8); revise Request for Judicial Notice (2.2); revise Kubler Declaration (.4); clean up revised Motion to Dismiss/Motion to Strike (1.2). |
| 8/18/2024 | Gregory R. Naron | 0.9 | $625.50 | Review D. Tufts, N. Spears comments on draft motion to dismiss/strike, motion for judicial notice and correspond with N. Spears, J. Giannini re same. |
| 8/18/2024 | Natalie J. Spears | 2.8 | $2,422.00 | Read key cases cited in our brief and suggest certain refining edits per same and related strategic issues. |
| 8/19/2024 | Gregory R. Naron | 3.7 | $2,571.50 | Review further research and cases re actual malice, limited public figure for motions (2.4); revise draft motion to dismiss/strike (1.3). |
| 8/19/2024 | Natalie J. Spears | 1 | $865.00 | Review D. Tufts edits to brief in support of motion to dismiss (.50); review and edit cover email to client re analysis and issues for consideration with motion to dismiss (.50). |

| 8/19/2024 | Jacqueline A. Giannini | 3.3 | $2,392.50 | Review research on Narvin Lichfield to date (1.2); revise Motion to Dismiss/Motion to Strike (1.5); draft and send email to Netflix client and K. Kubler regarding Motion to Dismiss/Motion to Strike and supporting documents (.6). |
|---|---|---|---|---|
| 8/20/2024 | Gregory R. Naron | 0.4 | $278.00 | Review draft request for judicial notice and declaration and provide edits on same (.4). |
| 8/20/2024 | Jacqueline A. Giannini | 0.8 | $580.00 | Draft Stipulated Motion for Additional Pages and Extension of Briefing Schedule (.6); call with Plaintiff's counsel regarding page limits and briefing schedule (.2). |
| 8/21/2024 | Gregory R. Naron | 1.3 | $903.50 | Review cases re anti-SLAPP and defamation by implication for motions and draft notes for use (1.0); review and edit Request to Judicial, edits to same (.3). |
| 8/21/2024 | Jacqueline A. Giannini | 0.6 | $435.00 | Revise Stipulated Motion for Additional Pages and Extension of Briefing Schedule and draft proposed order re same (.3); watch report on Troubled Teen Industry [for potential use in Motion to Dismiss/Strike] (.3). |
| 8/22/2024 | Jacqueline A. Giannini | 3.2 | $2,320.00 | Review and refine Declaration, Judicial Notice and Motion to Dismiss/Motion to Strike (2.7); watch Narvin Lichfield video [for potential use in Motion to Dismiss/Strike] (.5). |
| 8/23/2024 | Gregory R. Naron | 0.3 | $208.50 | Draft notes for concepts to raise on motion to dismiss. |
| 8/23/2024 | Natalie J. Spears | 1 | $865.00 | Review additional media research on Narvin Lichfield [for use in motion to dismiss] (.50); confer w/ J. Giannini re same and strategy issues for judicial notice, related arguments (.50). |
| 8/23/2024 | Jacqueline A. Giannini | 3.9 | $2,827.50 | Call with N. Spears regarding outstanding items on Motion to Dismiss and supporting papers (.5); rewatch Episodes 1 and 3 in order to review Motion to Dismiss/Motion to Strike and take notes (2.2); review exhibits for Request for Judicial Notice (.8); edit Motion to Dismiss/Motion to Strike (.4). |
| 8/25/2024 | Jacqueline A. Giannini | 0.3 | $217.50 | Finish editing Motion to Dismiss/Motion to Strike (.3). |
| 8/26/2024 | Gregory R. Naron | 2.5 | $1,737.50 | Review Netflix client, J Giannini comments on motion to dismiss brief (.50); edit draft brief, respond to comments and correspond with N. Spears and J. Giannini re same (1.5); review and analyze cases cited in brief (.5). |
| 8/26/2024 | Natalie J. Spears | 2.5 | $2,162.50 | Read Netflix client's edits to brief and assess same, read G. Naron responses to edits and further edits to same (2.0); confer w/ J. Giannini re same (.50). |
| 8/26/2024 | Jacqueline A. Giannini | 5.5 | $3,987.50 | Review Netflix client's edits to Motion to Dismiss/Motion to Strike (.4); revise Motion to Dismiss/Motion to Strike based on Netflix client's edits (1.8); revise Request for Judicial Notice and Kubler Declaration (1.1); email Netflix client re feedback on filings (.2); email K. Kubler re feedback on filings (.2); review exhibits to Request for Judicial Notice (1.3); call with N. Spears regarding edits to Motion to Dismiss/Motion to Strike (.5). |

| 8/27/2024 | Natalie J. Spears | 3 | $2,595.00 | Watch Episode 3 again in connection with review of motion to dismiss (1.0); read revised brief and edit same, including discussing with J. Giannini (1.50); review issues for judicial notice and exhibits to same (.50). |
|---|---|---|---|---|
| 8/27/2024 | Jacqueline A. Giannini | 3.5 | $2,537.50 | Meet with N. Spears to discuss edits to Motion to Dismiss/Motion to Strike (.6); revise Motion to Dismiss/Motion to Strike (1.2); revise Request for Judicial Notice and prepare accompanying exhibits (1.7). |
| 8/28/2024 | Gregory R. Naron | 1.5 | $1,042.50 | Review draft motion to dismiss brief and supporting documents and provide edits and comments re brief and cases cited therein. |
| 8/28/2024 | Natalie J. Spears | 2.6 | $2,249.00 | Prep and call w/ Kubler re her declaration (1.0); confer w/ J. Giannini re edits to same (.30); read judicial notice exhibits in full and edit same (1.30). |
| 8/28/2024 | Jacqueline A. Giannini | 4.2 | $3,045.00 | Call with K. Kubler regarding declaration (.6); revise Motion to Dismiss/Motion to Strike (2.9); correspond with Netflix client regarding Motion to Dismiss/Motion to Strike (.2); revise K. Kubler declaration following call (.5). |
| 8/29/2024 | Jacqueline A. Giannini | 2.8 | $2,030.00 | Assess edits to Request for Judicial Notice and exhibits (.5); revise Request for Judicial Notice and exhibits thereto (.5); revise Kubler declaration (.4); correspond with Netflix client and K. Kubler regarding revised Kubler declaration (.3); revise Motion to Dismiss/Motion to Strike (1.1). |
| 8/30/2024 | Natalie J. Spears | 2 | $1,730.00 | Read and finalize Kubler declaration (.70); read and finalize edits to motion to dismiss brief (.80); read and edit Judicial Notice (.50). |
| 8/30/2024 | Jacqueline A. Giannini | 2.5 | $1,812.50 | Finalize and file Motion to Strike/Motion to Dismiss and supporting papers. |
| 10/18/2024 | Gregory R. Naron | 1.6 | $1,112.00 | Review, analyze plaintiff's Opposition to Motion to Dismiss/Strike and cases cited therein (1.3); correspond with N. Spears, J. Giannini re impressions of Plaintiff's Opposition brief and strategy for reply (.3). |
| 10/18/2024 | Natalie J. Spears | 1.7 | $1,470.50 | Read Plaintiff's Opposition to motion to dismiss and assess same, notes on same (.70); read and analyze new Utah SLAPP act case (.60); email w/ Netflix client, J. Giannini re: Plaintiff's opposition and new case (.40). |
| 10/18/2024 | Jacqueline A. Giannini | 0.9 | $652.50 | Review Plaintiff's Opposition to Motion to Dismiss (.4); draft and send email to Netflix client and K. Kubler regarding Plaintiff's Opposition (.5). |
| 10/21/2024 | Gregory R. Naron | 1 | $695.00 | Review cases cited in Plaintiff's Opposition to Motion to Dismiss/Strike and draft notes for reply. |
| 10/22/2024 | Gregory R. Naron | 5.8 | $4,031.00 | Strategize Reply brief in Support of Motion to Dismiss/Strike (.5); research for reply brief (1.5); draft reply brief arguments and outline (3.8). |
| 10/23/2024 | Gregory R. Naron | 6 | $4,170.00 | Review Defendant's Motion to Dismiss/Strike for framing reply brief (.3); research, review cases re reply brief (1.5); confer w/ N. Spears, J. Giannini re reply brief outline and strategy (.8), draft reply brief arguments and outline (3.4). |

| Date | Timekeeper | Hours | Amount | Description |
|---|---|---|---|---|
| 10/23/2024 | Natalie J. Spears | 2.2 | $1,903.00 | Review in detail Plaintiff's opposition, and our prior brief to develop key points for reply (1.40); confer w/ G. Naron and J. Giannini re same and outline, strategy for reply brief (.80). |
| 10/23/2024 | Jacqueline A. Giannini | 1.1 | $797.50 | Review G. Naron's outline for Reply in Support of Motion to Dismiss (.3); strategize with N. Spears and G. Naron regarding Reply in Support of Motion to Dismiss (.8). |
| 10/24/2024 | Gregory R. Naron | 5.2 | $3,614.00 | Research, review cases, and briefs in related cases re reply in support of Motion to Dismiss (1.6); draft reply brief (3.6). |
| 10/25/2024 | Gregory R. Naron | 6.1 | $4,239.50 | Review plaintiff's opposition to Motion to Dismiss/Strike, complaint allegations, transcript of series for reply briefs (.9); research, review cases for Motion to Dismiss reply (1.6); draft reply brief (3.6). |
| 10/26/2024 | Gregory R. Naron | 3.8 | $2,641.00 | Research, review cases for Motion to Dismiss reply (1.4); draft reply brief (2.4). |
| 10/27/2024 | Gregory R. Naron | 1.5 | $1,042.50 | Research, draft Motion to Dismiss reply. |
| 10/28/2024 | Gregory R. Naron | 5.5 | $3,822.50 | Research, review cases for Motion to Dismiss reply (1.5); draft reply brief (4.0). |
| 10/29/2024 | Gregory R. Naron | 5.9 | $4,100.50 | Research, review cases, notes for Motion to Dismiss reply (2.2); draft reply brief (3.7). |
| 10/29/2024 | Jacqueline A. Giannini | 1.7 | $1,232.50 | Review and edit draft Reply in Support of Motion to Dismiss. |
| 10/30/2024 | Gregory R. Naron | 2.8 | $1,946.00 | Research, review cases, articles re issues for motion to dismiss reply (2.5); confer with N. Spears re Motion to Dismiss/Strike reply (.3). |
| 10/30/2024 | Natalie J. Spears | 2 | $1,730.00 | Edit reply brief. |
| 10/31/2024 | Gregory R. Naron | 1.3 | $903.50 | Research, review cases re issues for motion to dismiss reply. |
| 10/31/2024 | Natalie J. Spears | 1.5 | $1,297.50 | Finalize edits to reply brief (1.0); confer with G. Naron re reply brief issues (.50). |
| 11/1/2024 | Gregory R. Naron | 1.8 | $1,251.00 | Review comments on Motion to Dismiss Reply (.2); draft revisions to Motion to Dismiss Reply (1.6). |
| 11/1/2024 | Natalie J. Spears | 0.3 | $259.50 | Review revisions to Motion to Dismiss Reply brief from G. Naron. |
| 11/4/2024 | Gregory R. Naron | 1.8 | $1,251.00 | Review comments, edits to Motion to Dismiss Reply, emails N. Spears, J. Giannini re same (.3); review opening and opposition briefs, proofread, make further revisions to Motion to Dismiss Reply (1.5). |
| 11/4/2024 | Natalie J. Spears | 0.8 | $692.00 | Review revised reply brief and make final decisions on edits to same. |
| 11/4/2024 | Jacqueline A. Giannini | 1.8 | $1,305.00 | Revise and edit draft Reply in Support of Motion to Dismiss/Strike (1.6); email draft Reply brief to Netflix client and K. Kubler (.2) |
| 11/5/2024 | Gregory R. Naron | 0.8 | $556.00 | Review Motion to Dismiss Reply, cases cited in same (.40); review D Tufts edits, comments on reply draft (.40). |
| 11/8/2024 | Gregory R. Naron | 1.8 | $1,251.00 | Review client edits to Reply brief in support of Motion to Dismiss, cases cited (.4); revise draft Reply brief (1.4). |
| 11/8/2024 | Jacqueline A. Giannini | 1.3 | $942.50 | Review Netflix client's edits to Reply brief and G. Naron's further edits (.6); revise Reply brief on top of Netflix client's and G. Naron's edits (.7). |
| 11/9/2024 | Natalie J. Spears | 0.5 | $432.50 | Read updated Reply brief and email to J. Giannini re same and sending to clients. |

APP 00332

| 11/9/2024 | Jacqueline A. Giannini | 0.6 | $435.00 | Revise Reply in Support of Motion to Dismiss and send to clients. |
|---|---|---|---|---|
| 11/10/2024 | Gregory R. Naron | 0.4 | $278.00 | Review comments, edits to Reply brief in support of Motion to Dismiss, review cases cited (.4). |
| 11/10/2024 | Natalie J. Spears | 1 | $865.00 | Review Utah defamation case and notes on same, edits to brief on same. |
| 11/10/2024 | Jacqueline A. Giannini | 0.9 | $652.50 | Revise Reply in Support of Motion to Dismiss/Strike |
| 11/11/2024 | Gregory R. Naron | 1 | $695.00 | Review, edit reply brief in support of Motion to Dismiss. |
| 11/11/2024 | Jacqueline A. Giannini | 1.3 | $942.50 | Review and finalize Reply in Support of Motion to Dismiss/Strike (1.3). |
| 11/12/2024 | Jacqueline A. Giannini | 0.3 | $217.50 | Finalize and file Reply in Support of Motion to Dismiss (.1); correspond with D. Tufts regarding oral argument (.1); email Netflix client and K. Kubler regarding Reply brief and oral argument (.1). |
| 6/26/2025 | Jacqueline A. Giannini | 0.2 | $145.00 | Correspond with D. Tufts regarding Plaintiff's request for oral argument (.1); correspond with Netflix client re same (.1). |
| 8/14/2025 | Natalie J. Spears | 0.4 | $346.00 | Review order from court on oral argument on motion to dismiss and various emails with local counsel, Jacqui Giannini and clients regarding same and schedule, prep for same. |
| 8/14/2025 | Jacqueline A. Giannini | 0.2 | $145.00 | Correspond internally regarding order setting oral argument (.1); email Netflix client regarding order setting oral argument (.1). |
| 8/15/2025 | Jacqueline A. Giannini | 0.1 | $72.50 | Email K. Kubler regarding oral argument setting. |
| 8/20/2025 | Jacqueline A. Giannini | 0.1 | $72.50 | Correspond with D. Tufts regarding oral argument. |
| 8/21/2025 | Natalie J. Spears | 0.7 | $605.50 | Call w/ D. Tufts re oral argument before Court and experience (.60); email w/ clients re prep for oral argument (.10). |
| 8/21/2025 | Jacqueline A. Giannini | 0.2 | $145.00 | Email K. Kubler regarding oral argument (.1); email Netflix client regarding oral argument (.1). |
| 8/24/2025 | Jacqueline A. Giannini | 2 | $1,450.00 | Review Amended Complaint and prior notes on Series to prepare for oral argument (.6); rewatch Episode 1 and take notes to identify potential clips for oral argument (1.4). |
| 8/25/2025 | Gregory R. Naron | 0.2 | $139.00 | Review new UT S.Ct. defamation case, draft notes analyzing same and email team re same. |
| 8/25/2025 | Jacqueline A. Giannini | 1.3 | $942.50 | Rewatch Episode 2 and take notes to identify potential clips for oral argument (1.3). |
| 8/26/2025 | Gregory R. Naron | 2.8 | $1,946.00 | Review new UT S.Ct. defamation case decided and MTD briefing to assess for oral argument (1.2); draft notes analyzing same for oral argument (1.6). |
| 8/26/2025 | Natalie J. Spears | 3 | $2,595.00 | Rewatch Episodes 1 and 2 of The Program in preparation for oral argument on motion to dismiss, and take notes on same. |
| 8/26/2025 | Jacqueline A. Giannini | 1.4 | $1,015.00 | Watch Episode 3 and take notes to prepare for oral argument (1.4). |
| 8/27/2025 | Gregory R. Naron | 1.2 | $834.00 | Draft further notes analyzing new Utah defamation case for oral argument (1.2). |
| 8/27/2025 | Natalie J. Spears | 2.7 | $2,335.50 | Watch and take notes on main Episode 3 to refresh and prepare for oral argument. |
| 8/27/2025 | Jacqueline A. Giannini | 1 | $725.00 | Identify key cases and exhibits for oral argument prep for N. Spears to review (1.0). |

APP 00333

| Date | Name | Hours | Amount | Description |
|---|---|---|---|---|
| 8/28/2025 | Natalie J. Spears | 3.1 | $2,681.50 | Read complaint and motion to dismiss brief, opposition and reply in preparation for oral argument (2.50); listen to portions of Paris Hilton Podcast exhibit with interview of N. Lichfield submitted as part of Judicial Notice materials on motion to dismiss (.40); rewatch Inside Edition news story on Narvin Lichfield submitted as exhibit to MTD (.20). |
| 8/29/2025 | Natalie J. Spears | 3.8 | $3,287.00 | Finish reading motion to dismiss briefs (0.80); begin review of key case law cited in motion to dismiss briefing on numerous issues under Utah, federal and CA law (2.0); confer w/ J. Giannini re clips of Series and exhibits for potential use at hearing, and transcripts of Series, key video exhibits for ease of review (1.0). |
| 8/29/2025 | Jacqueline A. Giannini | 0.9 | $652.50 | Review portions of podcast interviewing Narvin Lichfield (.9). |
| 8/31/2025 | Natalie J. Spears | 3 | $2,595.00 | Read numerous key cases cited in motion to dismiss briefing from 2024 in preparation for oral argument, and make notes on cases and points, counterpoints for issues that may be raised at argument. |
| 9/1/2025 | Natalie J. Spears | 4.5 | $3,892.50 | Finish review of all key cases cited in motion to dismiss briefing from 2024 in preparation for oral argument, new Utah Supreme Court case, and make notes on same for issues that may be raised at argument. |
| 9/2/2025 | Gregory R. Naron | 2.2 | $1,529.00 | Review case law for MTD arguments and draft case summary and oral argument notes (2.2). |
| 9/2/2025 | Natalie J. Spears | 1.4 | $1,211.00 | Confer w/ G. Naron for oral argument, and assistance with prep on SLAPP act, new Utah SCt cases (.40); begin drafting oral argument notes (1.0). |
| 9/3/2025 | Natalie J. Spears | 2.5 | $2,162.50 | Review facts and allegations to prep for oral argument (1.0); continue prep for hearing on motion to dismiss including drafting notes on Series, arguments and potential exhibits to highlight (1.50). |
| 9/4/2025 | Natalie J. Spears | 1 | $865.00 | Prep for hearing on motion to dismiss including drafting notes on Series, arguments, and potential exhibits to highlight (1.0). |
| 9/5/2025 | Gregory R. Naron | 1.5 | $1,042.50 | Update research, review cases re anti-SLAPP law (1.0); draft notes re additional new UT anti-SLAPP decisions decided August and September 2025 (.5). |
| 9/8/2025 | Gregory R. Naron | 1.8 | $1,251.00 | Update research re D. Utah decisions, notes re same (.9); draft summary for client re new UT defam and anti-SLAPP decisions (.9). |
| 9/8/2025 | Natalie J. Spears | 1.2 | $1,038.00 | Email to Netflix client (.30); confer w/ G. Naron re same, and re additional research for oral argument (.20); confer w/ J. Domenella re call to Kubler, conferring with local counsel (.20); continue notes on prep for oral argument (0.5). |
| 9/8/2025 | Jacqueline A. Giannini | 0.3 | $217.50 | Confer with N. Spears re: call with K. Kubler and local counsel (.2); correspond with D. Tufts regarding oral argument prep (.1). |
| 9/9/2025 | Jacqueline A. Giannini | 0.3 | $217.50 | Call with D. Tufts regarding oral argument strategy (.3). |
| 9/10/2025 | Natalie J. Spears | 1.2 | $1,038.00 | Prep work for oral argument hearing including meeting with J. Domenella (.60); meeting w/ Netflix client, J. Domenella re same (.60). |

APP 00334

| 9/10/2025 | Jacqueline A. Giannini | 1.2 | $870.00 | Prep for oral argument with N. Spears (.6); call with Netflix client regarding oral argument (.6). |
|---|---|---|---|---|
| 9/12/2025 | Jacqueline A. Giannini | 0.5 | $362.50 | Call with K. Kubler regarding oral argument. |
| 9/12/2025 | Natalie J. Spears | 0.5 | $432.50 | Call with K. Kubler regarding oral argument. |
| 9/14/2025 | Natalie J. Spears | 1.5 | $1,297.50 | Final prep with D. Tufts prior to hearing (.80); further prep with J. Domenella for oral argument re video clips and exhibits as needed for zoom hearing on 9/18 (0.7). |
| 9/14/2025 | Jacqueline A. Giannini | 1.5 | $1,087.50 | Call with N. Spears and D. Tufts (part of call) to prepare for oral argument. |
| 9/17/2025 | Natalie J. Spears | 1.5 | $1,297.50 | Final prep for oral argument on Motion to Dismiss (1.5). |
| 9/18/2025 | Natalie J. Spears | 3 | $2,595.00 | Day of hearing prep for oral argument w/ J. Domenella (1.0); attend oral argument hearing (1.6); debrief with clients (.30); read court order (.10). |
| 9/29/2025 | Jacqueline A. Giannini | 0.8 | $580.00 | Review and analyze order granting motion to dismiss and discuss with N. Spears (0.5); call with client regarding order (.3). |
| 9/29/2025 | Natalie J. Spears | 0.5 | $432.50 | Read decision and email w/ clients re same. |
| 9/30/2025 | Jacqueline A. Giannini | 0.4 | $290.00 | Call with N. Spears and D. Tufts regarding procedure for fee petition in District of Utah, extension, appeal (.4). |
| 9/30/2025 | Natalie J. Spears | 0.4 | $346.00 | Confer w/ D. Tufts re fee process, local practice, extension, appeal. |
| | | 446.5 | $329,550.50 | |

APP 00335

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hoc vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hoc vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER, an individual,<br>NETFLIX, INC., a Delaware Corporation,<br>and JOHN DOES A-L,<br>        Defendants. | **DECLARATION OF DAVID W. TUFTS IN SUPPORT OF DEFENDANTS' FEE PETITION**<br><br>Case No. 2:24-cv-00458-CMR |

APP 00336

I, David W. Tufts, hereby state as follows under penalty of perjury:

1.    I am over the age of twenty-one years and am otherwise competent to make this declaration. I submit this declaration in support of Defendants' Fee Petition Pursuant to the Anti-SLAPP Acts. The statements contained herein are within my personal knowledge or are based upon reliable records of my law firm compiled and maintained in the ordinary course of business.

2.    Since the outset of this lawsuit, I have served as local counsel for the Defendants Netflix, Inc. ("Netflix") and Katherine Kubler ("Ms. Kubler").

3.    I am a shareholder at Dentons Durham Jones Pinegar, P.C. ("DDJP") in Salt Lake City, Utah. I currently serve in firm management as the Chair of DDJP's Commercial Litigation practice. In 2020, my predecessor firm Durham Jones & Pinegar launched a combination with Dentons to become DDJP.

4.    I am a member of the Utah and California State Bars and am licensed to practice law in both States. I graduated from Brigham Young University, J. Reuben Clark Law School in 1995. I have been in private practice my entire career, and have practiced in Salt Lake City since 1999. My practice focuses on pursuing and defending a wide range of commercial litigation issues on behalf of DDJP's clients. I have significant experience in the Utah state and federal courts.

5.    In addition to the fees incurred by Ms. Spears and her team at Dentons US, Defendants are seeking $26,868.00, representing DDJP's attorney time of 45.3 hours worked to represent Defendants in this matter.

6.    I worked closely with Ms. Spears and the other Dentons US attorneys to ensure that DDJP was not duplicating work performed by the Dentons US attorneys. Given Ms. Spears'

and her team's extensive subject-matter expertise in the areas of First Amendment, media and defamation law, the role of DDJP was limited to advising on local practice and procedure and providing high-level advice on the case strategy.  In my experience, it is common for clients in complex and higher profile litigation matters to hire national counsel with subject-area expertise as lead counsel and engage local attorneys to serve in an advisory capacity.

7.      My discounted billing rate on this case was $795 per hour from 2024-2025.  This rate represented a 11% discount off of my rate in 2024 and a 16% discount off my rate in 2025 (rates increased in 2025 but these increases were not passed on to the Defendants).

8.      I also worked with associate Ian Kinghorn in the litigation group in my office. Mr. Kinghorn is a 2018 graduate of the University of Iowa College of Law.  Prior to joining DDJP in 2021, Mr. Kinghorn clerked for Magistrate Judge Helen C. Adams of the United States District Court for the Southern District of Iowa and Judge David N. Mortensen of the Utah Court of Appeal.  Mr. Kinghorn's practice at the firm focuses on complex commercial matters.  Mr. Kinghorn's discounted billing rate for this case was $460.

9.      Based on my professional experience in the area of civil litigation and my knowledge of what my peers in the legal community charge for complex litigation, the rates charged by DDJP are consistent with prevailing rates charged in comparable cases by attorneys with similar qualifications, skill and experience in the Salt Lake City area.

10.      Further, based on my experience working with attorneys outside of Salt Lake City, it is my opinion that the rates charged by Dentons US for Ms. Spears, Mr. Naron and Ms. Domenella are commensurate with rates charged by attorneys at other national firms with a similar level of subject-area expertise.

11.     A breakdown of all DDJP's fees sought in Defendants' Petition is attached hereto as Exhibit 1.  Exhibit 1 is a true and correct copy of a schedule which contains the time, amount, and narrative description of the services performed by DDJP personnel in this litigation.  This schedule was generated from DDJP's time-keeping records system, which contains the daily time records entered by DDJP's lawyers and personnel at or near the time the work was performed in this case, and created and maintained in the ordinary course of DDJP's business.  All of the fees identified on Exhibit 1 were invoiced to Defendants at the rates noted above and paid by Defendants during the pendency of this litigation.

12.     I assisted with the preparation of and have reviewed Exhibit 1.  Based on my knowledge of the work performed on this case, the time reflected is a true and accurate account of work actually performed for Defendants by DDJP's lawyers in connection with the above-captioned case.  I exercised by judgment to remove and not seek reimbursement for a small amount of fees that could be viewed as duplicative or unnecessary.

13.     Based on the above, I believe that the attorneys' fees requested by both Dentons US and DDJP are reasonable.

I hereby declare, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

October 27, 2025                                    /s/ *David W. Tufts*
                                                    _____

                                                    David W. Tufts

# EXHIBIT 1

APP 00340

| Date | Name | Hours | Amount | Narrative |
|---|---|---|---|---|
| 7/12/2024 | Tufts, David W. | 0.5 | 397.5 | Collect information and experiences with opposing counsel (.5). |
| 7/15/2024 | Kinghorn, Ian M. | 0.8 | $368.00 | Review complaint (.6) and emails between D. Tufts and J. Giannini (.2). |
| 7/16/2024 | Kinghorn, Ian M. | 2.4 | $1,104.00 | Attention to emails pertaining to responding to complaint (.2); review docket (.2); draft motion to extend deadline and proposed order (1.2); discussion with D. Tufts about case (.2); review local rules regarding magistrate consent (.3); send draft filings to J. Giannini along with explanation regarding magistrate consent rules and deadlines (.3). |
| 7/16/2024 | Tufts, David W. | 0.2 | $159.00 | Review stipulated motion and order for extension and e-mail with I. Kinghorn regarding same (0.2). |
| 7/18/2024 | Kinghorn, Ian M. | 0.7 | $322.00 | Review PHV filing requirements (.2) and draft motions for pro hac vice and proposed orders granting the same (.5). |
| 7/19/2024 | Kinghorn, Ian M. | 0.2 | $92.00 | Finalize and ensure filing of motion for extension of time to answer (.2). |
| 7/22/2024 | Tufts, David W. | 0.2 | $159.00 | Attention to consent to jurisdiction notice, order granting extension, and e-mail with J. Giannini regarding same (.2). |
| 7/23/2024 | Kinghorn, Ian M. | 1 | $460.00 | Review first episode of The Program (1). |
| 7/24/2024 | Kinghorn, Ian M. | 2.2 | $1,012.00 | Correspondence with J. Giannini (.2); review The Program series on Netflix (2.0). |
| 7/25/2024 | Kinghorn, Ian M. | 2.2 | $1,012.00 | Emails and Zoom call with J Giannini about document review needed and other matters relating to litigation strategy (.4); undertake review of documents (1.8). |
| 7/26/2024 | Kinghorn, Ian M. | 2.2 | $1,012.00 | Review and analysis of Lichfield articles (2.2). |
| 7/29/2024 | Kinghorn, Ian M. | 1.5 | $690.00 | Finish document review of Lichfield articles (1.5). |
| 8/1/2024 | Tufts, David W. | 0.1 | $79.50 | Email with J. Giannini regarding judge assignment (0.1). |
| 8/6/2024 | Tufts, David W. | 0.1 | $79.50 | Review submission to decline participation in magistrate program (0.1). |
| 8/6/2024 | Tufts, David W. | 0 | $0.00 | Conference with J. Giannini, N. Spears, G. Naron and I. Kinghorn discussing case strategy and judicial assignment (0.5). |
| 8/7/2024 | Kinghorn, Ian M. | 0.1 | $46.00 | Transmit consent form to clerk's office. |
| 8/13/2024 | Kinghorn, Ian M. | 3.8 | $1,748.00 | Review materials sent by J. Giannini pertaining to request for judicial notice (.4); legal research and analysis relating to various issues germane to judicial notice and materials cited in motion dismiss (3.2); review local rules and related FRCP rules regarding discovery pending motions to dismiss (.2). |
| 8/13/2024 | Tufts, David W. | 0.6 | $477.00 | Conference with N. Spears, J. Giannini regarding local rules and motion practice requirements for Judge Parrish. |

APP 00341

| 8/15/2024 | Kinghorn, Ian M. | 3 | $1,380.00 | Review draft motion to dismiss and incorporate legal research and analysis related to judicial notice issue (1.5); draft request for judicial notice (1.5). |
|---|---|---|---|---|
| 8/15/2024 | Tufts, David W. | 1.7 | $1,351.50 | Review draft Rule 12(b)(6) motion to dismiss and motion to strike (1.7). |
| 8/16/2024 | Tufts, David W. | 1 | $795.00 | Assess strategy for arguments in Rule 12(b)(6) motion to dismiss (0.2); conference with N. Spears, J. Giannini, providing comments and discussing strategy of arguments in Rule 12(b)(6) motion to dismiss (0.8). |
| 8/17/2024 | Tufts, David W. | 3.2 | $2,544.00 | Review and comment on draft Rule 12(b)(6) motion to dismiss and motion for to strike, draft declaration, and draft request for judicial notice for local input (3.2). |
| 8/18/2024 | Tufts, David W. | 1.7 | $1,351.50 | Further review and revise draft Rule 12(b)(6) motion to dismiss (1.1); e-mail to J. Giannini with drafts of motion to dismiss, declaration and request for judicial notice with comments and additional case law (0.6). |
| 8/20/2024 | Tufts, David W. | 0.2 | $159.00 | Review draft stipulated request for additional pages of briefing and extension of time, and comment to J. Giannini (0.2). |
| 8/20/2024 | Tufts, David W. | 0.2 | $159.00 | Emails with J. Giannini regarding Judge Parrish's practices and standing order (0.2). |
| 8/28/2024 | Kinghorn, Ian M. | 4.2 | $1,932.00 | Perform cite check and review of motion to dismiss and request for judicial notice. |
| 9/3/2024 | Kinghorn, Ian M. | 0.4 | $184.00 | Review Civil Standing Order (.2); draft Notice of Acknowledgment of Civil Standing Order (.2). |
| 10/18/2024 | Tufts, David W. | 1.1 | $874.50 | Review memorandum in opposition to defendants motion to dismiss and motion to strike (.8); e-mail with N. Spears and J. Giannini regarding same and edits to consider based on local practice and Utah law (.3). |
| 10/23/2024 | Tufts, David W. | 0.5 | $397.50 | Conference with J. Giannini regarding local procedures (0.2); e-mail to J. Giannini with authorities for reply (0.3). |
| 11/5/2024 | Tufts, David W. | 2.4 | $1,908.00 | Review draft reply in support of motion to dismiss, and provide comments and edits to same (2.4). |
| 11/8/2024 | Kinghorn, Ian M. | 2.6 | $1,196.00 | Conduct citation check of reply brief in support of motion to dismiss and to strike. |
| 11/12/2024 | Tufts, David W. | 0.3 | $238.50 | Emails with J. Giannini regarding local rules and practice for requesting oral argument. |
| 8/21/2025 | Tufts, David W. | 0.6 | $477.00 | Conference with N. Spears regarding oral argument strategy. |
| 9/11/2025 | Tufts, David W. | 0.9 | $715.50 | Review motion to dismiss, opposition, and reply to prepare for conference to assist N. Spears with oral argument (0.9). |
| 9/14/2025 | Tufts, David W. | 0.7 | $556.50 | Conference with N. Spears and J. Domenella to prepare for hearing (0.7). |

APP 00342

| 9/18/2025 | Tufts, David W. | 1.8 | $1,431.00 | Appear at oral argument on motion to dismiss, etc. (1.6); conference with clients after hearing (0.2). |
|---|---|---|---|---|
|  |  | 45.3 | $26,868.00 |  |

APP 00343

Michael K. Hepworth (UT-15157)
**HEPWORTH LEGAL**
320 W 500 S, Ste. 200
Bountiful, Utah 84010
Phone: (801) 872-2222
michael@hepworthlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **NARVIN LICHFIELD**, <br><br> *Plaintiff,* <br><br> *vs.* <br><br> **KATHERINE KUBLER**, **NETFLIX, INC.**, and **JOHN DOES A-L**, <br><br> *Defendants.* | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' FEE PETITION** <br><br> **Case No.:** 2:24-cv-00458-CMR <br><br> **Judge:** *Honorable* Jill N. Parrish |

APP 00344

## TABLE OF CONTENTS

RELIEF SOUGHT                                                                          1

INTRODUCTION                                                                           1

ARGUMENT                                                                               2

   I.   THE LEGAL STANDARD REQUIRES A REASONABLE FEE BASED ON THE
   LODESTAR METHOD                                                                     2

   II.  DEFENDANTS' FEE REQUEST IS UNREASONABLE                                        2
   A.   Defendants' Requested Hourly Rates Are Untethered from the Prevailing Rates in the
   District of Utah. ................................................................................................................ 2
   B.   The Number of Hours Claimed is Grossly Excessive and Padded with Duplicative and
   Unnecessary Work. ............................................................................................................ 4

   III. PLAINTIFF'S PROPOSED REASONABLE FEE AWARD                                      8

CONCLUSION                                                                             9

APP 00345

## TABLE OF AUTHORITIES

### CASES

*Blum v. Stenson*, 465 U.S. 886 (1984) ---------------------------------------------------------------- 2

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ----------------------------------------------------------- 2

*In re Miniscrible Corp.*, 309 F.3d 1234 (10th Cir. 2002) ------------------------------------------ 2

*Ketchum v. Moses*, 24 Cal. 4th 1122, 17 P.3d 735 (2001) --------------------------------------- 3

*Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983) --------------------------------------------------- 4

*Robinson v. City of Edmond*, 160 F.3d 1275 (10th Cir. 1998) ------------------------------- 2, 7

### STATUTES

*Cal. Civ. Proc. Code* § 425.16                                        2
Utah Code Ann. § 78B-25-110                                           2

APP 00346

## RELIEF SOUGHT

Plaintiff Narvin Lichfield respectfully requests that the Court deny Defendants' Fee Petition in its entirety. Defendants have failed to meet their burden of establishing that the requested fees are reasonable. The petition seeks $356,418.50 based on unreasonable out-of-state hourly rates that are untethered to the prevailing market rates in the District of Utah, and for an excessive, duplicative, and unreasonable number of hours that reflects overstaffing, inefficiency, and improper billing practices. Because Defendants have not carried their burden of proving the reasonableness of their fee request, the petition should be denied.

## INTRODUCTION

Defendants seek an award of $356,418.50 in attorneys' fees for a single motion to dismiss. This request is grossly excessive, unreasonable, and wholly unsupported by the evidence. Defendants have failed to meet their burden of proving that the fees requested are reasonable under the applicable legal standards. This exorbitant demand is the product of a litigation strategy that relied on a bloated, out-of-state legal team billing at premium Chicago rates for work that was often duplicative, inefficient, and unnecessary.

The anti-SLAPP statutes authorize an award of reasonable attorneys' fees, not whatever amount a party chooses to bill. Defendants' petition ignores this fundamental requirement and seeks to shift the cost of their own excessive litigation choices—including hiring a team of expensive Chicago counsel for a case filed in Utah—onto Plaintiff. Defendants have provided no justification for their inflated rates, no explanation for why five attorneys were necessary for a single motion, and no adequate detail to allow the Court to assess whether the time claimed was actually reasonable. Because Defendants have failed to carry their burden of proving reasonableness, their fee petition should be denied.

## ARGUMENT

### I.   THE LEGAL STANDARD REQUIRES DEFENDANTS TO PROVE REASONABLENESS, WHICH THEY HAVE FAILED TO DO

Under both the California and Utah anti-SLAPP statutes, a prevailing defendant is entitled to an award of reasonable attorneys' fees and costs. Cal. Civ. Proc. Code § 425.16(c)(1); Utah Code Ann. § 78B-25-110. The starting point for determining a reasonable fee in the Tenth Circuit is the "lodestar" calculation, which is the "product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'" *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). While the lodestar amount is presumptively reasonable, see *In re Miniscribe Corp.*, 309 F.3d 1234, 1245 (10th Cir. 2002), it is the fee applicant's burden to establish that the rates and hours sought are, in fact, reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The Court is obligated to scrutinize the fee request to ensure that the award is not based on hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. As demonstrated below, Defendants' petition fails on every measure of reasonableness. As demonstrated below, Defendants have failed to carry this burden. Their petition is based on rates that are wholly disconnected from the Utah legal market and on hours that are bloated by overstaffing, duplication, and vague billing entries that prevent meaningful review.

### II.   DEFENDANTS' FEE REQUEST FAILES TO MEET THE STANDARD OF REASONABLENESS

Defendants' request for $356,418.50 fails to meet the standard of reasonableness in both the rates charged and the hours expended. The Court should deny the fee petition because Defendants have not proven that either component of their lodestar calculation is reasonable.

2

**A. Defendants' Requested Hourly Rates Are Untethered from the Prevailing Rates in the District of Utah.**

A reasonable hourly rate is determined by the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The relevant community is the district in which the court sits—here, the District of Utah. Defendants improperly base their fee request on the exorbitant rates of their Chicago-based counsel, a practice unsupported by law.

The California Supreme Court's seminal anti-SLAPP fee case, *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-32, 17 P.3d 735, 741 (2001), explicitly holds that the lodestar calculation should be based on the rates prevailing in the local community, regardless of where the retained counsel is based. In *Ketchum*, the California Supreme Court affirmed that attorney fees under the anti-SLAPP statute must be calculated using the lodestar method and that the hourly rate should be based on the local market, not the rates from the attorney's home jurisdiction. Defendants' claimed rates are dramatically out of line with the Utah market. According to the 2025 Clio Legal Trends Report, the average billing rate for an attorney in Utah is approximately $335 per hour, with rates for experienced partners rarely exceeding $450-$470 per hour. *See* **Exhibit A**. Other sources place the average rate in Utah around $291 per hour. In stark and unjustifiable contrast, Defendants' counsel claim rates as high as $865, $795, and $725 per hour.

Specifically, Defendants seek to recover fees at the following rates: Natalie Spears, a partner with 30 years of experience from Dentons US in Chicago, bills at $865 per hour—a rate that is 158% higher than the Utah average. David W. Tufts, a shareholder with 30 years of experience from Dentons Durham Jones Pinegar P.C. in Salt Lake City, bills at $795 per hour—137% above the Utah average. Jacqueline Domenella, a partner with 10 years of experience from Dentons US in Chicago, bills at $725 per hour—116% above the Utah average. Gregory R. Naron, counsel with over 30 years of experience from Dentons US in Chicago, bills at $695 per hour—

3

APP 00349

107% above the Utah average. Even Ian M. Kinghorn, a mid-level associate from the Salt Lake City office, bills at $460 per hour—37% above the Utah average and at the very top of the range for Utah attorneys.

Defendants have made no showing that it was necessary to retain a team of Chicago lawyers to handle this motion, nor that local counsel was incompetent to do so. Indeed, Defendants did retain competent local counsel in the form of Mr. Tufts and Mr. Kinghorn from Dentons Durham Jones Pinegar P.C. in Salt Lake City. Plaintiff should not be required to subsidize Defendants' decision to hire counsel from one of the most expensive legal markets in the country for a case litigated in Utah.

Because Defendants have failed to establish that their rates are reasonable under the prevailing market standard, their fee petition should be denied.

### B. The Number of Hours Claimed is Grossly Excessive and Padded with Duplicative and Unnecessary Work.

Beyond the unreasonable rates, the 491.8 hours claimed for a single dispositive motion is patently excessive and unreasonable. This unreasonable expenditure of time is a direct result of overstaffing, inefficient billing practices, excessive time spent on routine tasks, and vague billing entries that prevent the Court from assessing reasonableness. Defendants have failed to justify this bloated time expenditure, and their fee petition should be denied on this basis as well.

#### 1. Overstaffing and Duplication of Effort

Defendants assigned **five attorneys** – three from Chicago and two from Salt Lake City – to this motion, resulting in rampant duplication. The billing records show numerous instances where multiple attorneys billed for the same task, such as reviewing the same documents, attending the same internal calls, and editing the same drafts. Courts routinely reduce fee awards for such

4

overstaffing and duplication. *See Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983) (disallowing time for multiple attorneys and reducing hours for inefficiency).

For example, on **August 13, 2024**, three partners (Spears, Giannini, and Naron) collectively billed **13.4 hours** for reviewing and editing the same motion drafts:

- Gregory Naron: 2.9 hours ($2,015.50) – "*Review N. Spears and J. Giannini comments on draft motions (.6); research Utah defamation cases and draft notes analyzing same (2.3).*"

- Natalie Spears: 4.8 hours ($4,152.00) – "*Read draft briefs in support of motion to dismiss and motion to strike and edit same including discussing with J. Giannini (3.20); call w/local counsel D. Tufts re local experience and strategy for motion practice, discovery and related issues (.60); read next round of edits on brief and assess combining with motion to strike (1.0).*"

- Jacqueline Giannini: 5.7 hours ($4,132.50) – "*Meet with N. Spears to review and strategize edits to Motion to Dismiss (.8); revise Motion to Dismiss based on discussion with N. Spears (3.4); email I. Knighton regarding drafting of Request for Judicial Notice (.3); call with D. Tufts regarding information on local practice (.6); draft and send update to clients on Judge local practice (.4); review Judge Parrish's standing order (.2).*"

On **August 26, 2024**, the same three attorneys billed a combined **10.5 hours** simply to review client edits:

- Gregory Naron: 2.5 hours ($1,737.50) – "*Review Netflix client, J. Giannini comments on motion to dismiss brief (.50); edit draft brief, respond to comments and correspond*

5

> with N. Spears and J. Giannini re same (1.5); review and analyze cases cited in brief (.5)."

- Natalie Spears: 2.5 hours (2,162.50) – "*Read Netflix client's edits to brief and assess same, read G. Naron responses to edits and further edits to same (2.0); confer with J. Giannini re same (.5).*"

- Jacqueline Giannini: 5.5 hours ($3,987.50) – "*Review Netflix client's edits to Motion to Dismiss/Motion to Strike (.4); review Motion to Dismiss/Motion to Strike based on Netflix client's edits (1.8); revise Request for Judicial Notice and Kubler Declaration (1.1); email Netflix client re feedback on filings (.2); email K. Kubler re feedback on filings (.2); review exhibits to Request for Judicial Notice (1.3); call with N. Spears regarding edits to Motion to Dismiss/Motion to Strike (.5).*"

On **October 23, 2024**, during the reply brief phase, the same trio billed **8.5 hours** for an initial review of Plaintiff's opposition:

- Natalie Spears: 2.2 hours (1,903.00) – "*Review in detail Plaintiff's opposition, and our prior brief to develop key points for reply (1.40); confer w/ G. Naron and J. Giannini re same and outline, strategy for reply brief (.80).*"

- Jacqueline Giannini: 1.1 hours ($797.50) - "*Review G. Naron's outline for Reply in Support of Motion to Dismiss (.3); strategize with N. Spears and G. Naron regarding Reply in Support of Motion to Dismiss (.8).*"

- Gregory Naron: 5.2 hours ($3,614.00) – "*Research, review cases, and briefs in related cases re reply in support of Motion to Dismiss (1.6); draft reply brief (3.6).*"

The pattern of multiple high-billing partners attending the same meetings, reviewing the same documents, and conferring on the same issues is the epitome of inefficient and duplicative

6

work. A single, experienced attorney could have managed this motion efficiently without the need for constant internal conferences and layers of review, all billed to the opposing party.

### 2. Excessive Time on Routine Tasks and Improper Block Billing.

Defendants also billed an unjustifiable amount of time for routine tasks. The records show the team billed nearly **$8,700** and approximately **11.4 hours** simply to watch and re-watch the three-part documentary series that is the subject of this case. While some review of the documentary was necessary, the amount of time spent is excessive:

- August 8, 2024 – Giannini: 0.7 hours ($507.50) – "*Correspond with N. Spears regarding Narvin Lichfield research (.3); coordinate transcription of all three Episodes of Series (.4).*"

- August 21, 2024 – Giannini: 0.6 hours ($435.00) – "*Revise Stipulated Motion for Additional Pages and Extension of Briefing Schedule and draft proposed order re same (.3); watch report on Troubled Teen Industry [for potential use in Motion to Dismiss/Strike] (.3).*"

- August 22, 2024 – Giannini: 3.2 hours ($2,320.00) - "*Review and refine Declaration, Judicial Notice and Motion to Dismiss/Motion to Strike (2.7); watch Narvin Lichfield Video [for potential use in Motion to Dismiss/Strike] (.5).*"

- August 23, 2024 – Giannini: 3.9 hours ($2,827.50) - "*Call with N. Spears regarding outstanding items on Motion to Dismiss and supporting papers (.5); rewatch Episodes 1 and 3 in order to review Motion to Dismiss/Motion to Strike and take notes (2.2); review exhibits for Request for Judicial Notice; edit Motion to Dismiss/Motion to Strike (.4).*"

7

- August 27, 2024 – Spears: 3.0 hours ($2,595.00) - "*Watch Episode 3 again in connection with review of motion to dismiss (1.0); read revised brief and edit same, including discussing with J. Giannini (1.50); review issues for judicial notice and exhibits to same (.5).*"

Furthermore, the time entries are replete with vague, block-billed entries that make it impossible to assess their reasonableness. For example, the entry from Ms. Spears on August 15, 2024, bills 5.0 hours ($4,32500) for at least seven distinct tasks: "Edit revised draft of combined motion to dismiss and motion to strike; discuss same with J. Giannini; review judicial notice issues and law related to arguments in motion to dismiss; confer, emails w/ J. Giannini, G. Naron re same and edits to brief, request for judicial notice, and Kubler declaration." Such block billing is disfavored and warrants a substantial reduction of the hours claimed. S*ee Robinson v. City of Edmond*, 160 F.3d at 1284 (criticizing block billing and upholding reduction of fees).

### 3. Excessive Research Time

The billing records also reveal an excessive amount of time spent on legal research, particularly by Mr. Naron. While research is a necessary component of motion practice, the amount of time claimed here is unreasonable for what is essentially a straightforward anti-SLAPP motion based on well-established First Amendment principles. Notably, Mr. Naron had co-counsel licensed and practicing in Utah who was familiar with local rules and procedures. Rather than relying on his local co-counsel's expertise regarding Utah-specific requirements, Mr. Naron chose to conduct extensive research himself on matters that should have been routine for Utah counsel. This duplicative effort represents an unreasonable use of time and does not meet the reasonableness requirement. Examples of Mr. Naron's research entries include:

8

- August 8, 2024: 3.8 hours ($2,6410.00) – "*Further research and review of cases re defenses and judicial notice for motions (1.5); draft motion to dismiss (2.3).*"

- August 9, 2024: 4.4 hours (3,058.00) - "*Further research and review of cases re actual malice, truth, and judicial notice for motions (1.6); draft motion to dismiss, anti-SLAPP motion (2.8).*"

- August 10, 2024: 4.0 hours ($2,780.00) - "*Review cases and local rules and examples from local counsel for guidelines on motion to dismiss in D. Utah (.7); draft motion to dismiss, anti-SLAPP motion (3.3).*"

- August 11, 2024: 4.2 hours ($2,919.00) - "*Research and review cases, statutes, and statutory notes for motions (1.5); draft motion to dismiss, anti-SLAPP motion (2.7).*"

- August 14, 2024: 5.7 hours ($3,961.50) - "*Further research, review cases for motion to dismiss/strike (1.8); review N. Spears and J. Giannini comments, edits to motion (.3); further revisions to combined motion to dismiss/motion to strike (3.1); review, edit Kubler declaration, emails re same (.5).*"

- August 16, 2024: 5.1 hours ($3,544.50) - "*Review further research and cases re actual malice, judicial notice on 12b6 motion (2.5); review comments on draft motion to dismiss/strike (.3); revise draft motion to dismiss/strike (2.0); review draft Kubler declaration, motion for judicial notice, and provide comments on same (.3).*"

Mr. Naron's research time alone accounts for a substantial portion of the total hours claimed, and many of these entries are vague and do not specify which legal issues required such extensive research or which cases were reviewed. The presence of experienced Utah co-counsel makes Mr. Naron's extensive research on local rules and Utah-specific procedures particularly

9

unreasonable and suggests either inefficiency or unnecessary duplication of effort that inflates the fee request beyond what is reasonable under the anti-SLAPP statute.

### III.   DEFENDANTS HAVE FAILED TO CARRY THEIR BURDEN AND THE FEE PETITION SHOULD BE DENIED

Defendants bear the burden of proving that their fee request is reasonable. *See Hensley*, 461 U.S. at 437. They have failed to meet this burden. Their petition is based on hourly rates that are untethered to the prevailing market rates in the District of Utah and that Defendants have made no effort to justify. Their petition claims nearly 500 hours for a single motion, yet the billing records are replete with duplication, overstaffing, vague entries, and excessive time on routine tasks. Defendants have provided no explanation for why five attorneys were necessary, why Chicago rates should apply in a Utah case, or why the time claimed is reasonable.

Because Defendants have failed to carry their burden of proving reasonableness, the Court should deny the fee petition in its entirety. The fee request is grossly inflated, unreasonable, and unsupported by the evidence.

### CONCLUSION

For the foregoing reasons, Plaintiff Narvin Lichfield respectfully requests that the Court deny Defendants' Fee Petition. Defendants have failed to meet their burden of proving that the requested fees are reasonable. The petition seeks compensation at rates that are wholly disconnected from the prevailing market in Utah and for an excessive number of hours that reflects overstaffing, duplication, and inefficiency. Because Defendants have not carried their burden, their fee petition should be denied.

**DATED:** November 10, 2025

10

APP 00356

*/s/ Michael K. Hepworth*
Michael K. Hepworth (UT-15157)
**HEPWORTH LEGAL**
*Counsel for Plaintiff*

| CERTIFICATE OF SERVICE | |
| --- | --- |
| I hereby certify that on 10 November 2025, I caused a true and correct copy of the foregoing document to be served, via the method indicated below, upon the following: | |
| David W. Tufts (UT-8736)<br>Ian M. Kinghorn (UT-17717)<br>**DENTONS DURHAM JONES PINEGAR P.C.**<br>david.tufts@dentons.com<br>ian.kinghorn@dentons.com<br><br>Natalie J. Spears (Pro Hac Vice)<br>Gregory R. Naron (Pro Hac Vice)<br>Jacqueline A. Giannini (Pro Hac Vice)<br>**DENTONS US LLP**<br>natalie.spears@dentons.com<br>gregory.naron@dentons.com<br>jacqui.giannini@dentons.com<br><br>*Counsel for Defendants Katherine Kubler &*<br>*Netflix, Inc.* | ***Via Electronic Filing Notification*** |

*/s/ Michael K. Hepworth*
Michael K. Hepworth

11

APP 00357

# EXHIBIT A

APP 00358

# Legal Trends Report

Published by Clio

APP 00359



# Table of contents

**Introduction**     **4**

## An era of rapid transformation

A pivotal moment     6
Our most in-depth study yet     12

**Part — 01**     **16**

## Measuring the impact of AI

Legal work is evolving     18
Growing firms are the quickest to adopt AI     18
Law firms benefit from AI, but not at the expense of jobs     23
Legal professionals see the value in AI     24
AI benefits firm culture and well-being     28

**Part — 02**     **32**

## Reducing cognitive load

A first-of-its-kind study     34
Mental fatigue hurts performance and personal well-being in legal professionals     36
Measuring cognitive load in everyday legal work     40
Clio reduces emotional strain in data-entry tasks     44
Clio reduces the active mental focus required in data entry and time-entry calculations     46
Clio reduces memory demand in document review     48
Clio doesn't introduce added visual effort for new users     50
Composite findings: Clio reduces cognitive load by up to 25%     52

**Part — 03**     **56**

## Legal practice in the age of AI

Artificial intelligence in law     58
AI adoption remains high among legal professionals     60
Non-legal AI poses risks to law firms     65
Some firms see early revenue gains, while others continue to adapt     68
More law firms are adopting flat fees     71
Legal professionals still anticipate more AI adoption     74

**Part — 04**     **78**

## Transforming the legal experience

A wider perspective on AI     80
Consumers are consulting AIs with legal questions     81
Consumers hold law firms to a higher standard     84
Most clients don't have problems finding a lawyer     88
Clients still care about experience and reputation     94
Office tools are central to firm tech stacks     94
Growing firm advantages     96

**Part — 05**     **108**

## Managing growth and efficiency

A perspective on responsible lawyers     110
Comparing caseloads based on firm size     112
Revenue contributions of responsible lawyers     113
Defining opportunities for strategic growth     117

**Appendix — A**     **120**

## Hourly rates and KPI data

Business metrics for law firms     122
Key performance indicators     122
Utilization, realization, and collection rates by state     124
Lockup     126
Legal productivity index     126
Responsible lawyer revenue (year over year)     128
Hourly rates in legal     131
Hourly rates by state     132
Adjusted rates by state     133
Hourly rates by practice area     134

**Appendix — B**     **136**

## Detailed methodology

App data collection     138

APP 00360

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 361



Introduction

# An era of rapid transformation

APP 00361

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.579    Page 5 of

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 362

# A pivotal moment

Artificial intelligence has sparked the most rapid technological transformation in the history of the legal profession. It's a shift being driven by the pivotal innovations that have emerged in AI technologies within just a few short years. Yet, even with the pervasive uptake of AI among law firms, there is a vast amount of untapped potential still to be realized.

For many law firms, gains in productivity and efficiency will create opportunities for growth. Others, however, are seeing their traditional business models quickly become obsolete. After all, how can a lawyer charge clients for several hours when the same work can be done by AI in minutes?

These are the types of questions forward-thinking law firms are wrestling with. The ramifications will shape the nature of legal practice in the years to come, and in turn, they'll redefine how businesses succeed and fail.

## Examining growth and success at scale

This year's report includes an **analysis of what sets the highest-performing law firms** apart from their lower-performing peers.

The most successful firms in our analysis are meeting the challenges that all firms struggle with, and they're the ones overcoming them to reap the rewards. As a result, they are leaps and bounds ahead of the competition, with revenues more than doubling since 2020.

For these firms, breakthroughs are key to unlocking further gains. These innovations ultimately compound to create growth that becomes exponential over time.



APP 00362

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.580    Page 6 of

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 363

> # We look in depth at how legal technology has a positive influence on everyday brain functioning.

## A new look at technology-enabled performance

While there are countless examples of law firms that maintain high standards and have seen great success, the human cost has been a trade-off for many working in the legal profession, which has a reputation for long hours, high stress, and poor work-life balance.

According to a study by Bloomberg Law, attorneys reported feeling burned out in their job 42% of the time. The top challenges faced included the inability to disconnect from work (49%) and trouble focusing on work tasks (44%).[1] Another study by ALM Intelligence and Law.com Compass found that about 73% of attorneys and staff said they felt their work environment contributed to mental health issues.[2]

In a **first-of-its-kind neurological study of legal professionals**, we look in depth at how legal technology has a positive influence on everyday brain functioning. With this lens, we see how working with the right tools can greatly support individuals' mental bandwidth while improving both the quality and efficiency of their work.

The cognitive abilities of legal professionals are a finite resource for law firms, and managing them effectively can create better working conditions for individuals. The knock-on benefits include both the improved mental health of individuals and better contributions to the success of their law firms.

## Law firms must navigate a burgeoning market for AI solutions

The ubiquity of AI poses many opportunities for law firms, and the sheer range of options makes it difficult to know which are suitable for legal practice.

**First-to-market AI solutions** like ChatGPT are the most widely available, but they lack the foundational training and grounding in legal data needed to be proficient in law. In addition to potential privacy issues, these solutions can "hallucinate," or fabricate, precedent examples that don't exist.

But law firms also have access to **legal-specific AI solutions** that *are knowledgeable* about the law and trained specifically based on vast amounts of proprietary legal databases. These solutions give legal professionals greater certainty in their accuracy and an edge over other practitioners that haven't yet adopted these resources.

As firms adopt AI more widely in their *practices,* it's also shaping the nature of their *businesses.*

[1] Bloomberg Law, "Attorney Workload and Hours (2024 Wrapup)," Bloomberg Industry Group, 2025.
[2] ALM, "Mental Health by the Numbers: The 2025 Survey Infographic," Law.com, May 2025.

APP 00363

## AI is shifting client perspectives

**Consumers have access to their own AI solutions**, and these technologies are shaping how potential clients experience and understand their legal problems. Today's clients are both more knowledgeable and able to take more initiative in solving their own issues.

Ultimately, a lawyer's reputation is based on their ability to both solve problems for their clients and create trust with them. Law firms will need to stay abreast of these shifting market dynamics, as they'll influence what potential clients look for in a lawyer. As AI becomes more ingrained into consumer-facing platforms online, this will in turn influence how consumers find their next lawyer.

There is still a vast untapped market for legal problems that lawyers and their firms have yet to take advantage of. Knowing what today's clients are looking for, and delivering on those expectations effectively, will increasingly be what defines future success.

## How people and technology enable growth

Legal professionals today have access to technologies that weren't even dreamed of a generation ago. With these innovations, firms have the ability to redefine legal practice as we know it.

In our look at the **workloads of responsible lawyers**, we provide an insider's perspective into how firms of all sizes approach business growth and how they staff for change.

The patterns we've uncovered throughout this report point to a profession that will be more productive and sustainable for lawyers, their firms, and their clients alike. In turn, leaders in the industry will be solving some of the greatest challenges faced within the profession.



APP 00364

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 365

# Our most in-depth study yet

The *Legal Trends Report* uses a range of methodological approaches and data sources to deliver the most relevant insights into the state of legal practice and strategies for future growth.

### Clio data

We analyzed aggregated and anonymized data from tens of thousands of legal professionals in the U.S. This data provides important insights into how technology is being used by legal professionals, as well as its impact on firm performance.

### Survey of legal professionals

We surveyed 1,702 U.S. legal professionals from a market panel (500 respondents) and a cohort of current Clio customers (1,202 respondents). The legal professionals we surveyed included lawyers as well as support staff, such as paralegals and administrators, who are engaged in the management side of their practice.

### Survey of consumers

We surveyed 1,000 adults in the U.S. general population from a market panel. This survey was designed to gauge attitudes, opinions, preferences, and behaviors regarding the legal profession among individuals who have hired lawyers in the past or who may become potential legal clients in the future. This sample is representative of the U.S. population by age, gender, region, income, and race/ethnicity based on the most recent U.S. census statistics.

### Interviews and diary study of legal professionals

We conducted 24 virtual interviews with legal professionals using Clio, each lasting 45–60 minutes. Our diary studies involved 24 participants (representing seven growing firms, 10 stable firms, and nine shrinking firms, all of which were Clio customers), each committing to 30 minutes per day for five days. Quotations from interviews have been referenced with pseudonyms throughout this report.

### Neurological scanning

We worked with Neuro-Insight to conduct a neurological study of 63 legal professionals using patented Steady State Topography (SST™) methodology. Researchers used SST to analyze electrical brain activity to assess cognitive load across a variety of tasks using Clio versus a control. Participants all worked in private practices and had used legal practice management solutions in the past; some of them had used Clio.

### Cohort analyses

To determine characteristics that distinguish successful law firms from others, we've looked at different categories of law firms based on how much their revenue has grown or shrunk over the past four years:

- **Growing:** Firms that have increased revenues by more than 20%
- **Stable:** Firms that have maintained revenues within +/– 20% growth
- **Shrinking:** Firms that have seen revenues decrease by at least 20%

These segments are based on aggregated and anonymized data from thousands of law firms using Clio. By analyzing these segments, we're able to identify key trends that help define success.

Growing firms are those that stand out from the rest. These firms should be seen as role models to others based on their sustained growth and success. As we identify key characteristics within this group in terms of their knowledge, mindset, and approach to their businesses, we can form a blueprint for actions that other firms can adopt.



APP 00365

An era of rapid transformation    Introduction

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.583    Page 9 of
Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 366

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

## Growing law firms achieved startling gains

The revenue growth of growing firms is striking: on average, they **doubled their revenues** over four years.

In a traditional business model, these firms would have to double their casework and headcounts to achieve these gains. But these firms achieved this growth with only a **50% increase in clients and matters**. In other words, while these firms worked more cases overall, **they also found ways to *earn more* from each case and client**.

The gains far exceed the increases in hourly rates (jump to hourly rates) over this timeframe, which means these firms are either taking on more work, more *high-value* work, or both.

While hiring new staff adds cost, it's an investment that pays off for growing firms. **These firms increased lawyer headcounts by 25%, while revenues increased four times as much**.

This means the revenue contributions on a per-lawyer basis increased substantially. Growing firms aren't just taking on more, higher value work; they're doing it with minimal additional investment in staff.

For comparison, shrinking firms show the opposite. Revenues and casework fell by more than half and headcounts shrank by 21%, leaving each lawyer at the firm with a smaller workload and fewer business contributions over time.

**The takeaway? The most successful firms don't simply add people to grow.** Instead, they invest in other means to support their teams at every level of operations. In this report, we look at what capabilities these firms have adopted and how they can benefit both their business and the people taking on the work.

### Law firm growth by cohort

Revenue    Matters    Clients    Headcount



Growing firms

Stable firms

Shrinking firms

▲ Revenue increased 4x faster than **headcount**

▼ Revenue fell 2x faster than **headcount**

Revenues grew 4x faster than headcounts in growing firms

APP 00366


LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

Part — 01

# Measuring the impact of AI

APP 00367

# Legal work is evolving

In 2023, Harvard Business School published a study conducted by the Boston Consulting Group in partnership with several experts in the field of AI learning and adaptation. The landmark study found that AI greatly improved the work performance of consultants taking on complex tasks.

Those using AI in the experiment completed **12% more tasks** and finished them **25% faster** than those not using AI. They also produced **40% higher quality work**. Across the board, consultants at all levels of experience saw increases in their performance, demonstrating that AI benefits all types of workers regardless of their skill or prior training.[3]

In our own research, we've seen similar gains in law firms using AI, with the highest adoption seen among growing law firms. Those using AI are the ones most likely to see the benefits in their work, their firm's success, and their own personal well-being.

## Growing firms are the quickest to adopt AI

In our cohort analysis, growing law firms are those that have grown revenues by **more than 20%** over the past four years. These law firms take on substantially more casework with only minimal increases in their staff, therefore achieving substantial gains in per-employee productivity. Compared to others, these firms have adopted more technology and, in particular, AI.

Our analysis shows that growing firms use AI in Clio **twice as much** as stable and shrinking firms.

Growing a business is no easy task. Throughout this report, we look at multiple perspectives that help explain the success of growing law firms through the use of technology, and specifically AI. Our analyses show how AI helps legal professionals achieve substantial improvements in their **work quality, efficiency**, and overall **engagement** with their work.

These improvements are precisely what enable individuals to help their firms succeed and grow. They create work environments that can handle a higher volume of inputs, while at the same time eliminating friction.

Unnecessary processes, systems that create confusion or missteps in workflows, or redundant touchpoints may seem inconsequential on their own, but, when added up, amount to significant losses in productivity over time. These are the types of challenges that technology and AI solve.



**Growing law firms** use AI in Clio…

**+113%**
more than **stable firms**

**+96%**
more than **shrinking firms**

[3] Fabrizio Dell'Acqua, et al. "Navigating the Jagged Technological Frontier: Field Experimental Evidence of the Effects of AI on Knowledge Worker Productivity and Quality," Harvard Business School Working Paper 24-013 (September 2023).

APP 00368

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.586    Page 12 of
Appellate Case: 25-4135    Document: 01010345891    Date Filed: 11/10/2025    Page: 21

## Time-saving automations are integral to growing law firms

Automation through technology is another category of innovation that includes multiple areas of time-saving operations. Growing firms use time-saving automations **twice as much** as stable firms, and nearly **three times more** than shrinking firms.

These efficiencies are what save staff from the burdens of repetitive administrative tasks that take a mental toll on individuals. In turn, **eliminating menial tasks from daily work** frees up more capacity to focus on more impactful work that contributes to business growth.

**In our analysis, the most frequently used time-saving automations include:**

- **Automated consultation bookings in Clio Grow:** Potential clients book consultations from a firm's website or Google Business Profile and receive automated email confirmations, follow-ups, and reminders.

- **Document drafting with Clio Draft:** Firms draft legal documents by populating client information, which is collected from a questionnaire form, into smart templates that adjust language for grammatical elements like gender and verb agreement.

- **AI in Clio:** Individuals use AI to securely summarize documents and matter details, prioritize tasks, draft client communications, and automate administrative work like managing tasks, calendar entries, and time tracking.

Each of these technologies creates substantial gains in efficiency by reducing the time and energy invested in menial tasks and instead shifting resources to more client-facing work. Automation also helps eliminate the risk of errors by ensuring processes are clearly defined with a high degree of precision and reliability.

For more on what differentiates growing law firms from others, <u>see Part 4</u>.



Growing law firms use time-saving automations in Clio...

**+100%**
more than **stable firms**

**+162%**
more than **shrinking firms**

### IN THEIR WORDS

### GROWTH IS CREATED THROUGH EFFICIENCY

**AI improves productivity:** "If I double my productivity with AI, that means I don't have to hire anybody else, ever. I think AI has the potential to improve productivity by 50–60% over the next 10 years. And if it does, I'm all in." — *Pierce, lawyer at a small business and real estate law firm, Missouri*

**Automations open up time to work with more clients:** "Look at the numbers in terms of our matter count. We're definitely interacting with more clients. Part of that is we opened a second location, but part of that is more capability because of the automation and the AI tools that we have in the practice." — *Ezra, partner at a general practice, Indiana*

**AI will help lawyers reach underserved markets:** "What we're going to do as an industry is be able to handle a lot more matters. And when we do, it means we can handle more of the matters that are now going unrepresented. Access to justice is going to be easier to provide when you have AI." — *Casey, partner at a mid-sized civil litigation firm, California*

APP 00369

## AI IS CHANGING THE NATURE OF EVERYDAY BUSINESS SOLUTIONS

**Embedded AI assistants** are a type of AI that is becoming standard in everyday business software. Microsoft Office has Copilot, Google Workspace apps have Gemini, and QuickBooks has Intuit Assist, to name a few. Users can search, summarize, and even complete work by securely referencing data already stored in those platforms (without these models actually seeing or using that data for themselves).

In legal practice, the same concept is even more powerful when applied to **legal-specific platforms**. By working inside the systems lawyers use every day, legal-specific AI can instantly surface case details, interpret legal documents, and guide next steps, all with the right context.

**Clio's AI** has the ability to surface results specific to a law firm's data. It can work with and analyze data while ensuring full data privacy for law firms. Clio's AI helps law firms work smarter and faster by leveraging firm data to:

- **Summarize** client information and case history
- **Review** documents in detail to get staff up to speed quickly
- **Prioritize** tasks and keep deadlines on track
- **Answer** specific questions about a client or matter
- **Draft** timely, accurate client communications

# Law firms benefit from AI, but not at the expense of jobs

While the uptake of AI in many industries has coincided with losses in entry-level jobs, a recent report from the National Association for Law Placement shows that **employment rates for law graduates in 2025 is at an all-time high of 93%**, marking a four-year trend in strong employment for new grads overall.

While previous years attributed high employment rates to smaller classes, the latest graduating class sizes were the largest in nearly a decade.

New graduates are also being hired for better, more lucrative entry-level positions than in previous years. More are being hired into "attorney positions" that require bar admission, and more are being hired in full-time, long-term roles. **Eighty-three percent of grads landed full-time, long-term attorney positions** compared to just 57% in 2011.[4]

In contrast, research from Stanford University shows that early-career workers (ages 22–25) in occupations that are more exposed to AI have seen a **13% decline** in employment. These drops are attributed to occupations where AI is more likely to automate, rather than augment, work.[5]

At a time when law firms are seeing significant growth and success, AI is fueling that growth while keeping legal professionals integral. AI has the ability to greatly support and enhance the abilities of those working in a law firm, but individual legal professionals are still the ones to oversee the work while building and maintaining relationships and trust with clients.

[4] Nikia L. Gray and Danielle A. Taylor, "Employment for the Class of 2024: Selected Findings," National Association for Law Placement, 2025.
[5] Erik Brynjolfsson, Bharat Chandar, and Ruyu Chen, "Canaries in the Coal Mine? Six Facts about the Recent Employment Effects of Artificial Intelligence," *Stanford Digital Economy Lab Working Paper* (August 26, 2025).

APP 00370

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID 588    Page 14 of
Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 371

# Legal professionals see the value in AI

In our surveys of legal professionals, most of those using AI are seeing improvements in the **quality of their work, responsiveness to clients**, and **work capacity**.

Looking forward, many still see untapped opportunities, especially in **time savings** and **efficiency**. Many firms still see potential to adopt AI further in their operations, and AI technologies themselves will see further advancements in the years to come. For example, agentic AIs, which can take on complex tasks independently, are already being developed for niche applications, including core law firm processes.

**IN THEIR WORDS**

**LAWYERS EXPLAIN HOW AI BENEFITS THEIR LAW FIRMS**

The advantages of using AI are both wide and diverse. Lawyers use AI to improve the quality of their practices in different ways.

**Quality and efficiency:** "If I run across something that I don't know anything about, I now have confidence that AI will get me on the right path, and that's huge." — *Pierce, lawyer at a small business and real estate law firm, Missouri*

**Client understanding:** "AI helps explain difficult legal concepts in ways that clients understand. I can ask it to rewrite something I've used a million times and see what's missing for the client." — *Ezra, partner at a general practice, Indiana*

**Cost savings:** "Last year, I paid a consultant thousands of dollars to help us understand our staff needs as we continue to grow in 2025 and 2026. Now, I can plug those numbers into an AI and get that same advice instantaneously, and at a cost that's included in my AI subscription." — *Casey, partner at a mid-sized civil litigation firm, California*



Observed benefits to using AI

**65%**
Improved work quality

**63%**
Improved client responsiveness

**36%**
Increased profitability

**33%**
Reduced operational costs

**54%**
Increased work capacity

**34%**
Improved client satisfaction

**29%**
Increased competitiveness



Future potential value of AI

**62%** Time savings and increased efficiency

**44%** Improved quality of work

**38%** More-productive case management

**31%** Financial savings

**22%** Increased revenue

**18%** Business growth

APP 00371

Case 2:24-cv-00458-JNP     Document 57-1     Filed 11/10/25     PageID.589     Page 15 of
Appellate Case: 25-4135     Document: 22     Date Filed: 01/20/2026     Page: 372

Measuring the impact of AI     Part 1

## Wide adopters of AI see more revenue gains

Thirty-six percent **of legal professionals say that AI has had a positive influence on revenues**. Among wide adopters, the number jumps to **69%**.

In other words, firms that better integrate AI into their systems and workflows are more likely to see the financial benefits. This is another advantage of legal-specific AIs, which can be used more widely within law firms and can help realize financial gains quicker.

By far, administrative operations were the largest category of improvement. They include document creation, automating administrative work, reviewing documents, and more. Few legal professionals attributed accuracy as a benefit to improving revenue, suggesting that they're confident in their ability to avoid errors in their work.

**Revenue increases among AI adopters**

# 69%

Those using AI "widely" at their firms

# 36%

Those using AI

## How AI improves revenue

| | | % of law firms |
|---|---|---|
| **Improved operations** | Includes automations related to document generation, administrative tasks and processes; improvements to firm organization, work quality, strategy, and workload; time savings in billing processes, document review, drafting, research, and communication; and improved creativity, productivity, and error reduction. | 77% |
| **Boosted sales/marketing** | Includes improved pricing, marketing strategies, expansion into new revenue channels, and expanded client base. | 26% |
| **Benefited client experience** | Includes improvements to client experiences, intake, customer service and communication, and client trust. | 10% |
| **Better accuracy** | Includes better accuracy in document creation and review, and fewer errors. | 5% |

## Impact on competition and hourly billing

As AI improves efficiency in law firms, it raises important considerations:

1. **Administrative efficiencies:** AI will greatly reduce the time that law firms spend on non-billable administrative tasks, allowing them to focus more on their clients and their revenue-generating work.

2. **Competition:** Lawyers using legal AI will deliver higher quality results in less time, which translates to better value for clients. Firms delivering quality experiences will be quicker to earn more clients in the future, which will only reinforce their competitive advantage.

3. **Business and pricing:** For law firms that rely on hourly billing, substantial gains in efficiency will result in less time spent on individual clients and less revenue per matter, leaving much to be made up for in case volume. This will require many lawyers to reevaluate their reliance on the billable hour.

The bottom line for any business is to ensure value for the customer. The firms that do this the best will be the ones that figure out how to adapt and thrive with these new capabilities.

We look more deeply into these issues of quality, competition, and billing models in Part 3.

APP 00372

# AI benefits firm culture and well-being

AI isn't just making legal work faster; it's changing how legal professionals feel about their jobs. Our surveys show AI has boosted **curiosity** and **motivation** to explore new legal technologies, showing that AI is opening the door to **new ways of working**.

## In an industry where many struggle, AI improves quality of life

In an industry that struggles with overwork, burnout, and mental health challenges, nearly half of legal professionals say that AI has **reduced work stress, improved work-life balance**, and **increased job satisfaction**. More than half feel **empowered** to tackle more complex work overall.

These are major benefits for legal professionals and their families. They are also good for law firms. In a recent study, 24% of female and 17% of male lawyers were considering leaving the legal profession due to poor mental health, burnout, or stress.[6] Reducing these problems will help avoid turnover, saving managers the time and effort of having to find, hire, and train new staff.

## Legal professionals see many benefits to AI use



| 71% Motivated to keep up with technology | 62% Reduced tedious work | 48% Improved work-life balance | 47% Reduced stress |
| 58% Increased accuracy of work | 53% Empowered to handle complex work | 46% Improved job satisfaction | 38% Created development/ advancement opportunities |
| | | | 36% Increased likelihood to stay in current role |

**IN THEIR WORDS**

**LAWYERS EXPLAIN HOW AI BENEFITS THEIR WELL-BEING**

**Increased flexibility:** "Having that flexibility from the technology, it takes away a lot of the stress. It enables staff to spend time with their family and to travel, and it enables me as well." — *Sebastian, owner of a small law firm working in real estate, construction disputes, and transactions, California*

**Better confidence:** "The more we bring in technology and get more efficient, the less stressed I am. It's because I know nothing will fall through the cracks. I know everybody is getting great service." — *Leah, managing partner at a small law firm dealing in trusts, California*

**Job satisfaction:** "My job satisfaction significantly improved with technology." — *Jules, founder of a mid-sized family law firm, Saskatchewan*

[6] Justin Anker and Patrick R. Krill, "Stress, Drink, Leave: An Examination of Gender-Specific Risk Factors for Mental Health Problems and Attrition Among Licensed Attorneys," *PLoS One* 16, no. 5 (May 12, 2021).

APP 00373

# Key takeaways

## 01

### AI and automation support growth:

Growing law firms are the quickest to adopt AI and other time-saving automations in Clio. These capabilities help remove friction in firm operations and support further growth.

## 02

### AI benefits legal professionals:

Those using AI are benefiting in terms of the quality of their work, responsiveness to clients, and work capacity. Many also see even more potential in time savings and further efficiency.

## 03

### Those using AI more widely see bigger revenue gains:

Thirty-six percent of legal professionals have seen a positive influence on revenues. Among wide adopters, the number jumps to 69%.

## 04

### AI improves firm culture and quality of life:

AI has boosted curiosity and motivation in exploring new technologies, and has reduced work stress, improved work-life balance, and improved job satisfaction.

APP 00374

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 375



**Part — 02**

# Reducing cognitive load

APP 00375

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 376

# A first-of-its-kind study

The cognitive demand put on legal professionals is incredibly high, both in terms of the sheer volume of work they take on and the intense mental effort required. This, in addition to the high stakes that virtually every law firm must deal with in terms of the potential impacts on the lives of their clients, can take a significant toll on individual workers.

To better understand how law firms can ease the mental load on their staff, we worked with Neuro-Insight, one of the leading neuroanalytics research companies in the world, to conduct a **first-of-its-kind study of the neurological activity in legal professionals** as they performed everyday legal tasks.

In our research, we looked at several aspects of **cognitive load,** including **emotional strain, memory demand, active focus**, and **visual effort**. When aggregating findings across each of these measures, we determined that the use of **legal technology can reduce cognitive load by up to 25%**, which in turn offers benefits to both productivity and personal well-being.



APP 00376

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Mental fatigue hurts performance and personal well-being in legal professionals

Many in the legal industry suffer from burnout and serious mental health issues. Bloomberg Law's recent study found that lawyers reported feeling burned out in their work 42% of the time. Two key problems were that 49% were unable to disconnect from their work and 44% had trouble focusing while performing work tasks.[7] Another study from ALM Intelligence and Law.com Compass shows that 73% of lawyers and their staff say they felt their work environment contributed to mental health issues.[8]

**Mental fatigue** has been shown to be a key contributor to these types of issues. Research shows that mental fatigue decreases productivity and overall cognitive performance—both key areas that affect knowledge workers, and specifically legal professionals.

When suffering from mental fatigue, workers are less able to concentrate and process information, which can lead to a higher risk of errors. Mental fatigue can also be exacerbated by stress, especially when performing tasks requiring higher cognition and attention, as well as during long working hours and job strain, all of which are typical of the law firm environment.[9]

Over time, individuals who are put under sustained mental loads often feel mentally fatigued, stressed, and anxious about their work. These symptoms lead to burnout, emotional exhaustion, and depression.[10,11]



[7] Bloomberg Law, "Attorney Workload and Hours."

[8] ALM, "Mental Health by the Numbers."

[9] Kaveena Kunasegaran et al., "Understanding Mental Fatigue and Its Detection: A Comparative Analysis of Assessments and Tools," *PeerJ* 11 (August 2023): e15744.

[10] Léon G Faber, Natasha M Maurits, and Monicque M Lorist, "Mental Fatigue Affects Visual Selective Attention," *PLoS One* 7 no. 10 (October 2012): e48073.

[11] Razia AG Khammissa et al., "Burnout Phenomenon: Neurophysiological Factors, Clinical Features, and Aspects of Management," *J Int Med Res.* 50, no. 9 (September 2022): 03000605221106428.

APP 00377

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.595    Page 21 of

Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 378

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

## Repetition and context switching contribute to mental fatigue

The problem isn't just the *difficulty* of the work. It's also the **repetition** and **fragmentation** of menial tasks that contribute an unnecessary expense on cognitive load. Simple tasks (like checking email, managing time tracking, or reviewing client bills) may seem like basic, rote work, but dealing with them in a high enough volume creates a significant drain on the brain's executive functioning.

**Context switching** can be taxing in and of itself; simply switching between software applications creates stress hormones that have a negative impact on the ability to focus.

A recent study found that it takes an average of **9.5 minutes** to reorient after switching between different work contexts. In another study, researchers found that the average worker spends **four hours** per week reorienting between apps. Over the course of a year, that amounts to five weeks, or **9%**, of annual work time.[12]

# The average worker spends four hours per week reorienting between apps, amounting to five weeks, or 9%, of annual work time.

## WHAT MOTIVATES (AND DEMOTIVATES) LAWYERS

In our diary study of legal professionals, many lawyers struggled to balance the responsibilities of managing the business side of their law firms with practicing law.

The biggest drivers of stress were **difficult clients, emotional strain** from contentious cases, and the burden of **running a practice** (especially among solo lawyers). Administrative work like timekeeping and scheduling adds to the mental load, and isolation amplifies it for those without staff support.

On the other hand, lawyers found that stress eased when they immersed themselves in more **purpose-driven** work, saw the **positive impact** of their work, and had more **autonomy** in their work. Overall, lawyers feel more balanced when they control their schedule, have better systems and technology to support their work, and have more positive relationships with clients.

| Demotivators | Motivators |
|---|---|
| ◆ Administrative and billing tasks | ◆ Positive relationships and impact with clients |
| ◆ Client-related frustrations | ◆ Intellectual challenges and the ability to problem-solve |
| ◆ Work overload | ◆ Autonomy and control |
| ◆ Fatigue | ◆ Building and running their own business |
| ◆ Poor work-life balance | ◆ Professional growth and achievement |

---

12 Rohan Narayana Murty, Sandeep Dadlani, and Rajath B. Das, "How Much Time and Energy Do We Waste Toggling Between Applications?" *Harvard Business Review*, August 29, 2022.

APP 00378

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 379

# Measuring cognitive load in everyday legal work

We worked with Neuro-Insight to conduct a neurological study of legal professionals to better understand subconscious brain activity while performing certain tasks typical of any given law firm. Neuro-Insight is one of the world's leading neuroanalytics companies. They measure people's brain reactions using a proprietary technology called Steady State Topography (SST).

Neuro-Insight's research is based on **Cognitive Load Theory**, an area of study that assumes an individual's memory is limited. Exceeding or pushing that limit can hinder our ability to process information and stay focused. **Cognitive load** itself is the measure of mental effort used in intellectual tasks. When cognitive load is high, it's an indication that the brain is working harder to complete a given task. And when cognitive load remains high for extended periods of time, it can result in mental fatigue and affect overall mental performance.

The work from Neuro-Insight gives us an important look into how environmental factors within a law firm, namely the tools and operations used, can have a profound impact on the cognitive load put on legal professionals.

## Methodology

The researchers used SST to measure the speed of electrical activity in key brain regions within 63 legal professionals as they performed a set of timed work tasks.

Each participant was fitted with an SST cap, used to hold electrodes to measure electrical activity in the brain. While wearing the SST device, participants then performed a series of tasks, each of which was performed twice: once with a method used as a control and the other modified with the use of Clio. The control tasks and the task with Clio were performed in randomized order.

During the experiment, the researchers collected neurological data across four measures of brain activity, each contributing to an individual's cognitive load:

1. **Emotional strain:** The mental and emotional cost on an individual that occurs while performing a task.

2. **Active mental focus:** The conscious, deliberate effort spent on directing one's attention to a task while ignoring distractions.

3. **Memory demand:** The mental effort required to remember information to complete tasks.

4. **Visual effort:** The cognitive energy used to direct visual attention during a task.

The data from the experiment was then averaged among participants and compared between the control tasks and the modified tasks with Clio to determine the net change in each measure of brain activity. The changes in each measure were then averaged to determine the total change in cognitive load.



## Subconscious measurement in key brain regions

**Active mental focus:** How much do I actively need to focus to complete this task?

**Memory demand:** Do I need to remember a lot of information to be able to complete this task?

**Emotional strain:** Should I be feeling emotion right now?

**Visual effort:** How visually intuitive is this screen?

## Study participants

The study was conducted with 63 participants, each of whom:

◆ Works in privately owned law firms

◆ Has used legal practice management software in the past

### Participants by role

◆ **48%** Lawyer

◆ **30%** Paralegal

◆ **13%** Managerial/ administrative

### % using Clio

◆ **23%** Clio users

◆ **77%** Other

APP 00379

## Work tasks performed

The study compared the cognitive load, measured in brain activity, in participants as they completed a series of tasks using general office tools (like Microsoft Excel, PDF documents, and other pen-and-paper workflows) as controls to using Clio. Each participant in the study performed the control task and the task with Clio in a randomized order.

Each task had its own time limit, ranging from 2.5 to 5 minutes depending on the complexity of the task. Time limits were kept the same between Clio tasks and their controls and were designed to reflect the time it might realistically take a legal professional to complete them in the real world.

### TASK–01

## Client intake

Participants were asked to review an email from a prospective client regarding a property damage lawsuit.

**Task:** Participants logged details of the issue and assigned it to the appropriate practice area, status, and assignee.

- **Control:** Participants logged the information into a spreadsheet and ensured the appropriate folder was created in the firm's database.
- **With Clio:** Participants completed the task using Clio Grow's quick intake workflow.

### TASK–02

## Matter creation

Participants were asked to review information for a slip-and-fall case that a client wants to move forward with.

**Task:** Participants set up the matter and associated folders for the lawyer to follow up on. They then logged six minutes for "Time Spent Intaking Client."

- **Control:** Participants completed the task in a spreadsheet and logged their time in a separate "Time tracker" spreadsheet at a rate of $350 per hour.
- **With Clio:** Participants completed the task in Clio Manage and logged their time against a preset rate in Clio.

### TASK–03

## Work-in-progress report

Participants were asked to create a work-in-progress report to inform a firm manager of their billables for a divorce case.

**Task:** Participants reviewed a list of activities and time entries for a divorce case and calculated a total that included expenses but excluded any non-billable time.

- **Control:** Participants reviewed a list of activities logged in a spreadsheet and calculated their billables.
- **With Clio:** Participants used Clio Manage to review a list of activities and to calculate their billables.

### TASK–04

## Document summarization

Participants were asked to review a six-page will being contested and to inform the beneficiary of what this would mean for their case.

**Task:** Participants reviewed a will and summarized how a third-party's contestation would impact the bequeathments and duties of the beneficiary.

- **Control:** Participants reviewed a PDF of the will and recorded their summary in a booklet provided.
- **With Clio:** Participants used Clio's AI to find and analyze the will given the parameters of the task. They then recorded their summary in a booklet provided.

**EMAIL FROM A CLIENT (USED IN TASK 1)**

Below is the email copy that participants reviewed to complete Task 1 in our evaluation:

*Subject: Interested in pursuing a lawsuit*

*Dear Sir/Madam,*

*I hope this email finds you well. My name is James Smith and I'm writing to you today to request your firm's assistance in a lawsuit. I was referred to your services by my friend John Tacos, who spoke highly of your expertise.*

*My neighbor, Peter Young, was trimming their tree and a large branch fell on the roof of my house and has caused severe damage.*

*I live in Philadelphia, and I'm looking to move forward with this process as soon as possible. Please let me know what information you require from me to begin.*

*My phone number is 555-123-4567 if you need to contact me by phone.*

*My email address is James.Smith@notarealemail.com.*

*Thank you for your time and consideration. I look forward to hearing from you soon.*

*Sincerely,*

*James Smith*

APP 00380

# Clio reduces emotional strain in data-entry tasks

When legal professionals experience emotional strain, their minds are preoccupied with processing and managing their feelings. This is valuable mental effort that could be harnessed for high-demand, billable tasks.

Since the majority of participants in the study were first-time Clio users, our researchers expected to see higher levels of emotional strain due to participants having to learn a new tool compared to the control.

However, **Clio reduced emotional strain by 16%** for participants during their client intake tasks when compared to the control task, and by **9% when creating a matter in Clio**.

## The emotional experience of using new technologies

There was a slight uptick in emotional intensity when legal professionals used Clio's AI tool to analyze a will. This could, in part, be due to the novelty of the technology, since AI in law firms is still very new. Importantly, the increase was under 10%, meaning the emotional strain was minimal in comparison.

While Clio created an overall less emotional experience, we were also able to determine whether the dominant feelings were positive or negative—since either could directly affect the wellbeing of legal professionals.

We found that **93% of all emotions felt while using the Clio platform were positive. Within that, excitement (47%) and happiness (47%) dominated**. In contrast, during the client intake task specifically, the control task triggered negative emotions like anger. Whereas with Clio, the client intake experience was 100% positive.



**Change in emotional strain  |  Use of Clio versus control**



**Client intake**

**-16%**



**Matter creation**

**-9%**



**Work-in-progress report**

**+4%**



**Document summarization**

**+9%**

## Emotional strain:

The intensity of emotions individuals experience during a task.

APP 00381

# Clio reduces the active mental focus required in data entry and time-entry calculations

Putting effort into focusing on a task expends mental energy. In contrast, allowing the brain to function more passively, or to coast, while doing a task helps conserve mental energy for more demanding work.

**Clio reduced the amount of active focus required for calculating billable hours by 72%** and for **creating a new matter by 25%** compared to the control tasks.

These tasks represent the work that doesn't get billed to clients, and therefore, doesn't generate revenue for law firms. Reducing mental load in these areas means that staff expend less energy, and could even get these tasks done quicker, freeing them up to focus on more important work.

When analyzing a will with Clio's AI, there was a small uptick in active mental focus compared to the control task. This is likely because engaging with the AI tool requires individuals to actively type, input, and interact, demanding more sustained attention; traditional methods, in contrast, often lean more on passive reading.

And while using Clio's AI for document review required more active focus, the benefits were instead seen in reductions in memory demand (see p. 48) as well as in the overall quality and completion of the task.



## Active focus:

How much the brain needs to commit its mental approach to a task.



### Change in active focus | Use of Clio versus control

| TASK 1 | TASK 2 ✓ | TASK 3 | TASK 4 |
|---|---|---|---|

| Client intake | Matter creation | Work-in-progress report | Document summarization |
|---|---|---|---|
| **+4%** | **-25%** | **-72%** | **+15%** |

APP 00382

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Clio reduces memory demand in document review

When a task requires a lot of information to be remembered, it places a heavy demand on a brain's memory center, increasing the intrinsic cognitive load of the task.

AI in **Clio reduced the memory demand** of reviewing and summarizing a will by **11%** compared to the control task. By far, this was the most "memory-intensive" task in our evaluations, as participants needed to keep track of key details from the will and apply them to the context in which they were being contested.

The tasks of creating a new matter and calculating billable hours also saw small reductions in memory demand when using Clio compared to the control tasks, which again is a positive sign that legal professionals using Clio need to spend less mental energy remembering information.

### CLIO'S AI IMPROVED QUALITY AND COMPLETION RATES

Outside of the researcher's neurological data, one of the most impressive findings in our research was that the use of Clio's AI dramatically improved the work results in our participants:

**Improved work quality:** While completing the will review with AI in Clio, participants were **more than twice as likely** to answer a question correctly about the will they reviewed.

**Better completion rates:** Those using AI to review the will were **40% more likely** to complete the assignment, while more than half of those reviewing the PDF without AI weren't able to finish.

**Arguably, these are the two most important measures for performance in a legal professional:** Being able to provide the correct interpretation of the law to clients, and being able to deliver the work on time. The fact that AI was critical for so many to meet this bar only illustrates how advantageous this technology is to legal professionals.



**Performance results for task 4: document review**

Correct response

Control 21%  With Clio 48%  **2.3x**

Task completion

Control 43%  With Clio 60%  **1.4x**



**Memory demand:**

The level of executive functioning and memory used to complete a task.



## Change in memory demand | Use of Clio versus control



TASK 1 — 0, Control, Neutral, Low strain, High strain, -20, +20
**Client intake**
**0**

TASK 2 — 0, Control, Low strain, High strain, -20, +20
**Matter creation**
**-4%**

TASK 3 — 0, Control, Low strain, High strain, -20, +20
**Work-in-progress report**
**-2%**



TASK 4 — 0, Control, Low strain, High strain, -20, +20
**Document summarization**
**-11%**

APP 00383

# Clio doesn't introduce added visual effort for new users

Workers expend more of their mental energy when they need to actively search and scan for what they need. Conversely, being able to find what they're looking for quickly and more intuitively creates less of a drain on mental energy.

Visual strain assessments inherently disadvantage new platform users, as participants are less familiar with their visual design. When assessing visual strain, most of the participants (77%) had never used the Clio platform before, so the benchmarks for positive results were to see minimal differences in visual effort.

Neuro-Insight's research didn't see any significant impact on visual effort when comparing the use of Clio to control tasks. As most participants were using Clio for the first time, this indicates a positive result for the **intuitive user design** of the Clio platform, especially since findings were consistent across all four tasks.

As users become more familiar with new platforms, researchers typically see reductions in visual strain, which is what they expect to be the case for Clio as well. Among the small sample of Clio users in the study, they were **nearly twice as likely** to say that the platform was intuitive compared to those who hadn't used it before.



### Change in active focus  |  Use of Clio versus control

| TASK 1 | TASK 2 | TASK 3 | TASK 4 |
|---|---|---|---|
| Client intake | Matter creation | Work-in-progress report | Document summarization |
| 0% | 0% | +2% | +3% |



**Visual effort:**

How much cognitive energy the brain uses to direct visual attention during a task.

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.602    Page 28 of
Appellate Case: 25-4135    Document: 22    Date Filed: 01/20/2026    Page: 385

Reducing cognitive load    Part 2

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Composite findings: Clio reduces cognitive load by up to 25%

When looking at the biggest advantages across all measures of cognitive load, **Clio on average reduces cognitive load by up to 25%.**

This means that across the work that legal professionals perform throughout their workday, using a solution like Clio can free up the mental capacity of workers across multiple categories. These resources can be reinvested in other key focus areas:

- **Improving the quality of work performed:** As legal professionals reduce the cognitive load while they work, they're able to focus more attention on the substance of their work and the details that matter, ensuring a better work product for their clients.

- **Increasing work capacity to take on more work overall:** With the right tools, legal professionals can get tasks done quicker, allowing them to take on more work than they would without these technologies.

- **Taking on more *billable* work:** With an increased work capacity, legal professionals can put more time into revenue-generating work for clients and contribute more overall to their firms.

- **Reducing stress and improving well-being:** In an industry where many legal professionals struggle to keep up with their work, leading to issues of burnout and poor mental health, being able to get work done more competently and with less mental stress opens new opportunities for better, healthier work environments, and happier, healthier employees.

## Clio's impact on cognitive load  |  Use of Clio versus control



**Emotional strain**

0

Control

Low strain    High strain

-100    +100

### -16%

Less emotional strain



**Active focus**

0

Control

Low strain    High strain

-100    +100

### -72%

Significantly less active focus required



**Memory demand**

0

Control

Low strain    High strain

-100    +100

### -11%

Less memory demand required



**Visual effort**

0

Control

Low strain    High strain

-100    +100

### -0%

No added visual effort

## ÷ 4 =

Clio reduces cognitive load in administrative tasks by up to

# –25%

### COGNITIVE LOAD MANAGEMENT

Research suggests that "cognitive load management" should be a responsibility among managers in optimizing for human performance and operational efficiency.[13]

Working in a law firm is intrinsically difficult and requires a lot of knowledge management and task switching. Poor systems, disjointed tools, and administrative work add unnecessary burdens to firms, increasing cognitive fatigue and risk of error.

**To support workers in their capacity to keep their minds on the tasks at hand, firms should:**

- Give workers the tools and resources to better navigate complex information
- Automate routine busywork to minimize or eliminate distractions where possible

[13]Sebahattin Kilinç, Mehmet Alper Akdemir, and Murat Sağbaş, "Managing Cognitive Load in the Workplace: A New Role for Managers?" paper presented at the 14th International Başkent Congress on Social, Humanities, Administrative, and Educational Sciences, Ankara, December 2024.

### IN THEIR WORDS

### WHAT LAWYERS SAY ABOUT EASING MENTAL LOAD WITH TECHNOLOGY

"I used to use two programs which did not interface with each other in order to keep track of work being done and billing. Clio has allowed me to do both functions using one program."
— *Gregory, lawyer at a small tax law firm, California*

"Using tech at my law firm dramatically reduces my stress because it significantly reduces the time that I have to spend in my practice, especially on the administrative side."
— *Matthew, solo tax lawyer, California*

APP 00385

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 386

# Key takeaways

## 01

### The cognitive abilities of individuals are a precious resource:

Mental fatigue can have serious consequences for law firms in terms of productivity and the mental health of its workers. Cognitive load management should be a responsibility for firm managers.

## 02

### AI greatly improves work results:

Clio's AI improved the quality and completion rates of the document review looked at in our study. In total, Clio's AI improved correct responses by 129% and task completion by 40%.

## 03

### Clio offers several cognitive benefits to workers:

Clio significantly reduced emotional strain, active mental focus, and memory demand in the tasks we evaluated. These improvements help support cognitive performance, reduce mental fatigue, and allow individuals to focus more on strategy and client outcomes.

## 04

### Reducing cognitive load frees up workers to focus on more important work:

Overall, Clio reduces cognitive load by up to 25% in everyday tasks that legal professionals perform at any given law firm.

APP 00386



Part — 03

# Legal practice in the age of AI

APP 00387

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Artificial intelligence in law

In just a few years, artificial intelligence has reached a critical mass of adoption among legal professionals. It's a trend driven by the rapid advancements made in AI, and also by the dramatic results these tools have had in improving the quality and speed of work done in law firms, especially among firms that use them more widely.

But we've only just seen the beginning of what's possible with AI in legal, since the most popular tools among legal professionals are first-to-market consumer-based solutions like ChatGPT.

Legal professionals now have access to AI tools created specifically for legal practice. These solutions provide outsized advantages, both in their security and in their proficiency in working with the law. As we see more law firms adopt AI solutions trained on the law, we'll also see much deeper integration within law firm operations.



APP 00388

## AI adoption remains high among legal professionals

This year's data shows that AI adoption among legal professionals remains high: **79% use artificial intelligence in their firms**. While legal professionals may have been much quicker to adopt AI solutions early on, professionals in **other industries** are catching up.

As we discuss below, the types of AI that law firms invest in make a difference in terms of their use and impact. Law firms using consumer-oriented AIs, like ChatGPT, instead of solutions designed for legal practice may struggle to fully integrate them into their core workflows. As legal-specific AI solutions become more prominent, we expect to see greater adoption in firms.

## Younger generations are quicker to adopt AI

**More than five times** as many Millennials and Gen Xers have adopted AI widely in their firms compared to Baby Boomers. Baby Boomers are most likely to not be using AI at all.

These generational patterns are typical: younger generations embrace new technologies quickly, while older demographics stick to more familiar methods, at least until the benefits are clear.

The lack of AI adoption among Gen Z may seem like an anomaly, but this generation is more representative of junior lawyers and paralegals that have much less autonomy in their roles. They typically perform work that is more prescribed and highly supervised, giving them less freedom to experiment with new tools.

### Use of AI

2024
**79%** Legal professionals
**72%** Other professionals

2025
**79%** Legal professionals
**78%** Other professionals

### Wide and universal adopters of AI by generation



13% Gen Z
25% Gen X
28% Millennials
5% Baby Boomers

**Millennials** are **5.6x** more likely to use AI widely in their firms than **Baby Boomers**

**HOW YOUNGER GENERATIONS INFLUENCE TECHNOLOGY ADOPTION**

According to research from the ABA, AI is quickly becoming a key focus in law school curriculums. Over half (55%) of law schools surveyed offer classes dedicated to AI, and 83% offer clinics and other resources to help students learn to use AI effectively in their careers.[14]

As leaders in technology adoption, **younger team members** can be sources for new ideas and inspiration. As Pierce, a lawyer at a small business and real estate law firm in Missouri, says, "Younger staff members don't need any encouragement to use new technologies. They bring new ideas to me, and we adapt them to our practice."

[14]ABA Task Force on Law and Artificial Intelligence, *AI and Legal Education Survey Results* (American Bar Association, 2024).

APP 00389

LEGAL TRENDS REPORT PUBLISHED BY CLIO


LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

## Larger firms see more AI adoption

When comparing by firm size, those working in **larger and enterprise-level law firms have adopted AI more than smaller firms**.

Firms of this size have more resources to invest in new technologies, and even dedicated people to implement new procurements and training. On the other hand, adoption cycles with larger firms can be slower due to more robust purchasing and approval processes, which can lead to longer timelines for getting new solutions approved.

Larger firms also have a steady influx of younger talent who are more keen to use AI (and who may be using it, whether approved by the firm or not). Solo and small law firms, on the other hand, typically have more seasoned and experienced lawyers who may be less interested in new technologies.

### Use of AI by firm size



| 71% | 75% | 78% | 86% | 87% |
|---|---|---|---|---|
| Solo | 2-4 employees | 5-19 employees | 20-49 employees | 50+ employees |

### Age demographics by firm size

- 18-34
- 35-54
- 55+

| | Solo | 2-4 employees | 5-19 employees | 20-49 employees | 50+ employees |
|---|---|---|---|---|---|
| 18-34 | 9% | 21% | 33% | 35% | 39% |
| 35-54 | 42% | 48% | 45% | 43% | 45% |
| 55+ | 35% | 22% | 15% | 13% | 16% |

**LAW FIRMS ARE SHORT ON AI POLICY**

**More than half** of legal professionals say their firm either has no AI policy or they are unaware of one. Since most already use AI in their work, many are likely adopting their own AI solutions without any guidance from their firm.

Without clear guidelines or criteria on what AI solutions can be safely used or how to use them, staff may turn to free or low-cost options that could carry significant risks for law firms:

- **Data security:** Freeware versions often allow providers to use uploaded data to train their AI models.
- **Loss of confidentiality:** Once data is in a training set, it can appear in responses to other users.
- **Human review:** In some cases, data used for training is also reviewed manually by the provider.

For more on AI policies, read "Law Firm AI Policy Template, Tips & Examples" on the Clio blog.



**44%**
No policy

**9%**
Don't know

**5%**
Not allowed

**12%**
Allowed but not encouraged

**30%**
Allowed and encouraged

**Law firm policies on AI**

- Yes policy
- No policy

**More than half** of legal professionals say their firm has no AI policy or they are unaware of one.

APP 00390

## Non-legal AI poses risks to law firms

By a significant margin, generic, non-legal technologies are the most prevalent in law firms. **Nearly half of legal professionals are using a generic AI solution** like ChatGPT, Gemini, Claude, or Perplexity in their work, up from about a third last year. These solutions are increasingly popular among consumers, and their free tiers make them easy to adopt, which likely explains why they are so widely used among legal professionals as well.

Generic AI tools can be used for a broad range of tasks, including research, drafting, and review, but they come with serious limitations for legal work:

◆ **Data privacy:** Free tiers often lack confidentiality guarantees, which means that firms should be careful in what information they share, especially with sensitive client information.

◆ **Hallucinations:** Generic AIs lack training in legal data, leaving them open to fabricating false statements or citations that don't exist, creating a critical risk for licensed legal professionals.

Celeste, a partner at a mid-sized family law firm in Nebraska, says her team has strict guardrails when using ChatGPT: "We have rules and regulations in place for what we can and can't put in ChatGPT. We can't upload any confidential information, we can't reference specific account numbers, we can't reference client names."



**AI use by type**

□ 2024   ■ 2025

Generic non-legal AI tools may include ChatGPT, Gemini, Claude, Perplexity, Microsoft Copilot, etc; legal research platforms include Casetext, FastCase, etc; document drafting or automation include Spellbook, LegalMation, Midpage.ai, Lexis+ AI; e-discovery solutions include Relativity, etc; virtual receptionist include Smith.ai, Fireflies.ai, etc; contract review or analysis include IronClad, Evisort, Luminance, LawGeex, etc; predictive legal analytics include DocketAlarm, Lex Machina, Premonition, etc.

"We have rules and regulations in place for what we can and can't put in ChatGPT."

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

APP 00391

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

## Not enough firms rely on legal AI solutions

**Just 40% of legal professionals are using a legal-specific AI solution,** down from 58% in 2024, which could pose challenges for those who are shifting their use of AI to generic solutions like ChatGPT.

Legal-specific AI solutions are designed for legal work, offering a much more comprehensive knowledge of case law and how to apply it within the context of legal practice. Because these solutions are trained in the law, they offer more assurances based on the needs of legal practitioners:

- **Data privacy:** They offer guarantees for data privacy, ensuring user data isn't stored or used for training in any way, so that firms aren't putting their clients' data at risk.
- **Quality results:** They offer a more comprehensive review of all relevant and preceding cases, and more accuracy than other generic, consumer-facing AI models.

### AI use by category

2024    2025



| | Generic AI | Legal-specific AI |
|---|---|---|
| | Often lacks privacy guarantees, especially on free tiers | Built with strict data privacy and security protocols |
| | Higher risk of fabricated facts or citations ("hallucinations") | Trained on legal databases for higher accuracy |
| | General-purpose training | Purpose-built for legal tasks and content |
| | Widely accessible, often free to try | Increasingly available to firms of all sizes |

**IN THEIR WORDS**

### ADVANTAGES TO LEGAL RESEARCH WITH AI

Legal research AIs cut research time dramatically, remove guesswork, and allow lawyers to focus on analysis and client service.

**From hours to minutes:** "Before AI, I had to guess what keywords would trigger the right cases. Even then I wasn't always confident that we were getting it all. I would spend an hour or two searching, trying to find relevant cases, going down rabbit holes. Now it takes literally five minutes and my first two hours of research are done." — *Pierce, lawyer at a small business and real estate law firm, Missouri*

**Like delegating to an associate:** "I can query the AI as I would an associate lawyer. I get the response back very quickly, which I can then pass along to our client." — *Ezra, general practice partner, Indiana*

Legal-specific AI solutions include legal research platforms, document drafting or automation tools, e-discovery solutions, contract review or analysis, and predictive legal analytics; generic non-legal AI tools may include ChatGPT, Gemini, Claude, Perplexity, Microsoft Copilot, etc; other business tools include virtual receptionists and others.

APP 00392

# Some firms see early revenue gains, while others continue to adapt

As discussed in Part 1, 36% of firms using AI have seen a positive impact on revenues. For wide-adopters of AI, that number jumps to 69%. We also see that growing law firms are twice as likely to be using AI in Clio.

For such a new technology, the potential revenue impact will only increase as these technologies continue to evolve, and as law firms incorporate them more into their operations.

Nearly two-thirds of legal professionals have yet to see the benefits, however. While 16% haven't seen an impact on income, many just aren't sure. The largest category (32%) say that it's too early to tell, suggesting that they are still learning to adapt to new ways of working with AI.

Two potential factors that could be affecting revenue gains:

- Firms may struggle to increase the volume of clients they work with to offset gains in efficiency.
- Many firms haven't adapted their billing models to account for the use of AI. As discussed below, hourly billing isn't compatible with gains in efficiency resulting from AI. Despite the vast majority of firms billing by the hour, most haven't made any adjustments to their pricing to account for the use of AI.



AI's influence on revenue

Positive sentiment    Negative/no impact

**THE CLIENT VOLUME GAP**

With increased efficiencies, firms don't always have the client work to fill their time. According to Alana, a solo family law lawyer in Minnesota, "My actual time spent on cases has decreased significantly, which is great. If I could find the clients, I could do 10 times more work. But I don't have the volume of clients, so I just have less to do."

This poses a potential problem for law firms that struggle to market themselves. Studies estimate that 77% of legal problems don't receive support from a legal professional,[15] indicating a vast and untapped market for firms. This is also where marketing and intake solutions can support, which we look into more in the next section.

[15]World Justice Project, "Global Insights on Access to Justice: Findings from the World Justice Project General Population Poll in 45 Countries," 2018.

## Why the billable hour is (even more) outdated with AI

Though it's been the primary method for billing clients, **hourly billing creates a conflict of interest**; it rewards lawyers for taking more time on client work and disincentivizes innovation and efficiency. When billing based on time, lawyers who take advantage of AI to increase the efficiency and quality of their work ultimately make less than they would without AI.

For most firms, spending substantially less time on client matters would lead to a drop in revenue if they can't make up the difference in volume. As firms come to rely more on AI for their work, many may be approaching an existential reckoning; it's estimated that as much as 74% of billable work could be automated with AI.[16]

For clients, hourly billing creates uncertainty in cost. And at the end of the day, when hiring a lawyer, clients are buying expertise and outcomes; getting a lawyer's "time" isn't enough. As legal-specific AI solutions become more widely used in day-to-day legal practice, law firms will see increased pressure to revisit their pricing models.

**BALANCING TIME-SAVINGS WITH PRICING**

While time savings benefit clients billed by the hour, firms should seek a middle ground in improving profitability while also passing savings to clients. At the same time, reductions in pricing could also lead to increases in client demand, especially when positioning firms more competitively in their respective markets.

This is the approach taken by Sebastian, a partner at a small real estate firm in California: "I can generate more content and then go back and review how much time it would have taken without the AI. I split the savings between the client and myself so that everybody benefits."

It is a fine line to balance financial benefit with ensuring fees are reasonable. As Ezra, a partner at a general practice in Indiana describes, "If you can do the same function in a quarter of the time with AI, you can't ethically pass that on to your client."

## More law firms are adopting flat fees

While the vast majority of law firms still bill on an hourly basis, a growing number also offer flat fee services. In all of 2024, more than half of firms (54%) billed both hourly and flat fees, and only 41% billed exclusively by the hour. In total, **59% of firms billed flat fees exclusively or in addition to offering an hourly rate in 2024**.

While this is a trend that started in 2020, it's one that's likely being accelerated by AI, since law firms using AI more widely are more likely to see an impact on their revenues, and more have made adjustments to their pricing.

### Firms charging hourly and flat fees



Legend: Hourly and flat · Flat · Hourly

| Year | Hourly and flat | Flat | Hourly |
|---|---|---|---|
| 2016 | 49% | 4% | 47% |
| 2017 | 49% | 4% | 47% |
| 2018 | 48% | 4% | 48% |
| 2019 | 47% | 4% | 49% |
| 2020 | 49% | 4% | 47% |
| 2021 | 50% | 4% | 46% |
| 2022 | 51% | 4% | 45% |
| 2023 | 52% | 5% | 43% |
| 2024 | 54% | 5% | 41% |

[16]Clio, "Legal Trends Report," 2024.

APP 00394

**LEGAL TRENDS REPORT**
PUBLISHED BY CLIO

## Greater AI adoption has a stronger influence on firm pricing

Most legal professionals either haven't had any issue meeting their billable targets due to their use of AI or don't have an opinion yet on the potential impact.

However, among those using AI more widely, **one in five say AI** *is* **posing a challenge to meeting their billable targets, and nearly half (45%) have made adjustments to their pricing because of it.** Of the wide-adopters who have changed their pricing:

- ◆ Most (26%) have increased what they charge.
- ◆ Some (11%) have reduced pricing, likely passing cost savings to clients and increasing their competitiveness in their markets.
- ◆ Some (8%) have introduced new types of fees to account for AI-specific services specifically.

In contrast, firms that are using AI less are much less likely to have made changes to their pricing; *70% of partial-adopters haven't made any changes at all*.

While those using AI more widely are more likely to see challenges in meeting their billable targets, they're also more likely to make changes. As we see more firms adopt AI more fully into their operations, we're likely to see similar trends in firms facing challenges in meeting their billable targets, and needing to adjust their pricing accordingly.

### AI has made it difficult to meet billable hour targets (agree/disagree)



### AI's influence on pricing



**Raising prices across the board**

Sarah, a senior paralegal at a mid-sized entertainment and employment law firm, says her law firm raised their rates "across the board" and without any complaints from clients. They've done so based on a few factors:

1. They bill mainly based on a monthly subscription, and with AI they do much more for clients each month.

2. They adopted an AI software (CaseMark AI) to take on translation work; per-use charges get passed through as expenses to clients.

3. AI has freed the owner of the firm to spend more time with clients, which makes them feel more valued and attended to.

**Contributions get undervalued**

Benjamin, an operations manager at a mid-sized employment defense firm, says that with the use of AI, legal professionals aren't being recognized for the billable *impact* of their work, only the number of hours they put in.

For example, a staff member does 10 hours of work in 10 minutes for a client; the value of the work is the same, but the employee is way down on meeting their targets. "There's this conversation that is not happening. You shouldn't have to get all of your billable hours if you're meeting your billable impact. There's a gap right now," says Benjamin.

**Time savings pay off in work-life balance**

Some are willing to eat the cost of better efficiency as a tradeoff. Henry, owner of a small business law firm, says, "Instead of spending three hours on a file, I'll spend two. I still keep the same hourly rate. Maybe I make a little less, but I am also not working absolutely crazy hours."



APP 00395

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.613    Page 39 of
Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 396

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Legal professionals still anticipate more AI adoption

With AI advancing rapidly, and especially in models trained on case law, its potential will only continue to grow. Most legal professionals recognize the opportunity.

**Eighty-two percent** expect to be using AI more in the next 12 months. This is similar to last year, which shows sustained anticipation for further innovation. While solos have been the slowest adopters of AI, they show the highest anticipation for future use.

## AI's influence on pricing



## Plans for future AI use by firm size



APP 00396

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.614    Page 40 of

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Key takeaways

## 01

### AI use is widespread:

The vast majority of legal professionals use AI in their work. General AI solutions like ChatGPT, Gemini, Claude, or Perplexity are the most used by legal professionals.

## 02

### A need for dedicated legal AI:

There is a major opportunity for law firms to adopt legal-specific AIs, which are trained on legal libraries and offer much more robust capabilities in working with the law, as well as greater reassurance to both firms and their clients.

## 03

### Many firms are still adapting their business to AI:

Many firms haven't increased their volume in clients to offset gains in efficiency, and many haven't adapted their billing models. More wide-adopters of AI have made adjustments to their pricing.

## 04

### Firms continue to bill predominantly by the hour, though more are adopting flat fees:

Hourly billing creates an issue for law firms where gains in efficiency threaten revenue. As AI becomes more prominent in legal, firms will need to reconsider their use of the billable hour.

APP 00397



**Part — 04**

# Transforming the legal experience

APP 00398

# A wider perspective on AI

Law firms aren't the only ones with access to artificial intelligence. Consumer-facing solutions are just as accessible to potential clients. In fact, these AIs are seeing widespread use among consumers in answering legal questions.

In other words, AI isn't just changing how law firms work; it's shaping the legal experience for clients. Law firms need to consider what this means for their business, and how it affects the decision to hire a lawyer.

Many AIs offer a very simple, seamless user experience, accessible from a mobile phone. If these services start to compete in the market for legal services, law firms should focus heavily on ensuring the same convenience and accessibility in their own services. As we'll see, firms that incorporate technology more deeply into their workflows are the most likely to see success.

## Consumers are consulting AIs with legal questions

**More than half** of consumers have or would consider using AI to answer their legal questions. For those who have, just over half said that AI sufficiently answered it (see below). Not surprisingly, **younger generations** are more likely to use AI in this way, indicating that this is likely to become a growing trend in the future.

### Generations using AI to answer legal questions



23% Gen Z
26% Millennials
13% Gen X
3% Baby Boomers

Have used

Most consumers asked general legal questions about certain requirements or terms. But many queries had to do with problems related to constitutional rights, housing, employment, and contract review. These are just the top searches; the list goes on to cover virtually every aspect of the law.

### Legal problems pursued with AI



| Legal requirements/terms | **33%** |
| Property law/housing process | **6%** |
| Contract review | **6%** |
| Constitutional/human rights | **6%** |
| Hiring a lawyer/about | **6%** |
| Job-related/employee questions | **6%** |
| Speeding/traffic tickets | **6%** |
| Divorce | **3%** |
| Business/business formation | **3%** |
| Crime (e.g. sex offender, murder etc.) | **3%** |
| Landlord/tenant rights | **3%** |
| Health/medical | **3%** |
| Claims/settlements* | **3%** |

*Additional practice areas saw 1% to 2% consumers asking questions.

## Consumers using AI to answer legal questions

**Have used**

 14%

Have not used, but **would**

 43%

Have **not used**

 43%

80

81

APP 00399

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

## AIs are answering legal questions

**More than half** of consumers who used an AI for a legal question felt their AI had sufficiently answered it. While it could seem that AIs are cutting in on the legal market, the situation is likely more complex. In many cases, consumers may be more swayed to seek professional legal support: **28%** of consumers were directed by their AI to contact a lawyer.

Consumers using AI may also be **more informed** about their issue. For example, they may have a better sense of their options and the proceedings required. These potential clients may be less likely to be sold on actual legal recommendations and more on factors like **price, quality of service**, and **convenience.**

In **12% of cases**, consumers were convinced by an AI that their legal problems *weren't worth pursuing.* If accurate, these services could save firms from putting valuable time and resources into consultations with very little business potential.

### How AIs helped consumers with their legal problems



**53%** Answered legal question

**28%** Prompted to contact a lawyer

**12%** Helped decide the problem wasn't worth pursuing

**5%** Other

28% percent of consumers were directed by their AI to contact a lawyer.

In 12% of cases, consumers were convinced by an AI that their legal problems weren't worth pursuing.

**IN THEIR WORDS**

### WHAT LAWYERS SAY ABOUT THEIR CLIENTS USING AI

"I'm already seeing clients use ChatGPT and taking its word. I had a potential client use ChatGPT to explain the law to her and draft documents, and they were actually pretty on point. Since many lawyers charge by the hour, clients don't want to pay for them to draft something. They'd rather have ChatGPT do it and have a lawyer review it." — *Samantha, owner at a solo firm practicing in community association law, Washington*

"Lots of clients ask generative AI to answer legal questions or draft legal documents. AIs are usually 80% right but always have errors. Drafting legal documents with general-purpose AI tools, it ends up being a word salad of well-written sentences that are not purposeful. I have to read them with extra care." — *Ken, lawyer at a small corporate and transactional firm, California*

"The fact is that lawyers charge clients for a lot of tasks that can be better and more efficiently handled through automation and AI. As clients realize this, they will refuse to pay lawyers thousands of dollars per hour to perform tasks that a computer could easily handle for almost nothing." — *Jerry, owner at a solo business litigation firm, California*

APP 00400

# Consumers hold law firms to a higher standard

As more consumers turn to their AIs for their legal questions, **more than half** take issue with the use of AI by legal professionals. **Nearly half** aren't comfortable hiring a lawyer who uses AI to make decisions about their legal issue, and **over a third** are less likely to trust a lawyer who uses AI.

In other words, more consumers will use AI for themselves but believe the professionals should instead rely on their own personal knowledge and experience. The majority would also rather their lawyer **turn to a paralegal for support instead.**

While **disclosure leads many to be more open to lawyers using AI**, most remain concerned, even when using AI would make legal services more affordable. These findings are similar to those from 2023, though consumers are slightly more uncomfortable with lawyers using AI, and more keen on getting disclosure of its use.

In fact, **disclosure could reinforce client trust** when firms demonstrate that they use more sophisticated, legal-specific AIs rather than the same general-purpose solutions that most consumers already have access to. Knowing that a lawyer is getting the benefit of AI-assisted work, with the added layer of expertise provided by a dedicated legal solution, would make clients feel like they're also benefiting.

## Client perceptions on the use of AI in law firms



## I would be comfortable hiring a lawyer who...



**LAW FIRMS NEED TO DISTINGUISH THEMSELVES FROM CHATGPT**

Consumers are most likely using general AI solutions like ChatGPT, which aren't designed to advise on legal problems. They haven't been trained on the law, and **without the support of a lawyer, there is no oversight or accountability to ensure users are getting sound legal advice**, which is even more problematic with complex legal problems.

This poses an opportunity for law firms to distinguish themselves. When investing in AI solutions that have been trained in dealing with the law, firms can communicate more assurance in both the **accuracy, quality,** and **speed** of work they provide their clients.

APP 00401

Case 2:24-cv-00458-JNP     Document 57-1     Filed 11/10/25     PageID.619     Page 45 of
Appellate Case: 25-4135     Document: 72     Date Filed: 01/20/2026     Page: 402

Transforming the legal experience     Part 4

## Firms are unsure whether to disclose their use of AI

Most clients want to know whether their lawyer is using AI, which puts law firms in a difficult position. Disclosure could reinforce trust with those clients who are supportive, but it risks losing those who are not.

As it is, **just over a third** of law firms disclose the use of AI on an at least somewhat of a regular basis. Another third either never or rarely disclose its use with clients.

### Do law firms disclose their use of AI to clients?

| | |
|---|---|
| **Always** | 18% |
| **Sometimes** | 20% |
| **Rarely** | 15% |
| **Never** | 20% |
| **Don't know** | 27% |

**CONFIDENTIALITY CAN INFLUENCE GUIDANCE**

According to **Florida Bar Ethics Opinion 24-1** (January 19, 2024): "If the use of a generative AI program does not involve the disclosure of confidential information to a third-party, a lawyer is not required to obtain a client's informed consent pursuant to Rule 4-1.6."

## Lawyers say clients care more about the quality of work

Ivan, a partner at a small criminal defense law firm in California, says his clients aren't interested in how he gets the work done: "**Clients are interested in the results**: the finished document, the outcome, the summary. As far as how you get there, whether sitting through hours of video and reading thousands of pages of police reports, or whether a machine does it for me, they don't seem to care or appreciate it."

Sebastian, owner of a small law firm working in real estate, construction disputes, and transactions in California, shares a similar experience: "I don't specifically tell clients, 'This was generated by AI.' But I have seen that clients are happy with the **quality of the work, product**, and **clarity**."

**HOW (AND WHY) TO COMMUNICATE TO CLIENTS ABOUT AI**

Consumer-facing solutions like ChatGPT have given AI a bad reputation when it comes to solving legal problems. The media has been rife with reports of lawyers submitting briefs containing AI-hallucinated citations for legal precedents that don't exist.

But the problem isn't AI—it's that lawyers aren't reviewing the content of their work after consulting an AI.

Lawyers have a strict duty and accountability to the work they deliver to clients. When disclosing the use of AI to clients, firms can and should reassure clients in the quality of work in the following ways:

- Ensure they are using solutions designed specifically for the use in legal practice
- Explain the proficiency these solutions offer and the benefit to overall quality of results
- Caution that not using AI could give an opposing counsel an unnecessary advantage
- Reinforce a commitment to the quality, service, human oversight, and accountability of the work they deliver

APP 00402

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Most clients don't have problems finding a lawyer

Of those who have hired a lawyer recently, **70% say** they had an easy time finding and hiring one, largely thanks to referrals and online searches (discussed below).

Overall, clients are more likely to be satisfied with their lawyer than are to hire them again. **Twenty-four percent said they would be unlikely to rehire the lawyer they last worked with**, which could make client retention difficult for firms. Even if clients are happy, many still look for other options the next time they need a lawyer.

## How difficult was it for clients to find a lawyer?



## How clients felt about the most recent lawyer they hired



# Clients rely on referrals, but are turning more to the internet

Of those who hired a lawyer recently, **most sought a referral**, while some searched the internet and used a firm's website.

For future legal problems, more say they would turn to **online resources**. While most would still look for a referral, more than half would also turn to the internet, with firm websites and online reviews playing strong roles. In other words, in addition to asking clients for referrals, firms should ask for online reviews, which could be key drivers for future business.

## How clients found the **last** lawyer they hired



## How clients would find their **next** lawyer



APP 00403

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 404

## Online resources are a bigger focus for consumers hiring their next lawyer

Millennials and Gen Zers were **even more likely** to use digital channels to find a lawyer, and those of all generations (including older generations) are likely to turn to the internet to find their next lawyer.

### How each generation hired their **last** lawyer



### How each generation would find their **next** lawyer



### WHAT DO AIs RECOMMEND IN A LAWYER?

When consulting AIs, many consumers asked for advice on how to find "**the best**" lawyer. If potential clients continue to seek shopping advice from AIs, law firms should take a moment to learn what AIs recommend in discerning the good lawyers from the bad.

For example, if AIs typically recommend a list of key questions to ask, law firms should prepare to be forthcoming with strong answers.

**Prompt:** *Can you give me tips for finding the best lawyer?*

**Response:** *Absolutely—finding the right lawyer can make a huge difference. Here are some practical tips:*

1. *Identify your legal need.*
   *Different lawyers specialize in different areas (criminal defense, family law, bankruptcy, personal injury, corporate, etc.). Knowing your exact need will narrow the field.*

2. *Look for relevant experience.*
   *Check whether the lawyer has handled cases like yours before. Experience in your specific area of law is often more valuable than just years of practice.*

3. *Check reputation and reviews.*
   *Look up online reviews, testimonials, or ratings on sites like Avvo, Martindale-Hubbell, or Google. Ask people you trust for referrals.*

4. *Verify credentials.*
   *Confirm the lawyer is licensed and in good standing with your state or provincial bar association. Many bar association websites let you search by name.*

5. *Assess communication style.*
   *During an initial consultation, pay attention to whether the lawyer explains things clearly, listens to your concerns, and makes you feel comfortable.*

6. *Discuss fees upfront.*
   *Different lawyers charge hourly, flat fees, or contingency (no fee unless you win). Ask about billing practices, retainers, and expected costs before you commit.*

7. *Consider availability and workload.*
   *A great lawyer who doesn't have time for your case isn't the right fit. Make sure they can give your matter the attention it needs.*

8. *Evaluate fit and trust.*
   *You'll be sharing sensitive information. Choose someone you feel you can trust, not just the most impressive résumé.*

9. *Compare a few options.*
   *Don't settle on the first lawyer you speak with. Meet at least two or three before making a decision.*

10. *Trust your instincts.*
    *If something feels off—whether about their approach, personality, or fees—it's okay to keep looking.*

Source: Response provided by ChatGPT (GPT-5)

APP 00404

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Law firms are marketing in the right places

When marketing their firms, lawyers are investing more in the **channels that matter** to consumers. The vast majority boast having a website and relying on referrals, both of which have seen increased prominence since last year.

Online reviews also make up a significant focus for nearly two-thirds of firms compared to last year. Aside from social media and search engine optimization, all other forms of marketing have seen declines, with podcasts and television ads seeing the sharpest drops.



### Law firm investments in marketing

2024    2025

### THE NEW REALITY FOR ONLINE MARKETING: OPTIMIZING FOR AI

For any lawyer who prefers to rely on word-of-mouth to earn new business, the reality is that more clients are looking online to find their next lawyer, and in many cases they could be asking AIs directly for recommendations.

In addition to services like ChatGPT, online search engines like Google are already incorporating AI into their internet search experience. In addition to serving up recommendations for individual products and services, they are providing recommendations on what to look for when making a purchasing decision.

The implication? **Firms need to optimize their online marketing to appeal to the large language models that are the basis for AI training.**

APP 00405

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.623    Page 49 of
Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 406

Transforming the legal experience    Part 4

## Clients still care about experience and reputation

Aside from reaching clients, it's crucial that firms create positive experiences for those who reach out. **Experience** and **reputation** remain two of the top considerations that clients look for in a lawyer, which means firms should look to build trust with current and future clients more than anything.

Also ranked highly are client reviews, free consultations, and clear and concise information, indicating that potential clients will put in the effort to find a firm that they feel **confident** about. These considerations now outweigh responsiveness, which was an even greater priority for clients previously.

In all these cases, an intake and CRM can help firms excel in these early experiences, which we explore in more detail below.



### What clients look for in a law firm

2024    2025

| | 2024 | 2025 |
|---|---|---|
| Has experience with similar cases | 43% | 48% |
| Is a reputable firm | 39% | 44% |
| Has positive client reviews | 31% | 33% |
| Offers a free consultation | 21% | 32% |
| Provides clear and concise communication | 31% | 30% |
| Is responsive | 39% | 26% |
| Offers a fixed/flat fee | 15% | 19% |
| Has an easy step-by-step process | 14% | 18% |
| Is easy to do business with | 19% | 17% |
| Offers a competitive rate | 23% | 11% |
| Anticipates client needs | 16% | 11% |

## Office tools are central to firm tech stacks

The client experience can greatly influence the sense of **value** that people get from working with a lawyer. These experiences are created by the knowledge and expertise demonstrated by lawyers and their staff, and are also based on how easy and efficient the firm is to work with.

Law firms can optimize their client experiences by investing in the **right technologies**, which can both create ease for clients *and* free up staff to be more available to clients.



### Technologies most used by law firms

| | |
|---|---|
| General office tools (e.g. MS Office) | 86% |
| Video conferencing | 80% |
| E-filing | 76% |
| Cloud-based file storage | 74% |
| E-signatures | 73% |
| Legal research databases | 72% |
| Pen and paper | 68% |
| Cloud-based practice management software | 65% |
| Electronic payments | 58% |
| Client intake/CRM | 37% |
| Document automation | 24% |
| Email scheduling | 17% |

### PLATFORM SOLUTIONS OFFER MULTIPLE CAPABILITIES IN ONE SYSTEM

In addition to standard business software like Microsoft Office, many firms use solutions for specific tasks like e-filing, cloud storage, e-signatures, and payments. While nearly **two-thirds** use a **practice management solution**, those using a platform like Clio gain access to all of these capabilities within a single platform.

Minimizing the number of solutions a firm has to rely on reduces the difficulties in managing data across multiple pieces of software. As we'll see below, firms that invest in a wide range of capabilities within one system, and also invest in getting the most out of them, see the most success.

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

APP 00406

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Growing firm advantages

In our cohort analysis, we see where growing law firms are more likely to invest compared to shrinking law firms. Some key areas where these firms invest more include:

**Client intake and email automation** greatly simplify processes for prospective clients. Staff can manage client lead information and follow-ups in one system, which also gives them the ability to send intake forms and collect initial payments. These solutions also automate confirmations and reminders for consultation bookings, saving staff from having to manage and track follow-ups.

**Document automation** offers the ability to quickly draft documents from pre-designed templates. Once a client's information has been collected and inputted into a database, staff can use that information to quickly draft documentation from pre-designed templates. The software uses conditional logic to account for grammatical variables in gender and plural agreement, and questionnaire forms give staff an easy way to collect client information.

**Online payments** allow firms to quickly collect money from clients. Clients can pay online from a bill, email, text message or by visiting the firm's website, or they can also pay in person with tap to pay. When using a solution like Clio, firms also get features like split billing and the ability to pay via a client-facing mobile app. These capabilities save substantial administrative work in preparing and managing payment workflows, while also giving clients more options.

## Use of technology

- Growing firms
- Stable firms
- Shrinking firms

**Email scheduling:** 18% / 11% / 11%
**Client intake/CRM:** 48% / 28% / 33%
**Document automation:** 28% / 23% / 13%
**Electronic payments:** 70% / 63% / 60%

# Document automation offers many benefits to law firms

**Generating documents from custom fields:**
"We use Clio a lot for document automation. We use Clio's custom fields to its maximum. When we open a file, we have a certain set of custom fields for each case type that we fill in, so when we auto-generate most of our documents, all of that information gets filled in." — *Celeste, partner at a mid-sized family law firm, Nebraska*

**Key to being competitive:**
"I think document automation is going to be essential for law firms. For lawyers that aren't using it for drafting, it'll just make it that much harder for them to compete." — *Sebastian, owner of a small law firm working in real estate, construction disputes, and transactions, California*

**Benefits of client questionnaire forms:**
"I can now have my clients literally populate their own divorce forms. What used to take me two or three hours, I have them doing as part of my intake process." — *Samuel, solo lawyer practicing family law, New York*

APP 00407



## Most law firms want to save time, growing firms focus more on client experience

When adopting new technologies, most firms want to **save time, manage caseloads,** and ensure **quality**. In our cohort analysis, however, growing firms were much more likely than stable and shrinking firms to focus on improving **client satisfaction.**

In addition to improving processes and efficiencies, building a client base requires diligent attention to their needs. This means ensuring positive outcomes, but it also means eliminating as much friction for them as possible. It's these types of experiences that will ensure more positive word-of-mouth referrals and the future rewards that come with them.

**Top 3 considerations when adopting new technologies**



64%
Save time + increase efficiency

46%
Manage caseloads more productively

38%
Improve work quality

**% considering client experience when purchasing new technology**



27%
Growing firms



17%
Stable firms



11%
Shrinking firms



98

99

APP 00408

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

## How firms realize returns on their investments

When measuring the impact of their technology, firms are most likely to assess the benefits based on the **time savings**, but many are also focused on **revenue generation**, **cost savings**, and improved **employee satisfaction**.

Shrinking firms were the most likely to not have any performance goals for the technology, and growing firms were much more likely to measure client satisfaction and even more likely to assess employee satisfaction.

### Top measures for assessing impact of new technologies



**62%**
Time savings

**43%**
Revenue generation

**40%**
Reduced costs

**39%**
Client satisfaction

**37%**
Employee satisfaction

## How firms measure the impact of new technologies



Growing firms
Stable firms
Shrinking firms

Client satisfaction: 37%, 27%, 26%
Employee satisfaction: 41%, 36%, 22%
No performance goals: 4%, 7%, 15%



**IN THEIR WORDS**

**FIRMS LOOK FOR TECH COMPETENCY IN NEW HIRES**

**AI experience required:** "Legal professionals need to understand technology. If you're going to be in the legal workspace in 2025, you better understand what AI can and cannot do. That's super important." — *Pierce, lawyer at a small business and real estate law firm, Missouri*

**Tech competency at all levels:** "We include questions about technology in all of our interviews, not just with our junior team, but any person we interview." — *Fiona, founder at a mid-sized general practice law firm, UK*

## All firms face barriers to adopting new technologies, but successful firms overcome them

Across all of the cohorts we looked at, the largest barriers to adopting new technologies were the same: **time, integration**, and **learning**. But, as we see below, the firms that overcome these obstacles are the ones that see the most success.

### Barriers to adopting features in a technology



26%
Limited time

24%
Integrating tools into workflows

14%
Learning new tools

**IN THEIR WORDS**

**HOW LAWYERS OVERCOME BARRIERS TO TECHNOLOGY ADOPTION**

**Teamwide support and training:** "We have a tech committee. If someone has a cool, unique tool that they want to explore, we talk about it. We pilot it. We keep the conversation open. We also have quarterly technology training, so if anybody wants more training on a specific tool, they can always suggest that for the next session. Or if they want to use a new tool, we always say, yep, go explore it." — *Celeste, partner at a mid-sized family law firm, Nebraska*

**Prioritizing innovation:** "I put a Post-it note on everybody's computer saying, 'How can AI help me do this?' I want my staff to always think about how they can make their jobs easier through technology.

It's important to start the conversation and encourage experimentation within the team." — *Jules, founder of a mid-sized family law firm, Saskatchewan*

**Supporting the work and focusing on clients:** "It's worth putting the effort in to build your systems in a way that they are truly supportive of your work. The hardest part is actually making sure the technology fits what I do for my clients." — *Sebastian, owner of a small law firm working in real estate, construction disputes, and transactions, California*

## Advantages among firms using Clio

Clio offers a range of products designed to improve firm organization, efficiency, and client experience. Growing firms used 12% more products in the Clio ecosystem than stable firms, and 15% more than shrinking firms.

In addition to using more products, growing firms are also more likely to use more of the features and capabilities across Clio, which includes workflows to improve client communications, calendaring, time tracking and billing, bookkeeping, document management and drafting, e-filing, and much more.



**+12%** more than **stable firms**

**+15%** more than **shrinking firms**

**Growing firms** use more Clio products

**Growing firms** use more features across Clio

**+18%** more than **stable firms**

**+65%** more than **shrinking firms**

APP 00410



## Growing firms get more out of the technology they use

It's not just the number of products a firm has that's important. **Fully integrating** them into workflows will ensure that firms get the most from them and unlock the most value, which is a key differentiator for success.

In our cohort analyses, we looked at adoption rates within some of our products to determine how much of these solutions firms were using. Within **Clio Manage**, growing firms used **13% more** of the software than stable firms, and **46% more** than shrinking firms.

With greater adoption, growing firms are able to manage more of the case and client information in Clio, giving them the ability to better manage client communications, documents, billing and payments workflows, and much more. One of the most widely adopted features is **Clio Payments**, which growing firms use **13% more** than stable firms, and **33% more** than shrinking firms.

## Growing firms get more from their client intake solution

Of firms using **Clio Grow**, an intake and CRM solution in Clio, growing firms have much higher adoption scores. They use **15% more** of the software than stable firms, and **44% more** than shrinking firms.

This means these firms are taking more advantage of being able to market their services and manage their potential clients through the intake process. In turn, they are able to drive more business to support the growth we've seen in this cohort.

### Growing firms use more features in Clio Manage



+13% more than **stable firms**

+46% more than **shrinking firms**

### More growing firms use Clio Payments



+13% more than **stable firms**

+33% more than **shrinking firms**

### Growing firms use more features in Clio Grow



+15% more than **stable firms**

+44% more than **shrinking firms**

APP 00411

# Key takeaways

### 01

## Consumers are asking AIs their legal questions:

Most consumers have or would consider using AI to answer their legal questions. For those using AI, half got their legal questions answered, while just over a quarter were directed to contact a lawyer.

### 02

## Consumers don't have access to legal AI solutions:

Many consumers are uncomfortable with the idea of lawyers using AI for casework, but most are likely only familiar with general-purpose AIs that are more subject to hallucinations and aren't designed for legal work.

### 03

## More consumers plan to look for support online:

More consumers say they would look for their next lawyer online, which increases the likelihood that AIs will influence future decisions on hiring a law firm.

### 04

## Technology adoption influences growth:

Growing law firms are more likely to invest in a range of solutions within one platform, and they get more out of each software as well.

APP 00412



Part — 05

# Managing growth and efficiency

APP 00413

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.631    Page 57 of
Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 414

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# A perspective on responsible lawyers

**Responsible lawyers** are those assigned to oversee a matter. In addition to overseeing team members who may include more junior lawyers and paralegals, they are ultimately responsible for the actions a firm takes on a matter, including any documents filed with courts or other administrative agencies.

Typically, only one responsible lawyer is assigned to a matter. This means that looking at the casework of responsible lawyers gives a unique perspective into firm performance and growth.

The revenue contribution of responsible lawyers is a key metric for understanding the financial health and growth strategies of law firms. A lawyer's capacity for generating revenue influences a firm's growth and, ultimately, determines whether it's growing, stable, or shrinking. The path to growth varies significantly based on firm size, highlighting distinct approaches to scaling a business.



APP 00414

# Comparing caseloads based on firm size

Responsible lawyers in solo law firms take on the fewest cases on average, whereas firms with more than one employee (which could include additional lawyers or non-lawyer support staff) take on more cases.

### Average new matters per responsible lawyer



**Responsible lawyers in growing law firms take on more cases than the wider industry.** Those in solo firms take on 37% more cases than other solos, and those in small firms (2–4 employees) take on 25% more. For larger firms, despite being in our growing cohort, responsible lawyers in these law firms only took on 5–6% more cases compared to industry averages for firms of these sizes.

### Difference in new matters per responsible lawyer: Growing law firms versus all law firms

Responsible lawyers in growing law firms take on more cases



# Revenue contributions of responsible lawyers

Revenue attributed to responsible lawyers includes everything earned against all of their matters, including fees from other timekeepers. This review includes not just hourly fees, but also flat fees and contingency fees, making it the most complete analysis of law firm revenue yet published by the *Legal Trends Report.*

When looking at industry averages, responsible lawyers take on more work and earn between 7% and 10% more revenue for their firms.

### Growth in revenue (industry average): 2020–2023



Among our cohorts of growing, stable, and shrinking firms, we see that responsible lawyers contribute differently to firm growth.

APP 00415

## Growing law firms

In growing firms, responsible lawyers in larger firms (5–19 and 20+ employees) increased revenue contributions by a similar amount to industry averages (9%, above). Responsible lawyers in solo and small firms (2–4 employees), however, saw twice the growth compared to industry averages. This indicates that responsible lawyers in smaller firms are taking on increasingly greater earnings for their firms.

### Growth in revenue (growing firms): 2020–2023



## Stable law firms

In stable firms, responsible lawyers are taking on less revenue overall, with the largest drop in solos. This does not necessarily mean these stable firms are in trouble. These law firms may be reducing overhead expenses and shortening collection lockup, which can help balance out profitability. However, shrinking revenue per responsible lawyer must be addressed for these firms to be sustainable into the future.

### Growth in revenue (stable firms): 2020–2023



## Shrinking law firms

In shrinking law firms, the most significant reductions in firm revenue are reflected in the contributions of responsible lawyers within smaller law firms (solos and 2–4 employees), and are less pronounced in larger firms (5–19 and 20+ employees).

### Growth in revenue (shrinking firms): 2020–2023



LEGAL TRENDS REPORT
PUBLISHED BY CLIO

APP 00416

## Different paths to growth in larger versus smaller law firms

Responsible lawyers in **larger law firms** see less change in their casework and revenue contributions across all of our growing, stable, and shrinking cohorts. This gives us two different perspectives on growth and contraction in firms of these sizes:

- **In growing law firms**, larger firms are more likely to hire additional lawyers to take on their share of the firm's increasing revenue growth.
- **In shrinking law firms**, layoffs are more likely when casework declines, which helps ensure that their responsible lawyers maintain a higher volume of casework.

For smaller firms, responsible lawyers are able to increase their capacity to take on a greater share of revenue growth. Equipping their lawyers with better technology to handle higher volumes

of casework, for example, allows firms to greatly increase their overall revenues without increasing headcount, a defining characteristic of growing law firms in our cohort analysis.

This has been achieved by firms better managing their time and, in particular, their non-billable administrative work. With advancements in AI, these benefits are likely to increase further, enabling individual lawyers to take on even more casework and contribute even more revenue to their firms.

Additionally, improving firm operations with technology instead of adding headcount is also a cost-effective way to increase firm capacity without incurring the high cost of hiring and training new lawyers. This means that these firms are better positioned to weather slow periods in casework without having to lay off staff.

## Defining opportunities for strategic growth

When it comes to growth, firms can add more people, but they can also focus on making their people more impactful. Hiring more staff increases a firm's capacity, but it also increases complexity and overhead. The alternative is to amplify the contributions of those already in the firm.

The revenue contributions of responsible lawyers show that firms of different sizes typically employ different strategies for growth.

Smaller firms generally achieve growth through a vertical model, increasing the caseload and efficiency of existing lawyers, often by leveraging technology to boost productivity. This approach allows them to expand capacity without incurring the high costs of adding new staff. Larger firms, by contrast, typically pursue a horizontal growth model, expanding by hiring more lawyers rather than expecting their staff to take on a higher volume of work.

The distinction highlights the strategic trade-offs firms make: prioritizing efficiency and capacity-building versus focusing on expanding human capital to scale operations.

---

**VERTICAL VERSUS HORIZONTAL GROWTH**

**Vertical growth** occurs when firms increase their capacity to work by gaining efficiency and having each existing member take on a higher volume of work. This type of growth focuses on increasing productivity without increasing headcount.

**Horizontal growth** occurs when firms expand their business by adding more employees. Instead of existing lawyers and staff taking on significantly more work, the firm grows by increasing its overall staffing.

APP 00417

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 418

# Key takeaways

### 01

## Firms of different sizes have different growth strategies:

As firms grow, smaller firms are more likely to increase the caseloads of responsible lawyers, while larger firms expand by adding more responsible lawyers.

### 02

## Firms have multiple paths to growth:

Increasing the productivity and efficiency of individual lawyers and their teams allows law firms to grow without a heavy investment in growing headcount.

APP 00418



## Appendix — A

# Hourly rates and KPI data

APP 00419

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Business metrics for law firms

Each *Legal Trends Report* includes data on average hourly rates and key performance indicators (KPIs) to help analyze lawyer and law firm productivity, efficiency, and revenue generation.

## Key performance indicators

Clio's law firm KPIs provide benchmark insights into how law practices are performing over time, giving firms insight into how to measure and improve their performance. They include:

- **Utilization rate:** the percentage of an eight-hour day that gets put towards billable work.
- **Realization rate:** the percentage of billable work that gets invoiced to clients.
- **Collection rate:** the percentage of invoiced work that gets paid.

Since 2016, firms have seen steady improvements across all KPIs, meaning that firms are becoming more productive and efficient in generating revenue over time.

Compared to 2016, firms are billing 36% more hours per day, invoicing 16% more of their billable work to clients, and collecting 7% more of what they bill.

### Key performance indicators



When looked at in the context of the lawyer's funnel, we can see how shortfalls in each KPI reduce the overall efficiency in collecting revenue on a full eight-hour day.

For example, a utilization rate of 38% means that five hours of a lawyer's day goes unbilled. A realization rate of 88% means that only 2.6 hours of billable work actually gets captured in client bills. And a 93% collection rate means that **firms are collecting on only 2.4 hours of billable work each day**.

Yet, when factoring each KPI in this way and comparing it to historical firm performance, **the average law firm is collecting on nearly twice as many billable hours compared to 2016.**[17]

### The lawyer's funnel
Average hours worked, billed, and collected



[17] Based on KPIs for 2016: 8 hours × 28% utilization × 76% realization × 87% collection = 1.5 hours collected.

APP 00420



# Utilization, realization, and collection rates by state

| State | Utilization rate | | Realization rate | Collection rate | State | Utilization rate | | Realization rate | Collection rate |
|---|---|---|---|---|---|---|---|---|---|
| | Lawyer | Non-lawyer | Firm | Firm | | Lawyer | Non-lawyer | Firm | Firm |
| AK | 38% | 28% | 92% | 95% | MT | 39% | 22% | 92% | 96% |
| AL | 41% | 24% | 85% | 93% | NC | 33% | 23% | 89% | 92% |
| AR | 29% | 20% | 85% | 87% | ND | 33% | 20% | 93% | 91% |
| AZ | 37% | 30% | 87% | 92% | NE | 46% | 33% | 83% | 93% |
| CA | 37% | 34% | 78% | 93% | NH | 32% | 19% | 87% | 94% |
| CO | 37% | 28% | 91% | 94% | NJ | 38% | 30% | 77% | 90% |
| CT | 31% | 25% | 78% | 93% | NM | 40% | 28% | 92% | 95% |
| DC | 29% | 24% | 80% | 96% | NV | 45% | 30% | 89% | 94% |
| DE | 34% | 26% | 87% | 97% | NY | 35% | 23% | 81% | 92% |
| FL | 38% | 29% | 81% | 89% | OH | 35% | 24% | 83% | 90% |
| GA | 35% | 28% | 81% | 91% | OK | 38% | 21% | 85% | 92% |
| HI | 35% | 24% | 89% | 96% | OR | 35% | 23% | 87% | 94% |
| IA | 39% | 21% | 76% | 94% | PA | 39% | 23% | 88% | 94% |
| ID | 39% | 20% | 95% | 94% | RI | 44% | 20% | 85% | 96% |
| IL | 40% | 23% | 83% | 94% | SC | 37% | 26% | 89% | 92% |
| IN | 36% | 18% | 80% | 89% | SD | 45% | 20% | 83% | 95% |
| KS | 36% | 18% | 87% | 94% | TN | 32% | 22% | 81% | 89% |
| KY | 38% | 20% | 84% | 94% | TX | 37% | 30% | 87% | 92% |
| LA | 39% | 23% | 88% | 93% | UT | 41% | 26% | 94% | 96% |
| MA | 34% | 27% | 80% | 92% | VA | 31% | 18% | 85% | 94% |
| MD | 34% | 23% | 87% | 92% | VT | 32% | 20% | 92% | 95% |
| ME | 40% | 20% | 89% | 96% | WA | 36% | 29% | 91% | 92% |
| MI | 36% | 26% | 85% | 91% | WI | 40% | 22% | 85% | 89% |
| MN | 33% | 24% | 87% | 94% | WV | 38% | 23% | 74% | 92% |
| MO | 36% | 22% | 86% | 93% | WY | 32% | 18% | 92% | 96% |
| MS | 37% | 22% | 82% | 87% | | | | | |

APP 00421

LEGAL TRENDS REPORT
PUBLISHED BY CLIO

# Lockup

Lockup consists of three measures within the billing process and is measured in days:

- ◆ **Realization lockup:** This is the amount of revenue that is unbilled at any given time (also known as "work-in-progress lockup").

- ◆ **Collection lockup:** This is the amount of revenue that is uncollected at any given time (also known as "debtor lockup").

- ◆ **Total lockup:** This is a combination of revenue held in both realization and collection lockup.

Realization lockup has been trending down, meaning that firms are carrying less unbilled time and instead billing that work quicker to clients. Collection lockup, however, has been creeping up, which means that while firms are quicker to get bills out, clients have been slower to clients have been slower to pay—resulting in firms having to deal with more unpaid bills.

Overall, total lockup has remained fairly flat for the last two years, meaning that **the average law firm is carrying about 93 days worth of work that is either unbilled or unpaid at any given time**.

## Lockup days (12 month rolling average)



# Legal productivity index

The average timekeeper has seen substantial gains in terms of their casework and the revenue they bring into their firms. Since 2016, timekeepers have been working 25% more cases and earning over 75% more revenue (adjusted for changes in hourly rates).

In addition to being able to find more clients, the steady increases in firm KPIs, and the resulting improvements to the Lawyer's Funnel, help explain these gains. As individual timekeepers put more of their time towards billable work, ensure that work gets billed to clients, and eventually collect upon that work, all of these factors contribute to the substantial increase in performance for individual timekeepers.

## Legal productivity index | % change per timekeeper



*Adjusted for changes in hourly rates

APP 00422

# Responsible lawyer revenue (year over year)

Responsible lawyers in larger firms typically oversee much more in billables compared to smaller law firms, as much as three and a half times more than solo firms, and about two times more than those with 2–4 employees.

## Median earnings per responsible lawyer

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Solo | $77,630 | $80,535 | $81,595 | $86,499 | $75,333 | $79,847 | $82,382 | $84,135 | $83,219 |
| 2–4 employees | $137,648 | $141,720 | $146,037 | $159,298 | $150,922 | $160,716 | $166,715 | $167,999 | $156,963 |
| 5–19 employees | $201,089 | $203,161 | $215,374 | $236,455 | $228,675 | $245,409 | $261,665 | $269,250 | $249,758 |
| 20+ employees | $183,063 | $193,994 | $222,645 | $213,131 | $218,326 | $255,174 | $275,213 | $293,341 | $294,609 |

## Mean earnings per responsible lawyer

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Solo | $136,543 | $137,410 | $146,624 | $147,924 | $136,662 | $145,705 | $146,914 | $145,921 | $137,948 |
| 2–4 employees | $205,721 | $217,095 | $222,365 | $236,857 | $225,269 | $244,400 | $248,785 | $247,388 | $225,236 |
| 5–19 employees | $321,752 | $340,055 | $357,844 | $380,722 | $371,099 | $397,350 | $403,355 | $405,192 | $365,309 |
| 20+ employees | $401,211 | $436,630 | $461,144 | $495,779 | $490,388 | $522,113 | $531,650 | $534,035 | $491,946 |

APP 00423

Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 424

LEGAL
TRENDS
REPORT
PUBLISHED BY CLIO

# Hourly rates in legal

Overall, hourly rates for lawyers have largely kept pace with inflation. Non-lawyer rates, however, have remained relatively flat. This resulted in average firm rates falling behind increases in the Consumer Price Index in 2021, and they haven't caught up.

## Hourly rates



| Lawyer rate ($) | Firm rate ($) | Non-lawyer rate ($) | CPI |

$349
321
$309

$187

Jan 2016  Jan 2017  Jan 2018  Jan 2019  Jan 2020  Jan 2021  Jan 2022  Jan 2023  Jan 2024  Jan 2025

APP 00424

Case 2:24-cv-00458-JNP    Document 57-1    Filed 11/10/25    PageID.642    Page 68 of
Appellate Case: 25-4135    Document: 72    Date Filed: 01/20/2026    Page: 425

Hourly rates and KPI data    Appendix A

# Hourly rates by state

| State | Lawyer | Non-lawyer | Law firm | State | Lawyer | Non-lawyer | Law firm |
|---|---|---|---|---|---|---|---|
| AK | $329 | $191 | $290 | MT | $258 | $141 | $238 |
| AL | $250 | $141 | $230 | NC | $315 | $162 | $275 |
| AR | $269 | $141 | $247 | ND | $324 | $211 | $301 |
| AZ | $325 | $177 | $279 | NE | $261 | $156 | $235 |
| CA | $420 | $213 | $358 | NH | $289 | $197 | $269 |
| CO | $319 | $176 | $284 | NJ | $363 | $194 | $328 |
| CT | $404 | $223 | $356 | NM | $280 | $143 | $241 |
| DC | $490 | $222 | $454 | NV | $325 | $172 | $284 |
| DE | $472 | $222 | $417 | NY | $420 | $224 | $387 |
| FL | $351 | $182 | $303 | OH | $276 | $144 | $250 |
| GA | $363 | $205 | $321 | OK | $278 | $142 | $253 |
| HI | $337 | $169 | $301 | OR | $324 | $168 | $283 |
| IA | $250 | $153 | $232 | PA | $311 | $193 | $291 |
| ID | $304 | $151 | $269 | RI | $368 | $203 | $347 |
| IL | $349 | $206 | $324 | SC | $297 | $144 | $252 |
| IN | $290 | $169 | $266 | SD | $251 | $154 | $240 |
| KS | $311 | $157 | $285 | TN | $298 | $155 | $269 |
| KY | $244 | $132 | $225 | TX | $367 | $183 | $313 |
| LA | $265 | $118 | $241 | UT | $335 | $171 | $300 |
| MA | $331 | $232 | $307 | VA | $378 | $200 | $342 |
| MD | $361 | $199 | $327 | VT | $279 | $131 | $251 |
| ME | $254 | $166 | $237 | WA | $344 | $187 | $299 |
| MI | $296 | $164 | $270 | WI | $278 | $193 | $263 |
| MN | $325 | $174 | $291 | WV | $196 | $115 | $185 |
| MO | $300 | $148 | $268 | WY | $309 | $140 | $281 |
| MS | $248 | $138 | $223 | | | | |

# Adjusted rates by state*

*Adjusted rates reflect cost of living for each state.

| State | Lawyer | Non-lawyer | Law firm | State | Lawyer | Non-lawyer | Law firm |
|---|---|---|---|---|---|---|---|
| AK | $323 | $188 | $285 | MT | $286 | $157 | $264 |
| AL | $278 | $157 | $255 | NC | $335 | $172 | $293 |
| AR | $311 | $163 | $286 | ND | $366 | $239 | $340 |
| AZ | $322 | $175 | $276 | NE | $289 | $172 | $260 |
| CA | $373 | $189 | $318 | NH | $275 | $187 | $256 |
| CO | $315 | $173 | $280 | NJ | $333 | $179 | $301 |
| CT | $390 | $216 | $343 | NM | $310 | $158 | $266 |
| DC | $442 | $200 | $409 | NV | $335 | $177 | $293 |
| DE | $475 | $224 | $421 | NY | $390 | $208 | $359 |
| FL | $340 | $176 | $293 | OH | $301 | $157 | $272 |
| GA | $376 | $212 | $332 | OK | $315 | $161 | $287 |
| HI | $310 | $155 | $278 | OR | $310 | $160 | $270 |
| IA | $282 | $172 | $261 | PA | $319 | $198 | $299 |
| ID | $332 | $165 | $294 | RI | $363 | $200 | $342 |
| IL | $353 | $208 | $328 | SC | $319 | $154 | $270 |
| IN | $314 | $183 | $289 | SD | $285 | $174 | $273 |
| KS | $345 | $175 | $317 | TN | $322 | $168 | $291 |
| KY | $269 | $146 | $248 | TX | $378 | $189 | $323 |
| LA | $300 | $134 | $273 | UT | $353 | $180 | $316 |
| MA | $306 | $214 | $284 | VA | $375 | $198 | $340 |
| MD | $347 | $191 | $315 | VT | $289 | $136 | $260 |
| ME | $261 | $171 | $244 | WA | $317 | $172 | $276 |
| MI | $315 | $174 | $287 | WI | $298 | $207 | $283 |
| MN | $330 | $177 | $296 | WV | $218 | $129 | $206 |
| MO | $327 | $161 | $292 | WY | $340 | $154 | $310 |
| MS | $284 | $158 | $256 | | | | |

APP 00425

# Hourly rates by practice area

| Practice area | Lawyer | Non-lawyer | Law firm | Practice area | Lawyer | Non-lawyer | Law firm |
|---|---|---|---|---|---|---|---|
| Administrative law | $329 | $146 | $274 | Government | $248 | $167 | $240 |
| Appellate | $325 | $173 | $305 | Immigration | $361 | $317 | $342 |
| Bankruptcy | $456 | $205 | $386 | Insurance | $218 | $115 | $203 |
| Business formation / compliance | $377 | $189 | $352 | Intellectual property | $450 | $242 | $406 |
| Civil litigation | $351 | $171 | $318 | Juvenile | $133 | $138 | $133 |
| Civil rights / constitutional law | $380 | $171 | $332 | Mediation / arbitration | $366 | $214 | $342 |
| Collections / debt | $320 | $174 | $279 | Medical malpractice | $247 | $131 | $220 |
| Commercial / sale of goods | $411 | $194 | $390 | Personal injury | $335 | $163 | $284 |
| Construction | $314 | $153 | $284 | Real estate | $374 | $198 | $345 |
| Contracts | $369 | $190 | $352 | Small claims | $260 | $269 | $262 |
| Corporate litigation | $460 | $221 | $429 | Tax | $440 | $233 | $392 |
| Criminal | $217 | $188 | $212 | Traffic offenses | $326 | $245 | $297 |
| Elder law | $293 | $178 | $257 | Trusts | $394 | $203 | $331 |
| Employment / labor | $385 | $183 | $352 | Wills & estates | $370 | $193 | $314 |
| Family | $343 | $181 | $294 | Workers' compensation | $180 | $132 | $170 |

APP 00426



Appendix — B

# Detailed
# methodology

APP 00427

# App data collection

The *Legal Trends Report* uses aggregated and anonymized data collected from the Clio platform. By synthesizing actual usage data, we're able to identify trends that would be otherwise invisible to most firms.

The *Legal Trends Report* has been prepared using data aggregated and anonymized from tens of thousands of legal professionals. These customers were included in our dataset using the following criteria:

- They were paid subscribers to Clio. Customers who were evaluating the product via a free trial or were using Clio as part of our Academic Access Program were not included.

- They were located in the United States.

- Any data from customers who opted out of aggregate reporting was excluded.

- Outlier detection measures were implemented to systematically remove statistical anomalies.

## Data usage and privacy

The security and privacy of customer data is our top priority at Clio. In preparing the *Legal Trends Report*, Clio's data operations team observed the highest standard of data collection and reporting.

## Data collection

- All data insights were obtained in strict accordance with Clio's Terms of Service (section 2.12).

- All extracted data was aggregated and anonymized.

- No personally identifiable information was used.

- No data belonging to any law firm's clients was used.

## Reporting

Aggregate data has been generalized to avoid instances where individual firm data could be identified. For example, to avoid reporting data on a small town with only one law firm, which would implicate all of this town's data to this firm, we only report at country and state levels.

Additionally, raw datasets will never be shared externally. Clio is effectively a tally counter for user interactions—much like stadiums use turnstiles to count visitors without collecting any personally identifiable information from their customers. Similarly, as users interact with the Clio platform they trigger usage signals we can count and aggregate into datasets. We can identify trends without collecting information that reveals anything specific about individual customers.

APP 00428



The *Legal Trends Report*, published by Clio, provides information on the most important issues faced within the legal profession. By analyzing aggregated and anonymized data from tens of thousands of legal professionals in the U.S., supported by extensive survey research, this report offers unique insights into law firm efficiencies, hourly rates, and other key metrics for success.

Clio is the world's leading provider of cloud-based legal technology, providing lawyers with low-barrier, affordable solutions to manage and grow their firms more effectively, more profitably, and with better client experiences. Clio redefines how lawyers manage their firms by helping them run their practices securely from any device, anywhere.

Learn more at clio.com.



**Legal Trends Report**® is a registered trademark of Themis Solutions Inc. © 2025 Themis Solutions Inc. All rights reserved.

APP 00429

David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hoc vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hoc vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual, <br><br> Plaintiff, <br><br> v. <br><br> KATHERINE KUBLER, an individual, NETFLIX, INC., a Delaware Corporation, and JOHN DOES A-L, <br>Defendants. | **DEFENDANTS' REPLY IN SUPPORT OF FEE PETITION** <br><br> Case No. 2:24-cv-00458-CMR |

APP 00430

Plaintiff chose to bring this meritless action attacking the entirety of Defendants' three-part documentary. His Complaint was an unwieldy and untethered attack on Defendants' free speech rights. That decision and approach have consequences under the California Anti-SLAPP Act, Cal. C.C.P. § 425.16 and the Uniform Public Expression Protection Act, Utah Code Ann. § 78B-25-101, et seq. (the "Anti-SLAPP Acts"). For prevailing on their Motion to Strike Plaintiff's Complaint, Defendants are now entitled to their reasonable attorneys' fees, which are thoroughly supported with detailed declarations and time records. Plaintiff's Opposition fails to competently rebut the reasonableness of Defendants' counsel's rates and hours incurred in successfully defending this action, instead citing irrelevant data and cherry-picked time entries that Plaintiff then misrepresents. Defendants respectfully request the Court grant their Fee Petition in the amount of $356,418.50 for the Motion to Dismiss and Motion to Strike, and $31,294.00 for the Fee Petition and this Reply.

## ARGUMENT

**A.    Defendants Met Their Burden of Showing their Requested Fees Are Reasonable**

  **1.    Defendants' Attorneys' Rates Are Reasonable**

In objecting to the hourly rates charged by Defendants' counsel, Plaintiff ignores the context of this lawsuit and the seriousness of the claims. Plaintiff's claims against Netflix and Ms. Kubler raised important constitutional questions and Defendants were entitled to hire counsel with whom they were familiar and who have decades of experience handling these types of matters. Plaintiff does not challenge counsel's extensive qualifications, nor could he. While the Court easily dismissed Plaintiff's claims, that is due not to the simplicity of the case, but to defense counsel's efforts that were necessary in order to synthesize Plaintiff's nebulous Complaint for the Court and present the issues in a clear and concise manner. Plaintiff cannot be heard to complain about the

work required to defend a Complaint that rambled on and on, throwing the proverbial mud at the wall to attack the entire three-hour series. Nor can he fairly be heard to complain about rates charged by national counsel at a law firm with one of the top media law practices when he chose to sue a national streamer, Netflix, challenging material of significant public interest and importance—a personal memoir and documentary about the treatment of at-risk teens.

Even if the Court were to only look at local Salt Lake City rates, Plaintiff's comparator misses the mark. In objecting to Dentons' rates, Plaintiff cites a singular study purporting to calculate the average billing rate for an attorney in Utah as $335 per hour. This data point for the entire state of Utah has no bearing on a reasonable fee in Salt Lake City. Indeed, recent cases have approved rates for Salt Lake City counsel much higher than what Plaintiff suggests. *See*, *e.g.*, *Martin v. SGT, Inc.*, No. 2:19-CV-00289-RJS, 2023 WL 3585326, at *16 (D. Utah May 22, 2023) (approving rates of up to $695 for senior partner in Salt Lake City market); *Robert v. Red Lodges Land Dev., Inc.*, No. 2:20-CV-580 TC, 2021 WL 5179218, at *3 (D. Utah Nov. 8, 2021) (finding rate of $650 for senior partner to be reasonable in the Salt Lake City market); *Johnson v. Deseret Mut. Benefit Adm'rs*, No. 2:22-CV-330-HCN-JCB, 2025 WL 2194060, at *2 (D. Utah Aug. 1, 2025) (finding that "[a]t a time when partners and even some associates at large law firms routinely bill their time at four-figure hourly rates, the court has no difficulty concluding that" $400 to $600 per hour is reasonable).

Even one of the older cases cited by Plaintiff approved rates above the $335 per hour that Plaintiff deems reasonable. For example, in *In re Miniscribe Corp.*, 309 F.3d 1234, 1245 (10th Cir. 2002), the Tenth Circuit approved a rate of $400 per hour ***23 years ago***. To suggest Defendants' counsel's rates should be less than a decades-old standard is far from reasonable.

2

Defendants respectfully request the Court apply the rates charged by their attorneys and *paid by*

Defendants, which itself is an indicator of the current prevailing market rates for this type of case.

### 2.    The Amount of Hours Expended Was Reasonable

Defendants met their burden of showing that their request for recovery of 491.8 hours

incurred in bringing the Motion to Dismiss and Motion to Strike is reasonable. Plaintiff does not

address the cases cited in Defendants' Fee Petition demonstrating that courts have approved

upwards of 550 hours for similar motions. (Petition at 6.) Instead, Plaintiff cherry-picks counsel's

time entries, and in doing so, misrepresents the information provided by Defendants. For example:

- Plaintiff claims that on August 13, 2024, three attorneys spent 13.4 hours "reviewing and editing the same motion drafts". (Opp. at 5.) But the time entries cited by Plaintiff include 2.3 hours of research (Naron), as well as other tasks adjacent, and necessary, to the actual research and writing of the brief. (*Id*.)

- Plaintiff claims that Defendants' counsel spent 10.5 hours "simply to review client edits" to the draft brief. (Opp. at 5-6.) The time entries cited by Plaintiff clearly include time spent not just reviewing edits, but also revising the brief accordingly. Moreover, the time entries cited by Plaintiff include time unrelated to the client edits—1.1 hours for "revis[ing] Request for Judicial Notice and Kubler Declaration" and 1.3 hours for "review[ing] exhibits to Request for Judicial Notice". (*Id*.)

- Plaintiff claims that Defendants' counsel spent 8.5 hours "for an initial review of Plaintiff's opposition" to the Motion to Dismiss and Motion to Strike. (Opp. at 6.) But the time entries cited by Plaintiff include more than five hours spent outlining, researching, and drafting the reply brief, not just reviewing Plaintiff's Opposition. (*Id*.)

Plaintiff also takes issue with the amount of time spent researching the Motion to Dismiss

and Motion to Strike. (Opp. at 8-9.) Of the 27.2 hours identified by Plaintiff, only 9.6 hours relate

to research, while the remaining time relates to drafting and editing the brief, Request for Judicial

Notice and Ms. Kubler's Declaration. (*Id*.) In addition, carefully reviewing the three-hour series

to apply the case law to the content, including watching it more than one time, was both necessary

and reasonable. Moreover, Plaintiff's conclusory assertion that Utah counsel should have

3

conducted the research is baseless and ignores Mr. Naron's substantial expertise in this area of the law. Further, contrary to Plaintiff's claim that this case was overstaffed with five lawyers, the time entries make clear that while local counsel Mr. Tufts and Mr. Kinghorn assisted on case strategy and local practice questions, the core team consisted of three attorneys—Ms. Spears, Ms. Domenella and Mr. Naron.

Plaintiff also incorrectly claims that Defendants' counsel block-billed their time. That is simply false. Block-billing refers to the practice in which each individual "enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Robinson v. City of Edmond*, 160 F.3d 1275, 1285 n. 9 (10th Cir. 1998) (citations omitted). Here, Defendants' attorneys submitted single time entries for each day but broke those entries down by individual tasks and the time associated with each task. Plaintiff objects to the fact that a singular time entry for Ms. Spears on August 15, 2024 totals 5 hours for multiple distinct tasks. (Opp. at 8.) Egregiously, in copying the descriptions from Ms. Spears' time entry, Plaintiff *omits* the breakdown of hours for each task. (*Id.*) The actual entry included on Dentons' invoice and Exhibit 1 to Ms. Spears's Declaration identifies the amount of time for each individual task on that day (as do all other entries):

| 8/15/2024 | Natalie J. Spears | 5 | $4,325.00 | Edit revised draft of combined motion to dismiss and motion to strike (3.20); discuss same with J. Giannini (.30); review judicial notice issues and law related to arguments in motion to dismiss (1.0); confer, emails w/ J. Giannini, G. Naron re same and edits to brief, request for judicial notice, and Kubler declaration (.50). |

In light of Plaintiff's failure to identify any specific time entries that are duplicative or unnecessary, Defendants respectfully request that the Court award the entirety of the 491.8 hours requested. *Martin*, 2023 WL 3585326, at *15 (declining to reduce requested fee award where

4

opposing party "does not provide any examples of time entries that are unreasonable or unwarranted under the circumstances").

Overall, Plaintiff's Opposition rings hollow. While he deploys buzz words like "duplicative" and "excessive" to describe Defendants' counsels' work, what he actually points to in the time entries is either misleading or otherwise simply shows reasonable and normal team work, reflecting different roles and levels of review for the tasks needed. Not only was the work performed reasonable, but it resulted in success on the Motion and ultimately the efficient and early termination of the litigation, saving time and money for all involved and conserving judicial resources in the public interest. The Fee Petition should be granted in full.[1]

**B.      Defendants' Are Entitled to Recovery of Fees Spent in Bringing this Motion**

As set forth in Defendants' opening Fee Petition, they are entitled to recovery of the fees incurred in bringing this motion. (Fee Petition at 7.) Plaintiff does not dispute this in his Opposition. Attached as Exhibits 1 and 2 are charts showing the time spent by Dentons US and DDJP, respectively, in preparing the Fee Petition and this Reply, totaling 42 hours and $31,294.00. Defendants request that the Court include this amount in the fee award.

### CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court award $387,712.50 in reasonable attorneys' fees for defending against Plaintiff's lawsuit and filing this Fee Petition.

---

[1] Plaintiff's request to deny Defendants' Fee Petition in its entirety lacks any basis in the law. As shown above, Plaintiff's objections to Defendants' fees are baseless. Even if the Court were to find that a defendant did not sufficiently support its fee request, the proper remedy would be a reduction in fees, not a wholesale denial. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (noting that when documentation of hours is "inadequate, the district court may reduce the award accordingly"). However, for all the reasons discussed herein, Defendants maintain that their request is reasonable and not subject to reduction.

5

Dated:  November 24, 2025                    /s/ *Natalie J. Spears*

**DENTONS DURHAM JONES PINEGAR P.C.**
David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

**DENTONS US LLP**
Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. (Giannini) Domenella (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.domenella@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix Inc.*

6

APP 00436

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 24, 2025, I caused a copy of the foregoing to be filed

and served on counsel of record via the Court's electronic filing system.


*/s/ Natalie J. Spears*

7

APP 00437

# EXHIBIT 1

APP 00438

| Work Date | Timekeeper Name | Hours | Amount | Narrative |
|---|---|---|---|---|
| 10/1/2025 | Jacqueline A. Giannini | 2.5 | $1,812.50 | Research cases awarding fees under California anti-SLAPP act (2.0); begin reviewing spreadsheet of invoices (.5). |
| 10/14/2025 | Natalie J. Spears | 0.2 | $173.00 | Review issues regarding fee petition and contents for motion. |
| 10/15/2025 | Natalie J. Spears | 0.2 | $173.00 | Call w/ plaintiff's counsel re appeal and fee petition. |
| 10/15/2025 | Jacqueline A. Giannini | 0.2 | $145.00 | Call with opposing counsel regarding appeal and fee petition (.2). |
| 10/16/2025 | Jacqueline A. Giannini | 4.2 | $3,045.00 | Prepare chart of time entries exhibit for Fee Petition (3.0); draft N. Spears declaration in support of Fee Petition (1.2). |
| 10/17/2025 | Jacqueline A. Giannini | 3.7 | $2,682.50 | Draft declarations in support of Fee Petition (1.8); research decisions awarding attorneys fees under anti-SLAPP acts (1.9). |
| 10/19/2025 | Natalie J. Spears | 1.7 | $1,470.50 | Review and edit my declaration, fee petition chart, exhibit. |
| 10/19/2025 | Jacqueline A. Giannini | 2.8 | $2,030.00 | Research Utah case law on attorneys' fees (1.1); draft Fee Petition (1.7). |
| 10/20/2025 | Natalie J. Spears | 0.9 | $778.50 | Read draft fee petition and high level edits to same (.50); confer with J. Domenella re same and research (.40). |
| 10/20/2025 | Jacqueline A. Giannini | 2.9 | $2,102.50 | Revise chart of invoices to attach to Fee Petition (.5); call with N. Spears regarding Fee Petition (.4); draft Fee Petition (2.0). |
| 10/21/2025 | Natalie J. Spears | 0.8 | $692.00 | Read key cases from research, edit draft fee petition (.50); confer with J. Domenella re same (.30). |
| 10/21/2025 | Jacqueline A. Giannini | 0.9 | $652.50 | Call with N. Spears regarding fee petition (.3); update spreadsheet of invoices to attach as exhibit to fee petition (.6). |
| 10/22/2025 | Natalie J. Spears | 1 | $865.00 | Review updated drafts of fee petition, declarations, and brief and further edit same (1.0). |
| 10/22/2025 | Jacqueline A. Giannini | 1 | $725.00 | Review and edit Fee Petition, declarations (.6); email Netflix client draft Fee Petition and supporting materials (.2); email K. Kubler draft Fee Petition and supporting materials (.2). |
| 10/23/2025 | Natalie J. Spears | 1 | $865.00 | Review additional research on fee petition (.50); confer w/ J. Domenella re same (.30); email w/ clients re fee petition (.20) . |
| 10/23/2025 | Jacqueline A. Giannini | 0.6 | $435.00 | Strategize with N. Spears for Fee Petition (.3); correspond with I. Kinghorn regarding research for Fee Petition (.3). |
| 10/24/2025 | Jacqueline A. Giannini | 1.1 | $797.50 | Review additional fee cases gathered by I. Kinghorn (.9); revise Fee Petition based on new research (.2). |
| 10/26/2025 | Natalie J. Spears | 0.8 | $692.00 | Review and edit final brief in support of fee petition (.70); email w/ J. Domenella re finalizing same (.10). |
| 10/26/2025 | Jacqueline A. Giannini | 0.2 | $145.00 | Revise Fee Petition and chart based on N. Spears' edits. |
| 10/27/2025 | Jacqueline A. Giannini | 0.8 | $580.00 | Revise and finalize for filing Fee Petition and supporting declarations and exhibits. |
| 11/11/2025 | Jacqueline A. Giannini | 2.9 | $2,102.50 | Review Plaintiff's Opposition to Fee Petition (.3); draft Reply to Fee Petition (2.6). |
| 11/12/2025 | Jacqueline A. Giannini | 0.4 | $290.00 | Call with D. Tufts to discuss Reply in Support of Fee Petition, appeal logistics and appellate mediation (.4). |
| 11/14/2025 | Jacqueline A. Giannini | 0.5 | $362.50 | Revise Reply in Support of Fee Petition and send to N. Spears (.5). |
| 11/17/2025 | Jacqueline A. Giannini | 0.4 | $290.00 | Revise Reply in Support of Fee Petition based on N. Spears' and D. Tufts' edits. |
| 11/17/2025 | Natalie J. Spears | 1.5 | $1,297.50 | Read Plaintiff's opposition filing and assess same (.50); read draft reply brief in support of Fee Petition and edit reply (1.0). |

APP 00439

| 11/18/2025 | Jacqueline A. Giannini | 0.4 | $290.00 | Review and edit invoices related to Fee Petition for Reply in Support of Fee Petition (.4). |
|---|---|---|---|---|
| 11/19/2025 | Jacqueline A. Giannini | 0.5 | $362.50 | Revise Reply in Support of Fee Petition and accompanying charts of invoices. |
| 11/19/2025 | Natalie J. Spears | 0.4 | $346.00 | Review client response and further edits to reply (.40). |
| | | 34.5 | $26,202.50 | |

APP 00440

# EXHIBIT 2

APP 00441

| Date | Name | Hours | Amount | Narrative |
|---|---|---|---|---|
| 10/1/2025 | Tufts, David W. | 0.3 | $238.50 | Follow up on attorney fees issue with regard to authorities cited in other cases, and forward same to J. Domenella (0.3) |
| 10/7/2025 | Tufts, David W. | 0.2 | $159.00 | Conference and emails with J. Domenella regarding fees petition issue, extension, and motion for extension (0.2) |
| 10/15/2025 | Tufts, David W. | 0.1 | $79.50 | Attention to emails regarding communications with N. Lichfield's counsel on fee petition and appeal (0.1) |
| 10/20/2025 | Tufts, David W. | 0.3 | $238.50 | Find prior orders from Judge Parrish on attorney fees issue, and forward same to J. Domenella (0.3) |
| 10/21/2025 | Tufts, David W. | 0.9 | $715.50 | Review and revise declarations of D. Tufts and N. Spears in support of motion for attorney fees (0.9); forward comments to J. Domenella (NC). |
| 10/23/2025 | Kinghorn, Ian M. | 2.6 | $1,196.00 | Legal research into fee awards for fee petition |
| 10/26/2025 | Tufts, David W. | 0.2 | $159.00 | Review and comment on D. Tufts fee declaration (0.2) |
| 11/10/2025 | Tufts, David W. | 1.3 | $1,033.50 | Review of plaintiff's opposition to fee petition, including review of exhibit thereto |
| 11/12/2025 | Tufts, David W. | 0.5 | $397.50 | Conference with J. Domenella regarding strategy for reply in support of fees petition |
| 11/17/2025 | Tufts, David W. | 1.1 | $874.50 | Review and comment on draft reply in support of fees award |
|  |  | 7.5 | $5,091.50 |  |

APP 00442