**No. 25-4135**

_____

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

NARVIN LICHFIELD,
Plaintiff-Appellant,

v.

KATHERINE KUBLER, an individual;
NETFLIX, INC., a Delaware corporation,
Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Utah (No. 2:24-cv-00458-JNP)
Hon. Jill N. Parrish, U.S. District Judge

**APPELLANT'S OPENING BRIEF**

**ORAL ARGUMENT REQUESTED**

Michael K. Hepworth, Esq.
**HEPWORTH LEGAL**
320 W 500 S, Ste. 200
Bountiful, UT 84010
(801) 872-2222
*mhepworth@hepworthlegal.com*
*Counsel for Plaintiff–Appellant*

1

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Tenth Circuit Rule 26.1, Plaintiff–Appellant Narvin Lichfield states that he is an individual with no parent corporation, and that no publicly held corporation owns 10% or more of any stock of Plaintiff–Appellant.

**STATEMENT OF RELATED CASES**

There are no prior or related appeals.

**TABLE OF CONTENTS**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT   2

STATEMENT OF RELATED CASES   2

TABLE OF CONTENTS   3

JURISDICTIONAL STATEMENT   7

STATEMENT OF THE ISSUES   7

STATEMENT OF THE CASE   10

  Factual Background   10

  Procedural History   12

SUMMARY OF THE ARGUMENT   20

STANDARD OF REVIEW   26

ARGUMENT   28

  I. The Dismissal of the Defamation Claims Was Error Because the Challenged Statements Are Actionable Assertions of Fact – Not Immunized Opinion.   28

  II. A Reasonable Jury Could Find that the Documentary Implied Lichfield's Involvement in a Teen's Death – Dismissing the Defamation-by-Implication Claim at the Pleading Stage Was Improper.   34

  A. The Costa Rica Arrest "Half-Truth": Omitting Lichfield's Exoneration Could Make an Otherwise True Statement Defamatory.   38

  III. Lichfield Adequately Alleged the Requisite Fault, and the District Court Prematurely Dismissed the Complaint Without Addressing Public-Figure Status or Actual Malice.   43

  IV. The District Court Erred in Applying State Anti-SLAPP Statutes in Federal Court and Awarding Attorney's Fees to Appellees.   47

    A. State Anti-SLAPP Laws Do Not Apply in Federal Diversity Actions Under   48

    Erie.   48

B. Even if Anti-SLAPP Applied, the District Court's Manner of Application Was Procedurally Improper and the Resulting Fee Award Must Be Vacated.
52

V. The Dismissal of the Remaining Claims (False Light, IIED, and Civil Conspiracy) Should Be Reversed or Reconsidered on Remand, and Leave to Amend Should Be Freely Permitted.    56

CONCLUSION    59

ADDENDUM    64

DISTRICT COURT JUDGMENT FILED 9/29/25    65

MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS AND FOR RELIEF UNDER ANTI-SLAPP ACTS FILED 9/29/25    66

**CASES**

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015)...........43, 50

*Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282 (Utah 1993) ...........................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................26

*Berneike v. CitiMortgage, Inc.,* 708 F.3d 1141 (10th Cir. 2013) ...........................27

*Brehany v. Nordstrom, Inc.*, 812 P.2d 49 (Utah 1991) ..........................................16

*Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081 (10th Cir. 2017) ............................................................................................................16, 39

*Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231 (10th Cir. 2013)....26

*Carbone v. CNN*, 910 F.3d 1345 (11th Cir. 2018) .................................................50

*Cf. Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610 (Cal. 1984) ...................44

*Curley v. Perry*, 246 F.3d 1278 (10th Cir. 2001) ...................................................57

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)............44

*Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198 (Utah 2001) ....................................................................................................................18

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997) .............................................................................................................................11

*Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970)................15

*Hanna v. Plumer*, 380 U.S. 460 (1965).................................................................52

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ...................46

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ...........................................17, 57

*Jacob v. Bezzant*, 212 P.3d 535 (Utah 2009) ........................................................47

*Jacob v. Bezzant*, 212 P.3d 535 (Utah 2009) ........................................................26

*Jensen v. Sawyers*, 130 P.3d 325 (Utah 2005) ................................................17, 22

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019)...................................................50

*Lichfield v. Kubler,* 2:24-cv-00458-JNP-CMR, (D. Utah Sep. 29, 2025)..............17

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018) ...........................................................9, 24, 25, 48, 50, 51, 53, 55, 61

*Mackey v. Krause*, 2025 UT 37.........................................................................18, 51

*Mathews v. McCown*, 2025 UT 34....................................................................30, 32

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ...................................8, 29, 32

*Mink v. Knox*, 613 F.3d 995, 1000–01 (10th Cir. 2010) ........................................45

*Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185 (E.D.N.Y. 2018) .............................................................................................................................33

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828
   (9th Cir. 2018) ...................................................................................19, 51

*Rizzuto v. Nexxus Products Co.,* 641 F. Supp. 473, 477 (S.D.N.Y. 1986)...............15

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)...........49

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006)........................................................28

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ..............................................41

*Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516 (10th Cir. 2013).........................11

*Turner v. KTRK TV, Inc.*, 28 S.W.3d 103 (Tex. 2000) ...........................................39

*West v. Thomson Newspapers,* 872 P.2d 999 (Utah 1994) .....................................29

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990)......................41

## STATUTES

28 U.S.C. § 1927 ......................................................................................................54

Utah Code § 78B-25-104(2)–(3) .............................................................................49

Utah's Uniform Public Expression Protection Act .....................................9, 13, 19

## OTHER AUTHORITIES

*Restatement* (*Second*) of *Torts* § 582 ....................................................................39

*Restatement (Second) of Torts* § 614......................................................................35

## RULES

Cal. Civ. Proc. Code § 425.16..................................................................9, 19, 49

Federal Rule of Civil Procedure 15(a)(2).................................................................58

Federal Rule Evidence 201 ......................................................................................28

Federal Rule of Civil Procedure 12(b)(6)............ 7, 14, 19, 24, 25-27, 48, 52, 53, 57

**JURISDICTIONAL STATEMENT**

This appeal is taken from a final judgment of the United States District Court for the District of Utah (Hon. Jill N. Parrish) entered September 29, 2025, which dismissed Appellant Narvin Lichfield's complaint in its entirety and awarded attorney's fees to Appellees under state anti-SLAPP statutes. The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) because the parties are completely diverse and the amount in controversy exceeds $75,000. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's order disposed of all claims and is a final decision. Lichfield timely filed a notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a).

**STATEMENT OF THE ISSUES**

1. **Defamation and False Light (Rule 12(b)(6) Dismissal):** Did the district court err in dismissing Lichfield's defamation (including defamation per se) and false light claims at the pleading stage by treating Kubler's statements – *e.g.*, "the children he abused, the parents he conned, all of the crimes he's gotten away with" – as non-actionable opinion rather than factual assertions? Those statements were presented as assertions of fact (not as "allegations" or "in my opinion"), and they impute child abuse, fraud, and criminal conduct— classic actionable defamation (including defamation per se) if false. Did the

court misapply *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), by classifying these accusations as "pure opinion" instead of verifiable allegations of criminal or abusive conduct? And did the court improperly reject Lichfield's defamation-by-implication theory – that the film juxtaposed Lichfield's image with a news headline about a teenager's death to imply his involvement, and omitted exonerating facts about his past arrest to imply guilt – even though a reasonable factfinder could conclude the film conveyed those defamatory implications?

2. **Public Figure Status and Actual Malice:** Did the district court improperly short-circuit the analysis of Lichfield's status as a private or limited-purpose public figure, and thereby avoid addressing the issue of actual malice? Specifically, given that Lichfield (a former troubled-teen program operator) was portrayed in a Netflix documentary on a matter of public interest, should the court have allowed the case to proceed to discovery on whether he is a private figure (requiring negligence) or a limited-purpose public figure (requiring *New York Times* actual malice) rather than effectively deciding those issues *sub silentio* at the pleading stage? If actual malice was required, did Lichfield adequately allege facts giving rise to a plausible inference that Appellees published the statements with knowledge of falsity or reckless

disregard for the truth (for example, by knowingly mischaracterizing his role and omitting contrary facts)?

3. **State Anti-SLAPP Statutes in Federal Court:** Did the district court err by applying a state anti-SLAPP statute (either California's Cal. Civ. Proc. Code § 425.16 or Utah's Uniform Public Expression Protection Act) to strike Lichfield's state-law tort claims and award attorney's fees, notwithstanding the *Erie* doctrine[1] and this Court's precedent in *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018)? In other words, do the special motion-to-strike procedures and fee-shifting provisions of those anti-SLAPP laws apply in a federal diversity action given that Federal Rules 12 and 56 already "answer the same question" (the standards for pre-trial dismissal), and that applying the state laws imposes additional burdens on plaintiffs beyond the Federal Rules?

4. **Remaining Tort Claims and Leave to Amend:** Even if the core defamation claims were properly dismissed (which Appellant contests), did the district court err by dismissing Lichfield's other claims (false light, IIED, and civil conspiracy) with prejudice and without leave to amend? For example, since false light closely parallels defamation, should the false light claim be reinstated if the defamation dismissal is reversed? Did the court

---

[1] *Erie Railroad Co. v. Tompkins* 304 U.S. 64 (1938)

9

inappropriately dismiss the IIED claim despite allegations that Appellees falsely accused Lichfield of heinous conduct (child abuse and criminal behavior) with intent to inflict emotional distress – conduct a jury could deem "outrageous" if proven? And was it error to dismiss the civil conspiracy claim solely because the underlying torts were dismissed, and to deny Lichfield an opportunity to replead more specific facts (such as the "mastermind" allegation), particularly given that this was the initial complaint with no prior amendments?

**STATEMENT OF THE CASE**

**Factual Background**

Narvin Lichfield is a businessman who was involved in operating and promoting programs within the "troubled teen" residential treatment industry. Narvin's brother, Robert Lichfield, founded the World Wide Association of Specialty Programs (WWASP), an organization that ran behavior modification boarding schools for struggling teens. Narvin Lichfield, individually, operated three of his own youth facilities (including two in Costa Rica).

In 2023, Appellee Katherine Kubler – a filmmaker and former student of a WWASP-affiliated school (though not one of Lichfield's) – released a three-part Netflix

documentary series titled *The Program: Cons, Cults, and Kidnapping*,[2] ("Series")

which examines alleged abuse and misconduct in the troubled-teen industry. The

third episode focuses on the WWASP network and individuals "at the top" of that

system, including Narvin Lichfield.

During the documentary, Kubler makes several statements and insinuations about

Lichfield that are at issue in this case. In Episode 3, Kubler opens with a montage of

a bulletin board containing photographs of various WWASP figures and news

clippings. One brief shot shows Lichfield's photograph adjacent to a newspaper

headline reading "Another Teen Dies in Program." As this montage plays, Kubler's

voice-over states: *"It bothers me how people low on the totem pole end up taking*

*the fall, and the people at the top seem to get away with murder. I knew if I really*

*wanted to go after these places, I need to follow the money."* Immediately afterward,

Kubler's narration describes meeting Narvin Lichfield at a conference karaoke

---

[2] Plaintiff's claims are based on a three-part Netflix documentary series repeatedly cited in the Complaint (Compl. ¶¶ 10–25, 30, 45) and alleged to be defamatory. On a Rule 12(b)(6) motion, the Court may consider documents referenced in the complaint and central to the claims where authenticity is undisputed. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013). The series is the subject of the claims, and its authenticity is not disputed, so it may be considered without converting the motion to summary judgment. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997). The full footage—not either party's selective description—controls.

11

event. Over footage of that encounter, she says: *"It was surreal to see Narvin in person—knowing everything I know about this guy, the children he abused, the parents he conned, all of the crimes he's gotten away with. ... You know, all these people, they've gotten away with this stuff for so long. So, I think a lot of them really do think they got away with it. I think Narvin, I think Robert, they've gotten away with it for so long."* Later in the episode, Kubler discusses one of Lichfield's former Costa Rica facilities (Dundee), stating: *"Dundee was only open for 19 months before authorities were alerted to abuse, raided the facility, and Narvin was arrested."* Notably, Kubler does **not** mention that in 2007, Costa Rican judges declared Lichfield "innocent for lack of evidence."[3] Lichfield alleges that omitting this fact contributed to a false impression of his guilt.

**Procedural History**

After *The Program* aired, Lichfield filed suit against Kubler and Netflix in the U.S. District Court for the District of Utah on June 27, 2024. His First Amended Complaint (the operative complaint) asserted causes of action under Utah law for defamation, defamation per se, false light invasion of privacy, intentional infliction of emotional distress (IIED), and civil conspiracy (derivative of the other torts). In

---

[3] Adam Williams, *Costa Rica Gov't Closes Controversial "Tough Love" Youth Camp*, **TICO TIMES** (San José, Costa Rica), Mar. 22, 2011.

12

essence, Lichfield claims the documentary falsely and maliciously portrays him as a criminal and child abuser – a prime architect of an abusive, cult-like enterprise – even though he maintains he never harmed children and was never convicted of any crime. The complaint specifically quoted the statements described above ("abused" children, "conned" parents, "crimes he's gotten away with") as false and defamatory, and alleged that by juxtaposing Lichfield's image with the article about a teenager's death, the film falsely implied his involvement. It further alleged that by mentioning Lichfield's arrest without noting his exoneration, the film left viewers with the misleading impression that he was guilty of wrongdoing in Costa Rica.

Appellees Kubler and Netflix moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and in the alternative moved to strike or dismiss under either California's anti-SLAPP statute or Utah's recently enacted Uniform Public Expression Protection Act (UPEPA). They argued that Kubler's statements about Lichfield were non-actionable opinions or substantially true; that no reasonable viewer would draw the sinister implications alleged; and that Lichfield had not pleaded facts showing the requisite fault (especially given the subject matter was of public concern). They further contended that Lichfield's suit fell within the scope of both California's and Utah's anti-SLAPP laws (as speech on a public issue) and should be stricken with prejudice, with an award of attorney's fees and costs to the defense. Lichfield opposed the motion, maintaining that

Kubler's words were provably false factual assertions (or at least "mixed opinion" implying false underlying facts), and that his pleadings were sufficient under Rule 12(b)(6). He also challenged the applicability of any anti-SLAPP statute in federal court and argued that, if one did apply, Utah's law (as the forum state's law) should govern.

On September 29, 2025, the district court issued a Memorandum Decision and Order in favor of Appellees on all points. First, the court granted the Rule 12(b)(6) motion and dismissed each of Lichfield's tort claims with prejudice. The court held that the key statements in the film were "constitutionally protected opinions rather than assertions of fact" and thus could not sustain a defamation claim. In the court's view, phrases like "get away with murder" were obvious metaphor or hyperbole, not literal accusations; similarly, describing "children [Lichfield] abused" and "parents he conned" reflected Kubler's subjective characterization of the WWASP program practices (as abusive or deceptive), not an objectively verifiable claim of specific misconduct. The court reasoned that whether the programs constituted "abuse" or instead "tough love," and whether parents were "conned" out of tuition or simply paid voluntarily, are matters of personal viewpoint on which "there is no way to objectively verify" the truth. Although acknowledging that accusations of criminal conduct are usually factual, the court concluded that Kubler's reference to unspecified "crimes [Lichfield has] gotten away with" was too general to be proven

14

false and thus amounted to mere "rhetorical hyperbole." In reaching this conclusion, the court relied on *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970) (holding the use of the word "blackmail" in context was understood as figurative), and an out-of-circuit case that characterized the phrase "don't be conned" as rhetorical hyperbole. *See Rizzuto v. Nexxus Products Co.,* 641 F. Supp. 473, 477 (S.D.N.Y. 1986).

The court also rejected Lichfield's defamation-by-implication claims regarding both the teen-death headline montage and the Costa Rica arrest segment. As to the bulletin-board montage implying involvement in a teenager's death, the court held that no reasonable viewer would infer that Lichfield was responsible for the death mentioned in the news clipping. The court emphasized that the montage was a "jumble" of many photos and documents about the troubled-teen industry generally; Lichfield's photo happened to appear near the "Another Teen Dies" headline only briefly (for a couple of seconds) and before he was identified by name in the episode. Later in the episode, when Lichfield is introduced and his role explained, it is unrelated to wilderness "therapy hikes" like the one in which the teen's death occurred. In the court's view, given the brevity and context, the scene did not reasonably suggest that Lichfield had any connection to that incident. Thus, the court concluded, "no reasonable factfinder could conclude" that the image of Lichfield

15

next to the headline conveyed the defamatory meaning alleged, and it dismissed any claim premised on that implication.

Regarding the Costa Rica arrest, the court noted that the statement "Narvin was arrested" is literally true and that Lichfield conceded as much. Under defamation law, the court reasoned, truth is an "absolute defense," and the omission of "additional favorable information" (such as the later dropping of charges) cannot render an otherwise true statement materially false. The court cited *Brehany v. Nordstrom, Inc.*, 812 P.2d 49 (Utah 1991), and this Court's decision in *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081 (10th Cir. 2017), for the proposition that a speaker is not obligated to include all exculpatory details and that telling a partial truth (the fact of an arrest) is not actionable defamation merely because it omits subsequent developments. The court distinguished the doctrine of defamation by implication, ruling that Restatement (Second) of Torts § 566 (regarding opinions implying undisclosed facts) was inapplicable since an arrest is a statement of pure fact. It held that because "Narvin was arrested" was substantially true, leaving out the later dismissal of charges did not make it false. Accordingly, the court dismissed the defamation claims to the extent they were based on an allegedly misleading "half-truth" about the Costa Rica incident. The court likewise found that Lichfield's allegation that the series portrayed him as a behind-the-scenes "mastermind" of abuse was too vague: the complaint had not identified any specific

scene or quote using that term or its equivalent. Citing Utah's requirement that defamatory words be pleaded with particularity (ideally verbatim or in substance), the court ruled that the "mastermind" theory of defamation failed for lack of specificity.

Having disposed of the defamation and defamation per se counts, the court next dismissed Lichfield's false light claim. The District Court noted that under Utah law, false light invasion of privacy is closely parallel to defamation when based on the publication of falsehoods; the same First Amendment limitations apply. *See Lichfield v. Kubler,* 2:24-cv-00458-JNP-CMR, (D. Utah Sep. 29, 2025); (citing *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005). Because Lichfield's false light claim arose from the very same statements and alleged implications as his defamation claims, the court reasoned that it could not survive if those communications were not actionable in defamation. It therefore dismissed the false light claim "for the same reasons" as the defamation claims.

The court also dismissed the IIED claim. It held, first, that to the extent the IIED claim was predicated on the same speech (the documentary's statements), it was barred by the First Amendment's protection for opinion and by the *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), principle that plaintiffs cannot use tort claims like IIED to circumvent the constitutional safeguards in defamation law. Second, the

17

court found that even setting aside free-speech considerations, the conduct alleged did not meet Utah's extremely high standard for "outrageousness" in IIED claims. Under Utah law, conduct is actionable as IIED only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 206 (Utah 2001). The court observed that falsely accusing someone of serious misconduct is not per se sufficient to clear this bar. Indeed, the Utah Supreme Court's recent decision in *Mackey v. Krause*, 2025 UT 37, ¶86, noted that even a false accusation of child abuse (in that case, against a schoolteacher) was not outrageous enough to support IIED as a matter of law. By comparison, the court here thought Kubler's statements about Lichfield—while inflammatory—were "milder" than the graphic allegations in *Mackey* and therefore, *a fortiori*, did not satisfy the outrageousness element. Thus, the IIED claim was dismissed as well.

Finally, the court dismissed the civil conspiracy claim. Under Utah law, civil conspiracy is not an independent tort; it requires an underlying unlawful act. *See Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 (Utah 1993). Lichfield had alleged that Kubler and Netflix conspired to defame him through the documentary. Because the court found no viable underlying tort (defamation or false light), it held that the conspiracy claim necessarily failed.

18

After dismissing the case under Rule 12(b)(6), the district court additionally granted Appellees' alternative motion under the anti-SLAPP statutes. Noting that both California's and Utah's laws are intended to protect speech on issues of public concern, the court found that the documentary's subject matter – alleged abuse in private teen programs – plainly fell within the scope of both statutes. (Lichfield's counsel had conceded at the hearing that the topic was a matter of public concern, so the threshold public-issue requirement was not disputed.) The court therefore proceeded to apply the anti-SLAPP framework. It observed that under both California and Utah law, when an anti-SLAPP motion challenges only the legal sufficiency of the claims (as was the case here, since no contrary evidence was presented), the court essentially applies the Rule 12(b)(6) standard. *See*, *e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018) (so holding under California law); Utah Code § 78B-25-105(3) (UPEPA directing that a motion be granted if "the responding party failed to state a cause of action"). Because the court had already concluded that Lichfield's claims failed as a matter of law under Rule 12, it held that they likewise could not survive under the anti-SLAPP statutes' standards. It therefore granted the special motion to strike (pursuant to Cal. Civ. Proc. Code § 425.16) and, in the alternative, dismissed under UPEPA as well. Under the mandatory fee-shifting provisions of both statutes, the court ruled that Appellees are entitled to recover their attorney's

19

fees and costs as prevailing defendants, and it invited Appellees to file a fee application to determine the amount of the award.

Lichfield timely appealed. He now asks this Court to reverse the 12(b)(6) dismissal of his claims, vacate the anti-SLAPP ruling and associated fee award, and remand for further proceedings including discovery and trial on the merits.

**SUMMARY OF THE ARGUMENT**

The district court's dismissal of Lichfield's claims at the pleading stage was premised on an unduly broad view of what constitutes "opinion" protected by the First Amendment, and an unduly narrow view of the complaint's well-pleaded implications. Properly applied, governing precedent shows that Kubler's statements are actionable as defamatory factual assertions or at least as *mixed* opinions implying defamatory facts. There is no blanket "opinion privilege" that shields accusations of criminal, fraudulent, or abusive conduct from defamation liability. Accusations that a person abused children, conned parents, and committed crimes are precisely the kind of verifiable, reputation-destroying charges that defamation law subjects to truth-testing; treating them as "opinion" would create an end-run around *Milkovich*. The Supreme Court in *Milkovich* made clear that if a statement – even one phrased in opinion form – implies an objective fact that can be proven false, it is not constitutionally protected. Here, Kubler's claims that Lichfield "abused" children

20

and "conned" parents, and her assertion that he has gotten away with unspecified "crimes," would naturally be understood by a reasonable viewer as conveying actual facts – indeed extremely serious allegations – about Lichfield's conduct. This is far from the kind of loose or figurative rhetoric that might be dismissed as hyperbole (like using the word "blackmail" during a heated debate). Rather, Kubler's statements occur in a documentary purporting to investigate real-world wrongdoing. They are specific enough to be verified (or refuted) by evidence: either Lichfield did abuse children in his programs or he did not; either he defrauded parents or he did not. Treating such grave allegations as non-actionable opinion – essentially immune from truth-testing – was error, especially at the Rule 12 stage when all reasonable factual inferences should favor the plaintiff (aside from the narrow, upfront judicial gatekeeping on issues of defamatory meaning and fact-vs-opinion).

The district court also erred in rejecting Lichfield's defamation-by-implication theory. Defamation law reaches not only explicit false statements but also false implications and insinuations that arise from context, even if each individual fact stated is technically true. Both this Court and Utah courts have recognized that the arrangement or omission of facts can create a defamatory gist or impression actionable in tort. Lichfield alleges two such implications here: (1) that the film's visual juxtaposition of his photo with a headline about a teenager's death – combined with Kubler's ominous commentary about people "at the top" getting "away with

21

murder" – falsely links Lichfield to a fatal incident and insinuates that he and others escaped accountability for deadly abuse; and (2) that by noting his arrest in Costa Rica for child abuse without disclosing that the charges were later dropped, the film conveys a misleading impression that Lichfield was in fact guilty of that abuse (or at least that serious charges against him remain unresolved). The district court concluded that no reasonable viewer could draw these inferences, but that was an overreach. Whether a particular implication is conveyed is generally a question for the jury if the communication is reasonably capable of bearing the alleged meaning. Here, a reasonable viewer could interpret the montage and voice-over as suggesting Lichfield's complicity in a teen's death or other grave harm – precisely the sort of defamatory innuendo that the law permits a plaintiff to try to prove false and injurious. Likewise, while "Narvin was arrested" is literally true, omitting his exoneration – especially in a film ostensibly *exposing* wrongdoers – could mislead the audience into believing he was a criminal who somehow avoided punishment. Under the substantial truth doctrine, truth is a defense only if the "gist" or "sting" of the publication is true; conversely, if the implication of a series of facts is false and defamatory, the publisher may be held liable. *See Jensen v. Sawyers*, 130 P.3d 325, 342 (Utah 2005). The district court's categorical suggestion that omitting favorable facts can never render a statement defamatory cannot be reconciled with precedent. Courts have long recognized that half-truths and misleading omissions can amount

22

to libel if they lead the audience to believe something defamatory and untrue. By dismissing Lichfield's implication claims at the threshold, the court deprived him of any opportunity to develop evidence that viewers indeed took away a false impression – and that Appellees intended that result.

In addition, the district court's approach short-circuited analysis of Lichfield's status and the required degree of fault, matters that were premature on a motion to dismiss. If Lichfield is deemed a private-figure plaintiff, he need only show negligence (for actual damages) under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) whereas if he is a limited-purpose public figure in the troubled-teen industry controversy, he must ultimately prove "actual malice" (knowing or reckless falsity) under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The district court did not explicitly determine Lichfield's status or whether his scienter allegations were sufficient – it never reached those issues after finding no actionable falsehood. But if, as we argue, Kubler's statements are capable of defamatory meaning and are not immune as opinion, then at this stage Lichfield's pleading of fault is more than adequate to proceed. The complaint, read liberally, alleges that Appellees knowingly or recklessly made false factual accusations: for example, Kubler – an industry insider – would have known that Lichfield was never convicted of any crime and that many would dispute characterizing the programs' methods as "abuse," yet she presented only the most damning interpretation as if it were fact. Such allegations permit a

plausible inference of actual malice (if that standard is ultimately required) sufficient to survive dismissal. Moreover, public-figure status is often a fact-intensive question inappropriate for resolution without a developed record, and actual malice (focused on the defendant's state of mind) is notoriously ill-suited to adjudication on the pleadings or even summary judgment absent clear, undisputed evidence. In short, nothing in the First Amendment or Rule 12 required throwing out Lichfield's claims before he had any chance to conduct discovery into what Kubler knew and intended when making her accusatory statements.

Finally, the district court's invocation of state anti-SLAPP statutes in this federal case was improper and should be reversed. In *Los Lobos v. Americulture*, the Tenth Circuit held that a state anti-SLAPP law (New Mexico's) "is a procedural mechanism that does not apply in the courts of the United States." 885 F.3d at 668. The New Mexico statute in *Los Lobos* provided an expedited dismissal motion and fee shifting, and this Court ruled it could not be used in a federal diversity case because it conflicts with the uniform standards of Rules 12 and 56. Other circuits agree that the special dismissal and burden-shifting mechanisms of anti-SLAPP statutes cannot trump federal procedure. Here, the district court itself acknowledged that it was using the normal Rule 12(b)(6) standard instead of the state statutes' usual probability or prima facie case tests. In doing so, it essentially collapsed the anti-SLAPP analysis into the Rule 12 analysis – underscoring that the anti-SLAPP

24

mechanism was superfluous. Indeed, once the court decided the claims failed under Rule 12, it automatically granted the anti-SLAPP motion without any independent consideration. This confirms that the anti-SLAPP statutes were not supplying any substantive rule of decision, but merely a duplicative procedural vehicle to award fees. Under *Erie* and *Los Lobos*, that is impermissible. The fee award must therefore be vacated along with the dismissal. Moreover, if this Court reinstates any of Lichfield's claims, Appellees will no longer be "prevailing defendants" under the anti-SLAPP laws in any event, and the foundation for a fee award will have crumbled.

For all these reasons, this Court should reverse the judgment below. Lichfield's complaint satisfies Rule 12(b)(6) and First Amendment requirements for pleading a defamation-based case. Kubler's documentary made concrete accusations of gravely immoral and criminal conduct by Lichfield — accusations that are either true or false. He is entitled to his day in court to prove they are false and made with actual malice. Dismissing such claims without any fact-finding undermines the careful balance between free expression and protection of reputation established by the Supreme Court's defamation jurisprudence. This Court should correct that error. Additionally, the application of state anti-SLAPP procedures was improper under Tenth Circuit law, and the attorney's fee award must be vacated. The case should be

remanded for discovery and, ultimately, for a jury to determine whether Lichfield was defamed by the way Kubler chose to "follow the money."

**STANDARD OF REVIEW**

The Court reviews *de novo* a district court's dismissal under Rule 12(b)(6), accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in favor of the plaintiff (except to the extent First Amendment considerations impose special constraints). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). In defamation actions, two important caveats apply at the motion-to-dismiss stage: (1) whether a statement is capable of a defamatory meaning, and (2) whether a statement is fact or opinion, are questions of law that courts decide at the outset, without extending the usual plaintiff-friendly inferences. *See Jacob v. Bezzant*, 212 P.3d 535, 543 (Utah 2009). In practical terms, if a statement, read in context, cannot reasonably bear a defamatory meaning, or if it is plain that it is opinion, a court may dismiss despite the general rule of construing ambiguities in the plaintiff's favor. However, if the statement is reasonably susceptible of a defamatory interpretation and is not clearly protected opinion or privileged, then the plaintiff is entitled to proceed, and any remaining factual disputes (such as the speaker's intent or the truth/falsity of the statement) must be resolved at summary judgment or trial. Here, the district court's

26

determinations that Kubler's statements were "pure opinion" and carried no defamatory implications are legal determinations reviewed *de novo*. Likewise, whether state anti-SLAPP statutes could properly be applied in federal court is a legal issue reviewed *de novo*.

Finally, because this appeal challenges a Rule 12(b)(6) dismissal, this Court's *de novo* review is confined to the Rule 12 record—i.e., the pleadings plus any materials properly considered at the pleading stage. *See Berneike v. CitiMortgage, Inc.,* 708 F.3d 1141, 1146 (10th Cir. 2013). This case turns on an audiovisual publication of the Series. Defendants expressly asked the district court to take judicial notice of, and in any event treat as incorporated by reference, "the entirety of the three-part Series," and submitted a complete copy on a digital storage device. *See* Aplt. App. APP 00029 (ECF 29-1, PageID: 171). The district court agreed the Series is "the basis for all of Mr. Lichfield's claims" and noted Defendants supplied an "undisputably authentic copy of the series." *See* Aplt. App. APP 00273 (ECF 44, PageID.378 n.1). Accordingly, the Series is part of the Rule 12 record and is properly before this Court on *de novo* review. Because defamatory meaning and fact/opinion are context-driven questions of law, Appellant respectfully requests that the panel review Episodes 1–3 themselves (as lodged below) rather than rely on the parties' competing characterizations. If the Court would prefer a written aid for pinpoint

27

citations, Appellant requests leave to lodge certified transcripts of the Episodes already in the record.

Defendants also requested judicial notice of additional public materials submitted with the motion (news articles/other media, WWASP corporate filings, and a published judicial opinion). *See* Aplt. App. APP 00075 (ECF 29, PageID.163-170). This Court may likewise consider those materials for the limited Rule 201 purposes of establishing the existence and content of the public records and what was publicly reported—not for the truth of any disputed assertions. Fed. R. Evid. 201; *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

**ARGUMENT**

**I. The Dismissal of the Defamation Claims Was Error Because the Challenged Statements Are Actionable Assertions of Fact – Not Immunized Opinion.**

The district court's primary ground for dismissing Lichfield's defamation claims was its conclusion that Kubler's statements about Lichfield were non-actionable opinions rather than false statements of fact. This ruling cannot be squared with established defamation law. While the First Amendment does protect pure opinions on matters of public concern (expressions that neither state actual facts nor imply false facts), it does *not* allow a speaker to evade accountability by couching

28

defamatory factual accusations as "opinion." In *Milkovich.,* the Supreme Court rejected a categorical First Amendment privilege for statements merely because they are labeled opinion, explaining that *Gertz* did not create a "wholesale defamation exemption" for anything that might be called opinion. 497 U.S. 1, 18 (1990). Because an opinion may imply an "assertion of objective fact," the proper inquiry is whether, in context, the challenged statement would reasonably be understood as asserting or implying a provably false and defamatory fact; if so, it is not immunized simply by being framed as opinion (subject to the plaintiff satisfying the usual falsity and fault requirements). *Id*. at 18–21.

Utah law is in accord. In *West v. Thomson Newspapers*, the Utah Supreme Court held that "expressions of pure opinion" (incapable of objective verification) cannot serve as the basis for defamation liability, but that constitutional protection is "abused" when an opinion "states or implies facts" that are "false and defamatory." *See* 872 P.2d 999, 1015–16 (Utah 1994). Consistent with that framework, a plaintiff must also satisfy the ordinary elements of a defamation claim under Utah law, including publication, falsity, defamatory meaning, lack of privilege, the requisite degree of fault, and resulting damage. *See Id.* at 1008.

Kubler's statements that Lichfield *abused* children, *conned* parents, and *got away with crimes* meet that test: they expressly or impliedly assert provably false facts

29

about him. Common sense and usage confirm that accusing a person of "abusing" children is a factual charge of egregious misconduct – one that can be verified or refuted by evidence of that person's actual treatment of children. Similarly, to say someone "conned" parents out of money is to assert that he deceived them through fraudulent misrepresentations – again, a factual claim regarding his conduct and intent. These are not loose, figurative slurs without clear meaning; they are exactly the kind of allegations one might expect to see in a lawsuit or criminal indictment. Indeed, the Utah Supreme Court very recently reversed a defamation dismissal, holding that an accusation that someone "committed fraud" is a factual assertion, not protected opinion. *See Mathews v. McCown*, 575 P.3d 1114, 1130 (Utah 2025) (a reasonable reader would understand "committed fraud" as conveying actual, provable misconduct, not mere opinion or hyperbole). Likewise here, "abused children" and "conned parents" are statements that reasonably imply objective wrongdoing by Lichfield.

The context of Kubler's statements reinforces their factual character. They were delivered in a documentary investigative narrative, not in a casual conversation or editorial where one might expect subjective rhetoric. Kubler introduces them by saying "knowing everything I know about this guy" – a preface that signals she has factual knowledge to back up her ensuing claims about what Lichfield did. When a filmmaker in a purportedly factual documentary tells viewers about the "crimes"

30

someone has "gotten away with," it invites the audience to believe there is evidence of actual crimes that simply haven't led to accountability. Phrases like "abused children," "conned parents," and "crimes…gotten away with" are also phrased in past tense, describing concrete past conduct. The additional commentary "they've gotten away with it for so long" implies that actual bad acts occurred but escaped punishment. In short, Kubler was not *merely* expressing an opinion about Lichfield's character or debating an ambiguous matter; she was relating what comes across as factual information about his past deeds, in a context where viewers are primed to expect journalistic or documentary fact-finding.

To be sure, some of Kubler's language is forceful and imbued with her perspective. But forcefulness does not equal "non-factual." A person can strongly state an opinion *or* strongly assert a fact. The district court gave examples like calling someone a "jerk" or saying a restaurant is "terrible" – statements that convey only subjective judgment – to illustrate true opinion. Kubler's statements, in stark contrast, contain very specific assertions of misconduct. She did not say, for example, "In my view, what Narvin did was abusive" (which might blur the line between opinion and fact). She flat-out declared that he abused children and conned parents, and further asserted that he committed "crimes" and escaped justice. The only arguably opinion-like element was when she speculated that people like Narvin "think they got away with it" – but even that remark presupposes the factual

31

foundation that "it" (abuse, fraud, or crime) actually occurred. Thus, far from couching her accusations as mere conjecture or personal opinion, Kubler presented them as established fact ("knowing everything I know about this guy…").

That distinction matters because accusations of child abuse, fraud, and criminal conduct are not mere "value judgments" or debates over parenting style. They carry a concrete factual sting—that the accused committed serious wrongdoing—and are therefore verifiable and actionable if false. *See Milkovich,* 497 U.S. at 18–21; *Mathews*, 575 P.3d at1130 (Utah 2025). The district court's contrary approach effectively immunizes the most stigmatizing factual accusations by re-labeling them as "subjective characterization," even when the Series presents them as matters Kubler "knows" to be true.

In sum, the district court's classification of these grave accusations as "opinions" was legal error. Under the correct standards, Lichfield has adequately pleaded that Appellees made defamatory statements of fact about him. Therefore, the dismissal of his defamation and defamation per se claims (with respect to the "abused/conned/crimes" statements) should be reversed. This Court should hold that those statements are capable of defamatory meaning as factual allegations, and allow Lichfield to proceed to prove their falsity and Appellees' fault.

32

*Public Figure/Fault Considerations:* Although the district court did not decide whether Lichfield is a public or private figure, its insistence on characterizing the statements as non-factual may have been driven by an impulse to avoid a potential clash with First Amendment "actual malice" requirements. If Lichfield were deemed a public figure, he ultimately would have to prove actual malice – that Kubler and Netflix made these defamatory accusations with knowledge of their falsity or with reckless disregard for the truth. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964). Even if he is a private figure, because the speech involves a public issue, Utah law (following *Gertz*) would require at least negligence for liability and actual malice for any presumed or punitive damages. In their motion to dismiss, Appellees argued in the alternative that Lichfield had not plausibly alleged actual malice. This was not the basis of the district court's ruling (since it found no actionable statements), and the issue of fault is thus a potential alternative ground at most. We note, however, that Lichfield did plead actual malice generally, and provided circumstantial facts suggesting it (*e.g.*, deceptive editing choices and known omissions of exculpatory facts). Under Rule 9(b), malice may be alleged generally, and a defamation plaintiff need only plead facts supporting a plausible inference of actual malice – specific evidence is not required at the outset. *See Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 226 (E.D.N.Y. 2018) (plaintiff must allege enough facts to support a plausible inference of actual malice; the detailed proof comes later). If

33

deemed a public figure on remand, Lichfield is prepared to meet the demanding proof standard for malice – but critically, he cannot even attempt it if his case is shut down on an erroneous *Milkovich* ground. The proper course is to recognize these statements as actionable, allow the case to move forward, and then let the usual summary judgment process test whether sufficient evidence of actual malice exists after discovery. Notably, intentionally altering or *omitting known facts* to create a false impression (such as leaving out a known exoneration) can be powerful evidence of actual malice. If Lichfield's allegations are borne out – that Kubler and Netflix deliberately left out the Costa Rican court's finding of his innocence to make him look guilty – that would strongly support a finding of malice. Regardless, at the 12(b)(6) stage, it was inappropriate to preempt the entire case by labeling the statements "opinion." This Court should reverse that decision and reinstate the defamation claims based on Kubler's core accusations.

## II. A Reasonable Jury Could Find that the Documentary Implied Lichfield's Involvement in a Teen's Death – Dismissing the Defamation-by-Implication Claim at the Pleading Stage Was Improper.

Defamation is not limited to explicit assertions; it also encompasses defamatory implications reasonably drawn from context. Utah law recognizes defamation by implication: "it is the implication arising from the statement and the context in which

it was made, not the statement itself, which forms the basis of the claim." *West*, 872 P.2d at 1011 n.18. Lichfield's complaint alleges a textbook case of defamatory implication. In Episode 3's introduction, Appellees placed Narvin Lichfield's photograph directly next to a newspaper headline announcing a teen's death in a program, as part of a dramatic "crime board" montage. Simultaneously, Kubler's voiceover laments that people low on the ladder take the fall while the ones at the top "get away with murder." The implied message alleged is that Lichfield – one of the higher-ups shown – had something to do with a youth's death (or at least that his actions contributed to deadly outcomes in the troubled-teen industry).

The district court decided, as a matter of law, that no reasonable viewer would make that leap. But that was an overreach, especially at the pleading stage. In defamation suits, courts do serve a gatekeeping function to ensure truly implausible interpretations do not go to a jury. But plausibility is the key – if the alleged meaning is reasonable, it is for the factfinder to decide if that meaning was actually conveyed and understood. *See Restatement (Second) of Torts* § 614 (court determines whether communication is capable of defamatory meaning; jury determines whether it was so understood). Here, the implication that Lichfield was connected to a death is not only plausible; it appears to be exactly what a sensational documentary might seek to insinuate for dramatic effect. It is lurid and attention-grabbing to tie your antagonist to a teen's demise, even obliquely.

35

Consider what the audience sees and hears in those fleeting moments: A bulletin board cluttered with clues, implying an investigative breakthrough; a headline "Another Teen Dies in Program" prominently visible; Lichfield's face right beside that headline; and the narrator talking about people at the top "get[ting] away with murder." The visual grammar of film is such that when two images are presented side by side, the viewer naturally infers a connection between them. Filmmakers are well aware of this device and use it to convey messages without spelling them out. Here, the intended message a viewer could reasonably perceive is: *This man (Narvin Lichfield) is among those at the top who have literally gotten away with deadly wrongdoing.* The phrase "get away with murder" might be understood figuratively in isolation, but coupled with an actual death headline, it nudges the meaning toward the literal. The viewer has just been shown that a teenager died; thus "murder" in the voiceover isn't heard as a random idiom – it directly echoes the real tragedy on the screen. The combined effect strongly suggests Kubler is saying, **these people have blood on their hands**.

The district court gave several reasons why it thought this implication was too far-fetched: the scene was very brief (Lichfield's photo on screen for ~2 seconds); the board was a cluttered montage of many items; Lichfield hadn't been introduced yet, so viewers might not even recognize his face; and later in the episode his role is clarified as not involving wilderness programs. These points are not irrelevant – they

36

could certainly be argued to a jury as mitigating factors – but they do not categorically negate the implication for all reasonable viewers. Nor do they justify taking the issue away from the jury at the pleading stage. Even if Lichfield is not named in that opening montage, the sequence essentially foreshadows that *this person* (whose photo is pinned among the rogues' gallery of articles) will be implicated in the narrative. When he is introduced by name later, a viewer might well connect him back to the earlier montage. And while it is true the death occurred in a wilderness hike program (unrelated to Lichfield's facilities), the average viewer may not carefully distinguish that nuance – especially since the documentary's thrust is that all these programs were part of one abusive system run by WWASP leadership. In short, the court's reasons might be grounds for Appellees to argue *against* the implication on the facts, but they do not render the implication impossible as a matter of law.

At this stage, the question is only whether the film is reasonably capable of conveying the alleged defamatory meaning. Viewing the episode in Lichfield's favor (as we must at the 12(b)(6) stage), the answer is yes. The montage invites the inference that WWASP leaders like Lichfield "got away" with horrific outcomes such as a teenager's death. A viewer could easily interpret Kubler's pointed commentary about higher-ups evading consequences ("get away with murder") in light of the dramatic visuals (a "Teen Dies" headline next to Lichfield's picture) as

37

suggesting Lichfield bore some culpability for lethal abuse in the program world. That is a defamatory meaning: it imputes to him involvement in a heinous act. Whether he can ultimately prove that viewers took it that way, and that the innuendo is false, is a matter for evidence – but it was premature for the court to declare the implication dead on arrival. The complaint has sufficiently identified the implication and why it is false (Lichfield had nothing to do with that death). Nothing more is required at the pleading stage to proceed on this theory.

Accordingly, it was error to dismiss Lichfield's defamation claim insofar as it is based on the teen-death implication. This Court should reinstate that aspect of the claim, allowing Lichfield to attempt to prove at trial that viewers got a false impression and that Appellees are responsible for publishing that implication.

## A. The Costa Rica Arrest "Half-Truth": Omitting Lichfield's Exoneration Could Make an Otherwise True Statement Defamatory.

The second defamatory implication Lichfield asserts is that by informing viewers Lichfield was arrested after authorities raided his Costa Rica facility for abuse – *without* adding that he was not prosecuted and that charges were dropped – the film creates the false impression that Lichfield actually committed the alleged abuse or at least that he likely did (since viewers hear of an arrest but no exoneration, inviting an assumption of guilt). The district court acknowledged that the statement "Narvin

38

was arrested" is true and that authorities did raid the Dundee facility based on abuse allegations. But the court then declared that truth is an "absolute defense" and that omitting "additional favorable information" cannot render a true statement false. This is an oversimplification of defamation law, and its application here was erroneous, especially at the pleadings stage.

While it is correct that truth (or substantial truth) is a complete defense to defamation, the real question is: what is the "gist" or "sting" of the statement as presented? A statement can be technically true in its literal words but still convey an overall false impression. Comment d to Restatement (Second) of Torts § 582 illustrates that reporting only part of the truth while omitting key facts can be actionable if the resultant implication is defamatory and false. Many courts have held that literally true statements can be defamatory if they create a misleading impression: "A publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Turner v. KTRK TV, Inc.*, 28 S.W.3d 103, 115 (Tex. 2000). The Tenth Circuit echoed this in *Brokers' Choice*, observing that a series of accurate statements could potentially be arranged to imply something defamatory, even though in that particular case the plaintiff had not shown a materially false implication. *See* 861 F.3d at 1107–08.

Here, the material falsity of the implication is clear: the film's segment suggests Lichfield was culpable in Costa Rica (a raid and arrest naturally imply authorities had good cause and that he might be guilty) and that he "got away with it." In truth, if charges were dropped, it could mean there was not enough evidence or that he was innocent. That is the polar-opposite implication. Thus, the film's half-told story arguably gives a materially false account of the matter by omission.

The district court leaned on one sentence from *Brokers' Choice* stating that omission of favorable information does not make an "otherwise true" statement "materially false." But *Brokers' Choice* was a very different scenario. The plaintiff there claimed a TV segment defamed him by editing out parts of a seminar video; however, nothing broadcast was false, and the omitted portions did not *negate* the defamatory implication – indeed, the Tenth Circuit found the broadcast still accurately captured the gist of what the plaintiff had been teaching. 861 F.3d at 1108. The court cautioned against requiring the media to include every exculpatory detail so long as what was aired was substantially true. Crucially, that case was decided at summary judgment, on a developed factual record, where the court could evaluate what viewers likely inferred and whether any material facts were misrepresented.

By contrast, in Lichfield's case, the gist conveyed ("authorities arrested him for abuse") is arguably *not* substantially true when the full story is considered

40

("authorities arrested him, investigated, and found no prosecutable wrongdoing"). The difference between those narratives is critical to reputation. One suggests "he was caught as an abuser"; the other suggests "he was falsely accused or at least not proven to have done anything." The district court should not have resolved this factual nuance against Lichfield without any evidence. If Kubler and Netflix intentionally omitted the disposition of the arrest to cast Lichfield in a worse light, that could amount to actual malice and actionable defamation. *See White v. Fraternal Order of Police*, 909 F.2d 512, 520, 526 (D.C. Cir. 1990) ("Because a court must examine the entire context of a publication, *Tavoulareas v. Piro*, 817 F.2d 762, 779, (D.C. Cir. 1987), the court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning")).

Utah's own law does not preclude such a claim. The district court cited *Brehany* (a case involving an employer's internal statement about an employee's termination) for the basic principle that truth is a defense, but *Brehany* did not involve a half-truth or a public defamatory implication. Nothing in Utah precedent forecloses defamation by omission; indeed, Utah courts have shown openness to context-based defamation claims. In *Mathews*, for example, the Utah Supreme Court reinstated libel claims in part because the plaintiffs were not required to negate potential privileges at the pleading stage – by analogy, here Lichfield should not have to negate the defense of truth at the pleading stage without discovery. Under the

41

substantial truth rule, it is the defendant's burden to prove the "gist or sting" of the publication is true in all material respects. That is plainly not established on the face of Lichfield's complaint – quite the opposite, the complaint alleges the film leaves a false impression of guilt.

It bears emphasis: had Appellees said on camera, "Narvin Lichfield was arrested in Costa Rica for child abuse, *but those charges were later dropped*," it would be difficult (perhaps impossible) for Lichfield to claim defamation from that complete, true statement. The viewer would have heard the exonerating information. But Appellees did *not* include that; they gave only the damning half of the story. That editorial choice is what makes the segment potentially defamatory. At minimum, there is a jury question whether the ordinary viewer, hearing only about the arrest and nothing about the outcome, would be left with a materially false belief about Lichfield's culpability. The district court short-circuited that inquiry by rigidly focusing on the literal truth of "was arrested" and refusing to consider the broader context. Defamation law is not so wooden. It looks to the overall impression on the audience. Just as quoting someone out of context can mislead, telling only half the story can mislead.

Therefore, Lichfield's defamation claim based on the implication of guilt from the Costa Rica arrest segment was improperly dismissed. This Court should revive it,

42

allowing Lichfield to try to prove that viewers were in fact misled and that Appellees knew the effect of what they were doing. As the D.C. Circuit cautioned, courts should not apply the literal truth doctrine in a way that "would protect the deliberate use of half-truths and misleading omissions to harm another's reputation." *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015). That is precisely what is alleged here.

**III. Lichfield Adequately Alleged the Requisite Fault, and the District Court Prematurely Dismissed the Complaint Without Addressing Public-Figure Status or Actual Malice.**

Although the district court did not reach the issue of fault (having disposed of the case on opinion/implication grounds), this Court may consider whether the complaint meets the First Amendment's fault requirements, since Appellees urged below that Lichfield failed to plausibly allege actual malice as an alternative basis to affirm. The complaint does meet those requirements, or at least it should not have been dismissed prior to discovery on such issues.

Under *New York Times Co. v. Sullivan* and *Gertz v. Welch*, the level of fault required in a defamation case depends on the plaintiff's status and whether the speech is of public concern. Here, the documentary clearly involves a matter of public concern (the treatment of at-risk youth and alleged abuse in private programs). Thus, even a

43

private plaintiff would need to show at least negligence, and a public plaintiff would need to show actual malice for full damages. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985). If Lichfield is deemed a limited-purpose public figure with respect to the troubled-teen industry controversy (perhaps due to his prominent operational role in that widely reported network), then he must prove actual malice by clear and convincing evidence at trial. *See Gertz*, 418 U.S. at 351 (for limited public figure, *Sullivan* standard applies). But critically, whether Lichfield is a public figure is itself a fact-intensive question. Public-figure status turns on the nature and extent of the plaintiff's participation in the particular public controversy. Lichfield did not voluntarily thrust himself into the limelight; he was more of a behind-the-scenes businessman running and marketing programs. Defendants will likely argue he is a public figure because the WWASP abuse scandal was public and he was in charge of some facilities. However, that issue should be decided on a developed record, not on the pleadings alone. *Cf. Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610, 616 (Cal. 1984) (determination of public-figure status can often be made on summary judgment if facts are undisputed, but plaintiff must have opportunity to show he did not voluntarily inject himself into the debate).

Even assuming *arguendo* that Lichfield is a limited-purpose public figure (thus requiring actual malice), his complaint passes muster under Rule 12. Rule 9(b) specifically provides that conditions of mind like malice "may be alleged generally."

44

And this Court has held that a defamation plaintiff need only plead facts making it plausible that the defendant acted with the requisite state of mind; detailed proof is not required at the pleading stage. *See Mink v. Knox*, 613 F.3d 995, 1000–01 (10th Cir. 2010) (reversing 12(b)(6) dismissal where the complaint's allegations gave rise to a reasonable inference of actual malice). Here, Lichfield alleged, in substance, that Appellees either knew their portrayal was false or at least acted with reckless disregard for the truth. Specifically, the complaint indicates that Kubler, as an industry insider with personal knowledge, would have known that Narvin Lichfield himself was never accused – much less found – to have personally abused anyone, and that Lichfield was never convicted of any crime despite various investigations over the years. These were readily verifiable facts, and presenting the opposite as settled truth supports a plausible inference of at least negligence—and potentially reckless disregard—at the pleading stage. If Kubler nonetheless declared on camera that he *"abused"* children and got away with *"crimes,"* a strong inference arises that she spoke with reckless disregard for truth, or even knowing falsity. Publishing serious accusations that one knows are unsupported (or contradicted) by the facts is classic reckless disregard.

Moreover, Kubler omitted the dropped charges in Costa Rica even though she surely would have known that outcome if she researched Lichfield's history for the documentary. This deliberate omission of a material exculpatory fact in order to

45

create a misleadingly negative impression is evidence of actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth or a deliberate decision not to acquire available knowledge can support a finding of actual malice). The complaint's narrative of how the film was made – presumably with extensive research, editing, and production oversight – supports an inference that Kubler and Netflix carefully chose what story to tell. If that chosen narrative turned out to be false in key respects (*e.g.* implying Lichfield was a criminal mastermind or responsible for a death) despite contrary facts known to them, the actual malice standard would be met. At the pleading stage, these allegations are more than sufficient to be plausible.

Additionally, Kubler's own bias or agenda provides relevant circumstantial evidence of actual malice. She herself endured a troubled-teen program and set out to "go after" those she deemed responsible. While ill will alone is not actual malice, a defendant's motive can color the analysis – it can show that she had a strong predisposition to blame Lichfield and therefore might have been reckless with the facts to fit a pre-existing narrative. The complaint suggests Kubler had an axe to grind and may have painted with too broad a brush, consciously or recklessly smearing Lichfield to advance her thematic point. That is sufficient to warrant discovery on actual malice. It is famously rare to find direct evidence of actual malice (like an admission of "I knew it was false"); plaintiffs typically must build

the case through inference and circumstantial proof. That is why premature dismissal is especially disfavored when a complaint otherwise points toward knowing falsehood. *See Jacob v. Bezzant*, 212 P.3d 535 (Utah 2009) (actual malice can be proven inferentially, and summary judgment is appropriate only if no reasonable jury could find it).

In sum, nothing about the fault element provides an independent basis to affirm the dismissal here. The district court did not find the complaint insufficient regarding fault – and rightly so. If Lichfield is not a public figure, he clearly alleged at least negligence by asserting that the falsity of the portrayal was obvious and that any reasonable investigation would have revealed contrary facts. If he is a public figure, he alleged enough to warrant proceeding and investigating actual malice. The case should be allowed into discovery, where Lichfield can, for instance, depose Kubler about her knowledge and intentions, and obtain the filmmakers' notes and research. Dismissing now insulates potentially egregious defamation from any scrutiny – an outcome at odds with fundamental defamation principles and the Seventh Amendment right to a jury trial on disputed facts.

**IV. The District Court Erred in Applying State Anti-SLAPP Statutes in Federal Court and Awarding Attorney's Fees to Appellees.**

47

After dismissing under Rule 12(b)(6), the district court alternatively granted Appellees' motion under California's anti-SLAPP statute and Utah's UPEPA, and ruled that Appellees are entitled to recover their attorney's fees. This was mistaken for multiple reasons. First and foremost, state anti-SLAPP statutes – which provide special motions to dismiss, impose unique burdens on the plaintiff, and mandate fee awards – are procedural devices that conflict with the Federal Rules of Civil Procedure and therefore do not apply in federal court under *Erie*. Second, even if some anti-SLAPP features could in theory be applied in federal diversity cases, the manner in which the district court applied them here was flawed: it essentially duplicated the Rule 12 analysis and then automatically awarded fees, contrary to this Circuit's guidance in *Los Lobos*. Accordingly, the anti-SLAPP dismissal and fee award should be vacated in their entirety.

**A. State Anti-SLAPP Laws Do Not Apply in Federal Diversity Actions Under Erie.**

The Tenth Circuit has squarely addressed this issue in *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 591 (2018). In *Los Lobos*, defendants invoked New Mexico's anti-SLAPP statute in federal court; the district court declined to apply it, and the Tenth Circuit affirmed, holding that the New Mexico law "is a procedural mechanism that does not apply in

the courts of the United States." *Id.* at 668. The panel found that the anti-SLAPP statute – which provided an expedited dismissal motion and fee shifting – was purely procedural and collided with the transsubstantive Federal Rules. The logic is straightforward: if a state law answers the same question as a Federal Rule (*e.g.*, "On what grounds and with what showing can a claim be disposed of before trial?"), and the Federal Rule is valid and on-point, then the state law cannot apply in federal court. *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010). Both California's anti-SLAPP statute and Utah's UPEPA squarely conflict with Rules 12 and 56 under this test. California's statute (§ 425.16 requires a plaintiff to demonstrate a "probability of prevailing on the claim" once the statute is invoked, or else suffer dismissal and a fee award. *See* Cal. Civ. Proc. Code § 425.16(b). This forces an early, evidence-based merits evaluation – often before discovery – and shifts a burden onto the plaintiff not present under the Federal Rules. Utah's UPEPA similarly requires a plaintiff to establish "a prima facie case" for each essential element once the defendant shows the claim involves protected expression. *See* Utah Code § 78B-25-104(2)–(3). Both laws thus impose burdens far beyond what the Federal Rules require at the pleading stage (merely pleading a plausible claim) or even at summary judgment (where no burden shifts to the plaintiff unless and until the defendant has produced evidence negating an element). As the D.C. Circuit explained regarding a similar framework in D.C.'s anti-SLAPP law, the

49

statute tells courts to dismiss if the plaintiff cannot show likelihood of success, whereas under Rules 12 and 56 a plaintiff who states a claim and shows a genuine factual dispute is entitled to proceed – no "likelihood" showing required. In other words, the anti-SLAPP statute "answers the same question" (the standard for pretrial dismissal) but imposes an "additional hurdle" on the plaintiff not found in the Federal Rules. Such a conflict means the Federal Rules govern and the state law must yield in federal court.

Every federal appellate court to confront this conflict in a published opinion has agreed. Besides *Los Lobos* (10th Cir. 2018) and *Abbas* (D.C. Cir. 2015), the Fifth Circuit in *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019), held Texas's anti-SLAPP act inapplicable, finding that its burden-shifting "conflicts with the federal rules by elevating the procedural requirements" for plaintiffs. *Id.* at 247. The Fifth Circuit explicitly overruled its own prior precedent to align with *Abbas*. The Eleventh Circuit, sitting en banc, has likewise expressed deep skepticism of anti-SLAPP in federal court. *See Carbone v. CNN*, 910 F.3d 1345, 1350–52 (11th Cir. 2018) (describing the conflict and the persuasive reasoning of *Abbas*, though declining to finally resolve the issue because the case could be decided on other grounds). The First and Ninth Circuits initially allowed anti-SLAPP motions in federal court years ago, but even the Ninth has since curtailed its approach to avoid conflict: it now holds that when an anti-SLAPP motion challenges only the legal sufficiency of the

claim, courts apply Rule 12 standards; when it challenges factual sufficiency, it functions like Rule 56. *See Planned Parenthood*, 890 F.3d at 833–34. This effectively strips out the state law's conflicting parts (*e.g.*, pre-discovery evidentiary requirements), leaving mainly the fee-shifting and early-hearing provisions.

Applying these principles here, the district court should not have entertained the special motion to strike at all. Utah's UPEPA, enacted in 2022, is modeled on the Uniform Act which, like California's, suspends normal procedure and forces an early merits test. Tellingly, the Utah Supreme Court's first decision under UPEPA emphasized that it creates an "early dismissal" mechanism requiring the plaintiff to demonstrate a prima facie case once the defendant shows the statute applies. *Mackey v. Krause*, 2025 UT 37, ¶¶ 38–40. That is exactly the sort of procedural shift *Los Lobos* forbids in federal court. The existence of a fee award (which some might argue is substantive) does not save the anti-SLAPP law under *Erie*. *Los Lobos* noted that New Mexico's fee provision was in the nature of a sanction, not a compensatory damages rule, and the same is true of California's and Utah's – they are designed to disincentivize litigation and reimburse defendants automatically, not to compensate for any underlying harm. In diversity cases, state law governs substantive elements of claims and defenses (like what constitutes defamation or what privileges apply), but the mode of adjudication and allocation of costs are generally procedural (unless a fee-shifting rule is intertwined with a substantive right – here the fees are triggered

by the use of a special procedure). Federal courts have their own provisions for fee awards in appropriate circumstances (Rule 11, 28 U.S.C. § 1927, etc.). Importing state anti-SLAPP fee mandates into federal court would encourage forum-shopping and inequitable administration of the laws – precisely the concerns *Erie* guards against – but those concerns cannot override a direct conflict with a Federal Rule. *See Hanna v. Plumer*, 380 U.S. 460, 466–69 (1965).

In short, under binding Tenth Circuit precedent, the district court should have denied the anti-SLAPP motion outright on *Erie* grounds. It had no authority to "strike" Lichfield's claims pursuant to state procedural statutes that impose requirements beyond Rule 12 and 56.

**B. Even if Anti-SLAPP Applied, the District Court's Manner of Application Was Procedurally Improper and the Resulting Fee Award Must Be Vacated.**

Even setting aside the *Erie* point, what the district court did here was procedurally anomalous: it effectively entered a redundant dismissal under anti-SLAPP after already dismissing under Rule 12. The court noted that "under both the California and Utah statutes, courts employ the traditional Rule 12(b)(6) standard" when no evidence is submitted, citing Ninth Circuit precedent and UPEPA's provision equating failure to state a claim with grounds to strike. Having found the complaint failed to state a claim, the court *ipso facto* granted the anti-SLAPP motion on the

52

same basis. This highlights why anti-SLAPP adds nothing but complications in federal court. If the anti-SLAPP analysis is coextensive with Rule 12, it is duplicative; if it required something different, it would conflict. Here the court claimed to do the former, but in effect it accomplished the latter by tacking on a fee award that Rule 12 by itself would not allow.

In federal court, under the American Rule, each side bears its own fees absent a specific statutory or contractual basis for fee-shifting. California's and Utah's anti-SLAPP statutes provide such a basis *only* if their special motion is properly before the court. Given *Los Lobos*, it should not have been. But even if one were agnostic on *Erie*, the district court's handling here illustrates a procedural sleight-of-hand: use Rule 12 standards to grant an anti-SLAPP motion, then impose fees as if the stricter state standard had been met. That is not how these statutes are designed to operate. It also deprived Lichfield of a grace that some anti-SLAPP laws themselves allow – for example, California courts sometimes permit a plaintiff to amend the complaint once (though the law is unsettled) rather than awarding fees on a first strike if the pleading could be cured. Here, the district court did not address leave to amend at all; it simply dismissed with prejudice and invited a fee petition. In doing so, the court imposed a consequence (fee-shifting) that would not normally attach to a Rule 12(b)(6) dismissal of an initial complaint, effectively penalizing Lichfield in a manner foreign to ordinary federal practice.

53

If this Court reinstates any portion of Lichfield's claims (which it should), then Appellees are no longer prevailing parties and cannot recover fees under the anti-SLAPP statutes in any event. The fee award thus should collapse automatically upon reversal of the dismissal. But to guide the district court on remand and future cases, this Court should also hold (or reiterate) that state anti-SLAPP procedures have no place in federal court proceedings, at least in the form of special dismissal motions with different burdens or mandatory fees. Appellees remain free to seek attorney's fees by other means if truly warranted – *e.g.*, if they could show the suit was entirely frivolous or brought in bad faith, Rule 11 and 28 U.S.C. § 1927 provide avenues (notably, nothing in this record suggests such extreme circumstances; Lichfield's suit is far from frivolous given the substantive issues discussed above). But Appellees should not receive fees merely for prevailing on a Rule 12 motion, any more than any other defamation defendant normally would under the usual American Rule.

**Choice-of-Law Note:**

**The district court avoided choosing between California and Utah anti-SLAPP law by concluding the outcome was the same under either. If any anti-SLAPP law were to apply (which Appellant maintains it should not), Utah's would have the most significant relationship here and should govern as the forum state's**

**law and the law of the place where Lichfield's injury was centered (Lichfield is a Utah resident and WWASP was based in Utah). In any event, both statutes provide for fees, so the court awarded fees without deciding which state's law controlled. If this Court holds anti-SLAPP inapplicable, the choice-of-law issue is moot; if it were to allow anti-SLAPP, it should clarify that Utah's law would govern this Utah-based dispute (as that was an undeveloped issue below).**

In summary, the anti-SLAPP ruling and fee award should be set aside. *Los Lobos* remains binding precedent and dictates that the district court lacked authority to impose state anti-SLAPP procedures in this case. The proper course was to evaluate the complaint under Rule 12, and if dismissing, to do so without overlaying state-law fee penalties. By layering anti-SLAPP on top of Rule 12, the court gave Appellees an unwarranted windfall and set a precedent that could encourage gamesmanship in removal and choice of forum (removing cases to federal court for the sole purpose of obtaining fees, or conversely plaintiffs trying to stay in state court to avoid fees). Such forum-shopping is precisely what *Erie* aims to prevent. *See Hanna*, 380 U.S. at 467–68 (twin aims of *Erie* are to discourage forum-shopping and avoid inequitable administration of the laws). Affirming the fee award here would invite strategic behavior and inequity: a plaintiff who files in state court (where anti-SLAPP surely applies) could be hauled into federal court and hit with fees on dismissal, even though a federal forum normally doesn't award fees for a merit-

based dismissal; conversely, if anti-SLAPP were ignored in federal court, defendants might remove solely to avoid a fee exposure. The only coherent solution is the one this Circuit already adopted: anti-SLAPP statutes do not operate in federal court, period. That approach puts plaintiffs and defendants on equal footing in diversity cases and keeps the procedural playing field level. Accordingly, this Court should reverse the fee award and direct the district court to deny Appellees' anti-SLAPP motion in its entirety on remand (or simply vacate it as moot once the claims are reinstated).

## V. The Dismissal of the Remaining Claims (False Light, IIED, and Civil Conspiracy) Should Be Reversed or Reconsidered on Remand, and Leave to Amend Should Be Freely Permitted.

Aside from defamation, Lichfield pleaded three other torts: false light, intentional infliction of emotional distress (IIED), and civil conspiracy. The district court dismissed each, essentially for derivative reasons – because they arose from the same statements underlying the defamation claim, or because once defamation failed the others could not stand. If this Court restores the defamation claim, it follows that the false light claim should likewise be restored.

As for IIED, the district court offered two reasons for dismissal: (1) to the extent the IIED claim was based on the same alleged defamation, it would be barred by the

First Amendment just as a defamation claim would be (citing *Hustler v. Falwell*, which held a public figure could not use IIED to circumvent defamation standards for a parody); and (2) independently, the conduct alleged was not "outrageous" enough to meet Utah's stringent IIED threshold.

The civil conspiracy claim was dismissed solely because the underlying torts were dismissed.

**Leave to Amend:** A glaring aspect of the district court's decision was the lack of leave to amend. This was Lichfield's initial complaint (aside from a minor amendment as of right to correct a clerical detail early on). Generally, dismissals under Rule 12(b)(6) are presumed to be without prejudice unless amendment would be futile. *See Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001). Lichfield expressly requested, in his opposition below, leave to amend should the court find any pleading deficiency. The court's order did not address that request; by dismissing with prejudice and awarding anti-SLAPP fees, it effectively closed the case without permitting amendment. For example, the court faulted Lichfield for not quoting the exact statements that implied he was a "mastermind." If that was a curable pleading defect (indeed, the complaint could be amended to quote or describe more precisely the parts of the film that give the "mastermind" impression), then the court should have allowed amendment rather than terminating the claim

57

outright. We maintain that the thrust of the case was already apparent in the complaint and that the existing allegations met the plausibility standard. But if this Court were to identify any aspect in which the complaint was unclear or lacking in detail, the proper remedy would be to remand with instructions to permit an amendment, not to affirm a final dismissal. In defamation cases especially, plaintiffs sometimes need to refine their allegations once a court provides guidance on perceived deficiencies – for instance, if the implication about the teen's death was deemed insufficiently articulated, Lichfield could potentially add more detail describing how the scene conveys that false meaning. There is no indication that amendment here would be futile or in bad faith. The events in question are on film and well-documented; if needed, Lichfield can include additional transcript excerpts or context to address the court's concerns (such as pinpointing where and how the series portrays him as an architect of the abuse). Therefore, Lichfield alternatively requests that if any portion of the complaint is found wanting, he be given an opportunity to amend. This is especially appropriate given that this was the first adjudication of the pleadings – no prior amendment was allowed. The federal rules embody a liberal amendment policy: leave to amend should be "freely give[n] … when justice so requires." Fed. R. Civ. P. 15(a)(2). Dismissing *with prejudice* at the very first pass, in a complex defamation case, without leave to refine the pleadings,

was an abuse of discretion. At the very least, any affirmance of a dismissal should be without prejudice to amendment.

In conclusion on this point, the Court should reinstate the false light claim alongside defamation (since they rise and fall together here). It should also allow the IIED and conspiracy claims to proceed if the underlying defamation claim is revived – or at least remand for reconsideration, recognizing that certain First Amendment constraints might ultimately preclude IIED if Lichfield is a public figure. And the Court should direct that Lichfield be granted leave to amend his complaint to cure any pleading deficiencies identified, consistent with the generous standard of Rule 15(a)(2).

**CONCLUSION**

For the foregoing reasons, Appellant respectfully requests that this Court reverse the district court's dismissal of his defamation (including defamation per se), false light, IIED, and civil conspiracy claims; vacate the anti-SLAPP ruling and attorney's fee award entered in favor of Appellees; and remand the case for further proceedings. Upon remand, Lichfield's claims should be allowed to proceed to discovery and ultimately to trial, so that a jury can determine whether the challenged statements and implications are false and defamatory, and whether Appellees made them with the requisite degree of fault. To the extent this Court finds any aspect of the current

complaint inadequately pleaded, the Court should instruct that Lichfield be granted leave to amend his complaint to cure such deficiencies, consistent with the liberal amendment policy of Fed. R. Civ. P. 15(a)(2).

Lichfield seeks all relief to which he is entitled, including compensatory damages for harm to his reputation and emotional distress, and appropriate punitive damages if actual malice is proven. At this stage, he simply asks for the chance to prove his case. The First Amendment does not require immunity for unqualified accusations of child abuse and criminal conduct in a purported factual documentary; those charges are either true or defamatory, and the law provides a process to test them. The district court's premature termination of the action – and its award of fees to the defendants – was based on legal errors that this Court can and should now correct. By reinstating Lichfield's claims and eliminating the improperly imposed fee burden, this Court will ensure that an arguably innocent man has an opportunity to vindicate his name, and that the important issues at the heart of this case – free speech versus the protection of individual reputation – are decided on a full factual record under the proper legal standards.

**REQUEST FOR ORAL ARGUMENT**

Appellant respectfully requests oral argument. This appeal presents context-driven First Amendment defamation issues—fact versus opinion and defamation by

implication—arising from an audiovisual documentary where meaning depends on the interplay of narration, editing, and visual juxtaposition. It also presents an important procedural question under *Erie*: whether, and to what extent, state anti-SLAPP procedures and mandatory fee-shifting can be applied in federal diversity actions in light of *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, oral argument would materially assist the Court in (1) walking through the specific scenes at issue and the parties' competing "gist" interpretations, (2) clarifying the proper Rule 12 framework for gatekeeping defamatory meaning and fact/opinion in a documentary setting, and (3) addressing the interaction between Rules 12 and 56 and the state statutes as applied below. Because these issues are dispositive and have broader implications for speech-and-reputation litigation in this Circuit, Appellant submits that oral argument is warranted.

Respectfully submitted,

*/s/ Michael K. Hepworth*

Michael K. Hepworth, Esq.

Counsel for Narvin Lichfield, Appellant

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure page 32(g)(1), and Federal Rule of Appellate Procedure 29(a)(5), I certify that this Brief:

(a) was prepared using 14-point Times New Roman font;

(b) is proportionately spaced; and

(c) contains 12,964 words.

Submitted this 20th day of January, 2026.

*/s/ Michael K. Hepworth, Esq.*
Michael K. Hepworth, Esq.
HEPWORTH LEGAL

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I caused a true and correct copy of

the foregoing document to be served upon counsel for all parties via the ECF system.


/s/ Michael K. Hepworth, Esq.
Michael K. Hepworth, Esq.
HEPWORTH LEGAL

64

**ADDENDUM**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NARVIN LICHFIELD,<br><br>        Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER and NETFLIX, INC.,<br><br>        Defendants. | JUDGMENT<br><br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>District Judge Jill N. Parrish |

IT IS ORDERED AND ADJUDGED that plaintiff Narvin Lichfield's action is dismissed.


DATED September 29, 2025.


BY THE COURT        .

_____
Jill N. Parrish
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NARVIN LICHFIELD,<br><br>    Plaintiff,<br><br>v.<br><br>KATHERINE KUBLER and NETFLIX, INC.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS AND FOR RELIEF UNDER ANTI-SLAPP ACTS<br><br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>District Judge Jill N. Parrish |

Narvin Lichfield sued Katherine Kubler and Netflix, Inc. (collectively, the defendants), alleging that a documentary series created by Kubler and streamed on Netflix defamed him. Lichfield asserts claims for defamation per se, defamation, false light, intentional infliction of emotional distress, and civil conspiracy. Before the court is the defendants' motion to dismiss this action and for relief under the Anti-SLAPP Act of either California or Utah. ECF No. 28. The motion is GRANTED.

### BACKGROUND[1]

During her sophomore year of high school, Kubler's parents enrolled her in a private Christian boarding school in Long Island, New York. A few months after she arrived, the school expelled her under its zero-tolerance policy because she had been caught with an alcoholic beverage. Due to her expulsion, Kubler's parents decided to place her in a lockdown behavior modification program located in Upstate New York called The Academy at Ivy Ridge, which was marketed to parents as a boarding school for troubled teens. Kubler spent the next 15 months at Ivy Ridge without being allowed to go home.

Kubler later went to film school and began a career in the entertainment industry. She decided to create a documentary series about Ivy Ridge. Kubler produced and directed a three-part series called *The Program: Cons, Cults, and Kidnapping*, which streamed on Netflix.

The first episode of *The Program* describes the experiences of Kubler and other teenagers at Ivy Ridge. Kubler recounted being strip searched upon arrival and then introduced to the facility's strict regime of rules, including: no talking at all unless directed to do so, no going outside, no looking outside the windows, no eye contact with other students, no touching other students, no looking in the mirror, and no smiling. One of the most important rules was that detainees could not ask their parents to bring them home, which was labeled as manipulation.

---

[1] "Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion." *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013). But a court may consider a document submitted by a defendant if (1) "the document is referred to in the complaint," (2) it "is central to the plaintiff's claim," and (3) the defendant submits "an indisputably authentic copy to the court." *Id.* In this case, the basis for all of the Lichfield's claims is the Netflix documentary series entitled *The Program: Cons, Cults, and Kidnapping*, which is explicitly referred to in the operative complaint. The defendants have submitted an undisputably authentic copy of the series to the court. Accordingly, the court considers the content of this series in reciting the facts of the case and in resolving the motion to dismiss.

These rules were enforced 24 hours a day. Teenagers detained at Ivy Ridge could earn some privileges by advancing through its level system, which was called "working the program." Detainees gained points by complying with all of the rules, and if enough points were earned, teens could advance to the next level. Conversely, even minor infractions would result in the loss of points or levels. A detainee who reached level three could have a 15-minute monitored phone call with his or her parents once a month. At level four, the detainee could talk and look out of windows. But these upper-level detainees were required to become enforcers by reporting infractions committed by other detainees. Detainees were not allowed to leave Ivy Ridge until they reached level six. Kubler opined that the leaders of Ivy Ridge intentionally made it nearly impossible to advance to level six in order to keep the detainees in the program for as long as possible.

If the point system failed to induce compliance, Kubler alleged that more drastic measures were taken. Detainees would be violently taken to the floor and then transported to a small isolation room where they were required to hold stress positions or lay face down on the floor for hours. Some detainees in the isolation rooms were physically assaulted or given only two pieces of bread and eight ounces of milk for their meals.

The primary theme of the second episode of *The Program* is Kubler's contention that Ivy Ridge employed time-tested mind control techniques on teenagers detained in the facility. Kubler asserted, for example, that every six weeks detainees were required to participate in a seminar that lasted between two and four days. Some of the seminar activities included requiring participants to crawl on the floor like a baby for an hour and forcing them to scream and beat the floor as hard as they could with towels wrapped in duct tape until complete exhaustion. Detainees who stopped participating before time was called were sent to an alternative seminar called "breakpoint" because the intent of the seminar was to break the detainee. Breakpoint participants were required

to perform tasks such as chanting a meaningless mantra in unison for eight hours straight until they entered a dissociative trance. Kubler asserted that these activities—in conjunction with inadequate food, sleep deprivation, and the weaponization of embarrassing personal history details or coerced confessions—were intended to break down all resistance and to convince them that their only option was to surrender themselves to "the program."

Parents were also put through a separate series of seminars held about once a month. In these seminars, parents participated in guided meditation and engaged in group activities designed to get them outside of their comfort zone. Kubler contended that the central message of the parent seminars was not to give in to their children's requests to come home and not to remove their children from the facility before they completed the program.

In the third episode of *The Program*, entitled "Follow the Money," Kubler examines the larger troubled-teen industry. In particular, she focuses on the history and structure of the World Wide Association of Specialty Programs (WWASP), which was founded by Robert Lichfield. In 1988, Robert Lichfield founded his first facility for troubled teens in La Verkin, Utah. He later created WWASP, which acted as an umbrella organization for numerous other troubled teen facilities that were established across the United States and around the world, including Ivy Ridge. WWASP provided the template for running a troubled teen program to each member facility. It also provided services, such as supervising media relations, and putting on seminars. In exchange, the member facilities paid WWASP a fee for each teen detained in the facility. Kubler asserted that Robert Lichfield accumulated a great deal of personal wealth through WWASP by charging parents exorbitant fees while spending as little as possible on staffing and other expenses.

The third episode also examined other figures associated with WWASP, including Robert's brother, plaintiff Narvin Lichfield. Kubler asserted that Narvin Lichfield created the original

marketing materials for WWASP and pioneered the use of search engine optimization to ensure that parents searching for help with their teenagers on the internet would be directed to a WWASP website. Narvin Lichfield later opened and operated three troubled teen facilities under the WWASP umbrella: one in South Carolina and two in Costa Rica.

After *The Program* began streaming on Netflix, Narvin Lichfield sued Kubler and Netflix, asserting claims for defamation per se, defamation, false light, intentional infliction of emotional distress, and civil conspiracy. Lichfield alleged that the following statements found in the third episode of the documentary series were actionable:

(1) In the opening scene of the third episode, the camera focuses on several sections of a bulletin board with photographs of individuals, news articles, and biographical information about the pictured individuals attached to it. The first and second shots depicted low-level workers at Ivy Ridge and its director. The third shot showed pictures of individuals with ownership stakes in troubled teen facilities along with well-known politicians. The fourth shot depicted a picture of Narvin Lichfield next to a news article with the headline: "As Therapy Hikes Reviewed, Another Teen Dies in Program." While the camera progresses through these shots, Kubler provides the following voiceover: "It bothers me how people low on the totem pole end up taking the fall, and the people at the top seem to get away with murder. I knew if I really wanted to go after these places, I need to follow the money."

(2) In one scene of the third episode, Kubler went to a karaoke night at a public nightclub after seeing Narvin Lichfield's social media post inviting people to come. Kubler filmed both Lichfield and herself singing at the nightclub. During this scene, Kubler narrated the following voiceover:

> It was surreal to see Narvin in person—knowing everything I know about this guy, the children he abused, the parents he conned, all of the crimes he's gotten away with. . . . You know, all these people, they've gotten away with this stuff for so long. So, I think a lot of them really do think they got away with it. I think Narvin, I think Robert, they've gotten away with it for so long.

(3) Referring to the first Costa Rican troubled teen facility opened by Narvin Lichfield, called Dundee, Kubler stated: "Dundee was only open for 19 months before authorities were alerted to abuse, raided the facility, and Narvin was arrested."

Lichfield also alleged that the juxtaposition of his picture and the news article about the death of a teen during the opening scene of episode three implied that he was somehow involved with the death. And although Lichfield did not identify any specific statements made in the documentary series, the complaint also asserted that the series defamed him by "[c]laiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children" and by "[p]resenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." ECF No. 5 at ¶ 77.

Defendants Kubler and Netflix filed the instant motion seeking two forms of relief. First, they seek dismissal of Lichfield's action under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. Second, the defendants move to either strike Lichfield's claims pursuant to California's Anti-SLAPP statute or to dismiss the claims under Utah's Uniform Public Expression Protection Act (UPEPA). The defendants also request an award of fees and costs under these two statutes.

## ANALYSIS

### I.   MOTION TO DISMISS UNDER RULE 12(b)(6)

#### A.   Legal Standard

Rule 12(b)(6) provides that a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss, a court "accept[s] as true all well-pleaded factual allegations in the complaint." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). Although courts normally view these allegations "in the light most favorable to the plaintiff," *id.*, there are two caveats to this rule when determining whether a defamation claim brought under Utah law is subject to dismissal. To uphold constitutional protections of speech, courts do not draw inferences in favor of the plaintiff when determining (1) whether an allegedly defamatory statement is capable of a defamatory meaning or (2) whether the statement is one of fact or opinion. *Mathews v. McCown*, 2025 UT 34, ¶¶ 6, 98, --- P.3d ---.

#### B.   Defamation and Defamation Per Se

Lichfield asserts claims for defamation and defamation per se against the defendants based on statements and alleged inferences found in *The Program*. To state a claim for defamation, he must show that the defendants "published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994). To state a claim for defamation per se, Lichfield must also show that the defamatory statements were "on their face, and without the aid of intrinsic

proof, . . . unmistakably recognized as injurious." *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 977 n.7

(Utah 1981). If the statements are deemed defamatory per se, the plaintiff need not prove damages.

*Id.*

The defendants argue that the court should dismiss the defamation and defamation per se

claims. Because the defendants' arguments center on elements that are common to both of these

causes of action, the court analyzes them jointly.

> 1)      Statements about seeming "to get away with murder" and getting away
>         with abuse, conning parents, and unspecified crimes

In *The Program*, Kubler makes the following allegedly defamatory statements: (1) "It

bothers me how people low on the totem pole end up taking the fall, and the people at the top seem

to get away with murder" and (2) "the children he [Lichfield] abused, the parents he conned, all of

the crimes he's gotten away with." The defendants argue that these statements are not actionable

because they are constitutionally protected opinions rather than assertions of fact. The court agrees.

The free speech protections found in the Federal and Utah Constitutions limit liability for

defamation. *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005) ("Defamation claims always reside

in the shadow of the First Amendment."); *West*, 872 P.2d at 1015 (holding that the Utah

Constitution limits liability for defamation). Specifically, the Utah Constitution protects

expressions of opinion from liability for defamation. "Because expressions of pure opinion fuel

the marketplace of ideas and because such expressions are incapable of being verified, they cannot

serve as the basis for defamation liability." *West*, 872 P.2d at 1015. In contrast, "[a]ssertions of

fact, being objectively verifiable and much more capable of harming reputation, are not entitled to

the same degree of protection afforded expressions of opinion." *Id*. Thus, in order to prove a

defamation claim, a plaintiff must show that the defendant stated or implied facts that are both

false and defamatory. *Id.* Courts consider four non-exhaustive factors to distinguish facts from opinions:

> (i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears.

*Id.* at 1018. "Whether a statement is one of fact or opinion is a question of law for the court to decide." *Mathews*, 2025 UT 34, ¶ 96.

Applying the *West* factors, the court determines that the "seem to get away with murder" statement is an expression of opinion rather than fact. This statement employs the common idiom "to get away with murder" to figuratively describe Kubler's view that the individuals who had profited from troubled teen programs had avoided any negative consequences for owning or operating them. Kubler's use of the introductory phrase "seem to" emphasizes that the statement is used metaphorically, and not to literally accuse leaders and owners of these programs of being culpable of the crime of murder. The broader context of the documentary series as a whole reinforces this understanding of the phrase. Throughout the series, Kubler accuses these leaders of profiting from an abusive system. But she does not accuse them of murder. Finally, this statement, taken in context, is an expression of moral disapprobation that is not capable of being proved true or false. Accordingly, Kubler's statement that leaders like Lichfield "seem to get away with murder" is a constitutionally protected opinion.

The phrase "the children he abused, the parents he conned" also expresses an opinion. Throughout the three-episode series, Kubler consistently expressed her view that the tactics employed in WWASP-associated facilities were abusive and psychologically damaging. She also opined that WWASP programs used manipulative techniques to encourage parents to keep their

9

children in facilities for as long as possible. And given her assessment that these programs were abusive and ineffective, she expressed her belief that the monthly fees were a waste of money. In the context of these expressed viewpoints, statements about the children Lichfield abused and the parents he conned are protected opinions. There is no way to objectively verify whether the WWASP methodology should be considered abusive or merely tough love for troubled teens. *See Rinsley v. Brandt*, 700 F.2d 1304, 1306–07, (10th Cir. 1983) (holding that strong criticisms of a psychiatrist, including "God knows what other cruelties he calls treatment" and "What does it take to put a stop to such a man? How many more children must die?" were protected opinions). Nor is it possible to definitively ascertain whether parents were conned out of their money or whether it was well spent. *See Rizzuto v. Nexxus Prods. Co.*, 641 F. Supp. 473, 481 (S.D.N.Y. 1986) (holding that the phrase "don't be conned" was "no more than rhetorical hyperbole").

Similarly, Kubler's reference to "all of the crimes [Lichfield has] gotten away with" expresses a protected opinion. Accusing an individual of committing a specific criminal act is typically an assertion of fact. *See Mathews*, 2025 UT 34, ¶¶ 99–101 (holding that an accusation that a plaintiff "defrauded the entire community" was not a protected opinion because, in context, the best understanding of the statement "is that [the defendant] was accusing [the plaintiffs] of committing crimes and not offering opinions about their character or conduct"); *Hogan v. Winder*, 762 F.3d 1096, 1107 (10th Cir. 2014) (applying Utah law and holding that "[f]alse accusations of criminal conduct can be defamatory, of course"). But a speaker's use of words that may carry criminal connotations do not always constitute assertions of fact. In *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, for example, the Supreme Court held that the use of the term "blackmail" during a heated city council meeting did not amount to a criminal accusation. 398 U.S. 6, 13–14 (1970). The Court analyzed the elements of the crime of blackmail and reasoned

that the defendants never indicated that the plaintiff had engaged in conduct approximating criminal blackmail. *Id.* at 14 n.7. Instead, "the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Id.* at 14.

In *The Program*, Kubler does not accuse Lichfield of specific criminal conduct. Indeed, her generic statement about unspecified crimes Lichfield had gotten away with provides no temporal or other limitation that would hint at a particular crime. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1232 (D. Utah 2018) (finding that a statement that the plaintiff should investigate whether she was "guilty of harassment" was a protected opinion because the defendant did "not allege or imply that [the plaintiff] committed any specific criminal acts"). Absent any indication as to what crimes Lichfield may have committed, it is difficult to conceive of what specific assertion of fact could be examined in a trial or how the statement could be proven true or false. In light of the generality of Kubler's statement, it is best understood as rhetorical hyperbole emphasizing Kubler's opinions regarding the tactics employed at WWASP faculties. *See Westmont Residential LLC v. Buttars*, 340 P.3d 183, 189 (Utah Ct. App. 2014) (holding that the defendant's use of the term "crooks" was "no more than rhetorical hyperbole" (citation omitted)). In other words, Kubler's statement amounts to an expression of a strong negative opinion akin to accusing Lichfield of "crimes against humanity" and not an assertion of provable fact.

The context in which the statement was made further emphasizes that it is no more than rhetorical hyperbole. In *The Program*, Kubler tells a personal story about her traumatic experiences as a teenager at Ivy Ridge and how that event strained her relationship with her father for many years thereafter. In the scene of the documentary where Kubler makes the "crimes" statement, she describes her reaction to seeing Lichfield in person in light of those personal experiences and her

11

investigation of the troubled-teen industry, stating: "It was surreal to see Narvin in person—knowing everything I know about this guy . . . ." Because Kubler's reference to "crimes" Lichfield "had gotten away with" was couched as a description of her visceral response in light of her personal experiences, a viewer would take the statement as a hyperbolic expression of strong opinion rather than an accusation of specific criminal conduct. *See Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1402–03 (1999) (holding that in the context of a book describing the author's personal experiences and feeling regarding a lawsuit against her, a reasonable reader would take the author's statements as "highly partisan opinions" rather than assertions of fact); *West*, 872 P.2d at 1020 (holding that the fact that the allegedly defamatory statements appeared in editorial columns "as opposed to 'hard news'" indicated that they constituted protected opinions). Indeed, Kubler indicated that she was expressing her opinion by stating that she was articulating her personal thoughts about Lichfield getting away with it: "So, I think a lot of them really do think they got away with it."

In short, none of the statements regarding getting away with murder or getting away with unspecified crimes are actionable because they are protected opinions.

> 2)    Alleged defamatory implication from the image of the news article

Lichfield also alleges that the image showing his picture adjacent to a news article with the headline "As Therapy Hikes Reviewed, Another Teen Dies in Program" is defamatory. He argues that this juxtaposition would cause reasonable viewers to believe he was involved with or somehow responsible for the death referenced in the headline. Thus, Lichfield asserts a defamation-by-implication claim rather than by a direct statement. *See West*, 872 P.2d at 1011 (holding that under a defamation-by-implication claim, "it is the implication arising from the statement and the context in which it was made, not the statement itself, which forms the basis of

12

[the] claim"). When a plaintiff asserts a claim for defamation by implication, the court must first determine whether a reasonable factfinder could conclude that the underlying statement (or in this case, the underlying image) "conveys the allegedly defamatory implication." *Id* at 1019. In making this determination, courts must examine the context in which the underlying statement was made. *Id*. at 1011 n.18; *Hogan*, 762 F.3d at 1105–06 (10th Cir. 2014) (applying Utah law).

Here, the context in which Lichfield's picture and the article were presented would not lead a reasonable viewer to believe that the documentary series implied that Lichfield was responsible for the death referenced in the headline. First, the scene in which the image appears does not lend itself to the alleged defamatory implication. During the introduction to episode three, Kubler employed the well-worn trope of an investigator pinning evidence to a bulletin board in an attempt to solve a case—or here, to "follow the money." She depicted a board covered with pictures of individuals who worked at Ivy Ridge, individuals who financed or owned troubled teen facilities, politicians, and leaders of WWASP and WWASP facilities. Interspaced between the pictures were various news articles about the troubled teen industry, LinkedIn profiles, and a variety of other documents. These disparate pictures and documents are crowded together on the board so that they overlap. At the center of the board is a map of the United States with red string attached to pins linking locations on the map with various documents on the board. For approximately fifteen seconds, the camera zooms in on various sections of the board. And for about two seconds, the camera focuses on a picture of Lichfield next to the article. Because the board represents a jumble of pictures and other documents mixed together that reference the troubled-teen industry as a whole, a reasonable viewer would not assign significance to the juxtaposition of Lichfield's picture and the article. Indeed, at this point in the documentary series, the viewer is unaware of who Narvin Lichfield is because the series does not even mention him until later in episode three.

Viewing this two-second shot in context of episode three as a whole also demonstrates that viewers would not draw the alleged defamatory inference. Later on in the episode, Kubler describes in detail Lichfield's role in the troubled-teen industry, including working on the marketing for WWASP and later opening and operating three WWASP facilities. Because episode three specified Lichfield's role in the industry, which had nothing to do with "therapy hikes" or other wilderness therapy programs, viewers would not infer that Lichfield had anything to do with a death during a therapy hike. Although episode three briefly addresses wilderness programs for troubled teens, it does not tie these programs in any way to Lichfield.

For these reasons, no reasonable factfinder could conclude that the image of Lichfield's picture next to an article about therapy hikes conveys a defamatory implication. Accordingly, the court dismisses the defamation and defamation per se claims to the extent that they are based on allegations of this defamatory inference. *See Keisel v. Westbrook*, 542 P.3d 536, 552–53 (Utah Ct. App 2023) (affirming summary judgment in favor of a defendant on a defamation-by-implication claim because a reasonable fact finder could not have drawn the alleged defamatory inference).

3)  Statement that Lichfield had been arrested in Costa Rica

Lichfield claims that Kubler defamed him when she stated that Costa Rican authorities raided one of his facilities and arrested him. He acknowledges that this statement is true. But Lichfield argues that Kubler may nonetheless be held liable for stating the truth because she did not also say that Costa Rican authorities later dropped the charges against him. He contends that Kubler defamed him by "omitting information that would exonerate him or present a more balanced picture of his involvement in youth programs." ECF No. 35 at 13.

This claim fails as a matter of law because "truth is an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). "The omission of additional

14

favorable information from an otherwise true publication does not render a statement materially false." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017). Lichfield asserts that the Restatement (Second) of Torts supports his incomplete truth argument. The provision he cites provides that a statement of opinion may be actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566 (1977); *accord Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("[E]xpressions of 'opinion' may often imply an assertion of objective fact."). On its face, this provision does not apply to true statements of fact. Accordingly, the court dismisses Lichfield's defamation and defamation per se claims to the extent that they rely on the arrest statement.

4)        Allegations that the series stated that he was a "mastermind"

In his complaint, Lichfield alleges that the defendants defamed him by "[c]laiming Plaintiff had exercised direct control in youth programs" and by "[p]resenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." ECF No. 5 at ¶ 77. In his briefing on this motion to dismiss, Lichfield does not specify the foundation for these claims, merely asserting that "the Series goes to great lengths to portray Lichfield as a central figure in the WWASP organization."

These allegations are not specific enough to support a defamation claim. When pleading a defamation claim, the plaintiff "must describe the nature or substance of the acts or words complained of." *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 971 (Utah 1982). Specifically, the complaint "must set forth 'the language complained of . . . in *words* or *words* to that effect.'" *Id.* (citation omitted). Lichfield did not identify which declarations allegedly stated or implied that Lichfield was a "mastermind or architect" of WWASP. Nor is it evident from reviewing the documentary series what statements are being referenced in the complaint. Due to this complete

15

lack of specificity, the court dismisses the defamation and defamation per se claims to the extent that Lichfield alleges he was defamed by statements that he was a mastermind of an abusive system.

### 5)    Conclusion

The statements that Lichfield claims to be defamatory are either constitutionally protected opinions or absolutely privileged as true. Moreover, a reasonable viewer would not draw the alleged defamatory implication alleged in the complaint. Accordingly, the court dismisses the defamation and defamation per se claims.

### C.    False Light

Lichfield asserts a false light claim based on the same statements and alleged inferences discussed above for the defamation and defamation per se claims. False light claims are very similar to defamation claims. *SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1246 (Utah 2016). Accordingly, "false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims." *Id*. The same principles that limit liability under defamation law also apply to false light claims. *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005); *Keisel v. Westbrook*, 542 P.3d 536, 556–57 (Utah Ct, App. 2023). Accordingly, the court dismisses the false light claim for the same reasons that it dismisses the defamation claims.

### D.    Intentional Infliction of Emotional Distress

Lichfield also asserts a claim for intentional infliction of emotional distress (IIED) based on the allegedly defamatory statements and inferences. Similar to a false light claim, constitutional protections of free speech also restrict liability for IIED claims. *Keisel v. Westbrook*, 542 P.3d 536, 556–57 (Utah Ct. App. 2023). In other words, "[a] plaintiff may not attempt an end-run around

First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims." *Id.* at 556 (citation omitted). Thus, the court dismisses the IIED claim for the same reasons that the false light claim must be dismissed.

The IIED claim must also be dismissed because the statements that allegedly cause emotional distress are not egregious enough to support liability. In order to state a claim for IIED, the plaintiff must show that the defendant's "actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality." *Mackey v. Krause*, 2025 UT 37, ¶ 86, ---P.3d---. "It is difficult to satisfy the 'outrageous conduct' element," which requires "extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Id.* ¶ 87 (citation omitted). Applying this outrageous conduct standard to allegations that a defendant falsely published statements that a teacher (1) threw a rock at a student, striking the student on the stomach and (2) threw a student across the room into a wall, the Utah Supreme Court recently held that, as a matter of law, these allegedly false publications did not meet the "high bar" for outrageous conduct to support an IIED claim. *Id.* ¶ 93; *accord Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 31 (Utah 2003) (affirming dismissal of IIED claim because allegations of abusive litigation tactics were not sufficiently outrageous or intolerable); *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 207 (Utah 2001) (affirming dismissal of IIED claim because an allegation that a church referred a parishioner to an unlicensed counselor was not sufficiently outrageous or intolerable).

In this case, the defendants published opinions about higher-ups seeming to get away with murder and that it was surreal for Kubler to finally see Lichfield in person in light of "the children he abused, the parents he conned, all of the crimes he's gotten away with." These assertions of

17

opinion are milder than the specific allegations of abuse in *Mackey*. Thus, Lichfield's IIED claim similarly fails to clear the "high bar" for outrageous conduct. The court, therefore, dismisses the IIED claim for this additional reason.

### E.   Civil Conspiracy

"To prove civil conspiracy, five elements must be shown: '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'" *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993). Lichfield based his civil conspiracy claim on the alleged unlawful acts of defamation and portraying him in a false light. Because these claims fail as a matter of law, Lichfield cannot satisfy the unlawful acts element. Accordingly, the court dismisses the civil conspiracy claim as well.

## II.   MOTION FOR ANTI-SLAPP RELIEF

In addition to their motion to dismiss under Rule 12(b)(6), the defendants also move to strike Lichfield's action under California's Anti-SLAPP statute, CAL. CIV. PROC. CODE § 425.16(b), or, in the alternative, to dismiss the action under Utah's UPEPA, UTAH CODE § 78B-25-103. The defendants assert that California's statute should control this analysis, while Lichfield argues that the court should apply Utah's statute.

In diversity jurisdiction cases, federal courts apply the forum state's choice-of-law rules. *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014). Under Utah law, courts typically first determine whether there is a meaningful difference between the relevant laws of the different states before engaging in a choice of law analysis. *Volonte v. Domo, Inc.*, 528 P.3d 327, 339 (Utah Ct. App. 2023). Because, as discussed below, the outcome of

the defendants' motion is the same under either the California or the Utah statute, the court need not engage in a choice of law analysis at this juncture.

In determining whether to grant a motion to strike or to dismiss under either state's Anti-SLAPP statute, the court must first determine whether the statute applies to the plaintiff's claims. *Serova v. Sony Music Entm't*, 515 P.3d 1, 8 (Cal. 2022) (holding that a court must first determine whether California's anti-SLAPP statute applies); *Mackey v. Krause*, 2025 UT 37, ¶ 38 ---P.3d--- (holding that the first step of analyzing a motion to dismiss under UPEPA "requires the court to determine whether UPEPA applies to all or part of the challenged causes of action"). California's statute applies if the conduct that forms the basis of the Lichfield's claims furthers the exercise of the defendants' free speech rights "in connection with a public issue or an issue of public interest." CAL. CIV. PROC. CODE § 425.16(e). Similarly, Utah's statute applies to Lichfield's claims if they are based on the defendants' exercise of free speech "on a matter of public concern." UTAH CODE § 78B-25-102(2)(c).

There is no real difference (or at least no difference that matters in this case) between the California and Utah standards for determining the applicability of the relevant Anti-SLAPP statute. The defendants have satisfied both standards. The Tenth Circuit has found that "it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006). And one district court has specifically found that "the licensing and use of private for-profit teen rehabilitation programs . . . is an issue of public interest" under the California standard. *Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-cv-751-TC, 2016 WL 633351, at *6 (D. Utah Feb. 17, 2016). Moreover, anther court in this district analyzed the "matter of public concern" standard under Utah's UPEPA and found that a troubled teen facility's "actions, business model, tactics, and

19

treatment of vulnerable populations are matters of public concern, as is evident from the repeated news coverage, public documentaries, and recent legislation related to alleged past abuses at" the facility. *UHS of Provo Canyon, Inc. v. Bliss*, No. 2:24-cv-163-DAK-CMR, 2024 WL 4279243, at *5 (D. Utah Sept. 24, 2024). The court finds these cases to be persuasive. Under the standard applicable to either California's Anti-SLAPP statute or Utah's UPEPA, the statements and alleged inferences that form the basis of Lichfield's claims involve both an "an issue of public interest" and "a matter of public concern." Accordingly, both statutes apply to the claims in this action.[2]

Under both the California and Utah statutes, courts employ the traditional Rule 12(b)(6) standard to determine whether to grant the motion to strike or to dismiss. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) ("[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated."); UTAH CODE § 78B-25-107(1)(c)(ii) (providing that a court shall dismiss an action under the UPEPA if "the moving party establishes that . . . the responding party failed to state a cause of action upon which relief can be granted"). Thus, for the same reasons that the court granted the defendants' motion to dismiss under Rule 12(b)(6), the court also grants the defendants' motion under California's Anti-SLAPP statute and Utah's UPEPA.

Because the defendants prevailed on their Anti-SLAPP motion, they are entitled to an award of attorney fees and costs. CAL. CIV. PROC. CODE § 425.16(c)(1) ("[A] prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and

---

[2] Although Lichfield argued that Kubler's speech did not touch on a matter of public concern in his briefing, he conceded at oral argument that it did.

20

costs."); UTAH CODE § 78B-25-110 ("[T]he court shall award court costs, reasonable attorney fees, and reasonable litigation expenses related to the motion . . . to the moving party if the moving party prevails on the motion."). The defendants may file a motion for fees and costs that specifies the amount requested.

## CONCLUSION AND ORDER

The court grants the defendants' motion (1) to dismiss pursuant to Rule 12(b)(6) and (2) to strike under California's Anti-SLAPP statute or to dismiss under Utah's UPEPA. Accordingly, the court grants the defendants' request for reasonable attorney fees and costs for bringing its motion.

DATED September 29, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge